## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

**AFFORDABLE HOUSING GROUP, INC.,**
**as an agent of the Federal Deposit Insurance**
**Corporation, as Manager of the FSLIC Resolution**
**Fund, successor in interest to the Resolution**
**Trust Corporation,**
      **Plaintiff / Counterclaim Defendant**

**v.**

**FLORIDA HOUSING AUTHORITY, INC.,**
      **Defendant / Counterclaim Plaintiff,**

**v.**                             **Case No._____**

**FEDERAL DEPOSIT INSURANCE CORPORATION,**
      **Additional Counterclaim Defendant.**
_____/

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. § 1446(a), 12 U.S.C. § 1819(b)(2), and Local Rule of Civil Procedure 1.06, please take notice that:

The Federal Deposit Insurance Corporation ("FDIC"), Counterclaim Defendant in *Affordable Housing Group, Inc., as an agent of the Federal Deposit Insurance Corporation, as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation, v. Florida Housing Affordability, Inc., v. FDIC*, filed as case no. 2020-CA-000170 in the Circuit Court of the Ninth Judicial Circuit in and for Osceola County, Florida (the "State Court"), having joined that action as a party pursuant to the State Court's March 2, 2023 Agreed Order Granting Motion to Intervene, hereby removes that action to United States District Court for the Middle District of Florida.

## PROCEDURAL HISTORY

1.    On January 20, 2020, Affordable Housing Group, Inc. ("AHG"), acting in its capacity as a monitoring agent for the FDIC, filed suit against Florida Housing Affordability, Inc. ("FHA") in the Circuit Court in and for the Ninth Judicial Circuit, Osceola, Florida, based upon FHA's failure to comply with the provisions of a Land Use Restriction Agreement signed by the Resolution Trust Corporation ("RTC")[1] and FHA.

2.    On July 24, 2020, the State Court granted FHA's February 24, 2020 motion to dismiss the complaint.

3.    On August 17, 2020, AHG filed an amended complaint.

4.    On November 20, 2020, the State Court denied FHA's August 27, 2020 motion to dismiss the amended complaint.

5.    On December 17, 2020, FHA answered the amended complaint, denying the allegations and asserting several affirmative defenses.

6.    On December 28, 2020, AHG filed its reply to the affirmative defenses.

7.    On December 7, 2021, FHA moved for leave to file an amended answer, affirmative defenses and counterclaim.

8.    On February 18, 2022, the State Court denied AHG's December 27, 2021 motion to strike and granted FHA's motion for leave to amend.

9.    On March 10, 2022, AHG filed its reply to the amended affirmative defenses and counterclaim.

10.   On July 27, 2022, FHA moved for leave to file a second amended answer, affirmative defenses and counterclaim.

---

[1] Pursuant to 12 U.S.C. § 1831q(n)(4), the FDIC assumed responsibility for the Land Use Restriction Agreement in 1995 following the sunset of the RTC.

11.    On September 16, 2022, the State Court entered the agreed upon order granting FHA's motion for leave to file a second amended answer, affirmative defenses and counterclaim, deeming its proposed amended pleading as filed as of that date.

12.    On October 24, 2022, AHG filed its answer and affirmative defenses to FHA's second amended answer, affirmative defenses, and counterclaim and a reply to the second amended affirmative defenses to the amended complaint.

13.    On October 27, 2022, FHA filed its reply to AHG's affirmative defenses.

14.    On February 9, 2023, the FDIC moved to intervene as an additional counterclaim defendant. By agreed order dated March 2, 2023, the FDIC was joined as a party to this lawsuit, and permitted to intervene in the State Court action as an additional counterclaim defendant.

15.    True and correct copies of all pleadings served and responses filed in this case, as required by 28 U.S.C. § 1446(a), as well as the State Court Docket Sheet as required by Local Rule of Civil Procedure 1.06 and all other Court filings, are attached as composite **Exhibit "1."**

**BASIS FOR REMOVAL**

16.    The district courts of the United States have original jurisdiction over the action pursuant to 12 U.S.C. § 1819(b)(2), which provides the FDIC with a statutory right to remove to federal court cases to which the FDIC is a party:

> (A) Except as provided in subparagraph (D), all suits of a civil nature at common law or in equity to which the Corporation [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States.
>
> (B) Except as provided in subparagraph (D), the Corporation [FDIC] may, without bond or security, remove any action, suit, or proceeding from a State court to the appropriate United States district court before the end of the 90-day period beginning on the date the action, suit, or proceeding is filed against the Corporation [FDIC] or the Corporation [FDIC] is substituted as a party.

3

12 U.S.C. § 1819(b)(2)(A)-(B).[2]

17.    Pursuant to 12 U.S.C. § 1819(b)(2), the FDIC may remove the State Court action now that it has become a party to the State Court action. *FDIC v. Constructora Japimel, Inc.*, 981 F.3d 66, 69 (1st Cir. 2020) (finding that "[t]he fact that the FDIC has become a party to the case is sufficient for removal" under § 1819(b)(2)). *See also FDIC v. 232 Inc.*, 920 F.2d 815, 817 (11th Cir. 1991) (noting that Section 1819(b)(2) governs jurisdiction and removal for cases in which the FDIC is a party).

18.    Further, this Notice of Removal is filed within 90 days of the FDIC becoming a party to the State Court action on March 2, 2023, and therefore is timely pursuant to 12 U.S.C. § 1819(b)(2)(B).[3] *See, e.g., Castleberry v. Goldome Credit Corp.*, 408 F.3d 773, 782 (11th Cir. 2005) (finding the FDIC's removal of state court action timely under § 1819 where FDIC removed within 90 days of being joined as cross-defendant in state court action, and noting that under the plain language of the statute, the 90–day removal period does not begin until an "action, suit, or proceeding is filed against the [FDIC] or the [FDIC] is substituted as a party."); *see also NCVB Tx. Nat. Bank. v. P & R Investments No. 6*, 962 F.2d 518, 519 (5th Cir. 1992) (finding the FDIC's removal of a state court action timely pursuant to § 1819 within ninety days of the FDIC's intervention in the state court action).

19.    Accordingly, by virtue of the provisions of 12 U.S.C. § 1819(b)(2), and in accordance with the procedure set forth in 28 U.S.C. § 1446, the State Court action is removed to the United States District Court for the Middle District of Florida.

---

[2] 12 U.S.C. § 1819(b)(2)(D) is inapplicable here for two reasons: first, the FDIC is not acting in its capacity as a receiver of a State insured depository institution, and second, resolution of the litigation requires the interpretation of Federal law.

[3] The exception set forth in 12 U.S.C. § 1819(b)(2)(D) is inapplicable to the State Court action.

20.     Counsel for the FDIC certifies, as required by 28 U.S.C. § 1446(d), that they will provide written notification of this Notice of Removal to all parties of record in the State Court action, and that the FDIC will promptly file a Notification of Removal attaching a copy of this Notice of Removal with the Clerk of the Circuit Court of the Ninth Judicial Circuit in and for Osceola County, Florida.

WHEREFORE, Counterclaim Defendant, Federal Deposit Insurance Corporation, pursuant to the statutes referenced above and in conformity with the requirements set forth in 28 U.S.C. § 1446, removes the case styled *Affordable Housing Group, Inc., as an agent of the Federal Deposit Insurance Corporation, as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation v. Florida Housing Affordability, Inc., v. Federal Deposit Insurance Corporation*, Case no 2020-CA-000170 in the Circuit Court of the Ninth Judicial Circuit in and for Osceola County, Florida to this Court on this 16th day of March 2023.

Respectfully submitted,

/s/ Dora F. Kaufman
Dora F. Kaufman (Florida Bar No. 771244)
Mary J. Walter (Florida Bar No. 45162)
**LIEBLER, GONZALEZ & PORTUNDO**
Courthouse Tower-25th Floor
44 West Flagler Street
Miami, FL 33130
Tel: (305) 379-0400
Fax: (305) 379-9626
dfk@lgplaw.com;     mjw@lgplaw.com;     and
service@lgplaw.com
Counsel   for   Counterclaim   Defendant,
Federal Deposit Insurance Corporation

**FEDERAL DEPOSIT INSURANCE CORPORATION**
**LEGAL DIVISION**
Jeffrey Schmitt, Senior Counsel
Sonya Levine, Counsel
Emre Ilter, Senior Attorney
3501 Fairfax Drive, Room VS-D-7066
Arlington, Virginia 22226

(703) 562-2783
jschmitt@fdic.gov
slevine@fdic.gov
eilter@fdic.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 16th day of March 2023, the foregoing **Notice**

**of Removal was filed via CM/ECF with the Clerk of the Court,** and sent on the same date via

First Class U.S. Mail to counsel for all other parties to this lawsuit as follows:

Russell E. Klemm, Esq
Clayton & McCulloh, P.A.
1065 Maitland Center Commons Blvd.
Maitland, Florida 32751
rklemm@clayton-mcculloh.com
Counsel for Plaintiff Affordable Housing
Group, Inc.

Jason R. Hawkins, Esq.
South Milhausen, P.A.
1000 Legion Place, Suite 1200
Orlando, Florida 32801
jhawkins@southmilhausen.com
Counsel for Defendant Florida Housing
Affordability, Inc.

*/s/ Dora F. Kaufman*
Dora F. Kaufman (FBN 771244)

# EXHIBIT "1"

**2020 CA 000170 OC - AFFORDABLE HOUSING GROUP INC vs. FLORIDA HOUSING AFFORDABILITY INC**

## SUMMARY

| | | |
|---|---|---|
| **Judge:** ALVARO, CHAD | **Court Type:** CIRCUIT CIVIL | **Case Type:** OTHER - OTHER CIVIL |
| **Case Number:** 2020 CA 000170 OC | **Uniform Case Number:** 492020CA000170XXXXXX | **Status:** OPEN |
| **Clerk File Date:** 1/22/2020 | **Status Date:** 1/22/2020 | **Waive Speedy Trial:** ☐ |
| **Total Fees Due:** 0.00 | **Custody Location:** | **Agency:** |
| **Agency Report Number:** | | **Foreclosure:** ACTIVE - 1/22/2020 |

## PARTIES

| TYPE | PARTY NAME | ATTORNEY |
|---|---|---|
| PLAINTIFF | AFFORDABLE HOUSING GROUP INC | KLEIMAN, RUSSELL E (Main Attorney) |
| DEFENDANT | FLORIDA HOUSING AFFORDABILITY INC | HAWKINS, JASON R (Main Attorney) |
| COUNTERCLAIM PLAINTIFF | FLORIDA HOUSING AFFORDABILITY INC. | |
| COUNTERCLAIM DEFENDANT | AFFORDABLE HOUSING GROUP INC. | HAWKINS, JASON R |
| COUNTERCLAIM DEFENDANT | FEDERAL DEPOSIT INSURANCE CORPORATION | KAUFMAN, DORA F. (Main Attorney) |

## EVENTS

| DATE | EVENT | JUDGE | LOCATION | RESULT |
|---|---|---|---|---|
| 7/10/2023 9:00 AM | JURY TRIAL | ALVARO, CHAD | COURTROOM 5E | |
| 5/22/2023 2:00 PM | PRETRIAL | ALVARO, CHAD | COURTROOM 5E | |
| 2/11/2022 10:15 AM | MOTION TO STRIKE | SCHREIBER, MARGARET H | HEARING ROOM 6A | HEARING HELD |
| 11/10/2020 11:00 AM | MOTION TO DISMISS | SCHREIBER, MARGARET H | HEARING ROOM 6A | HEARING HELD |
| 7/20/2020 10:00 AM | MOTION TO DISMISS | SCHREIBER, MARGARET H | HEARING ROOM 6A | HEARING HELD |

## OUTSTANDING AMOUNT

| COUNT | CODE | DESCRIPTION | ASSESSMENT | PAID | WAIVED | BALANCE | PAYMENT PLAN / JUDGMENT | DUE DATE |
|---|---|---|---|---|---|---|---|---|
| 1 | .CI | CIRCUIT CIVIL FILING | $400.00 | $400.00 | $0.00 | $0.00 | | |
| | | | | | Total Outstanding: | $0.00 | | |
| 1 | .SUMCA | SUMMONS CIRCUIT CIVIL | $10.00 | $10.00 | $0.00 | $0.00 | | |
| | | | | | Total Outstanding: | $0.00 | | |

## RECEIPTS

| DATE | RECEIPT # | APPLIED AMOUNT |
|---|---|---|
| 1/23/2020 | 2020007605 | $410.00 |

## CASE DOCKETS

| VIEWER | IMAGE | DATE | ENTRY |
|---|---|---|---|
| | Requested | 3/2/2023 | AGREED ORDER GRANTING MOTION TO INTERVENE |
| | Requested | 2/13/2023 | NON PARTY FEDERAL DEPOSIT INSURANCE CORPORATION MOTION TO QUASH AND FOR PROTECTIVE ORDER IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2 2023 AND OBJECTIONS AND RESPONSES |
| | Requested | 2/9/2023 | MOTION TO INTERVENE BY NON-PARTY FEDERAL DEPOSIT INSURANCE CORPORATION AND MEMORANDUM OF LAW IN SUPPORT |
| | 46 | 2/7/2023 | SUBPOENA D/T FOR DEPOSITION, RETURNED, SERVED FEDERAL DEPOSIT INSURANCE CORPORATION RA JANE RICHARDSON 2/1/23 |
| | 44 | 1/27/2023 | AMENDED NOTICE OF TAKING DEPOSITION DUCES TECUM |
| | 2 | 10/27/2022 | DEFENDANT/COUNTERPLAINTIFF, FLORIDA HOUSING AFFORDABILITY, INC.'S REPLY TO AFFIRMATIVE DEFENSES |
| | 2 | 10/24/2022 | REPLY TO SECOND AMENDED AFFIRAMTIVE DEFENSES TO AMENDED COMPLAINT |
| | 7 | 10/24/2022 | PLAINTIFF'S AFFORDABLE HOUSING GROUP INCS ANSWER AND AFFIRMATIVE DEFENSES TO DEFENANTS SECOND AMENDED ANSWER AFFORMATIVE DEFENSES AND COUNTERCLAIMANSWER AND DEFENSES |
| | 2 | 9/16/2022 | AGREED ORDER ON DEFENDANT S MOTION FOR LEAVE TO FILE SECOND AMENDED ANSWER AND AFFRAMTIVE DEFENSES AND COUNTERCLAIM |
| | | 8/22/2022 | JURY TRIAL SET FOR 07/10/2023 AT 9:00 AM IN 5E BEFORE JUDGE: SCHREIBER, MARGARET H |

| VIEWER | IMAGE | DATE | ENTRY |
|---|---|---|---|
| | | 8/22/2022 | PRETRIAL SET FOR 05/22/2023 AT 2:00 PM IN 5E BEFORE JUDGE: SCHREIBER, MARGARET H |
| | 6 | 8/19/2022 | UNIFORM ORDER SETTING CASE FOR JURY TRIAL; PRE-TRIAL CONFERENCE & REQUIRING PRETRIAL MATTERS TO BE COMPLETED |
| | 20 | 7/27/2022 | DEFENDANT'S MOTION FOR LEAVE TO FILE SECOND AMENDED ANSWER AND AFFIRMATIVE DEFENSES AND COUNTERCLAIM |
| | 2 | 6/30/2022 | NOTICE FOR NON-JURY TRIAL |
| | 4 | 6/15/2022 | NOTICE OF FILING PRIVILEGE LOG |
| | 4 | 5/31/2022 | PLAINTIFF, AFFORDABLE HOUSING GROUPM INC.'S, RESPONSE TO DEFENDANT, FLORIDA HOUSING AFFORDABILITY, INC.'S, FIRST REQUEST FORPRODUCTION OF DOCUMENTS TO PLAINTIFF |
| | 2 | 5/31/2022 | PLAINTIFF, AFFORDABLE HOUSING GROUP, INC.'S NOTICE OF SERVICE OF ANSWERS AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF |
| | 2 | 5/13/2022 | NOTICE OF UNAVAILABILITY |
| | 5 | 4/29/2022 | DEFENDANT, FLORIDA HOUSEING AFFORDABILITY, INC.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF |
| | 2 | 4/29/2022 | DEFENDANT, FLORIDA HOUSEING AFFORDABILITY INC.'S NOTICE OF SERVICE OF FIRST SET OF INTERROGATORIES TO PLAINTIFF |
| | 7 | 3/11/2022 | PLAINTIFF AFFORDABLE HOUSING GROUP INC ANSWER AND AFFIRMATIVE DEFENSES TO COUNTERCLAIM |
| | 2 | 3/10/2022 | REPLY TO AMENDED AFFIRMATIVE DEFENSES TO AMENDED COMPLAINT |
| | 3 | 2/18/2022 | ORDER DENYING PLAINTIFF'S MOTION TO STRIKE, AND GRANTING DEFENDANT'S MOTION TO FILE AMENDED ANSWER, AFFIRMATIVE DEFENSNES AND COUNTERCLAIM |
| | 12 | 1/28/2022 | NOTICE OF FILING NOTICE |
| | | 1/7/2022 | MOTION TO STRIKE SET FOR 02/11/2022 AT 10:15 AM IN 6A BEFORE JUDGE: SCHREIBER, MARGARET H |
| | 2 | 1/4/2022 | NOTICE OF HEARING |
| | 8 | 12/27/2021 | PLAINTIFF'S MOTION TO STRIKE DEFENDANT'S MOTION FOR LEAVE TO FILE AMENDED ANSWER AND AFFIRMATIVE DEFENSES AND COUNTERCLAIM, AND FOR SANCTIONS |
| | 19 | 12/7/2021 | DEFENDANT MOTION FOR LEAVE TO FILE AMENDED ANSWER AND AFFIRMATIVE DEFENSE AND COUNTERCLAIM |
| | 25 | 11/29/2021 | NOTICE OF RE-FILING/ EXHIBIT "A" TO PLAINTIFF'S COMPLAINT |
| | 3 | 11/29/2021 | DEFENDANTS RESPONSE TO PLAINTIFFS FIRST REQUEST TO PRODUCE |
| | 9 | 10/29/2021 | PLAINTIFFS FIRST REQUEST TO PRODUCE TO DEFENDANT |
| | 1 | 10/27/2021 | MEDIATION REPORT |
| | 2 | 10/18/2021 | CERTIFICATION OF AUTHORITY FOR MEDIATION |
| | 2 | 10/6/2021 | NOTICE OF SETTING MEDIATION |
| | 4 | 8/5/2021 | AGREED CASE MANAGEMENT PLAN AND ORDER (STREAMLINED) |
| | 3 | 6/25/2021 | NOTICE OF REQUIREMENT FOR CASE MANAGMENT PLAND AND ORDER |
| | 4 | 4/21/2021 | DEFENDANT'S OBJECTION TO PLAINTIFF NOTICE OF TAKING DEPOSITION DUCES TECUM OF DEFENDANT CORPORATE REPRESENTATIVE |
| | 6 | 3/23/2021 | NOTICE OF TAKING DEPOSITION DUCES TECUM OF DEFENDANT CORPORATE REPRESENTATIVE |
| | 2 | 2/11/2021 | NOTICE OF CHANGE OF ATTORNEY OF RECORD AND E-MAIL DESIGNATION & DIRECTIONS TO CLERK TO UPDATE INFORMATION |
| | 1 | 12/28/2020 | REPLY TO AFFIRMATIVE DEFENSES TO AMENDED COMPLAINT |
| | 11 | 12/17/2020 | DEFENDANT FLORIDA HOUSING AFFORDABILITY INC ANSWER AND AFFIRMATIVE DEFENSES TO AMENDED COMPLAINT |
| | 2 | 11/20/2020 | ORDER ON DEFENDANT MOTION TO DISMISS AMENDED COMPLAINT |
| | | 10/2/2020 | MOTION TO DISMISS SET FOR 11/10/2020 AT 11:00 AM IN 6A BEFORE JUDGE: SCHREIBER, MARGARET H |
| | 2 | 10/2/2020 | NOTICE OF HEARING |
| | 9 | 8/27/2020 | DEFENDANT FLORIDA HOUSING AFFORDABILITY INC MOTION TO DISMISS AMENDED COMPLAINT |
| | 4 | 8/17/2020 | EXHIBIT G |
| | 5 | 8/17/2020 | EXHIBIT F |
| | 1 | 8/17/2020 | EXHIBIT E |
| | 14 | 8/17/2020 | EXHIBIT D |
| | 14 | 8/17/2020 | EXHIBIT C |
| | 3 | 8/17/2020 | EXHIBIT B |
| | 1 | 8/17/2020 | DOCUMENT DID COME THROUGH THE PORTAL |
| | 11 | 8/17/2020 | AMENDED COMPLAINT |
| | 1 | 7/24/2020 | ORDER GRANTING MOTION TO DISMISS |
| | 2 | 5/15/2020 | AMENDED NOTICE OF HEARING |
| | | 5/6/2020 | MOTION FOR SUMMARY JUDGMENT SET FOR 07/20/2020 AT 10:00 AM IN 6A BEFORE JUDGE: SCHREIBER, MARGARET H |
| | 2 | 5/4/2020 | NOTICE OF HEARING |
| | 7 | 2/24/2020 | DEFENDANT, FLORIDA HOUSING AFFORDABILITY, INC.'S, MOTION TO DISMISS |
| | 2 | 1/30/2020 | SUMMONS RETURNED, CORPORATE SERVED DATE SERVED : 1/23/20 PARTY SERVED: FLORIDA HOUSING AFFORDABILITY, INC. |
| | 1 | 1/23/2020 | PAYMENT $410.00 RECEIPT #2020007605 |
| | 1 | 1/22/2020 | SUMMONS ISSUED (EMAILED TO ATTY) |
| | | 1/22/2020 | CASE FILED 01/22/2020 CASE NUMBER 2020 CA 000170 OC |
| | 1 | 1/20/2020 | SUMMONS TO BE ISSUED |
| | 1 | 1/20/2020 | ENDORSED DESIGNATION |
| | 4 | 1/20/2020 | EXHIBIT F |
| | 2 | 1/20/2020 | EXHIBIT D |
| | 14 | 1/20/2020 | EXHIBIT D |
| | 14 | 1/20/2020 | EXHIBIT C |
| | 3 | 1/20/2020 | EXHIBIT B |

| VIEWER | IMAGE | DATE | ENTRY |
|---|---|---|---|
| | 1 | 1/20/2020 | EXHIBIT ( ATTORNEY WILL RE-FILE EXHIBIT A) |
| | 9 | 1/20/2020 | COMPLAINT |
| | 2 | 1/20/2020 | CIVIL COVER SHEET |

Filing # 167924060 E-Filed 03/02/2023 03:40:56 PM

IN THE CIRCUIT COURT IN AND FOR
THE NINTH JUDICIAL CIRCUIT
OSCEOLA COUNTY, FLORIDA

AFFORDABLE HOUSING GROUP, INC.,          CASE NO.: 2020-CA-000170
as an agent of the FEDERAL DEPOSIT
INSURANCE CORPORATION, as Manager
of the FSLIC Resolution Fund, successor in
interest to the Resolution Trust Corporation,
          Plaintiff,

v.

FLORIDA HOUSING AFFORDABILITY,
INC.,
          Defendant.
_____/

## AGREED ORDER GRANTING MOTION TO INTERVENE

THIS CAUSE, having come before the court upon the Motion to Intervene ("motion") by the

Federal Deposit Insurance Corporation ("FDIC"), and this Court having considered the motion, and

reviewed relevant portions of the Court file, taken note that counsel for the parties and proposed intervenor

FDIC have agreed to entry of this Order, and being otherwise fully apprised in the premises, it is

**ORDERED AND ADJUDGED:**

1.    That the motion is hereby granted.

2.    FDIC is joined as an additional Counterclaim Defendant and shall file a response to the

      Second Amended Counterclaim within 20 days of the date of this order.

3.    FDIC's intervention is limited to its joinder as an additional counterclaim defendant as to

      the Second Amended Counterclaim (deemed filed February 18, 2022 per court order) and

      any further permitted amendment.

Done and ordered in Chambers in Osceola County, Florida, this _____ date of February, 2023.

Signed by ALVARO, CHAD in 2020 CA 000170 OC
on 03/02/2023 15:40:30 kpakRlst
_____
CIRCUIT COURT JUDGE

CASE NO.: 2018-CA-014446

Copies to:
Russell E. Klemm, Esq. (Counsel for Plaintiff)
Jason R. Hawkins, Esq. (Counsel for Defendant)
Dora F. Kaufman, Esq. (Counsel for Intervenor)

Filing # 166713547 E-Filed 02/13/2023 05:32:17 PM

## IN THE CIRCUIT COURT IN AND FOR THE NINTH
## JUDICIAL CIRCUIT OSCEOLA COUNTY, FLORIDA

### CASE NO.: 2020-CA-000170

AFFORDABLE HOUSING GROUP, INC.,
as an agent of the FEDERAL DEPOSIT
INSURANCE CORPORATION, as Manager
of the FSLIC Resolution Fund, successor in
interest to the Resolution Trust Corporation,
     Plaintiff,

v.

FLORIDA HOUSING AFFORDABILITY,
INC.,
     Defendant.
_____/

## NON-PARTY FEDERAL DEPOSIT INSURANCE CORPORATION'S MOTION
## TO QUASH AND FOR PROTECTIVE ORDER IN RESPONSE TO SUBPOENA
## DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023, AND
## OBJECTIONS AND RESPONSES

     Non-party, FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC"), through undersigned counsel appearing on its behalf, hereby moves to quash subpoena and for a protective order, in response to the Amended Subpoena for Deposition Duces Tecum served on CT Corporation in Lawrenceville, Georgia on February 1, 2023, and commanding an appearance of a "Corporative Representative of the Federal Deposit Insurance Corporation" on **unspecified Topics** and document production spanning over 10-years on a **unilaterally noticed (and unavailable) date of March 2, 2023 at 10:00 a.m.**[1], as issued by Defendant/Counterclaim Plaintiff, Florida Housing Affordability, Inc. ("FHA" or "Defendant"), and also provides its responses and objections, and states as follows:

_____

[1] A copy of the amended Subpoena Duces Tecum is attached as Exhibit "A."

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

## I.    INTRODUCTION

As will be shown below, this Court has a strong basis to protect the FDIC from the Amended Subpoena for Deposition Duces Tecum ("Subpoena"), served on February 1, 2023, by the FHA.  FHA unilaterally scheduled the deposition sought by the Subpoena for March 2, 2023, at 10:00 a.m., without providing topics for the deposition to the FDIC and at a time when the FDIC's anticipated corporate designees were not available.  The document request is burdensome, overly broad, seeks commercially sensitive/proprietary information invasive of financial privacy rights of non-parties (including but not limited to parties to other contracts not at issue in this case), and is not likely to produce relevant admissible factual evidence because, based upon the operative pleadings (Defendant's Second Amended Answer, Affirmative Defenses and Counterclaims and the Plaintiff's Amended Complaint), there are few, if any, factual disagreements in the underlying dispute.

On Friday, February 10, 2023, the undersigned counsel for FDIC requested a conferral call with counsel for the parties for sometime today if possible, and advised of, *inter alia*, **prior conflict for the unilaterally selected March 2, 2023 deposition date**, and the FDIC's interest in attempting to amicably resolve issues as to the duces tecum requests, topics and scope of any ESI searches (e.g., related charges, custodians and search terms, and payment requirements).  However, based on the schedules of parties' counsel, the conferral call between counsel for both parties and the undersigned has been set for 11:00 am on February 17, 2023.  Amongst other deficiencies and issues:

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

- FHA failed to include any topics or areas for requested witness testimony in the attempted Fla. R. Civ. P. 1.310(b)(6) Subpoena Duces Tecum[2] thus rendering the FDIC unable to properly and thoroughly prepare its witness to testify or to determine the most knowledgeable person(s) to testify on its behalf;

- There are prior conflicts of the anticipated potential corporate witnesses on that date as to anticipated areas of examination (notwithstanding the failure to provide any Topics in the Subpoena); (The FDIC is willing to provide a testifying witness once topics are provided and its objections are resolved and estimates that it will require at least 60 days to properly prepare for such deposition.)

- The document requests are objectionable and require limitations and clarifications sufficiently in advance of the deposition date to permit the FDIC to conduct a search, review, and produce responsive, non-privileged records. These objections include, without limitation: (a) the overly broad scope of requests spanning, in part, more than 10 years and seeking documents regarding properties and entities unrelated to the property and contract at issue in this litigation; and (b) protections for any privileged, proprietary, and/or confidential information.

---

[2] Fla. R. Civ. P. 1.310(b)(6) expressly requires the notice of deposition to a governmental agency (including the FDIC) or other corporation or association include a "**designation] with reasonable particularity [as to] the matters on which examination is requested.**" *Id.* (emphasis added). Such a designation allows for the named government agency or organization to "designate one or more officers, directors, or managing agents, or other persons...to testify on its behalf" and to determine the matters on which each designated person would testify. *Id.*

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

- The need for a Protective Order to address any inadvertent disclosure of documents and to maintain the confidentiality of any sensitive business and proprietary information.

- The FDIC's entitlement to receive advance payment for the estimated costs to search, review, process and produce responsive, non-privileged documents.

However, thus far, Plaintiff's/Counterclaimant's counsel only offered to re-set the deposition once definitive alternative dates are offered. It is hoped that, following the conferral call between counsel on February 17, 2023 (the earliest date available for counsel for both parties), progress will be made regarding, *inter alia*, compromise and resolution of Topics for the deposition, the scope of the requests, agreement as to confidentiality, and preliminarily anticipated timing for the deposition.

## II.    BACKGROUND

Resolution Trust Corporation ("RTC"), which operated between 1989 and 1995, resolved savings and thrift institutions by selling or merging the troubled institutions, including by selling the institutions' assets at heavily discounted prices. As part of this resolution process, Congress established the RTC's Affordable Housing Disposition Program ("AHDP") pursuant to section 501 of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989 (Section 21A(c) of the Federal Home Loan Bank Act, as amended by 501 of FIRREA, 12 U.S.C. § 1441a). One of the goals of the AHDP was to ensure preservation and maintenance of affordable rental opportunities for moderate-income, low-income and very-low-income households. RTC used different strategies to achieve this goal including selling multi-family residential properties

4

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

at a substantial discount with the requirement that a purchaser agree to execute Land Use Restriction Agreement ("RTC LURA").[3]

RTC LURAs are contracts recorded in the land records and run with the land. They require residential multi-family property owners to provide a certain number of apartments for low and very-low income families, file compliance reports and pay administrative monitoring fees.

This litigation involves one such RTC LURA, the March 31, 1994 LURA executed between the Defendant, and the RTC ("1994 LURA"), in connection with the Defendant's purchase of a 192-unit residential apartment building in Kissimmee, Florida (the "Property"). Like other RTC LURAs, the 1994 LURA was recorded in the land records and runs with the land, *see* Am. Compl. p. 2 (¶ 5), and pursuant to the 1994 LURA, Defendant agreed, *inter alia*, to provide affordable housing opportunities to lower income families for forty years, file compliance reports, and pay administrative monitoring fees.

In anticipation of the termination of the RTC, on December 17, 1993, Congress enacted the Resolution Trust Corporation Completion Act ("RTC Completion Act"), Pub. L. 103-204, 107 Stat. 2369, directing the RTC and the FDIC to enter into an agreement to develop a plan for the orderly unification of the FDIC's and RTC's affordable housing programs. The RTC Completion Act also amended the Federal Deposit Insurance Act to provide that the FDIC "shall carry out the RTC's remaining authorities and responsibilities of the [RTC] as set forth in Section 21A(c) of the Federal Home Loan Bank Act." *See* 12 U.S.C. § 1831q(n)(4). The FDIC monitors and enforces RTC LURAs, using third-party monitoring agencies.[4]

---

[3] The RTC LURAs are effective for the greater of 40 years from the date of closing or 50 years from the date of initial occupancy.

[4] FDIC also serves as the manager of the Federal Savings and Loan Insurance Corporation Resolution Fund, which funds the AHDP program.

5

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

On January 20, 2020, Affordable Housing Group, Inc. ("AHG" or "Plaintiff") the current

FDIC compliance monitor for the 1994 LURA, *see Id.*, p. 3-4 (¶ 15-19), initiated this litigation

against FHA to enforce the 1994 LURA. *See* Am. Comp., p. 2 (¶ 5). In its amended complaint,

AHG alleges that FHA has violated the terms of the 1994 LURA by failing to file periodic

"Compliance Review" reports or pay the required Administrative Fees to cover monitoring costs.

In its September 2022 Second Amended Answer, Affirmative Defenses and Counterclaims

to the Amended Complaint, FHA *did not dispute* these factual contentions. Instead, FHA disputed

that those obligations were owed based upon various legal theories including statutes of

limitations, laches, waiver and the termination of the 1994 LURA based upon the repeal of 12

U.S.C. § 1441a under the Dodd-Frank Act in 2010, the RTC's enabling statute.

Thus, because the facts are largely undisputed, the extensive scope of the Subpoena's

document request is disproportionate to the Defendant's discovery needs, unlikely to lead to

relevant and admissible evidence and is therefore an unnecessary, unwarranted, improperly

invasive, and burdensome imposition on a non-party.

Accordingly, in the absence of topics for the deposition and an appropriately tailored

document request, the FDIC, a non-party,[5] respectfully seeks to quash the Subpoena and for a

protective order due to these and other deficiencies, as explained further herein.

### III.    OBJECTION TO UNILATERALLY SCHEDULED DEPOSITION

The FDIC objects to the unilaterally scheduled deposition of a corporate witness for two

reasons. First, as the FDIC advised the Defendant, the likely corporate witness(es) are unavailable

---

[5] Although presently a non-party to this action, the FDIC's motion to permit it to intervene as a
counterclaim Defendant is currently pending with this Court. This was necessitated by Defendant's
refusal to consent to FDIC's intervention.

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

on March 2, 2023. Second, Defendant has failed to provide topics for its proposed deposition to enable the FDIC to select the most knowledgeable corporate designee and to prepare its designee(s) sufficiently to testify. FHA has not yet agreed to a postponement. The FDIC is willing to provide a witness if it is given sufficient time and a list of topics/areas of examination, and any remaining objections or disputes as to the scope of the topics and duces tecum requests can be resolved beforehand. The FDIC's proposed request for additional time would still permit the Defendant to conduct the deposition well before the discovery deadline in this case.

## IV.    GENERAL OBJECTIONS TO THE DOCUMENT REQUEST

1.    *Unduly Burdensome, Overly Broad and Vague.* As drafted, the Subpoena is burdensome, overly broad and vague because it seeks documents not relevant to the lawsuit (as framed by the pleadings) or likely to lead to discoverable evidence. *Alterra Healthcare Corp. v. Estate of Shelley*, 827 So. 3d 936, 946 (Fla. 2002) ("Even though discovery is broad, it must be relevant to issues properly framed by the pleadings in the litigation.").

2.    The Subpoena seek documents for a period of more than ten years, including records that are unrelated to the 1994 LURA, the Property or the parties, records held by other entities, including Defendant and Plaintiff, and documents that may be confidential or proprietary or subject to various privileges. Florida law recognizes the need for proportionality in discovery. *See* Florida Rule of Civil Procedure 1.280(d) (governing limitations on discovery of electronically stored information and limiting the frequency or extent of electronic discovery where discovery is unreasonably cumulative or duplicative or can be obtained from another source that is more convenient, less burdensome, or less expensive; or the burden or expense of the discovery outweighs its likely benefit.).

3.    For example, with respect to documents relating to other non-parties, such as other

7

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

property owners' compliance reports, or other compliance monitors, that may be subject to confidentiality or constitute proprietary business information, FHA has not shown a reasonable need for such materials nor how the discovery of such documents would be relevant or lead to admissible evidence in this litigation. AHG currently monitors 109 RTC LURAs and Florida Housing Financial Corp. ("FHFC") currently monitors 24 RTC LURAs. Together, they monitor over 3,000 restricted units set aside for lower income tenants[6] under the 133 RTC LURAs. To justify receipt of such documents, Defendant must make a showing of "good cause" under Rule 1.280(c), which "is informed by Article I, Section 23" and requires "balancing the need for discovery with affected privacy interests." *See, e.g., Rasmussen v. S. Fla. Blood Serv., Inc.*, 500 So. 2d 533, 535 (Fla. 1987). The party seeking production must show reasonable necessity for the materials and that its need outweighs the privacy interests of the third-parties. *See, e.g., General Caulking Coating Co., Inc. v. J.D. Waterproofing, Inc.*, 958 So. 2d 507, 509 (Fla. 3d DCA 2007); *see also Kavanaugh v. Stump*, 592 So. 2d 1231, 1232 (Fla. 5th DCA 1992) (providing that "Fla. R. Civ. P. 1.280(c)(7) allows the court to protect discovery of a trade secret or other confidential research, development, or commercial information by prohibiting or restricting disclosure.").

4.    *Burdensome to the Extent the Request is Duplicative or Seeks Documents That Could be Obtained from the Plaintiff.* The Subpoena also seeks documents that are already in the Defendant's possession, *i.e.*, its own email communications, its compliance reports, etc., or have been obtained or requested from the Plaintiff through discovery, and would therefore be duplicative. Further, to the extent that the Subpoena seeks documents about the Plaintiff, beyond those already produced by the Plaintiff, FHA should make such a request to the Plaintiff and not

---

[6] A restricted unit may have more than one tenant on the lease, therefore many include personal financial information of more than 3,000 tenants.

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

burden a non-party. FHA has made no showing that it has been unable to obtain documents from

the Plaintiff or its overwhelming need for such documents. *See, e.g., Federal Deposit Ins. Corp.*

*v. Balkany*, 564 So. 2d 580, 581 (Fla. 3d DCA 1990) ("the rule that allows a party to request

production of its opponent's records is in no sense designed to afford a litigant an avenue to pry

into his adversary's business or go on a fishing expedition to uncover business methods,

confidential relations, or other facts pertaining to the business").

     5.     *Objectionable to the Extent that the Subpoena Seeks Documents Subject to Trade*

*Secret Privilege, or which Constitute Non-Public Confidential or Proprietary Information.*

Moreover, to the extent that the Subpoena seeks documents that are internal business information

of the Plaintiff or other non-parties, such as other property owners or compliance monitors, the

documents may be subject to certain privileges. Section 90.506 of the Florida Evidence Code

governs trade secret privilege in Florida. *See, e.g., Del Monte Fresh Produce Co. v. Dole Food

Co.*, 148 F. Supp. 2d 1322, 1324 (S.D. Fla. 2001). Section 90.506 provides that trade secrets

should be secure from encroachment by third-parties and Florida Courts have consistently

recognized the need to carefully scrutinize requests for internal business information and to protect

such information. *See Allstate Ins. Co. v. Langston*, 655 So. 2d 91, 94 (Fla. 1995) ("Discovery of

certain kinds of information may reasonably cause material injury of an irreparable nature.")

(internal citation and quotation omitted); *Megaflight, Inc. v. Lamb*, 749 So. 2d 594, 595 (Fla. 5th

DCA 2000) ("[W]e agree with those who suggest that erroneous orders that require overbroad

discovery of nonprivileged documents should be subjected to certiorari review more cautiously

than erroneous orders requiring discovery of confidential or privileged matters."); *Rousso v.

Hannon*, 146 So. 3d 66, 71 (Fla. 3d DCA 2014) ("Discovery orders that require the disclosure of

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

claimed confidential are reviewed with greater caution than those that are simply burdensome or
costly due to overbreadth.").

      6.    FHA has not shown a compelling need for records that may be covered by this
privilege. *See, e.g., General Caulking Coating Co.*, 958 So. at 508 (providing that where a trade
secret is sought, "the court must require the party seeking production to show reasonable necessity
for the requested materials") (citing *Sheridan Healthcorp, Inc. v. Total Health Choice, Inc.*, 770
So. 2d 221, 222 (Fla. 3d DCA 2000)); *Bright House Networks, LLC v. Cassidy*, 129 So. 3d 501,
505 (Fla. 2d DCA 2014) ("Orders improperly requiring the disclosure of trade secrets or other
proprietary information often create irreparable harm and are thus appropriate for certiorari
review.").

      7.    *Objectionable to the Extent the Subpoena Seeks Other Privileged Documents.* The
Subpoena is also objectionable insofar as it calls for production of documents protected from
disclosure under the attorney-client privilege, the attorney work-product doctrine, the deliberative
process privilege, the joint defense privilege, or any other legally recognized privilege, immunity
or exemption from discovery. *See, e.g., Harborside Healthcare, LLC v. Jacobson*, So. 3d 612
(Fla. 2d DCA 2022) (holding trial court departs from essential requirements of law where it
requires production of documents without specifically addressing claims of statutory privilege
(citing *Bartow HMA, LLC v. Kirkland*, 171 So. 3d 783, 785 (Fla. 2d DCA 2015))).

      8.    *Rough Estimate of Time and Costs to Respond to Document Request.* To put the
costs and time required to comply with the document requests in the Subpoena into context, the
FDIC conducted a *preliminary rough search* of its email records, using limited search terms it
believes are most likely to discovery relevant factual evidence in this lawsuit without input from
Defendant. The FDIC searched the emails of current and former FDIC employee whose emails

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

would most likely have responsive documents from Jan 1, 2012 to present (the time frame set forth in the Subpoena). The resulting data set, based only on the email records, was approximately 10,800 hits, before application of analytics or deduping.

9.    Assuming that once the document set was deduped and analytics applied, the likely hit count of responsive records would be reduced by 25-40%, resulting in a total number of documents of between 6,480 and 8,000 documents (which would include single emails as well as emails with documents embedded in the email). Then, applying the FDIC's standard rate for review, search and production costs of $83 per hour for professionals (internal FDIC personnel) and an average estimate for review of approximately 1-2 minutes per document, the FDIC computed the time it would take to complete, between 180 and 266 hours, and cost, between $14,940 and $22,133.61. This *rough estimate* captures only the time and cost involved in reviewing the email data set. It does not include the time and cost of searching, reviewing and producing any responsive, non-privileged documents from FDIC's physical storage records nor obtaining any responsive documents from its other monitoring agent, to the extent that the Subpoena would require the FDIC to do so (the Subpoena's definition of the FDIC included its "agents"). Nor does the estimate include any additional searches, reviews and productions if the Defendant could show additional documents are necessary.

10.    *Non-party Advanced Payment for Document Response to Subpoena.* As a non-party, the FDIC is entitled to be paid in advance for the total cost of producing, searching for, reproducing or transporting the requested documentation. *See* Fla. Stat. § 92.153(2)(a) (stating that a non-party shall be paid for the cost of producing, searching for, reproducing or transporting documents in response to a Subpoena); *Schering Corp. v. Thornton*, 280 So. 2d 493 (Fla. 4th DCA 1973); Fla. R. Civ. P. 1.351(c) (stating that a person upon whom a subpoena is served may

11

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

"condition the preparation of copies on the payment of the reasonable costs of preparing the copies."). To date, FHA has failed to discuss the estimated costs with the FDIC, much less offer to make any payment.

11.    *A protective order is needed.* Finally, a protective order is needed to clarify the use and disposition of privileged, confidential or proprietary documents in this litigation, the return of any inadvertently disclosed documents to which other non-parties may assert that such documents are privileged, confidential or proprietary documents, and the ultimate disposition of documents subject to privileges or deemed confidential or proprietary, after the conclusion of the litigation.

12.    Each of the foregoing General Objections and limitations is incorporated into the Specific Objections and responses below as if fully stated therein. Failure to repeat any General Objection in response to a specified request for documents shall not be deemed a waiver of that objection, and each of the General Objections is reserved. Moreover, when one or more of the General Objections is repeated in response to specific requests, such a specific objection shall not be deemed a waiver of any remaining General Objections.

## V.    ADDITIONAL OBJECTIONS AND RESPONSES

1.    **Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or related to any communication(s) between FDIC and AHG, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the [1994] LURA and/or Property.**

RESPONSE: FDIC objects to this overbroad request because it seeks information that is confidential, privileged, proprietary, or considered a trade secret ("proprietary/confidential"), and extends well beyond the 1994 LURA or the Property at issue in this lawsuit. The FDIC further objects to the extent this request seeks information that is irrelevant to the factual allegations framed by the parties in their pleadings.

The FDIC also objects to the production of any communications between FDIC and AHG to the extent that FHA can obtain such documents directly from AHG, the plaintiff herein. Further, the request is objectionable to the extent that it seeks records that bear no relationship to the 1994 LURA or Property at issue in this lawsuit, or involve other non-party entities (such as other

12

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

property owners or tenants) who are entitled to the protection of their financial privacy or business information.

Finally, the FDIC also objects to this request to the extent it seeks documents that are subject to privilege from disclosure, including attorney-client and work product privileges.

Notwithstanding, the general and specific objections set forth above, the FDIC shall produce non-privileged responsive documents not otherwise claimed as proprietary/confidential between FDIC and AHG pertaining to the 1994 LURA or Property that can be located upon reasonable searches (including any stipulated or court-ordered electronic searches) following Defendant's advance payment of search costs and entry of an appropriate protective order.

2. **Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or related to any communication(s) between FDIC and AHG, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the [July 9, 2002] Memorandum of Understanding for Monitoring and Enforcement specifically with respect to the [1994] LURA, the Property, and/or FHA.**

RESPONSE: FDIC objects to this overbroad request that seeks information that is confidential, privileged, proprietary, or considered a trade secret ("proprietary/confidential"), and extends well beyond the 1994 LURA or the Property at issue in this lawsuit. The FDIC further objects to the extent this request seeks information that is irrelevant to the factual allegations framed by the parties in their pleadings.

The FDIC objects to this request because it seeks information from the FDIC, as a non-party, that has been obtained or is obtainable from the Plaintiff.

The FDIC objects to the production of all communications between FDIC and AHG since January 1, 2012 ("TIME PERIOD" referenced in the Subpoena) to the extent those records bear no relationship to the 1994 LURA or Property at issue in this lawsuit, and involve other non-party entities (including tenants or property owners) entitled to protection of their financial privacy or business information.

The FDIC also objects to this request as unclear whether Defendant intended to expand the TIME PERIOD referenced in the Subpoena to the date of the execution of the Memorandum of Understanding for Monitoring and Enforcement between the FDIC and AHG, July 2, 2002.

The FDIC also objects to this request to the extent it seeks privileged information, including attorney-client, work product, proprietary, or other information privileged from disclosure.

Notwithstanding, the general and specific objections set forth above, the FDIC shall produce non-privileged responsive documents not otherwise claimed as proprietary/confidential between FDIC and AHG pertaining to the 1994 LURA or Property that can be located upon

13

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

reasonable searches (including any stipulated or court-ordered electronic searches) following Defendant's advance payment of search costs and entry of an appropriate protective order.

**3.    Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or related to any communication(s) between FDIC and FHFC [compliance monitor for other LURAs; and monitor for subject LURA since 2016], including but not limited to, all e-mail communications, notes, and correspondence that related to the [1994] LURA, the Property, and/or FHA.**

RESPONSE: FDIC objects to this overbroad request that seeks information that is confidential, privileged, proprietary, or considered a trade secret ("proprietary/confidential"), and extends well beyond the 1994 LURA or the Property at issue in this lawsuit. The FDIC further objects to the extent this request seeks information that is irrelevant to the factual allegations framed by the parties in their pleadings.

The FDIC also objects to the production of any communications between FDIC and FHFC to the extent it seeks records that bear no relationship to the 1994 LURA or Property at issue in this lawsuit, or involve other non-party entities (such as tenants and other property owners) who are entitled to the protection of their financial privacy or business information.

The FDIC also objects to this request to the extent it seeks privileged information, including attorney-client, work product, proprietary, or other information privileged from disclosure.

Notwithstanding, the general and specific objections set forth above, the FDIC shall produce non-privileged responsive documents not otherwise claimed as proprietary/confidential between FDIC and FHFC pertaining to the 1994 LURA or Property that can be located upon reasonable searches (including any stipulated or court-ordered electronic searches) following Defendant's advance payment of search costs and entry of an appropriate protective order.

**4.    Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or related to any communication(s) between FDIC and [Defendant/Counterclaimant FHA], including but not limited to, all e-mail communications, notes, and correspondence that relate to the [1994] LURA, the Property, and/or FHA.**

RESPONSE: FDIC objects to this overbroad request which seeks information that should be in the possession of the Defendant/Counterclaimant, FHA, a party to this action, and to the extent that the information is unrelated to the 1994 LURA or Property at issue herein. The FDIC also objects to this request as it defines the FDIC to include its agents, to the extent that the FDIC would be required to obtain documents from both the Plaintiff and other non-parties, who act as agents for the FDIC.

Notwithstanding, the general and specific objections set forth above, the FDIC shall produce non-privileged responsive documents not otherwise claimed as proprietary/confidential between FDIC and FHA pertaining to the 1994 LURA or Property that can be located upon

14

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

reasonable searches (including any stipulated or court-ordered electronic searches) following Defendant's advance payment of search costs and entry of an appropriate protective order.

5. **Copies of all compliance reviews performed by You [defined to include any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of the FDIC] for the Property pursuant to Section 4.5 of the [1994] LURA.**

RESPONSE: FDIC objects to this request to the extent that it seeks information that is confidential, privileged, proprietary, or considered a trade secret ("proprietary/confidential") or is part of or contained in a document(s) that includes information about other non-parties or that is unrelated to the 1994 LURA or the Property involved in this lawsuit. The FDIC further objects to the extent this request seeks information that is irrelevant to the issues of this case as framed by the parties in their pleadings.

The FDIC also objects to this request to the extent it seeks privileged information, including attorney-client, work product, proprietary, or other information privileged from disclosure.

The FDIC also objects to this request to the extent that the Defendant is already in possession of the requested information.

Notwithstanding, the general and specific objections set forth above, the FDIC shall produce non-privileged responsive documents not otherwise claimed as proprietary/confidential pertaining to compliance review of the Property following Defendant's advance payment of search costs and entry of an appropriate protective order.

VI. **CONCLUSION**

For the reasons stated herein, the Subpoena does not comply with applicable Florida rules in that it fails to list any topics or areas of examination of a government agency witness. Further, the purported corporate deposition of the FDIC was **unilaterally scheduled** on a date that the FDIC's preliminarily anticipated or potential corporate designees are not available and without permitting sufficient time for the FDIC to prepare its witness(s).

The document requests are also inconsistent with necessary proportionality in discovery under Florida law. And, as stated herein, the requests are overly broad, unduly burdensome, not calculated to discover relevant and admissible evidence, seek privileged and potentially

15

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

confidential material, and are disproportionate to Defendant's discovery needs as the facts set forth in the operative pleadings are largely undisputed.

Notwithstanding the requested relief herein, the FDIC remains open to discussions regarding a corporate deposition of an FDIC witness(es) and search, review and production of relevant, non-privileged discovery. Specifically, agreements or rulings are needed regarding the appropriate scope for testimony (e.g., Topics or areas and production), a mutually convenient date for the deposition and sufficient preparation time (at least 60 days), proportionate document requests related to the 1994 LURA or Property at issue, together with sufficient time to complete searches, review and production of relevant documents, receipt of advance payment for ESI searches, and obtaining entry of an appropriate protective order.

WHEREFORE, Non-party FEDERAL DEPOSIT INSURANCE CORPORATION, respectfully requests that this Honorable Court enter an Order granting the subject Motion for Protective Order and to Quash Subpoena and issuing such other and further relief as this Court deems just and proper[7].

---

[7] Further efforts to confer (e.g., as to search terms and custodians for requested e-searches; as to Topics or areas for testimony; as to the scope of production; etc.) and attempt to cooperatively refine document requests and prospective Topics or areas of testimony shall be made prior to a hearing on this Motion/Objections.

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

Respectfully submitted,

**LIEBLER, GONZALEZ & PORTUONDO**
*Attorneys for Federal Deposit Insurance*
Corporation *(FDIC)*
Courthouse Tower - 25th Floor
44 West Flagler Street
Miami, FL 33130
Tel: (305) 379-0400
Fax: (305) 379-9626
Primary: service@lgplaw.com
Secondary: dfk@lgplaw.com; ec@lgplaw.com

By: /s/ *Dora F. Kaufman*
    DORA F. KAUFMAN, ESQ.
    Florida Bar No. 771244
    MARY J. WALTER, ESQ.
    Florida Bar No. 45162

CASE NO.: 2020-CA-000170

NON-PARTY, FEDERAL DEPOSIT INSURANCE CORPORATION'S,
OBJECTIONS, RESPONSES, AND MOTION TO QUASH AND FOR PROTECTIVE ORDER
IN RESPONSE TO SUBPOENA DUCES TECUM FOR DEPOSITION ON MARCH 2, 2023

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of February, 2023, I electronically filed the

foregoing with the Clerk of Court by using the Florida Courts E-filing Portal which will send a

notice of electronic filing to the following: Russell E. Klemm, Esq. at rklemm@clayton-

mcculloh.com and sroe@clayton-mcculloh.com (Attorney for Plaintiff); and Jason R. Hawkins,

Esq., jhawkins@southmilhausen.com and lcarpenter@southmilhausen.com (Attorney for

Defendant).

/s/ *Dora F. Kaufman*
DORA F. KAUFMAN

18

# EXHIBIT "A"

IN THE CIRCUIT COURT IN AND FOR
THE NINTH JUDICIAL CIRCUIT
OSCEOLA COUNTY, FLORIDA

AFFORDABLE HOUSING GROUP, INC.,
as an agent of the FEDERAL DEPOSIT
INSURANCE CORPORATION, as Manager
of the FSLIC Resolution Fund, successor in
interest to the Resolution Trust Corporation,

CASE NO.: 2020-CA-170

     Plaintiff,

v.

FLORIDA HOUSING AFFORDABILITY, INC.,

     Defendant.

_____/

## AMENDED SUBPOENA FOR DEPOSITION DUCES TECUM

(Via Zoom)

STATE OF FLORIDA:

TO:   **Corporate Representative of Federal Deposit Insurance Corporation**
      **By Serving the CT Corporation System as Registered Agent**
      **289 Culver Street S**
      **Lawrenceville, GA 30046**

     **YOU ARE COMMANDED** to appear before a person authorized by law to take

depositions at South Milhausen, P.A., 1000 Legion Place, Suite 1200, Orlando, FL 32801, **via**

**Zoom** on **March 2, 2023, at 10:00 a.m.,** for the taking of your deposition to testify on the

following topics and to produce the following documents: **PLEASE SEE ATTACHED**

**EXHIBIT "A."** If you fail to appear, you may be in contempt of court.

Join Zoom Meeting:
https://us02web.zoom.us/j/81302016403?pwd=TjJrM3IyNHZ6TFVnTXhmUHgvb3YrQT09
Meeting ID: 813 0201 6403
Passcode: 745579

You are subpoenaed to appear by the following attorney, and unless excused from this subpoena by this attorney or the court, you must respond to this subpoena as directed.

Dated this 27th day of January 2023.

/s/ *Jason R. Hawkins*
Jason R. Hawkins
Florida Bar No.: 11925
jhawkins@southmilhausen.com
South Milhausen, P.A.
1000 Legion Place, Suite 1200
Orlando, Florida 32801
Telephone: (407) 539-1638
Facsimile: (407) 539-2679
*Attorneys for Defendant,*
*Florida Housing Affordability, Inc.*

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, the provision of certain assistance. Please contact Jason R. Hawkins, Esq. at 407-539-1638 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

Copy to:
Attorneys for Plaintiff
Russell E. Klemm, Esq.
Clayton & McCulloh, P.A.
1065 Maitland Center Commons Blvd.
Maitland, FL 32751
Phone: 407-875-2655
Fax: 407-875-3363
Email: rklemm@clayton-mcculloh.com; cpraria@clayton-mcculloh.com

## EXHIBIT "A"

### DEFINITIONS

1.    As used herein, "You" and/or "Your", "FDIC", shall refer to FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation, and any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of FDIC.

2.    As used herein, "AHG" means AFFORDABLE HOUSING GROUP, INC., and any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of AHG.

3.    As used herein, "FHA", shall refer to Florida Housing Affordability, Inc., and any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of FDIC.

4.    "FHFC" means Florida Housing Finance Corporation, and any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of FHFC.

5.    The Term "Memorandum of Understanding for Monitoring and Enforcement" shall mean the Memorandum of Understanding for Monitoring and Enforcement dated July 9, 2002 by and between the FDIC acting in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation and AHG, a copy of which is attached hereto as **Exhibit "1"**.

6.    The term "LURA" shall mean the Land Use Restriction Agreement for the "Three Fountains Apartments" dated March 31, 1994 and recorded on April 4, 2994 in the Osceola County, Florida public records at Official Records Book 1180, Page 0185, a copy of which is attached hereto as **Exhibit "2"**.

7.    The term "Property" shall refer to the Three Fountains Apartments as more particularly described in the LURA.

8.    The word "document" is used in the broad and liberal sense and means any written, typed, printed, recorded or graphic matter, however produced or reproduced, of any kind and description, whether sent, received, or neither, and all copies which differ in any way from the original (whether by interlineations, stamped received, notation, indication of copy sent or received, or otherwise) regardless of whether designated confidential, privileged or otherwise and whether an original, master, duplicate or copy, including, but not limited to, papers, notes, account statements or summaries, ledgers, pamphlets, periodicals, books, advertisements, electronic mail, computerized information, objects, letters, memoranda, notes or notations of conversations, contracts, agreements, drawings, telegrams, audio or video tape recordings, communications, including inter-office and intra-office memoranda, delivery tickets, bills of lading, invoices, quotations, claims documents, reports, records, studies, work sheets, working papers, corporate records, minutes of meetings, circulars, bulletins, notebooks, bank deposit slips, bank checks, canceled checks, check stubs, diaries, diary entries, appointment books, desk calendars, data processing cards and/or tapes, computer software, photographs, transcriptions or sound recordings

of any type of personal or telephone conversations, interviews, negotiations, meetings or conferences, or any other things similar to any of the foregoing.

9.    As used herein, the word "communication" means any words heard, spoken, written or read, regardless of whether designated confidential, privileged or otherwise, and including, without limitation: (a) Words spoken or heard at any meeting, discussion, interview, encounter, conference, speech, conversation or other similar occurrence; and (b) Words written on or read from any document(s) as described above.

10.    As used herein, the term "person" means individuals or entities of any type, including, but not limited to, natural persons, governments (or any agencies thereof), quasi-public entities, corporations, partnerships, groups, mutual or joint ventures and other forms of organizations or associations.

11.    As used herein, the words or phrases, "explaining", "describing", "defining", "concerning", "reflecting", or "relating to" when used separately or in conjunction with one another mean directly or indirectly mentioning, pertaining to, involving, being connected with or embodying in any way or to any degree the stated subject matter.

12.    When the context herein makes it appropriate, each singular word shall include its plural and each plural word shall include its singular.

13.    "Evidencing" means tending to show, in any probative manner, the existence or nonexistence of any matter.

14.    "Or" and "and" mean "and/or" in any request, where the meaning would have an effect of bringing additional communications, documents, and files within the scope of a request.

## TIME PERIOD

Unless otherwise specified herein, the time period covered in this Duces Tecum is for the period from January 1, 2012 to the present.

## DOCUMENTS REQUESTED

1. Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or relate to any communication(s) between FDIC and AHG, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the LURA and/or Property.

2. Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or relate to any communication(s) between FDIC and AHG, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the Memorandum of Understanding for Monitoring and Enforcement specifically with respect to the LURA, the Property and/or FHA.

3. Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or relate to any communication(s) between FDIC and FHFC, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the LURA, the Property, and/or FHA.

4. Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or relate to any communication(s) between FDIC and FHA, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the LURA, the Property, and/or FHA

5. Copies of any and all compliance reviews performed by You for the Property, pursuant to Section 4.5 of the LURA.

1

MEMORANDUM OF UNDERSTANDING
FOR MONITORING AND ENFORCEMENT

By and Between

the

FEDERAL DEPOSIT INSURANCE CORPORATION,
acting in its capacity as Manager of the
FSLIC Resolution Fund, successor in interest to
the Resolution Trust Corporation

and

AFFORDABLE HOUSING GROUP, INC.
(the "Agency")

_____JuLY_____ o 9 , 2002

MEMORANDUM OF UNDERSTANDING
FOR MONITORING AND ENFORCEMENT

WHEREAS, certain Properties have been sold and certain other such eligible Properties may be sold in the State pursuant to the requirements of the Affordable Housing Disposition Program of the former Resolution Trust Corporation (the "RTC") as set forth in Section 21A(c) of the Federal Home Loan Bank Act (the "FHLBA") (12 U.S.C §1441a(c));

WHEREAS, the Owners of such Properties have entered or will enter into Land Use Restriction Agreements ("LURAs") with respect to the Owners' obligations to comply with the occupancy, rent and resale restrictions with respect to the Properties, as set out in Section 21A(c) of the FHLBA and in the Final Rule for the RTC's Affordable Housing Disposition Program;

WHEREAS, the LURAs provide that the RTC, its successor, or a Agency contracted by the RTC or its successor shall monitor the compliance of the Owners with the occupancy, rent and resale restrictions set out in the LURAs;

WHEREAS, the LURAs and Section 21A(c)(11)(B) of the FHLBA (12 U.S.C. §1441a(c)(11)(B)) authorize the RTC, its successor, and other specified parties to judicially enforce the occupancy, rent, income and resale restrictions set out in the LURAs against purchasers of such Properties, or their successors in interest;

WHEREAS, pursuant to Section 21A(m) of the FHLBA (12 U.S.C.§1441a(m)) upon the termination of the RTC, all of its rights and obligations were transferred to the FSLIC Resolution Fund as the successor in interest to the RTC;

WHEREAS, pursuant to Section 11A of the Federal Deposit Insurance Act, (12 U.S.C. §1821a), the Federal Deposit Insurance Corporation (the "FDIC") is responsible for the management of the FSLIC Resolution Fund; and,

WHEREAS, the FDIC, as the manager of the FSLIC Resolution Fund, successor in interest to the RTC, and the Agency have agreed that the Agency will, for itself and on behalf of the FDIC, under the terms and conditions set forth herein, monitor and enforce the compliance of the Owners with the occupancy, rent and resale restrictions set out in the LURAs;

NOW THEREFORE, in consideration of the mutual promises herein set forth, the FDIC, acting in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust corporation, and the Agency enter into this Memorandum of Understanding and agree as follows:

1. Definitions:

The capitalized terms used herein shall have the meanings given them below and such meanings shall be equally applicable to the singular and the plural forms of such terms, as the context may require.

"Agency" shall mean Affordable Housing Group, Inc., together with its successors and assigns, located at: 1910 ESE Loop 323, # 329, Tyler, Texas 75701.

"Compliance Monitoring Manual" shall mean the Compliance Monitoring Manual for State Agencies attached hereto as Exhibit B.

"Condominium Owners" shall mean nonprofit organizations, public agencies and for-profit entities that purchased Condominium Properties from the RTC in bulk pursuant to Section 21A(c) of the FHLBA (12 U.S.C. §1441a(c)).

"Condominium Property" shall mean an "eligible condominium property" under Section 21A(c)(9)(D) of the FHLBA (12 U.S.C. §1441a(c)(9)(D)) that is sold to a Condominium Owner subject to the Multifamily Occupancy Requirements, the Rent Restrictions and the Condominium Resale Restrictions, under the terms of the applicable LURA.

"Condominium Resale Restrictions" shall mean the requirement that a single Condominium Property may be sold by a Condominium Owner only to a purchaser that is a Lower-Income Family (i) which agrees to occupy, and certifies in writing that it intends to occupy, such property as a principal residence for at least 12 months and (ii) which enters into an agreement providing for the recapture of seventy-five percent (75%) of the profits from the resale of such property, if such resale takes place within 12 months after such purchase, all as more fully provided in the applicable LURA.

"Effective Date" shall mean ___July   09___, 2002.

"FDIC" shall mean the Federal Deposit Insurance Corporation, acting in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation, pursuant to Section 21A(m)(2) of the Federal Home Loan Bank Act (12 U.S.C. §1441a(m)(2)), and Section 11A of the Federal Deposit Insurance Act (12 U.S.C. §1821a).

"FHLBA" shall mean the Federal Home Loan Bank Act, 12 U.S.C. §1421, et seq.

"Final Rule" shall mean the final rule for the RTC's Affordable Housing Disposition Program, codified at 12 C.F.R. §1609, et seq., as such rule may be modified or amended from time to time by the RTC or its successor.

"Low-Income Restrictions" shall mean occupancy, rent, income and resale restriction set out in Section 21A(c) of the FHLBA (12 U.S.C. §1441a(c)), the Final Rule, and the applicable LURA, including without limitation, the Occupancy Restrictions, the Rent Restrictions and the Resale Restrictions.

"Lower-Income Families" shall mean families and individuals whose annual incomes do not exceed 80 percent of area median income in the area in which the particular Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

"LURA" shall mean the Land Use Restriction Agreement entered into by the Owner, setting forth the Owner's obligation to comply with the applicable occupancy, rent and resale restrictions with respect to the Owner's Property.

"MOU" shall mean this Memorandum of Understanding for Monitoring and Enforcement between the FDIC, acting in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation, and the Agency.

"Multifamily Occupancy Requirement" shall mean the requirement to set-aside a minimum number of units in a Multifamily Property or a Condominium Property (or a group of such Multifamily Properties or Condominium Properties) for occupancy by Lower-Income Families and Very Low-Income Families, in accordance with

Sections 21A(c)(3) and (14) of the FHLBA (12 U.S.C. §1441a(c)(13) and (14)) and the applicable LURA.)

"Multifamily Owners" shall mean owners of Multifamily Property purchased pursuant to Section 21A(c)(3) of the FHLBA (12 U.S.C. §1441a(c)(3)), and any successors in title to such owners.

"Multifamily Property" shall mean the eligible Multifamily Properties purchased by Multifamily Owners pursuant to Section 21A(c)(3) of the FHLBA (12 U.S.C. §1441a(c)(3)), and subject to the Multifamily Occupancy Requirements and the Rent Restrictions.

"Occupancy Requirements" shall mean the Multifamily Occupancy Requirement and the Single Family Occupancy Requirement.

"Owners" shall mean the Multifamily Owners, the Single Family Owners and the Condominium Owners.

"Property" or "Properties" shall mean, individually and collectively, the Multifamily Properties, the Single Family Properties and the Condominium Properties subject to this MOU and listed in Exhibit A hereto.

"Qualifying Units" shall mean the total units in a Property or Properties required to be set aside to meet the Multifamily Occupancy Requirement or the Single Family Occupancy Requirement, as applicable.

"Rent Restrictions" shall mean the applicable rent limits for Qualifying Units in a Property, as provided in the applicable LURA.

"Resale Restrictions" shall mean the Single Family Resale Restrictions and the Condominium Resale Restrictions.

"RTC" shall mean the former Resolution Trust Corporation as established pursuant to Section 501(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended (Section 21A of the Federal Home Loan Bank Act; 12 U.S.C. §1441a).

"Secretary" shall mean the Secretary of Housing and Urban Development.

"Single Family Occupancy Requirement" shall mean the requirement that Single Family Owners set-aside not less than 100% of all eligible Single Family Property for occupancy by Lower-income Families, as evidenced by the applicable LURA.

"Single Family Owners" shall mean nonprofit organizations or governmental agencies which purchased Single Family Property from the RTC or a previous Single Family Owner in accordance with Section 21A(c)(2)(B) of the FHLBA (12 U.S.C. §1441a(c)(2)(B)).

"Single Family Property" shall mean a one-to-four unit property purchased by a Single Family Owner pursuant to Section 21A(c)(2)(B) of the FHLBA (12 U.S.C. §1441a(c)(2)(B)), and subject to the Single Family Occupancy Requirement, the Rent Restrictions and the Single Family Resale Restrictions.

"Single Family Resale Restrictions" shall mean the requirement that a Single Family Property may be sold by a Single Family Owner only to a purchaser that is a Lower-Income Family (i) which agrees to occupy, and certifies in writing that

it intends to occupy, such Single Family Property as principal residence for at least 12 months, and (ii) which enters into an agreement providing for the recapture of seventy-five percent (75%) of the profits from the resale of such property, if such resale takes place within 12 months after such purchase, all as more fully provided in the applicable LURA.

"State" shall mean any state of the United States where properties have been sold through RTC's Affordable Housing Disposition Program and where FDIC has assigned those properties to the Agency to monitor.

"Very Low-Income Families" shall mean families and individuals whose Annual Incomes do not exceed 50 percent of area median income in the area in which the particular property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

2. Monitoring and Enforcement.

(a) Properties and Owners

(i) Inclusion of Properties in Exhibit A - The Properties that the Agency shall monitor under the terms of this MOU, and the Owners thereof, are identified in Exhibit A hereto and incorporated herein. The FDIC may amend Exhibit A at any time to add as Properties additional properties located within the State which have been sold through the RTC's Affordable Housing Disposition Program, upon thirty (30) days written notice to the Agency by registered or certified mail. Upon so amending Exhibit A, the FDIC shall (i) furnish the Agency with copies of the LURA executed with respect to each such property, (ii) advise the Agency as to which of the forms of LURA generally used served as the basis for the LURA for such property and (iii) notify the Agency of any variations in the terms thereof from those of the general form of LURA upon which it was based.

The Agency shall amend Exhibit A to reflect (i) a change in the Owner of a Property as set forth in the related LURA, (ii) the release of a Property from the requirements of the related LURA in accordance with the terms thereof, or (iii) any change in the number of Qualifying Units required to be maintained in a particular property or group of Properties. The Agency shall notify the FDIC in writing within thirty (30) days of making any such amendment to Exhibit A.

(ii) Removal of Properties from Exhibit A - Upon sixty (60) days written notice to the Agency by registered or certified mail, the FDIC may, without cause, amend Exhibit A to remove any Property listed therein from any or all of the requirements of this MOU.

(b) Agreement to Monitor and Enforce Compliance with the LURAs.

The Agency hereby agrees to monitor and enforce, for itself and on behalf of the FDIC, the compliance of the Owners with all occupancy, rent and resale requirements set out in Section 21A(c) of the FHLBA (12 U.S.C. §1441a(c)) and the applicable LURAs, including, but not limited to, the Occupancy Requirements, the Rent Restrictions and the Resale Restrictions.

(c) Compliance Monitoring Procedures.

The specific services that the Agency shall perform pursuant to this MOU are set out in the Compliance Monitoring Manual attached hereto as Exhibit B and incorporated herein by reference. The Agency shall at all times perform its

duties in accordance with the Compliance Monitoring Manual, provided, however, that the Agency shall be and hereby is authorized to take any and all action authorized by the FHLBA, the Final Rule, the LURAs or the laws of the State which may be necessary or desirable, in its discretion, in order to monitor or assure compliance by the Owners and the Properties with the terms of the LURAs, in particular the Low-Income Restrictions. No monitoring or enforcement action taken by the Agency which is otherwise permitted under the FHLBA, the Final Rule, the LURAs or the laws of the State shall fail or be held to be impermissible because it is not specifically identified or authorized in the Compliance Monitoring Manual. The Agency shall carry out its monitoring and enforcement functions in the State.

After prior consultation with the Agency, the FDIC may amend, modify or replace the Compliance Monitoring Manual. The FDIC shall notify in writing and file with the Agency any such amendment, modification or replacement within thirty (30) days after FDIC's authorization and approval thereof. The replacement, amendment, or modification of the Compliance Monitoring Manual shall in no way be deemed to limit the monitoring and enforcement authority of the Agency hereunder, nor to diminish its obligation to assure that the Owners comply fully with the requirements of the LURAs, in particular the Low-Income Restrictions.

Together with the Compliance Monitoring Manual and appended hereto as Exhibit B-2, FDIC is providing the Agency with the standard forms of LURAs used with respect to Properties to be monitored by the Agency within the State. FDIC agrees to consult with the Agency prior to making any changes in the standard forms of LURAs as hereinafter provided to the Agency.

(d) Judicial Enforcement by FDIC and the Agency.

If the Agency shall find that a Property is not in compliance with the Low-Income Restrictions and if the Agency shall determine that administrative measures have not been effective or are not likely to be effective in bringing such Property into compliance, the Agency may commence appropriate judicial enforcement action pursuant to authority provided under the FHLBA, the laws of the State, and/or the terms of the applicable LURA. No less than thirty (30) days prior to actual commencement of such a judicial enforcement action, the Agency shall notify the FDIC in writing of its intent to do so.

If, prior to commencing such an enforcement action or during the prosecution thereof, the Agency shall determine that, for reasons of administrative capacity, the adequacy of compensation pursuant to Section 3 of this MOU, or other reasons unrelated to the merits of the particular enforcement action, it is unwilling to commence or continue such action on its own, the Agency shall so advise the FDIC in writing and the FDIC may take such steps as the FDIC deems appropriate to assure compliance by the Owner(s). Nothing in this MOU shall be deemed to limit the FDIC's authority under the FHLBA, the laws of the United States or the LURAs to carry out such monitoring or enforcement activities with respect to the Low-Income Restrictions as it shall determine to be appropriate.

(e) Agreements with Other Monitoring Agencies.

The Agency is authorized to enter into cooperative agreements with State Housing Finance Agencies (as defined in Section 21A(c)(g)(P) of the FHLBA; 12 U.S.C. §1441A(c)(9)(P)) and/or other parties with responsibility for monitoring or enforcing LURAs governing eligible residential properties, whether such properties are located within or without the State, whenever the Agency determines that any such agreement will further the purposes of this MOU or will

assist any other party in performing monitoring and enforcement activities under a LURA with respect to a Property. Any such cooperative agreement may provide for such division of administrative fees payable under the LURAs which are the subject of such cooperative agreement as the parties thereto deem appropriate, and if such cooperative agreement provides in writing for a division of responsibilities, the assumption of responsibilities by such State Housing Finance Agency or other party shall relieve or discharge the Agency of the responsibility so assumed.

The Agency shall provide the FDIC with written notice of its intent to enter into such an cooperative agreement no less than thirty (30) days prior to the date of actual execution of the agreement. Such written notice shall include a copy of the agreement to be executed.

(f) Agreements for Performance of Monitoring and Enforcement Activities.

The Agency is authorized to enter into agreements with any party to provide for the performance of specific functions under the Compliance Monitoring Manual or for the carrying out of any of its monitoring or enforcement obligations hereunder whenever the Agency determines that any such agreement will further the purposes of this MOU, provided, however, that only the Agency, or another entity authorized under the laws of the State to prosecute, may commence or prosecute judicial enforcement actions in its own name. By entering into any such agreements, the Agency does not relinquish ultimate responsibility for performance of the obligations comprehended by this MOU and the Compliance Monitoring Manual.

The Agency shall provide the FDIC with written notice of its intent to enter into any such agreement no later than thirty (30) days prior to the date of actual execution of the agreement. Such written notice shall include a copy of the agreement to be executed.

(g) Agency as Owner.

FDIC and the Agency agree that, if the Agency shall be the Owner of any Properties, all of the terms hereof and of the Compliance Monitoring Manual shall apply to the Agency with regard to such Properties; provided, however, that in addition, the Agency agrees promptly to notify the FDIC of any finding of noncompliance with respect to any such Property and of the action which it proposes to take to correct such noncompliance; and provided, further, that if the Agency shall own a Property for more than two years, the FDIC shall be authorized to designate another party, whether a governmental agency of the State or any other state, or a private contractor, to carry out monitoring and enforcement activities on its behalf with respect to such Property and to collect the attendant fees.

3. Compensation.

(a) Annual Administrative Fees.

The Agency shall be entitled to collect from the Owners annual administrative fees for performing the monitoring and enforcement services set forth in the Compliance Monitoring Manual. Annual administrative fees shall be payable in such installments and at such times during the year, whether in advance or in arrears, as the Agency shall determine.

(i) Multifamily Property and Condominium Property. The Agency shall be entitled to collect from the Owners of Multifamily Property and Condominium Property an annual administrative fee of $50 per Qualifying Unit; provided, however, that the Agency shall be entitled to collect a minimum fee of $250 per Multifamily Property or Condominium Property. Annual administrative fees shall be adjusted for inflation as provided in the applicable LURAs. The Agency shall not be entitled to collect an administrative fee from a Lower-Income Family that purchases a Qualifying Unit in a Condominium Property in accordance with the resale restrictions set forth in the applicable LURA.

(ii) Single Family Property. The Agency shall be entitled to collect from the Owners of Single Family Property an annual administrative fee of $50 per Property, adjusted for inflation as provided in the applicable LURA.

(b) Property Noncompliance Fees.

Upon finding noncompliance by a Property with the Low-Income Restrictions or the administrative requirements of the LURA, the Agency shall be entitled to charge an annual administrative fee (not exceeding $50 per Qualifying Unit or such other maximum as is applicable under the LURA after adjustment for inflation as provided therein) sufficient to compensate it for the additional monitoring and enforcement activities undertaken. The Agency shall carry out such additional monitoring and enforcement activities for such time period as it determines appropriate to ensure continued compliance by the Property and shall be entitled to compensation for such activities for a period of up to three calendar years following the year of the most recent finding of noncompliance. Any such fees are in addition to, and distinct from, any reimbursements of costs and legal fees to which the Agency may be entitled as a result of judicial enforcement action, and such fees will be payable without regard to whether the Agency undertakes or succeeds in judicial enforcement action.

(c) Conflict With LURAs.

In the event of a conflict between the provisions for payment of fees hereinabove set forth and the terms of a particular LURA, the terms of the LURA shall govern; provided, however, that the Agency shall be permitted to negotiate with the particular Owner for fee terms comparable to those set forth above. If the Agency shall make a finding of noncompliance with respect to a particular Property but shall be unable to collect the fee described in subsection (b) hereof for additional monitoring and enforcement activities because the LURA executed with respect to such Property made no provision for such fee, the Agency may notify the FDIC of any such noncompliance and advise the FDIC that it will not undertake additional monitoring and/or enforcement activities with respect to such Property without receiving equivalent compensation. In such event, FDIC may (i) undertake additional monitoring and enforcement activities directly or (ii) pay to the Agency the additional administrative fee which would have been payable under the applicable LURA had it included the provision for such fees incorporated in the standard form of LURA, in which event the Agency shall undertake appropriate additional monitoring and enforcement activities.

4. Evaluation.

Twelve (12) months after the Effective Date and annually thereafter, the FDIC will evaluate the Agency's performance under this MOU and the Compliance Monitoring Manual. If the FDIC determines, upon an annual evaluation or at any other time, that the Agency's monitoring and enforcement activities hereunder and/or thereunder are unsatisfactory, the FDIC shall provide written notice to

the Agency of the specific items of unsatisfactory performance and provide the Agency a reasonable opportunity to correct such unsatisfactory performance.

5. Semi-Annual Reports.

The Agency shall timely prepare and provide to the appropriate FDIC regional office and to the Washington office of the FDIC, each at the addresses provided hereinafter at Section 12, for each semi-annual period or portion thereof in which this MOU is in effect, the first such period being deemed to have commenced on the Effective Date, a report of its activities hereunder, setting forth (i) the names of the Owners and a description of the Properties, (ii) a description of the monitoring activities the Agency has undertaken with respect to the Owners and the Properties, (iii) based on such monitoring activities, a list of those Properties which are not in compliance with the Low-Income Restrictions, and (iv) if a Property is not in compliance, a description of the nature of the noncompliance and the enforcement activities the Agency has undertaken with respect to such noncompliance.

6. Record Retention; FDIC's Right to Examine Books and Records; Examination of Records by Comptroller General.

(a) The Agency shall maintain all files and records pertaining to its performance under this MOU at a single location which is secure and accessible. Records shall be retained with respect to the Agency's activities hereunder during the most recent calendar year and the three preceding calendar years.

(b) At all times during the term of this MOU and at all times during the three year period following the expiration or termination of this MOU, the FDIC and its duly authorized agents, representatives or employees may, upon not fewer than five business days' notice and at such reasonable times as the FDIC may determine, inspect, audit, and copy, at the FDIC's expense and on the premises of the Agency if appropriate facilities are available, any of the Agency's records, reports and related materials pertaining to the Agency's performance under this MOU.

(c) The Comptroller General of the United States or a duly authorized representative from the General Accounting Office shall, until three (3) years following the expiration or termination of this MOU, have access to, and the right to examine, any property within the Agency's possession or control, involving transactions related to this MOU.

7. Term of MOU and Compliance Monitoring Manual.

Unless earlier terminated in accordance with the terms hereof, the term of this MOU shall commence on the Effective Date and terminate at such time as there shall be no LURA applicable to any of the Properties. The Agency shall not be responsible for assuring compliance of the Properties prior to the Effective Date, but shall take appropriate steps, in accordance with the Compliance Monitoring Manual, to bring any non-complying Properties into compliance.

8. Termination.

(a) The FDIC may terminate this MOU without cause upon one hundred and twenty (120) days' written notice to the Agency by registered or certified mail, except that the FDIC may, upon thirty (30) days' written notice to the Agency by registered or certified mail, terminate this MOU for cause, upon the happening of either of the following events:

(i) FDIC, in its sole discretion, determines that the Agency has ceased to be a non-profit corporation authorized to operate in the State of Texas; or

(ii) The Agency materially fails to perform the services set out in the Compliance Monitoring Manual, or if there is no Compliance Monitoring Manual in effect, fails to undertake sufficient monitoring and enforcement activities to ensure compliance by the Properties with the Low-Income Restrictions, provided that in any such instance, the Agency shall have been provided with notice and an opportunity to correct any items of unsatisfactory performance in accordance with Section 4 of this MOU and shall have failed to do so.

(b) The Agency may terminate this MOU without cause upon ninety (90) days written notice to the FDIC by registered or certified mail. In addition, the Agency may, upon thirty (30) days written notice to the FDIC by registered or certified mail, provide for a substitute agency of the State, reasonably satisfactory to the FDIC, to carry out its responsibilities hereunder.

The Agency may also terminate this MOU immediately upon the cessation of its authority to operate under the laws of the State or its authority to carry out the activities required hereunder; provided, however, that the Agency agrees to notify the FDIC of any such cessation which is required to occur under the laws of the State no later than (90) days prior to the scheduled date for such cessation.

(c) Except as provided in the paragraph (d), upon any termination of this MOU, the Agency shall, no later than the date of termination, (i) prepare and provide to the FDIC a report of the type required pursuant to Section 5 hereof with respect to its activities for the period subsequent to the last such report and (ii) pay to the FDIC the proportional share of the annual administrative fee payable with respect to each Property for the part of the annual period applicable to such Properties occurring after the date of termination. If Exhibit A is amended by the FDIC pursuant to paragraph 2(a)(ii) of this MOU, the Agency shall pay to the FDIC the proportional share of the annual administrative fee payable with respect to such Property for the part of the annual period applicable to such Property occurring after the date of such amendment.

(d) If a substitute agency of the State is approved by the FDIC to undertake the responsibilities of the Agency hereunder, such event shall not be treated as a termination of this MOU, provided that the Agency and its successor shall have satisfactorily resolved each party's entitlement to annual administrative fees for the period in which the succession occurs.

9. Exclusive Monitoring and Enforcement Agent.

Except for monitoring and enforcement activities undertaken by the FDIC and except as otherwise specifically provided in this MOU or authorized by the Final Rule or Section 21A of the FHLBA (12 U.S.C. §1441a), the Agency shall have the sole responsibility for the performance of monitoring and enforcement activities under the LURAs with respect to Properties located within the State; provided, however, that any alleged or actual violation of this provision or any other provision of this MOU shall not be a defense against any monitoring or enforcement action taken against an Owner of a Property by the Agency or any other entity, but shall only concern matters between the FDIC and the Agency, including the right to compensation for activities performed hereunder.

10. Indemnification of the Agency.

If any judicial action or legal proceeding shall be instituted against the Agency by a third party with respect to any action of the Agency which is authorized by the applicable Land Use Restriction Agreement or the Compliance Monitoring Manual or which is otherwise authorized in writing by the FDIC, the FDIC shall indemnify and hold the Agency harmless from and against any and all loss, damage and expense which the Agency may sustain or incur by reason thereof, including, without limitation, the amount of any judgment, plus and costs and interest thereon, which may be entered against the Agency, as well as reasonable attorneys, fees and expenses paid or incurred in connection therewith.

In order to avail itself of such indemnity, the Agency must (i) notify the FDIC immediately upon receiving notice of or information as to any such judicial action or legal proceeding, (ii) provide the FDIC with an opportunity to defend the Agency and/or itself in such action or proceeding with counsel chosen by the FDIC, provided that the Agency shall be entitled to be represented by separate counsel with respect to any claim in which the Agency believes its interests to be adverse to those of the FDIC, and (iii) cooperate fully with the FDIC in any such defense. Notwithstanding the foregoing, the FDIC shall not indemnify and hold the Agency harmless with respect to any judicial action, legal proceeding, or settlement not previously submitted to, reviewed and approved by the FDIC, or the consequences thereof, (I) which is based on acts, failures to act or omissions of the Agency which are determined by a court or in a legal proceeding to be ultra vires or to constitute grounds for a writ of mandamus or to constitute negligence, gross negligence or willful misconduct or (II) in which the Agency is adjudged to have failed to perform its monitoring or enforcement obligations hereunder or under the Compliance Manual or the applicable Land Use Restriction Agreement.

11. Liability of the FDIC

Any financial liability of the FDIC under this MOU, including any obligation to indemnify the Agency pursuant to paragraph 10 above, shall be a liability of the FSLIC Resolution Fund and shall be limited to the resources available in such Fund.

12. Entire Agreement/Modification.

This MOU contains the entire understanding of the parties. The terms contained in this MOU shall not be modified or amended except as agreed to by the parties hereto in writing.

13. Notices.

All notices required or permitted to be given hereunder shall be in writing and deemed given when mailed to such party at its address set forth below:

To FDIC:

Federal Deposit Insurance Corporation
1910 Pacific Avenue
Dallas, Texas 75201
Attn: Affordable Housing Section Chief

With a copy to:

Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C. 20429.
Attn: Director, Office Of Affordable Housing

To the Agency:

Affordable Housing Group, Inc.
1910 ESE Loop 323, #: 329
Tyler, Texas 75701
Attn: Deidra D. Young, Director of Compliance

Either party may change its address for notice purposes by giving notice to the other party in accordance with this Section

14. Successor to the FDIC.

If the FDIC shall cease to manage the FSLIC Resolution Fund or if the FSLIC Resolution Fund shall cease to exist as a specific entity, all rights and obligations hereunder shall be transferred to any successor entity thereto, unless the laws of the United States shall specifically assign the responsibility for the monitoring and enforcement of the Low-Income Restrictions to a different entity, in which case such entity shall assume the rights and obligations hereunder. All references to the FDIC or to the RTC hereunder or in the LURAs shall, unless the context shall clearly indicate otherwise, be deemed to refer to any entity succeeding the rights and obligations hereunder.

15. Severability.

If any provision of this MOU is held to be unenforceable, invalid or illegal by any court of competent jurisdiction, such unenforceable, invalid or illegal provision shall not affect the remainder of this MOU.

16. Governing Law.

This MOU shall be construed in accordance with and governed by the laws of the United States.

17. Survival.

The provisions contained in this MOU which, by their terms, require performance after the expiration or termination of this MOU, shall be enforceable notwithstanding the expiration or other termination of this MOU.

18. Counterparts.

This MOU may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, each party has caused this instrument to be signed on its behalf by its duly authorized agents.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation

By: _____
Name Gary Holloway
Asset Disposition & Operations

Date: ___JULY 9 2002___

AFFORDABLE HOUSING GROUP, INC.

By: _____
Name:  Donald Cage
Title:  President

Date: ___July 5, 2002___

EXHIBIT A

LIST OF PROPERTIES AND OWNERS

[EXHIBIT SHOULD IDENTIFY FOR EACH PROPERTY: (I) OWNER; (II) PROPERTY ADDRESS;
(III) TOTAL NUMBER OF UNITS; (IV) NUMBERS OF LOW-INCOME AND VERY LOW-INCOME
UNITS; (V) MORTGAGE LENDER, IF KNOWN. IF ANY PROPERTIES ARE PART OF A BULK SALE
COMPLIANCE REGIME, SUCH PROPERTIES SHOULD BE IDENTIFIED SEPARATELY, TOGETHER
WITH ALL PROPERTIES SUBJECT TO SUCH REGIME.]

MEMORANDUM OF UNDERSTANDING                              PAGE 5
AFFORDABLE HOUSING GROUP, INC.

2

MEL WILLS JR., CLERK OF THE CIRCUIT COURT - OSCEOLA CTY    BK   1180
04/04/94  16:25   VERIFIED: TAB  INSTR #   94-025302       PG   0185

## LAND USE RESTRICTION AGREEMENT
### BY AND BETWEEN

RESOLUTION TRUST CORPORATION AS RECEIVER
FOR SOUTHWEST FEDERAL SAVINGS ASSOCIATION
DALLAS, TEXAS

AND

FLORIDA HOUSING AFFORDABILITY, INC.,
A FLORIDA NOT FOR PROFIT CORPORATION

(MULTIFAMILY PROPERTIES)

NOTE:  THIS DOCUMENT MUST BE REFERENCED IN THE DEED, AND MUST BE
RECORDED AND TIME STAMPED IMMEDIATELY AFTER THE DEED

Prepared By and Return To:
Bernice S. Saxon, Esq.
Salem, Saxon & Nielsen, P.A.
P.O. Box 3399
Tampa, FL  33601

October 1992
Version 2.0

| BOOK   1180   PAGE   0186 |

## TABLE OF CONTENTS

Page

### ARTICLE I

**Definitions**. . . . . . . . . . . . . . . . . . . . . . .    1

Section 1.1.   General . . . . . . . . . . . . . . .    1
Section 1.2.   Generic Terms . . . . . . . . . . . .    4

### ARTICLE II

**Use and Occupancy of the Property**. . . . . . . . . . .    4

Section 2.1.   Use of the Property . . . . . . . . . .    4
Section 2.2.   Occupancy Requirements. . . . . . . . .    5

### ARTICLE III

**Rent** . . . . . . . . . . . . . . . . . . . . . . . . .    7

Section 3.1   Rent Limitations for Qualified Tenants. . .    7

### ARTICLE IV

**Administration** . . . . . . . . . . . . . . . . . . . .    8

Section 4.1.   Lease Provisions. . . . . . . . . . . .    8
Section 4.2.   Examination and Reexamination of Incomes.    9
Section 4.3.   Certification by Owner. . . . . . . . .    9
Section 4.4.   Maintenance of Documents. . . . . . . .    9
Section 4.5.   Compliance Review . . . . . . . . . . .   10
Section 4.6.   Administrative Fee. . . . . . . . . . .   10
Section 4.7.   Releases . . . . . . . . . . . . . . .   11

### ARTICLE V

**Representations and Warranties of Owner**. . . . . . . .   11

Section 5.1.   Representations and Warranties . . . . .   11
Section 5.2.   Indemnification . . . . . . . . . . . .   12

i

| BOOK   1180   PAGE   0187 |

Page

ARTICLE VI

Enforcement and Remedies . . . . . . . . . . . . . . . . . .   13

Section 6.1.   Remedies of RTC or the Agency . . . . . . .   13
Section 6.2.   Remedies of Other Parties . . . . . . . . .   13
Section 6.3.   Reliance Upon Information . . . . . . . . .   13


ARTICLE VII

Miscellaneous . . . . . . . . . . . . . . . . . . . . . . .   14

Section   7.1.   Amendments. . . . . . . . . . . . . . . .   14
Section   7.2.   Notices . . . . . . . . . . . . . . . . .   14
Section   7.3.   Entire Agreement. . . . . . . . . . . . .   15
Section   7.4.   Governing Law . . . . . . . . . . . . . .   15
Section   7.5.   Severability. . . . . . . . . . . . . . .   15
Section   7.6.   Binding Effect; Covenants Running with
                 the Land . . . . . . . . . . . . . . . . .   15
Section   7.7.   Counterparts. . . . . . . . . . . . . . .   16
Section   7.8.   Section Titles. . . . . . . . . . . . . .   16

ii

| BOOK   1180   PAGE   0188 |

## LAND USE RESTRICTION AGREEMENT

THIS LAND USE RESTRICTION AGREEMENT (this "Agreement") is made and entered into this 31st day of March, 1994, by and between Resolution Trust Corporation, established pursuant to Section 501(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, acting in its capacity as Receiver for Southwest Federal Savings Association, Dallas, Texas ("Seller"), and FLORIDA Housing Affordability, Inc., a Florida not for profit corporation ("Owner").

### Recitals

Owner has purchased from RTC certain land described on Exhibit A attached hereto and incorporated herein by reference, together with the improvements located thereon, including a 192-unit rental housing project commonly known as Three Fountains Apartments (said land and improvements are hereinafter collectively referred to as the "Property"), which constitute an "eligible multifamily housing property" as defined in Section 21A(c)(3)(D) of the Federal Home Loan Bank Act (12 U.S.C. §1441a(c)(3)(D)), as amended.

Pursuant to Section 21A(c) of the Federal Home Loan Bank Act (12 U.S.C. §1441a(c)), as amended, Owner must agree to comply with certain occupancy and rent restrictions for the remaining useful life of the Property, and the parties hereto have entered into this Agreement to evidence Owner's agreement to comply with such restrictions.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

### ARTICLE I

### Definitions

Section 1.1.   General.   Capitalized terms used in this Agreement shall have, unless the context clearly requires otherwise, the meanings specified in this Article I. Certain additional terms may be defined elsewhere in this Agreement.

1

(a) "Act" means Section 21A of the Federal Home Loan Bank Act (12 U.S.C. §1441a), as amended, or any corresponding provision or provisions of succeeding law as it or they may be amended from time to time.

(b) "Agency" means the State Housing Finance Agency or any agency, corporation or authority of the United States government that normally engages in activities related to the preservation of affordable housing which is a successor to or assignee of RTC with respect to its powers and responsibilities hereunder.

(c) "Annual Income" means "income" as defined in Section 3(b)(4) of the United States Housing Act of 1937 and as determined in accordance with the regulations thereunder promulgated by the Secretary.

(d) "Agreement" means this Land Use Restriction Agreement, as it may from time to time be amended.

(e) "Lower-Income Families" means families and individuals whose Annual Incomes do not exceed 80 percent of area median income in the area in which the Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

(f) "Owner" means Florida Housing Affordability, Inc., a Florida non-profit corporation, as set forth at the beginning of this Agreement, or any successor in title to the Property.

(g) "Qualified Tenant" means a family or individual tenant of a Qualifying Unit who satisfies the requirements of Section 2.2(a) of this Agreement with respect to such Qualifying Unit.

(h) "Qualifying Unit" means a Unit that (i) is rented to either a Lower-Income Family or Very Low-Income Family and (ii) is used in complying with the lower income occupancy requirements of Section 2.2(a). Any Unit rented to a Lower-Income Family or Very Low Income Family that is not needed to meet the lower income occupancy requirements of Section 2.2(a) will not be deemed a Qualifying Unit and will not be subject to the rent restrictions of Article IV.

(i) "RTC" means the Resolution Trust Corporation, established pursuant to Section 501(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended.

(j) "Regulations" means the regulations promulgated pursuant to the Act by RTC or any successor, as amended from time to time.

| BOOK   1180   PAGE   0190 |

(k)   "Related Entity" means, with respect to any party which has been an Owner hereunder: (i) any spouse, parent, child, grandchild, brother or sister of such Owner; or (ii) any person or entity (A) that directly or indirectly controls or is controlled by or is under common control with such Owner, (B) that is an officer of, partner in or trustee of, or serves in a similar capacity with respect to, such Owner or of which such Owner is an officer, partner or trustee, or with respect to which such Owner serves in a similar capacity, or (C) that is the beneficial owner, directly or indirectly, of 10% or more of any class of equity securities of such Owner or of which such Owner is directly or indirectly the owner of 10% or more of any class of equity securities.

(l)   "Secretary" means the Secretary of Housing and Urban Development.

(m)   "State" means the state in which the Property is located.

(n)   "State Housing Finance Agency" means the public agency, authority, corporation, or other instrumentality of the State that has the authority to provide residential mortgage loan financing throughout the State.

(o)   "Term" means the period commencing on the date hereof and continuing until the earliest to occur of the following:

(1)   the date upon which there is an involuntary loss of the Property by Owner caused by seizure, condemnation, foreclosure or deed in lieu of foreclosure of a mortgage or deed of trust securing a bona fide loan from an institutional lender, or upon which there is a change in federal law which prevents RTC or the Agency from enforcing this Agreement; provided, however, that in the event of loss of the Property by foreclosure or deed in lieu of foreclosure, if the party which was Owner at the time of or immediately prior to such foreclosure or deed in lieu of foreclosure, or a Related Entity of such party, acquires an ownership interest in the Property at any time thereafter, then the covenants and restrictions set forth in this Agreement shall be revived and shall remain in force until the further occurrence of an event described in this subsection;

(2)   the date upon which there is a total involuntary loss of the use of the Property for residential housing purposes by Owner caused by fire or other casualty;

(3)   the date upon which there is a partial involuntary loss of the Property, or of the use thereof for residential housing purposes, caused by seizure or condemnation or by fire or other casualty, which partial loss shall not have been restored through repair or other restoration measure, in which event the covenants and restrictions hereof shall be modified to reflect the appropriate numbers of Units to be held available for Lower Income

3

| BOOK  1180  PAGE  0191 |

Families and Very Low-Income Families, based upon the reduced number of Units in the Property and the percentages of Units for Lower-Income Families and Very Low-Income Families previously required to be maintained in the Property, which covenants and restrictions shall remain in effect for the remainder of the Term;

(4)  the date upon which RTC or the Agency determines, in accordance with the Regulations, (i) that all or a portion of the Property is obsolete as to physical condition, location or other factors, making it unusable for housing purposes, and (ii) that no reasonable program of modifications is financially feasible to return the Property or a portion of the Property to useful life; or

(5)  the date which is the later of (i) forty (40) years from the date of this Agreement or (ii) fifty (50) years from the date the Property was initially occupied as multifamily housing.

(p)  "Unit" means a residential accommodation constituting a part of the Property and containing separate and complete living facilities.

(q)  "Very Low-Income Families" means families and individuals whose Annual Incomes do not exceed 50 percent of area median income in the area in which the Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

Section 1.2.  Generic Terms.  Unless the context clearly indicates otherwise, where appropriate the singular shall include the plural and the masculine shall include the feminine or neuter, and vice versa, to the extent necessary to give the terms defined in this Article I and/or the terms otherwise used in this Agreement their proper meanings.

ARTICLE II

Use and Occupancy of the Property

Section 2.1.  Use of the Property.  During the Term, Owner will maintain the Property as multifamily rental housing and will rent or hold available for rental each Unit on a continuous basis; provided, however, that Owner may convert a portion of the Property to a use other than multifamily rental housing if Owner shall continue to observe and perform the covenants and restrictions contained in Sections 2.2 and 3.1 hereof.

4

| BOOK   1180   PAGE   0192 |

Section 2.2.   Occupancy Requirements.

(a)   Subject to subsections (c) and (d), during the Term, Owner will make continuously available for occupancy by Lower-Income Families as Qualifying Units (including compliance with Article III hereof) not less than 192 Units, of which not less than 39 Units shall be made available for occupancy by Very Low-Income Families.   Owner shall use its best efforts, subject to current market conditions, (i) to distribute Units reserved for Lower-Income Families and Very Low-Income Families among unit sizes in proportion to the distribution of unit sizes in the Property and (ii) to avoid concentration of Lower-Income Families or Very Low-Income Families in any area or areas of the Property.

(b)   (i)   The determination of whether the Annual Income of a family or individual occupying or seeking to occupy a Qualifying Unit exceeds the applicable income limit shall be made prior to admission of such family or individual to occupancy in a Qualifying Unit (or to designation of a Unit occupied by such family or individual as a Qualifying Unit), except that with respect to families or individuals occupying Units on the date hereof, such determination shall be made within 60 days prior to the designation if any such Unit as a Qualifying Unit.   Thereafter such determination shall be made at least annually on the basis of an examination or reexamination of the current income of the family or individual.

(ii)   If the Annual Income of a Qualified Tenant which is a Very Low-Income Family shall be determined upon reexamination to exceed the applicable income limit for Very Low-Income Families, but not the applicable income limit for Lower-Income Families, the Unit shall be counted as occupied by a Qualified Tenant which is a Lower-Income Family other than a Very Low-Income Family during such family's or individual's continuing occupancy of such Unit in accordance with clause (iii) below, and Owner shall be required to make the next available Qualifying Unit available for occupancy in accordance with clause (iv) below.

(iii)   If the Annual Income of a Qualified Tenant shall be determined upon reexamination to exceed the applicable income limit for Lower-Income Families, the Unit occupied by such family or individual shall be counted as occupied by a Qualified Tenant (and such family shall be considered, for purposes of subsection (a) and Article III, a Qualified Tenant which is a Lower-Income Family other than a Very Low-Income Family) so long as (A) the Annual Income of such family or individual shall not be determined to exceed 140 percent of the applicable income limit for Lower-Income Families, or (B) if the Annual Income of such family or individual shall be determined to exceed 140 percent of the applicable income limit for Lower-Income Families, so long as each

5

Unit of comparable or smaller size in the Property which is or becomes available is occupied or held available for occupancy by a new resident whose Annual Income does not exceed the applicable income limit for Lower-Income Families (or a Unit other than a Qualifying Unit occupied by a family or individual whose Annual Income is determined to not exceed the applicable income limit for Lower-Income Families is designated a Qualified Unit) until the occupancy requirements of subsection (a) are met without counting such over-income family or individual. If the Annual Income of a Qualified Tenant shall be determined to exceed 140 percent of the applicable income limit for Lower-Income Families, Owner shall not be required to observe, with respect to such tenant, the restrictions on maximum rents provided under Article III.

(iv)  If the required occupancy by Very Low-Income Families is not met at any time, but the requirement as to occupancy by Lower-Income Families other than Very Low-Income Families is met, Owner shall be required to make each available Unit in the Property available to a Very Low-Income Family until the required occupancy by Very Low-Income Families is achieved. If the required occupancy by Very Low-Income Families is not met at any time but the total requirement as to occupancy by Lower-Income Families including Very Low-Income Families is met, Owner shall not be required to make the next available Unit in the Property available to a Very Low-Income Family, but shall be required to make each Qualifying Unit vacated by a Lower-Income Family available for occupancy by a Very Low-Income Family until the required occupancy by Very Low-Income Families is achieved. Notwithstanding the foregoing two sentences, the State Housing Finance Agency may, upon application by Owner, permit any such Qualifying Unit to be rented to a Lower-Income Family other than a Very Low-Income Family if the Agency determines (i) that Owner has taken reasonable steps to rent such Unit to a Very Low-Income Family and has been unable to do so and (ii) that continued vacancy will cause financial hardship to the Property. If the Agency shall not have responded to an application by Owner pursuant to the preceding sentence within 90 days from the date of submission thereof, such application shall be deemed to have been granted.

(v)  If neither the required occupancy by Very Low-Income Families nor the required occupancy by Lower-Income Families other than Very Low-Income Families is met at any time, preference (as between potential tenants of a waiting list or simultaneous applicants) must be given to Very Low-Income Families in the renting of each Unit in the Property which becomes available until the requirement as to occupancy by Lower-Income Families other than Very Low-Income Families is met, after which the rule of clause (iv) will apply, if necessary.

(vi)  A Unit that was occupied by a Qualified Tenant and becomes vacant shall be counted as occupied by a Qualified Tenant until it is reoccupied for a period in excess of thirty-one

6

(31) days, at which time the Unit shall be considered to be occupied by a Qualified Tenant only if the family or individual then occupying the unit satisfies the definition of a Qualified Tenant.

(c)     (i) Anything to the contrary in the foregoing notwithstanding, Owner will not terminate the occupancy of any tenants in occupancy on the date hereof that are not Lower-Income Families or Very Low-Income Families for purposes of meeting the requirements of this Section. In the event that Owner is unable to comply with the occupancy requirements of this Section because of the occupancy at the date hereof of any Units by tenants who are not Lower-Income Families or Very Low-Income Families, or who have not been determined to be Qualified Tenants, Owner will be in compliance with this Section if each Unit which thereafter becomes vacant is occupied or held available for occupancy by Lower-Income Families or Very Low-Income Families, as the case may be, in accordance with the requirements of subsection (b) until the lower-income occupancy requirements of such subsection are met.

(ii) If a Unit has been designated as or determined to be a Qualifying Unit, Owner must continue to treat such Unit as a Qualifying Unit for as long as it is continuously occupied by a tenant whose income does not exceed 140 percent of the applicable income limit for Lower-Income Families.

(d) Notwithstanding the foregoing, the Secretary or the State Housing Finance Agency may, upon application by Owner, temporarily reduce the lower-income occupancy requirements set forth in subsection (a) if the Secretary or the State Housing Finance Agency determines that Owner's compliance with such requirements is no longer financially feasible. Owner will make a good-faith effort to return the lower-income occupancy to the level required by subsection (a), and the Secretary or the State Housing Finance Agency, as appropriate, will review the reduction annually to determine whether financial infeasibility continues to exist.

## ARTICLE III

### Rent

Section 3.1 Rent Limitations for Qualified Tenants.

(a)     (i) The rent charged by Owner for Qualifying Units occupied by Very Low Income Families shall not exceed the maximum rent for Qualified Tenants who are Very Low-Income Families for units of the applicable size in the area, as established by RTC or the Agency or the Secretary. Such maximum rent shall be not greater than 30% of the adjusted income of a family whose income equals 50% of area median income, with adjustment for family size based upon unit type.

7

| BOOK    1180    PAGE    0195 |

(ii) The rent charged by Owner for Qualifying Units occupied by Lower-Income Families other than Very Low-Income Families shall not exceed the maximum rent for Qualified Tenants who are Lower-Income Families other than Very Low-Income Families for units of the applicable size in the area, as established by RTC or the Agency or the Secretary. Such maximum rent shall be not greater than 30% of the adjusted income of a family whose income equals 65% of area median income, with adjustment for family size based upon unit type.

(iii)    For purposes of calculating maximum rents under this section, (x) the adjustment for family size based upon unit type shall be calculated on the basis of the number of bedrooms in such unit as set forth at Exhibit B hereto and (y) the adjusted income of a family shall be calculated by subtracting from the annual income of a family at the applicable maximum income level the specific adjustments set forth at Exhibit B hereto.

(b)    Owner may make a written request to RTC for the schedule of maximum rents applicable to the Property as of the date hereof, and RTC shall provide such schedule within thirty days after (i) the date hereof or (ii) the date RTC receives such request, whichever is later.    Such rents shall be subject to annual adjustment upon publication by the U.S. Department of Housing and Urban Development of revised income limits for area lower-income and very low-income families, which adjustment shall be based upon changes in the applicable area median income limits.

(c)    If a Qualified Tenant ceases to be considered a Qualified Tenant in accordance with Section 2.2(b), Owner shall, subject to the terms of the lease and applicable law, be free to condition such family's or individual's continued occupancy in the Property upon its payment of a rental charge not subject to the limitations of this Article III.

ARTICLE IV.

Administration

Section 4.1. Lease Provisions.  All tenant leases entered into with Qualified Tenants during the Term shall contain provisions wherein each individual lessee (i) certifies the accuracy of the information provided in connection with the examination or reexamination of Annual Income of the household of such lessee, and (ii) agrees that the Annual Income and other eligibility requirements shall be deemed substantial and material obligations of his or her tenancy, that he or she will comply promptly with all requests for information with respect thereto from Owner or RTC or the Agency, and that his or her failure to provide accurate information regarding such requirements (regardless of whether such inaccuracy is intentional or unintentional) or refusal to comply

8

with a request for information with respect thereto shall be deemed a violation of a substantial obligation of his or her tenancy and constitute cause for immediate termination thereof.

Section 4.2. Examination and Reexamination of Incomes.

(a) Owner shall be responsible for determination of the Annual Income and family composition of Qualified Tenants, and for reexamination of Annual Income and family composition of Qualified Tenants at least annually, in accordance with procedures prescribed by RTC or the Agency.

(b) As a condition of admission to occupancy of a Qualifying Unit, Owner shall require the household head and other such household members as it designates to execute an RTC or Agency approved release and consent authorizing any depository or private source of income, or any Federal, State or local agency, to furnish or release to Owner and to RTC or the Agency such information as Owner or RTC or the Agency determines to be necessary. Owner shall also require the household to submit directly documentation determined to be necessary. Information or documentation shall be determined to be necessary if it is required for purposes of determining or auditing a household's eligibility as a Qualified Tenant, or for verifying related information. The use or disclosure of information obtained from a household or from another source pursuant to this release and consent shall be limited to purposes directly connected with administration of this Agreement.

(c) Owner shall not be deemed to be in violation of Articles II and III of this Agreement if, in determining Annual Income and family composition of a Qualified Tenant, (i) Owner has relied in good-faith upon information which is supplied to Owner by the tenant, (ii) Owner has no reason to believe such information is false, and (iii) Owner shall have complied with all requirements of RTC or the Agency with respect to verification of household income and family composition.

Section 4.3. Certification by Owner. During the Term, on each anniversary of the date upon which this Agreement was first recorded in the land records of the jurisdiction in which the Property is located, or upon such other annual date as RTC or the Agency, in its discretion, upon reasonable notice to the Owner, shall establish, Owner shall submit to RTC or the Agency a certification, in a form prescribed by RTC or the Agency, as to Owner's compliance with all of the terms and provisions of this Agreement.

Section 4.4. Maintenance of Documents. All tenant lists, applications, leases, waiting lists, income examinations and reexaminations relating to the Property shall at all times be kept separate and identifiable from any other business of Owner which is unrelated to the Property, and shall be maintained, as required by

9

| BOOK  1180  PAGE  0197 |

RTC or the Agency, in a reasonable condition for proper audit and subject to examination and photocopying during business hours by representatives of RTC or the Agency.

Section 4.5. <u>Compliance Review</u>.  RTC or the Agency periodically will monitor Owner's compliance with the requirements of this Agreement. In conducting its compliance review, RTC or the Agency will rely primarily on information obtained from Owner's records, reports, findings from on-site monitoring, and audit reports. RTC or the Agency may also consider relevant information gained from other sources, including litigation and citizen complaints. Owner shall cooperate with RTC or the Agency in any such compliance review and shall furnish all notices, information and reports reasonably required by RTC or the Agency for such purpose.

Section 4.6.    <u>Administrative Fee</u>.

(a)  In order to compensate RTC or the Agency for the review performed pursuant to Section 4.5, Owner shall pay to RTC (in its corporate capacity and not as receiver or conservator for the savings institution identified on the first page of this Agreement) or the Agency, as applicable, an annual administrative fee for the first twelve month period of this Agreement in the amount of $50 per Qualifying Unit required to be held available under Section 2.2(a) hereof, but in no event less than $250.

(b)  If RTC or the Agency shall find the Property not to be in compliance with the terms hereof (including the requirements of this Article IV), Owner shall pay to RTC or the Agency, as applicable, an additional administrative fee in an amount prescribed from time to time by RTC or the Agency, which amount, for the first twelve month period of this Agreement, shall be $50 per Qualifying Unit required to be held available under Section 2.2(a) hereof, for additional monitoring and enforcement activities undertaken with respect to the Property. The annual fee payable in the event of noncompliance shall be in addition to, and distinct from, the amount due pursuant to Section 4.6(a), as well as any reimbursements of costs and legal fees to which RTC or the Agency may be entitled as a result of judicial enforcement action, and such fee shall be payable without respect to whether RTC or the Agency undertakes or succeeds in judicial enforcement action. RTC or the Agency shall be entitled to undertake additional monitoring and enforcement activities, and to be compensated therefor, for a period of up to three years following its most recent finding of noncompliance with respect to the Property.

(c)  For each twelve month period after the first twelve month period of this Agreement, the administrative fees payable hereunder shall be the amounts set forth in subsections (a) and (b) of this Section 4.6, as applicable, multiplied by the increase in the

10

| BOOK  1180  PAGE  0198 |

Consumer Price Index for All Urban Consumers (CPI-U) published by the Bureau of Labor Statistics of the United States Department of Labor (or any generally recognized successor to such Index) between the date hereof and the latest publication of such Index immediately preceding the applicable anniversary date of this Agreement.

Section 4.7.  Releases.

(a)  RTC shall --

(i)  execute such documents as may be required to evidence release of the Property from the covenants and restrictions set forth in this Agreement based upon the expiration of the Term as provided in section 1.1(o) hereof (subject, in the event of foreclosure or deed in lieu of foreclosure, to revival as set forth in Section 1.1(o)(1)), upon receipt from Owner of a certification as to the occurrence of the event giving rise to such expiration and such other evidence as RTC or the Agency may reasonably require; and

(ii)  execute an appropriate modification to this Agreement to reflect reduced requirements for occupancy by Qualified Tenants in the event of a partial loss of the Property as provided in Section 1.1(o)(3) hereof.

(b)  If RTC shall have contracted with the Agency for the performance of its responsibilities hereunder, the Agency shall execute the appropriate release and/or modification to this Agreement in the name of RTC in accordance with the terms of subsection (a) of this Section 4.7 and shall provide appropriate evidence to Owner of its authorization so to act in the name of RTC.

ARTICLE V

Representations and Warranties of Owner

Section 5.1.   Representations and Warranties.   Owner represents and warrants to RTC that:

(a)  Valid Execution.   Owner has validly executed this Agreement and the same constitutes the binding obligation of Owner. Owner has full power, authority and capacity (i) to enter into this Agreement, (ii) to carry out Owner's obligations as described in this Agreement and (iii) to assume responsibility for compliance with all applicable federal rules and regulations, including, without limitation, the Regulations.

(b)  No Conflict or Contractual Violation.   To the best of Owner's knowledge the making of this Agreement and Owner's obligations hereunder:

11

| BOOK   1180   PAGE   0199 |

(i) will not violate any contractual covenants or restrictions (A) between Owner or any third party or (B) affecting the Property;.

(ii) will not conflict with any of the instruments that create or establish Owner's authority;

(iii)    will not conflict with any applicable public or private restrictions;

(iv) do not require any consent or approval of any public or private authority which has not already been obtained; and

(v) are not threatened with invalidity or unenforceability by any action, proceeding or investigation pending or threatened, by or against (A) Owner, without regard to capacity, (B) any Person with whom Owner may be jointly or severally liable, or (C) the Property or any part thereof.

(c) No Litigation. No litigation or proceedings are pending or to the best of Owner's knowledge, threatened against Owner which if adversely determined could individually or in the aggregate have an adverse effect on title to or the use and enjoyment or value of the Property, or any portion thereof, or which could in any way interfere with the consummation of this Agreement.

(d) No Bankruptcy. There is not pending or, to Owner's best knowledge, threatened against Owner any case or proceeding or other action in bankruptcy, whether voluntary or otherwise, any assignment for the benefit of creditors, or any petition seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for Owner under any federal, state or other statute, law, regulation relating to bankruptcy, insolvency or relief for debtors.

Section 5.2.   Indemnification.   Owner agrees to indemnify and hold harmless RTC or the Agency from and against all liabilities, losses, claims, damages, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by RTC or the Agency as a result of any material inaccuracy in any of the representations and warranties contained in Section 5.1.

12

| BOOK  1180   PAGE   0200 |

## ARTICLE VI

### Enforcement and Remedies

Section 6.1.   <u>Remedies of RTC or the Agency.</u>

(a)  If Owner defaults in the performance of any of its obligations under this' Agreement or breaches any covenant, agreement or restriction set forth herein, and if such default remains uncured for a period of sixty (60) days after notice thereof shall have been given by RTC or the Agency (or for an extended period approved in writing by RTC or the Agency if the default or breach stated in such notice can be corrected, but not within such 60-day period, unless Owner does not commence such correction or commences such correction within such 60-day period but thereafter does not diligently pursue the same to completion within such extended period), RTC or the Agency shall be entitled to apply to any court having jurisdiction of the subject matter for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the Property in accordance with the terms of this Agreement or for such other relief as may be appropriate, it being acknowledged that the beneficiaries of Owner's obligations hereunder cannot be adequately compensated by monetary damages in the event of Owner's default. RTC or the Agency shall be entitled to its reasonable attorneys' fees in any such judicial action in which RTC or the Agency shall prevail.

(b)  Each right, power and remedy of RTC or the Agency provided for in this Agreement now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by RTC or the Agency of any one or more of the rights, powers or remedies provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by RTC or the Agency of any or all such other rights, powers or remedies.

Section 6.2.  <u>Remedies of Other Parties.</u>  The occupancy requirements set forth in Section 2.2 of this Agreement also shall inure to the benefit of, and may be judicially enforced against Owner by, affected Lower-Income Families and Very Low-Income Families. Any such party that prevails in any such judicial action shall be entitled to its reasonable attorneys' fees.

Section 6.3.  <u>Reliance Upon Information.</u>  In carrying out its obligations hereunder, Owner shall be entitled to rely upon information provided by RTC or the Agency with respect to (i) income limits applicable to Lower-Income Families and Very-Low

13

| BOOK  1180  PAGE  0201 |

Income Families, (ii) the method for calculating the incomes of such families and (iii) the maximum rents which may be charged to such families pursuant to Section 3.1 hereof.

## ARTICLE VII

### Miscellaneous

Section 7.1. Amendments. This Agreement may not be amended or modified except by written instrument signed by each party hereto.

Section 7.2. Notices. All notices required or permitted to be given under this Agreement must be in writing and will be deemed to have been duly given if delivered personally or mailed, postage prepaid, by registered or certified United States mail, return receipt requested, addressed to the parties at the following addresses:

If to RTC:
Resolution Trust Corporation
801 17th Street, N.W.
Washington, DC 20434-0001
Attention:  Director,  Affordable  Housing
Disposition Program

with copies to:
Resolution Trust Corporation
801 17th Street, N.W.
Washington, DC 20434-0001
Attention: Senior Vice President,
Assets/Real Estate

Resolution Trust Corporation
801 17th Street, N.W.
Washington, DC 20434-0001
Attention: Assistant General Counsel, Real
Estate

Resolution Trust Corporation
100 Colony Square
Suite 2300, Box 68
Atlanta, GA  30361
Attention: Affordable Housing Disposition
Specialist

If to Owner:
Florida Housing Affordability, Inc.
1101 North Lake Destiny Road, Suite 225
Maitland, FL  32751
Attention:  Joseph J. Savino, President

14

| BOOK   1180   PAGE   0202 |

wi'  copies to:      Benjamin Felder, Esq.
                     Riden, Earle & Kiefner, P.A.
                     100 2nd Avenue South
                     Suite 400 North Tower
                     St. Petersburg, FL  33701

Any party may change its address for notice purposes by giving notice to the other parties in accordance with this Section 7.2.

Section 7.3. <u>Entire Agreement</u>.  This Agreement contains the entire understanding between the parties hereto with respect to the subject matter hereof.

Section 7.4. <u>Governing Law</u>.  This Agreement, as it may affect the rights, remedies and obligations of RTC or the Agency, shall be governed by and construed in accordance with federal law. Insofar as federal law does not apply, the provisions of this Agreement shall be governed by and construed in accordance with the laws of the State.

Section 7.5. <u>Severability</u>.  This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of this Agreement or the application thereof to any person or circumstance shall be held invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

Section 7.6. <u>Binding Effect; Covenants Running with the Land</u>. During the Term, this Agreement and the covenants, reservations and restrictions contained herein shall be deemed covenants running with the land for the benefit of RTC and its successors, and shall pass to and be binding upon Owner's heirs, assigns and successors in title to the Property, or if the Property shall not include title to land, but shall include a leasehold interest in land, this Agreement and the covenants, reservations et al shall bind the leasehold interest as well as the Property and shall pass to and be binding upon all heirs, assigns and successors to such interests; provided, however, that upon expiration of the Term in accordance with the terms hereof said covenants, reservations and restrictions shall expire. Each and every contract, deed or other instrument hereafter executed covering or conveying the Property or any portion thereof shall conclusively be held to have been executed, delivered and accepted subject to such covenants, reservations and restrictions, regardless of whether such covenants, reservations and restrictions are set forth in such contract, deed or other instruments. If a portion or portions of the Property are conveyed, all of such covenants, reservations and restrictions shall run to each portion of the Property. Owner, at its cost and expense, shall cause this Agreement to be duly recorded or filed and re-recorded

15

| BOOK   1180   PAGE   0203 |

or refiled in such places, and shall pay or cause to be paid all recording, filing, or other taxes, fees and charges, and shall comply with all such statutes and regulations as may be required by law, in the opinion of qualified counsel, in order to establish, preserve and protect the ability of RTC or the Agency to enforce this Agreement.

Section 7.7. Counterparts. This Agreement and any amendments hereto may be executed in several counterparts, each of which shall be deemed to be an original copy, and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

Section 7.8. Section Titles. Section titles and the table of contents are for descriptive purposes only and shall not control or limit the meaning of this Agreement as set forth in the text.

IN WITNESS WHEREOF, the undersigned have hereunto affixed their signatures and seals as of the date first above written.

ATTEST:

By: _____
Printed Name: DANA E. LEACH
Title: MULTIFAMILY SPECIAL ASSET
APPROVABLE HOUSING

SELLER:
RESOLUTION TRUST CORPORATION AS RECEIVER FOR SOUTHWEST FEDERAL SAVINGS ASSOCIATION, DALLAS, TEXAS

By: _____
Printed Name: J. LEROY HALL

Attorney-in-fact for Resolution Trust Corporation pursuant to Power of Attorney dated MARCH 4 , 19__

16

| BOOK  1180  PAGE  0204 |

OWNER:
FLORIDA HOUSING AFFORDABILITY,
INC., A FLORIDA NOT FOR PROFIT
CORPORATION

ATTEST:

By: _____
Printed Name: _____
Title: _____

By: _____
Print Name: _JOSEPH J. SAVI___
Title: _President_____

**Acknowledgments**

STATE OF _Georgia_
COUNTY OF _DeKalb_

The foregoing instrument was acknowledged before me on this _28th_ day of _March_ 1994, by _L LEROY HILL_ on behalf of the Resolution Trust Corporation, a corporation organized and existing under the laws of the United States, as Receiver for Southwest Federal Savings Association, Dallas, Texas, who is personally known to me or has produced _N.A_ as identification and who did take an oath.

_____
Notary Public, State of

Notary Public, DeKalb County, Georgia.
My Commission Expires June 1997

My Commission Expires: _____
My Commission Number: _____

STATE OF FLORIDA
COUNTY OF _Hillsborough_

The foregoing instrument was acknowledged before me on this _31st_ day of _March_, 1994, by _JOSEPH J. SAVINO_ as its _PRESIDENT_ on behalf of Florida Housing Affordability, Inc., a Florida not for profit corporation, who is personally known to me or has produced _FL DRIVERS LICENSE_ as identification and who did take an oath.

_____
Notary Public, State of
Florida

My Commission Expires: _____
My Commission N_____

JOANNE J. FOMUNE
MY COMMISSION # CC 205635
EXPIRES: April 29, 1997
Bonded Thru Notary Public Underwriters

| BOOK    1180    PAGE    0205 |

## EXHIBIT "A"

## DESCRIPTION OF THE REAL PROPERTY

From the Southeast corner of Section 17, Township 25 South, Range 29 East, run along the East line of said Section 17, North 0°20'0" West, 2520.00 feet to the Point of Beginning, from said Point of Beginning continue North 0°20'09" West 410.96 feet; thence run North 89°42'49" West 1060.20 feet; thence South 0°20'09" East 410.96 feet; thence run East to the Point of Beginning, less the East 30 feet for road right-of-way, said lands lying and being in Osceola County, Florida.



| BOOK  1180  PAGE  0205 |

## EXHIBIT "A"

### DESCRIPTION OF THE REAL PROPERTY

From the Southeast corner of Section 17, Township 25 South, Range 29 East, run along the East line of said Section 17, North 0°20'0" West, 1520.00 feet to the Point of Beginning, from said Point of Beginning continue North 0°20'09" West 410.96 feet; thence run North 89°42'49" West 1060.20 feet; thence South 0°20'09" East 410.96 feet; thence run East to the Point of Beginning, less the East 30 feet for road right-of-way, said lands lying and being in Osceola County, Florida.

| BOOK   1180   PAGE   0206 |

EXHIBIT B

## FAMILY SIZE AND INCOME ADJUSTMENTS

A.   Family Size Adjustments.

For purposes of Section 3.1(a)(iii)(x), rents for units will be calculated on the basis of the size of household anticipated to occupy a unit with the particular number of bedrooms as follows:

| Unit Size | | | | | |
|---|---|---|---|---|---|
| 0-Bedroom | 1-BR | 2-BR | 3-BR | 4-BR | 5-BR |
| Household Size | | | | | |
| 1 Person | 2 Pers. | 3 Pers. | 5 Pers. | 7 Pers. | 8 Pers. |

Thus, for example, rent for a 3-bedroom unit occupied by a very low-income family will be based upon the HUD-determined income for a household at 50% of area median income which has 5 members. The rent for a 2-bedroom unit occupied by a lower-income household will be based upon the HUD figure for a household at 65% of median income which has 3 members.

B.   Income Adjustments.

Prior to the rent calculation, the applicable income limit must be reduced by an adjustment based upon unit size as follows:

| Unit Size | | | | | |
|---|---|---|---|---|---|
| 0-Bedroom | 1-BR | 2-BR | 3-BR | 4-BR | 5-BR |
| Income Adjustment | | | | | |
| $800 | $800 | $800 | $1,560 | $1,560 | $2,040 |

The applicable amount must be subtracted from the applicable income limit before multiplying by 30% in order to determine maximum rent.

Filing # 166471266 E-Filed 02/09/2023 11:47:34 AM

## IN THE CIRCUIT COURT IN AND FOR THE NINTH
## JUDICIAL CIRCUIT OSCEOLA COUNTY, FLORIDA

### CASE NO.: 2020-CA-000170

AFFORDABLE HOUSING GROUP, INC.,
as an agent of the FEDERAL DEPOSIT
INSURANCE CORPORATION, as Manager
of the FSLIC Resolution Fund, successor in
interest to the Resolution Trust Corporation,

       Plaintiff,

v.

FLORIDA HOUSING AFFORDABILITY,
INC.,
      Defendant.

_____/

## MOTION TO INTERVENE BY NON-PARTY FEDERAL DEPOSIT INSURANCE
## CORPORATION AND MEMORANDUM OF LAW IN SUPPORT

Non-party intervenor, FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC"),

by and through undersigned counsel and pursuant to Florida Rule of Civil Procedure 1.230,

respectfully moves this Honorable Court for an order permitting it to intervene as an additional

counterclaim defendant in the above-styled action. As detailed in this motion, the Defendant's

counterclaim directly challenges the FDIC's statutory authority to administer the Resolution Trust

Corporation's Affordable Housing Disposition Program, which includes the enforcement and

management of 690 current land use restriction agreements. Thus, the FDIC has a direct,

substantial, and immediate interest in this litigation. The FDIC will be prejudiced if unable to

defend its rights and interests, and therefore respectfully requests that the Court grant this motion

and permit it to intervene as an additional counterclaim defendant.

CASE NO.: 2020-CA-000170

## Background

The Resolution Trust Corporation ("RTC"), which operated between 1989 and 1995, resolved savings and thrift institutions by selling or merging the troubled institutions, including by selling the institutions' assets at heavily discounted prices.  As part of this resolution process, Congress established the RTC's Affordable Housing Disposition Program ("AHDP") pursuant to section 501 of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989 (Section 21A(c) of the Federal Home Loan Bank Act, as amended by 501 of FIRREA, 12 U.S.C. § 1441a).  One of the goals of the AHDP was to ensure preservation and maintenance of affordable rental opportunities for moderate-income, low-income and very-low-income households.  RTC used different strategies to achieve this goal including selling multi-family residential properties at a substantial discount with the requirement that the purchasers agree to execute long-term land use restriction agreements ("RTC LURAs").[1]  RTC LURAs, signed by the RTC and property owners, required that a certain percentage of apartment units be allocated for low and very low-income tenants and were recorded as liens against the properties.

Anticipating the termination of the RTC, Congress enacted the Resolution Trust Corporation Completion Act ("RTC Completion Act"), Pub. L. 103-204, 107 Stat. 2369 on December 17, 1993, which directed the RTC and the FDIC to enter into an agreement to develop a plan for the orderly unification of the FDIC's and RTC's affordable housing programs.  The RTC Completion Act also amended the Federal Deposit Insurance Act to provide that the FDIC "shall carry out the RTC's remaining authorities and responsibilities of the [RTC] as set forth in Section 21A(c) of the Federal Home Loan Bank Act." *See* 12 U.S.C. § 1831q(n)(4).  Thus, Congress

---

[1] The RTC LURAs are effective for the greater of 40 years from the date of closing or 50 years from the date of initial occupancy.

CASE NO.: 2020-CA-000170

authorized the FDIC to administer the RTC's AHDP, including monitoring and enforcing RTC LURAs, for which the FDIC contracts with third-party monitoring agencies.[2]

This litigation involves an RTC LURA executed on March 31, 1994 (the "1994 LURA") between the Defendant, Florida Housing Affordability, Inc. ("FHA" or "Defendant") and the RTC in connection with the Defendant's purchase of a 192 unit residential apartment building in Kissimmee, Florida. The 1994 LURA was recorded in the land records and runs with the land. *See* Am. Compl. p. 2 (¶ 5). Pursuant to the 1994 LURA, as a condition of its purchase of the property, Defendant agreed to provide affordable housing opportunities to lower income families for forty years, file compliance reports and pay administrative monitoring fees.

Affordable Housing Group, Inc. ("AHG" or "Plaintiff") is the current FDIC compliance monitor for the 1994 LURA. *See Id.*, p. 3-4 (¶ 15-19). On January 20, 2020, AHG initiated this litigation against FHA to enforce the 1994 LURA, which requires the filing of a periodic "Compliance Review" and the payment of an Administrative Fee to cover monitoring costs. *See* Am. Compl., p. 2 (¶ 5). In its amended complaint, AHG alleges that FHA has failed to comply with the terms of the 1994 LURA and it is therefore seeking declaratory judgment, injunctive relief, breach of contract, and appointment of a receiver for rent. *See Id.*, p. 5-8.

In FHA's September 16, 2022 Second Amended Answer, Affirmative Defenses and Counterclaims to the Amended Complaint, FHA acknowledged that RTC entered into RTC LURAs with the purchasers of certain properties pursuant to the Federal Home Loan Bank Act. *See* Second Am. Answer, Affirmative Defenses, and Counterclaim (Exhibit A to FHA's Motion for Leave (7/27/2022)), p. 14 (¶ 5). However, FHA alleges, *inter alia*, that the term of the 1994 LURA ended when 12 U.S.C. § 1441a was repealed in 2010, and that as a result the FDIC, and its

---

[2] FDIC also serves as the manager of the Federal Savings and Loan Insurance Corporation Resolution Fund, which funds the AHDP program.

3

CASE NO.: 2020-CA-000170

agent (AHG), lack the necessary authority to prosecute this claim and enforce the 1994 LURA's terms. *Id.*, p. 14-15 (¶ 6-13). Based in large part on these allegations, FHA seeks (I) a declaratory judgment that the terms of the 1994 LURA ended upon repeal of 12 U.S.C. § 1441a; (II) a temporary injunction to enjoin enforcement of the 1994 LURA; and (III) a permanent injunction to enjoin enforcement of the 1994 LURA. *See Id.*, p. 15-17.

These allegations and the relief FHA seeks directly challenge the FDIC's statutory authority to administer the RTC's AHDP as mandated by Congress, and the contractual integrity of RTC LURAs, including the 1994 LURA and the remaining 690 RTC's LURAs currently administered by the FDIC. It is therefore respectfully requested that the Court grants the FDIC leave to intervene and be joined as an additional counterclaim defendant to protect its rights and interests.

## Argument

### *(A) Florida Law Permits Intervention.*

Under the Florida Rules of Civil Procedure, "[a]nyone claiming an interest in pending litigation may at any time be permitted to assert a right by intervention, but the intervention shall be in subordination to, and in recognition of, the propriety of the main proceeding, unless otherwise ordered by the court in its discretion." Fla. R. Civ. P. 1.230. By the terms of rule, intervention may occur at any time. *Id.* A party seeking to intervene must establish "an interest in the litigation of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment." *Lexington Insurance Company v. James*, 295 So. 3d 367, 371 (Fla. 1st DCA 2020) (citing *Union Cent. Life Ins. Co. v. Carlisle*, 593 So. 2d 505, 507 (Fla. 1992) (quoting *Morgareidge v. Howey*, 78 So. 14, 15 (Fla. 1918))). In other words, the party's interest must be at issue when the intervention is sought. *Id.*

4

CASE NO.: 2020-CA-000170

Once the trial court confirms the requisite interest exists, it must decide whether to permit intervention. *Id.* Factors to consider in this regard include the derivation of the interest, any pertinent contractual language, the size of the interest, the potential for conflicts or new issues, and any other relevant circumstances. *Id.* (citing *Carlisle*, 593 So. 2d at 507-08). While intervention rests within the court's "sound discretion," courts have recognized that "the aim of the rules is to allow liberal joinder of parties and claims and the policy of equity to grant complete relief and avoid multiplicity of suits." *Symcon Dev. Grp. Corp. v. Passero*, 219 So. 3d 879, 881 (Fla. 4th DCA 2017) (reversing the denial of a motion to intervene and permitting a contracting party to intervene where the litigation had a direct and immediate interest upon its contract). Thus, "[i]ntervention should be liberally allowed." *Id.* (quoting *Nat'l Wildlife Fed'n Inc. v. Glisson*, 531 So. 2d 996, 998 (Fla. 1st DCA 1988)).

### (B) Intervention Factors Weigh in Favor of Granting FDIC's Request.

The factors weigh in favor of intervention in this matter for several reasons. First, the FDIC is an indispensable party to the counterclaim litigation and second, it has substantial and direct interests derived from both federal law and the 1994 LURA itself. These interests could also extend beyond the current counterclaim litigation to the entire AHDP administered by the FDIC.

### (i)    FDIC is an indispensable party to the counterclaim litigation.

The FDIC is an indispensable party to the litigation of the counterclaim. As the Florida Supreme Court has stated, "[a]n indispensable party is one whose interest in the controversy makes it impossible to completely adjudicate the matter without affecting either that party's interest or the interests of another party in the action." *Fla. Dept. of Revenue v. Cummings*, 930 So. 2d 604, 607 (Fla. 2006) (internal citations omitted). Indeed, the general rule in equity is that "all persons materially interested, either legally or beneficially, in the subject-matter of the suit, must be made

CASE NO.: 2020-CA-000170

parties either as complainants or defendants, so that a complete decree may be binding upon all parties." *Id.* An indispensable party "has a due process right to defend the suit in the same way any other named party to civil litigation has a due process right to defend. *Toyano's Auto Repair Servs. v. S. Auto Fin. Co., LLC,* 331 So. 3d 186, 188–89 (Fla. 4th DCA 2021).

(ii)     *FDIC has substantial and direct interests in the counterclaim litigation.*

Defendant's counterclaim alleges that repeal of the RTC's enabling statute under the Dodd-Frank Act deprived the FDIC of its authority to enforce the 1994 LURA. However, the FDIC's authorizing statute, 12 U.S.C. § 1831q(n)(4), in which Congress mandated that the FDIC "carry out the RTC's remaining authorities and responsibilities as set forth in Section 21A(c) of the Federal Home Loan Bank Act," has not been repealed. The Dodd-Frank Act contained no language that explicitly, or even implicitly, repealed the FDIC's authorizing statute or extinguished existing liabilities and obligations under Section 21(a) of the Federal Home Loan Bank Act.[3] The FDIC has a direct and substantial interest in defending its rights against a collateral attack on its statutory responsibilities and its statutorily granted interests under the 1994 LURA.

---

[3] As the Supreme Court explained, a general savings statute preserves liabilities under the prior statute. *See Hertz v. Woodman,* 218 U.S. 205, 218 (1910) (discussing Section 13, Rev. Stat., the predecessor to 1 U.S.C. § 109, and holding that a liability or obligation to pay a tax imposed under a repealed statute is not only within the letter, but the spirit and purpose, of the provision); *see also Korshin v. Comm'r of I.R.S.,* 91 F.3d 670, at 673-74 (4th Cir. 1996). Section 109 provides that:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability.

1 U.S.C. § 109.

6

CASE NO.: 2020-CA-000170

The FDIC, as successor to the RTC, also has contractual rights under the 1994 LURA. The Supreme Court has held that contracts are property and create vested rights that are protected by the Fifth Amendment. *Lynch v. United States*, 292 U.S. 571, 576-77 (1934)(the Supreme Court held that Congress could not reduce expenditures by abrogating contractual obligations of the United States because to do so would be a repudiation). Contracts are interpreted in accordance with the law in effect at the time of their formation. *See Bloomfield v. Bloomfield*, 97 N.Y.2d 188, 194 (2001). The repeal of a statute has no impact upon contractual rights established while the statute was in force. *W.R. Grace & Co. v. Cont'l Cas. Co.*, 332 F.3d 145, 159 (2003); *see also United States v. Sec. Indus. Bank*, 459 U.S. 70, 78 (1982) (lien avoidance statute was not intended to be applied retroactively to destroy property rights granted before the bankruptcy code was enacted). Those rights include the right to enforce the terms of the 1994 LURA, as set forth in section 6.1 of the 1994 LURA.

Further, because Defendant's counterclaim challenges the FDIC's statutory authority and the contractual integrity of the 1994 LURA, it could also pose a challenge to all RTC LURAs. To put this in context, the FDIC, through its monitoring agents, administers over 27,000 qualified low and very low-income housing units for qualified tenants pursuant to 690 LURAs in place in 35 states under the ADHP. Thus, the FDIC has a substantial interest here.

Finally, as the pleadings already involve the enforcement and validity of the 1994 LURA and FHA's counterclaims present purely legal issues, no new factual issues will result from the FDIC being added as a counterclaim defendant in this action. *See Passero*, 219 So. 3d at 881-82 (noting the general proposition that, under Florida law, the interest entitling a non-party to intervention must be created by some part of a claim to the demand in suit, or property claim, which is the subject of the existing litigation). Nor will adding the FDIC as a counterclaim

7

CASE NO.: 2020-CA-000170

defendant unnecessarily delay or disrupt the litigation. The Court has not yet ruled on the counterclaim, and discovery is ongoing. In fact, Defendant recently filed a notice of deposition seeking the testimony of a corporate representative of the FDIC.

Thus, the FDIC has shown substantial grounds to grant its request to intervene in the counterclaim litigation.

## CONFERRAL WITH COUNSEL FOR THE PARTIES

The undersigned counsel has conferred with attorney Russell Klemm of Clayton & McCulloh, P.A., counsel for Plaintiff/Counterclaim Defendant AHG, and believes that attorney Klemm agrees to and/or does not oppose entry of an Order allowing the FDIC to intervene as an additional Counterclaim Defendant to the Second Amended Counterclaim, filed on or about September 22, 2022, and providing the FDIC with a limited time period (e.g., such as 20 days following entry of the Order permitting FDIC to intervene as an additional Counterclaim Defendant) for FDIC to file its response to the Second Amended Counterclaim.

The undersigned has been advised by attorney Klemm on February 8, 2023 that he has discussed the request to intervene with opposing counsel, and that attorney Jason R. Hawkins of South Milhausen, P.A., counsel for Defendant/Counterclaim Plaintiff FHA, has not agreed to allowing the FDIC to intervene in this lawsuit. Further efforts to reach agreement with attorney Hawkins shall be made prior to a hearing on this Motion.

CASE NO.: 2020-CA-000170

## CONCLUSION

In sum, for the reasons stated herein, the FDIC respectfully requests that this Court exercise its discretion and allow the FDIC to intervene in this action as a counterclaim defendant. Plaintiff has consented to the intervention sought by this motion.

WHEREFORE, Intervenor, FEDERAL DEPOSIT INSURANCE CORPORATION, respectfully requests this Court enter an Order that grants its Motion to Intervene, directs it to file a response to the Second Amended Counterclaim within 20 days of the date of the order, and provides such other and further relief as this Court deems just and proper.

Respectfully submitted,

**LIEBLER, GONZALEZ & PORTUONDO**
*Attorneys for Intervenor, Federal Deposit Insurance* Corporation *(FDIC)*
Courthouse Tower - 25th Floor
44 West Flagler Street
Miami, FL 33130
Tel: (305) 379-0400
Fax: (305) 379-9626
Primary: service@lgplaw.com
Secondary: dfk@lgplaw.com; ec@lgplaw.com

By: /s/ *Dora F. Kaufman*
    DORA F. KAUFMAN, ESQ.
    Florida Bar No. 771244
    MARY J. WALTER, ESQ.
    Florida Bar No. 45162

9

CASE NO.: 2020-CA-000170

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 9th day of February, 2023, I electronically filed the foregoing with the Clerk of Court by using the Florida Courts E-filing Portal which will send a notice of electronic filing to the following: Russell E. Klemm, Esq. at rklemm@clayton-mcculloh.com and sroe@clayton-mcculloh.com (Attorney for Plaintiff); and Jason R. Hawkins, Esq., jhawkins@southmilhausen.com and lcarpenter@southmilhausen.com (Attorney for Defendant).

*/s/ Dora F. Kaufman*
DORA F. KAUFMAN

10

Filing # 166289777 E-Filed 02/07/2023 12:26:32 PM

Sheriff Number: 23003388    Court Case Number: 2020-CA-170
Date Received: 1/31/2023 Time: 10:06 AM
Special Service Inst:

State of Georgia
Gwinnett County

AFFORDABLE HOUSONG GROUP, INC., ETC.
PLAINTIFF
VS.
FLORIDA HOUSING AFFORDABILITY, INC
DEFENDANT

## ATTORNEY'S ADDRESS

# SUBPOENA

SOUTH MILHAUSEN
1000 LEGION PLACE
SUITE 1200
ORLANDO. FL 32801

NAME AND ADDRESS OF PARTY TO BE SERVED

HEARING DATE
03/09/2023

FEDERAL DEPOSIT INSURANCE CORPORATION
CT CORP.
289 SOUTH CULVER STREET
LAWRENCEVILLE, GA 30046

SHERIFF'S ENTRY OF SERVICE

**PERSONAL** ☐    Sex_____ Skin Color_____ Hair Color_____ Age_____ Hgt_____ Wgt_____
I have this day served the defendant_____ personally with a copy of the within action and summons.

**NOTORIOUS** ☐
I have this day served the defendant _____ by leaving a copy of the action and
summons at his most notorious place in this County.

Delivered same into the hands of _____ described as follows:

| SEX | SKIN COLOR | HAIR COLOR | AGE | HGT | WGT |
|-----|-----------|-----------|-----|-----|-----|
|     |           |           |     |     |     |

**CORPORATION** ☑
I have this day served the _Federal   Deposit Insurance Corporation_ a corporation by leaving a copy of
the within action and summons with __Jane  Richerdson__ in charge of the office and place of
doing business of said Corporation in this County.

**TACK AND MAIL** ☐

I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises
designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an
envelope properly addressed to the defendant at the address shown in said summons, with adequate postage affixed thereon containing notice to the
defendant(s) to answer said summons at the place stated in the summons.

**NON EST** ☐
Diligent search made and defendant _____ not to be found
in the jurisdiction of this Court.

**SPECIAL PROCESS**

**COMMENTS**

Date: 2/1/23

Time:_____

N. Higgins  55541
Deputy Sheriff

_____
GWINNETT COUNTY GEORGIA

STATE OF GEORGIA
COUNTY OF GWINNETT

☐ SUPERIOR COURT    ☐ CIVIL DIVISION
☐ STATE COURT       ☐ CRIMINAL DIVISION
☐ MAGISTRATE COURT

## SUBPOENA FOR DEPOSITION
### *INCORPORATE THE TERMS USED IN THE FOREIGN SUBPOENA*

Plaintiff _____

Vs.                                    Case Number: _____

Defendant _____

TO WITNESS:

NAME: _____
ADDRESS _____
_____
_____

**YOU ARE HEREBY COMMANDED,** laying all business aside, you be and appear at the time, date and place set forth below to testify at a trial or hearing in this case.

PLACE: _____        DATE: _____
_____              TIME: _____ AM/PM
_____

If you are an organization that is not a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

_____

Production: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material, or those set forth in an attachment:

_____

**HEREIN FAIL NOT,** under penalty of the law.  Witness my hand and seal of this court, this the _____ day of _____, 20____.

If you have any questions, contact Attorney for the Plaintiff/Defendant:

NAME: _____
ADDRESS: _____
_____
PHONE: _____

*Tiana P. Garner*

TIANA P. GARNER, CLERK
Gwinnett County Clerk of Superior, State & Magistrate Courts

By: Deputy Clerk or Attorney of Record

Pursuant to O.C.G.A. 24-13-21 a subpoena must be completed prior to being served on a witness.  Any person misusing a subpoena is subject to punishment for contempt of court and may be fined not more than $300 and imprisoned for not more than 20 days, or both.  Witnesses may contact the Office of the Clerk of Court at 770.822.8100 to verify that this subpoena was issued for a valid case.

IN THE CIRCUIT COURT IN AND FOR
THE NINTH JUDICIAL CIRCUIT
OSCEOLA COUNTY, FLORIDA

AFFORDABLE HOUSING GROUP, INC.,    CASE NO.: 2020-CA-170
as an agent of the FEDERAL DEPOSIT
INSURANCE CORPORATION, as Manager
of the FSLIC Resolution Fund, successor in
interest to the Resolution Trust Corporation,

       Plaintiff,

v.

FLORIDA HOUSING AFFORDABILITY, INC.,

       Defendant.

_____/

## AMENDED SUBPOENA FOR DEPOSITION DUCES TECUM

(Via Zoom)

STATE OF FLORIDA:

TO:    **Corporate Representative of Federal Deposit Insurance Corporation
By Serving the CT Corporation System as Registered Agent
289 Culver Street S
Lawrenceville, GA 30046**

       **YOU ARE COMMANDED** to appear before a person authorized by law to take

depositions at South Milhausen, P.A., 1000 Legion Place, Suite 1200, Orlando, FL 32801, **via**

**Zoom** on **March 2, 2023, at 10:00 a.m.,** for the taking of your deposition to testify on the

following topics and to produce the following documents: **PLEASE SEE ATTACHED**

**EXHIBIT "A."** If you fail to appear, you may be in contempt of court.

Join Zoom Meeting:
https://us02web.zoom.us/j/81302016403?pwd=TjJrM3IyNHZ6TFVnTXhmUHgvb3YrQT09
Meeting ID: 813 0201 6403
Passcode: 745579

You are subpoenaed to appear by the following attorney, and unless excused from this subpoena by this attorney or the court, you must respond to this subpoena as directed.

Dated this 27th day of January 2023.

/s/ Jason R. Hawkins
Jason R. Hawkins
Florida Bar No.: 11925
jhawkins@southmilhausen.com
South Milhausen, P.A.
1000 Legion Place, Suite 1200
Orlando, Florida 32801
Telephone: (407) 539-1638
Facsimile: (407) 539-2679
Attorneys for Defendant,
Florida Housing Affordability, Inc.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, the provision of certain assistance. Please contact Jason R. Hawkins, Esq. at 407-539-1638 at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

Copy to:
Attorneys for Plaintiff
Russell E. Klemm, Esq.
Clayton & McCulloh, P.A.
1065 Maitland Center Commons Blvd.
Maitland, FL 32751
Phone: 407-875-2655
Fax: 407-875-3363
Email: rklemm@clayton-mcculloh.com; cpraria@clayton-mcculloh.com

# EXHIBIT "A"

## DEFINITIONS

1.     As used herein, "You" and/or "Your", "FDIC", shall refer to FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation, and any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of FDIC.

2.     As used herein, "AHG" means AFFORDABLE HOUSING GROUP, INC., and any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of AHG.

3.     As used herein, "FHA", shall refer to Florida Housing Affordability, Inc., and any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of FDIC.

4.     "FHFC" means Florida Housing Finance Corporation, and any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of FHFC.

5.     The Term "Memorandum of Understanding for Monitoring and Enforcement" shall mean the Memorandum of Understanding for Monitoring and Enforcement dated July 9, 2002 by and between the FDIC acting in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation and AHG, a copy of which is attached hereto as **Exhibit "1"**.

6.     The term "LURA" shall mean the Land Use Restriction Agreement for the "Three Fountains Apartments" dated March 31, 1994 and recorded on April 4, 2994 in the Osceola County, Florida public records at Official Records Book 1180, Page 0185, a copy of which is attached hereto as **Exhibit "2"**.

7.     The term "Property" shall refer to the Three Fountains Apartments as more particularly described in the LURA.

8.     The word "document" is used in the broad and liberal sense and means any written, typed, printed, recorded or graphic matter, however produced or reproduced, of any kind and description, whether sent, received, or neither, and all copies which differ in any way from the original (whether by interlineations, stamped received, notation, indication of copy sent or received, or otherwise) regardless of whether designated confidential, privileged or otherwise and whether an original, master, duplicate or copy, including, but not limited to, papers, notes, account statements or summaries, ledgers, pamphlets, periodicals, books, advertisements, electronic mail, computerized information, objects, letters, memoranda, notes or notations of conversations, contracts, agreements, drawings, telegrams, audio or video tape recordings, communications, including inter-office and intra-office memoranda, delivery tickets, bills of lading, invoices, quotations, claims documents, reports, records, studies, work sheets, working papers, corporate

records, minutes of meetings, circulars, bulletins, notebooks, bank deposit slips, bank checks, canceled checks, check stubs, diaries, diary entries, appointment books, desk calendars, data processing cards and/or tapes, computer software, photographs, transcriptions or sound recordings of any type of personal or telephone conversations, interviews, negotiations, meetings or conferences, or any other things similar to any of the foregoing.

      9.    As used herein, the word "communication" means any words heard, spoken, written or read, regardless of whether designated confidential, privileged or otherwise, and including, without limitation: (a) Words spoken or heard at any meeting, discussion, interview, encounter, conference, speech, conversation or other similar occurrence; and (b) Words written on or read from any document(s) as described above.

      10.    As used herein, the term "person" means individuals or entities of any type, including, but not limited to, natural persons, governments (or any agencies thereof), quasi-public entities, corporations, partnerships, groups, mutual or joint ventures and other forms of organizations or associations.

      11.    As used herein, the words or phrases, "explaining", "describing", "defining", "concerning", "reflecting", or "relating to" when used separately or in conjunction with one another mean directly or indirectly mentioning, pertaining to, involving, being connected with or embodying in any way or to any degree the stated subject matter.

      12.    When the context herein makes it appropriate, each singular word shall include its plural and each plural word shall include its singular.

      13.    "Evidencing" means tending to show, in any probative manner, the existence or nonexistence of any matter.

      14.    "Or" and "and" mean "and/or" in any request, where the meaning would have an effect of bringing additional communications, documents, and files within the scope of a request.

## TIME PERIOD

      Unless otherwise specified herein, the time period covered in this Duces Tecum is for the period from January 1, 2012 to the present.

## DOCUMENTS REQUESTED

      1.    Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or relate to any communication(s) between FDIC and AHG, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the LURA and/or Property.

2.      Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or relate to any communication(s) between FDIC and AHG, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the Memorandum of Understanding for Monitoring and Enforcement specifically with respect to the LURA, the Property and/or FHA.

3.      Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or relate to any communication(s) between FDIC and FHFC, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the LURA, the Property, and/or FHA.

4.      Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or relate to any communication(s) between FDIC and FHA, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the LURA, the Property, and/or FHA.

5.      Copies of any and all compliance reviews performed by You for the Property, pursuant to Section 4.5 of the LURA.

1

MEMORANDUM OF UNDERSTANDING
FOR MONITORING AND ENFORCEMENT


By and Between

the

FEDERAL DEPOSIT INSURANCE CORPORATION,
acting in its capacity as Manager of the
FSLIC Resolution Fund, successor in interest to
the Resolution Trust Corporation

and

AFFORDABLE HOUSING GROUP, INC.
(the "Agency")

_____July_____ _o 9_, 2002

MEMORANDUM OF UNDERSTANDING
FOR MONITORING AND ENFORCEMENT

WHEREAS, certain Properties have been sold and certain other such eligible Properties may be sold in the State pursuant to the requirements of the Affordable Housing Disposition Program of the former Resolution Trust Corporation (the "RTC") as set forth in Section 21A(c) of the Federal Home Loan Bank Act (the "FHLBA") (12 U.S.C §1441a(c));

WHEREAS, the Owners of such Properties have entered or will enter into Land Use Restriction Agreements ("LURAs") with respect to the Owners' obligations to comply with the occupancy, rent and resale restrictions with respect to the Properties, as set out in Section 21A(c) of the FHLBA and in the Final Rule for the RTC's Affordable Housing Disposition Program;

WHEREAS, the LURAs provide that the RTC, its successor, or a Agency contracted by the RTC or its successor shall monitor the compliance of the Owners with the occupancy, rent and resale restrictions set out in the LURAs;

WHEREAS, the LURAs and Section 21A(c)(11)(B) of the FHLBA (12 U.S.C. §1441a(c)(11)(B)) authorize the RTC, its successor, and other specified parties to judicially enforce the occupancy, rent, income and resale restrictions set out in the LURAs against purchasers of such Properties, or their successors in interest;

WHEREAS, pursuant to Section 21A(m) of the FHLBA (12 U.S.C.§1441a(m)) upon the termination of the RTC, all of its rights and obligations were transferred to the FSLIC Resolution Fund as the successor in interest to the RTC;

WHEREAS, pursuant to Section 11A of the Federal Deposit Insurance Act, (12 U.S.C. §1821a), the Federal Deposit Insurance Corporation (the "FDIC") is responsible for the management of the FSLIC Resolution Fund; and,

WHEREAS, the FDIC, as the manager of the FSLIC Resolution Fund, successor in interest to the RTC, and the Agency have agreed that the Agency will, for itself and on behalf of the FDIC, under the terms and conditions set forth herein, monitor and enforce the compliance of the Owners with the occupancy, rent and resale restrictions set out in the LURAs;

NOW THEREFORE, in consideration of the mutual promises herein set forth, the FDIC, acting in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust corporation, and the Agency enter into this Memorandum of Understanding and agree as follows:

1. Definitions:

The capitalized terms used herein shall have the meanings given them below and such meanings shall be equally applicable to the singular and the plural forms of such terms, as the context may require.

"Agency" shall mean Affordable Housing Group, Inc., together with its successors and assigns, located at: 1910 ESE Loop 323, # 329, Tyler, Texas 75701.

"Compliance Monitoring Manual" shall mean the Compliance Monitoring Manual for State Agencies attached hereto as Exhibit B.

"Condominium Owners" shall mean nonprofit organizations, public agencies and for-profit entities that purchased Condominium Properties from the RTC in bulk pursuant to Section 21A(c) of the FHLBA (12 U.S.C. §1441a(c)).

"Condominium Property" shall mean an "eligible condominium property" under Section 21A(c)(9)(D) of the FHLBA (12 U.S.C. §1441a(c)(9)(D)) that is sold to a Condominium Owner subject to the Multifamily Occupancy Requirements, the Rent Restrictions and the Condominium Resale Restrictions, under the terms of the applicable LURA.

"Condominium Resale Restrictions" shall mean the requirement that a single Condominium Property may be sold by a Condominium Owner only to a purchaser that is a Lower-Income Family (i) which agrees to occupy, and certifies in writing that it intends to occupy, such property as a principal residence for at least 12 months, and (ii) which enters into an agreement providing for the recapture of seventy-five percent (75%) of the profits from the resale of such property, if such resale takes place within 12 months after such purchase, all as more fully provided in the applicable LURA.

"Effective Date" shall mean _____July   09_____, 2002.

"FDIC" shall mean the Federal Deposit Insurance Corporation, acting in its capacity as manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation, pursuant to Section 21A(m)(2) of the Federal Home Loan Bank Act (12 U.S.C. §1441a(m)(2)), and Section 11A of the Federal Deposit Insurance Act (12 U.S.C. §1821a).

"FHLBA" shall mean the Federal Home Loan Bank Act, 12 U.S.C. §1421, et seq.

"Final Rule" shall mean the final rule for the RTC's Affordable Housing Disposition Program, codified at 12 C.F.R. §1609, et seq., as such rule may be modified or amended from time to time by the RTC or its successor.

"Low-Income Restrictions" shall mean occupancy, rent, income and resale restriction set out in Section 21A(c) of the FHLBA (12 U.S.C. §1441a(c)), the Final Rule, and the applicable LURA, including without limitation, the Occupancy Restrictions, the Rent Restrictions and the Resale Restrictions.

"Lower-Income Families" shall mean families and individuals whose annual incomes do not exceed 80 percent of area median income in the area in which the particular Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

"LURA" shall mean the Land Use Restriction Agreement entered into by the Owner, setting forth the Owner's obligation to comply with the applicable occupancy, rent and resale restrictions with respect to the Owner's Property.

"MOU" shall mean this Memorandum of Understanding for Monitoring and Enforcement between the FDIC, acting in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation, and the Agency.

"Multifamily Occupancy Requirement" shall mean the requirement to set-aside a minimum number of units in a Multifamily Property or a Condominium Property (or a group of such Multifamily Properties or Condominium Properties) for occupancy by Lower-Income Families and Very Low-Income Families, in accordance with

Sections 21A(c)(3) and (14) of the FHLBA (12 U.S.C. §1441a(c)(13) and (14)) and the applicable LU'

"Multifamily Owners" shall mean owners of Multifamily Property purchased pursuant to Section 21A(c)(3) of the FHLBA (12 U.S.C. §1441a(c)(3)), and any successors in title to such owners.

"Multifamily Property" shall mean the eligible Multifamily Properties purchased by Multifamily Owners pursuant to Section 21A(c)(3) of the FHLBA (12 U.S.C. §1441a(c)(3)), and subject to the Multifamily Occupancy Requirements and the Rent Restrictions.

"Occupancy Requirements" shall mean the Multifamily Occupancy Requirement and the Single Family Occupancy Requirement.

"Owners" shall mean the Multifamily Owners, the Single Family Owners and the Condominium Owners.

"Property" or "Properties" shall mean, individually and collectively, the Multifamily Properties, the Single Family Properties and the Condominium Properties subject to this MOU and listed in Exhibit A hereto.

"Qualifying Units" shall mean the total units in a Property or Properties required to be set aside to meet the Multifamily Occupancy Requirement or the Single Family Occupancy Requirement, as applicable.

"Rent Restrictions" shall mean the applicable rent limits for Qualifying Units in a Property, as provided in the applicable LURA.

"Resale Restrictions" shall mean the Single Family Resale Restrictions and the Condominium Resale Restrictions.

"RTC" shall mean the former Resolution Trust Corporation as established pursuant to Section 501(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended (Section 21A of the Federal Home Loan Bank Act; 12 U.S.C. §1441a).

"Secretary" shall mean the Secretary of Housing and Urban Development.

"Single Family Occupancy Requirement" shall mean the requirement that Single Family Owners set-aside not less than 100% of all eligible Single Family Property for occupancy by Lower-income Families, as evidenced by the applicable LURA.

"Single Family Owners" shall mean nonprofit organizations or governmental agencies which purchased Single Family Property from the RTC or a previous Single Family Owner in accordance with Section 21A(c)(2)(B) of the FHLBA (12 U.S.C. §1441a(c)(2)(B)).

"Single Family Property" shall mean a one-to-four unit property purchased by a Single Family Owner pursuant to Section 21A(c)(2)(B) of the FHLBA (12 U.S.C. §1441a(c)(2)(B)), and subject to the Single Family Occupancy Requirement, the Rent Restrictions and the Single Family Resale Restrictions.

"Single Family Resale Restrictions" shall mean the requirement that a Single Family Property may be sold by a Single Family Owner only to a purchaser that is a Lower-Income Family (i) which agrees to occupy, and certifies in writing that

it intends to occupy, su_ Single Family Property as_ principal residence for at least 12 months, and _i) which enters into an a_ _ement providing for the recapture of seventy-five percent (75%) of the profits from the resale of such property, if such resale takes place within 12 months after such purchase, all as more fully provided in the applicable LURA.

"State" shall mean any state of the United States where properties have been sold through RTC's Affordable Housing Disposition Program and where FDIC has assigned those properties to the Agency to monitor.

"Very Low-Income Families" shall mean families and individuals whose Annual Incomes do not exceed 50 percent of area median income in the area in which the particular Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

2. Monitoring and Enforcement.

(a) Properties and Owners

(i) Inclusion of Properties in Exhibit A - The Properties that the Agency shall monitor under the terms of this MOU, and the Owners thereof, are identified in Exhibit A hereto and incorporated herein. The FDIC may amend Exhibit A at any time to add as Properties additional properties located within the State which have been sold through the RTC's Affordable Housing Disposition Program, upon thirty (30) days written notice to the Agency by registered or certified mail. Upon so amending Exhibit A, the FDIC shall (i) furnish the Agency with copies of the LURA executed with respect to each such property, (ii) advise the Agency as to which of the forms of LURA generally used served as the basis for the LURA for such property and (iii) notify the Agency of any variations in the terms thereof from those of the general form of LURA upon which it was based.

The Agency shall amend Exhibit A to reflect (i) a change in the Owner of a Property as set forth in the related LURA, (ii) the release of a Property from the requirements of the related LURA in accordance with the terms thereof, or (iii) any change in the number of Qualifying Units required to be maintained in a particular Property or group of Properties. The Agency shall notify the FDIC in writing within thirty (30) days of making any such amendment to Exhibit A.

(ii) Removal of Properties from Exhibit A - Upon sixty (60) days written notice to the Agency by registered or certified mail, the FDIC may, without cause, amend Exhibit A to remove any Property listed therein from any or all of the requirements of this MOU.

(b) Agreement to Monitor and Enforce Compliance with the LURAs.

The Agency hereby agrees to monitor and enforce, for itself and on behalf of the FDIC, the compliance of the Owners with all occupancy, rent and resale requirements set out in Section 21A(c) of the FHLBA (12 U.S.C. §1441a(c)) and the applicable LURAs, including, but not limited to, the Occupancy Requirements, the Rent Restrictions and the Resale Restrictions.

(c) Compliance Monitoring Procedures.

The specific services that the Agency shall perform pursuant to this MOU are set out in the Compliance Monitoring Manual attached hereto as Exhibit B and incorporated herein by reference. The Agency shall at all times perform its

duties in accordance with the Compliance Monitoring Manual, provided, however, that the Agency shall be and hereby is authorized to take any and all action authorized by the FHLBA, the Final Rule, the LURAs or the laws of the State which may be necessary or desirable, in its discretion, in order to monitor or assure compliance by the Owners and the Properties with the terms of the LURAs, in particular the Low-Income Restrictions. No monitoring or enforcement action taken by the Agency which is otherwise permitted under the FHLBA, the Final Rule, the LURAs or the laws of the State shall fail or be held to be impermissible because it is not specifically identified or authorized in the Compliance Monitoring Manual. The Agency shall carry out its monitoring and enforcement functions in the State.

After prior consultation with the Agency, the FDIC may amend, modify or replace the Compliance Monitoring Manual. The FDIC shall notify in writing and file with the Agency any such amendment, modification or replacement within thirty (30) days after FDIC's authorization and approval thereof. The replacement, amendment, or modification of the Compliance Monitoring Manual shall in no way be deemed to limit the monitoring and enforcement authority of the Agency hereunder, nor to diminish its obligation to assure that the Owners comply fully with the requirements of the LURAs, in particular the Low-Income Restrictions.

Together with the Compliance Monitoring Manual and appended hereto as Exhibit B-2, FDIC is providing the Agency with the standard forms of LURAs used with respect to Properties to be monitored by the Agency within the State. FDIC agrees to consult with the Agency prior to making any changes in the standard forms of LURAs as hereinafter provided to the Agency.

(d) Judicial Enforcement by FDIC and the Agency.

If the Agency shall find that a Property is not in compliance with the Low-Income Restrictions and if the Agency shall determine that administrative measures have not been effective or are not likely to be effective in bringing such Property into compliance, the Agency may commence appropriate judicial enforcement action pursuant to authority provided under the FHLBA, the laws of the State, and/or the terms of the applicable LURA. No less than thirty (30) days prior to actual commencement of such a judicial enforcement action, the Agency shall notify the FDIC in writing of its intent to do so.

If, prior to commencing such an enforcement action or during the prosecution thereof, the Agency shall determine that, for reasons of administrative capacity, the adequacy of compensation pursuant to Section 3 of this MOU, or other reasons unrelated to the merits of the particular enforcement action, it is unwilling to commence or continue such action on its own, the Agency shall so advise the FDIC in writing and the FDIC may take such steps as the FDIC deems appropriate to ensure compliance by the Owner(s). Nothing in this MOU shall be deemed to limit the FDIC's authority under the FHLBA, the laws of the United States or the LURAs to carry out such monitoring or enforcement activities with respect to the Low-Income Restrictions as it shall determine to be appropriate.

(e) Agreements With Other Monitoring Agencies.

The Agency is authorized to enter into cooperative agreements with State Housing Finance Agencies (as defined in Section 21A(c)(g)(P) of the FHLBA; 12 U.S.C. §1441a(c)(9)(P)) and/or other parties with responsibility for monitoring or enforcing LURAs governing eligible residential properties, whether such properties are located within or without the State, whenever the Agency determines that any such agreement will further the purposes of this MOU or will

assist any other party in performing monitoring and enforcement activities under a LURA with respect to property. Any such cooperative agreement may provide for such division of administrative fees payable under the LURAs which are the subject of such cooperative agreement as the parties thereto deem appropriate, and if such cooperative agreement provides in writing for a division of responsibilities, the assumption of responsibilities by such State Housing Finance Agency or other party shall relieve or discharge the Agency of the responsibility so assumed.

The Agency shall provide the FDIC with written notice of its intent to enter into such an cooperative agreement no less than thirty (30) days prior to the date of actual execution of the agreement. Such written notice shall include a copy of the agreement to be executed.

(f) Agreements For Performance of Monitoring and Enforcement Activities.

The Agency is authorized to enter into agreements with any party to provide for the performance of specific functions under the Compliance Monitoring Manual or for the carrying out of any of its monitoring or enforcement obligations hereunder whenever the Agency determines that any such agreement will further the purposes of this MOU, provided, however, that only the Agency, or another entity authorized under the laws of the State to prosecute, may commence or prosecute judicial enforcement actions in its own name. By entering into any such agreements, the Agency does not relinquish ultimate responsibility for performance of the obligations comprehended by this MOU and the Compliance Monitoring Manual.

The Agency shall provide the FDIC with written notice of its intent to enter into any such agreement no later than thirty (30) days prior to the date of actual execution of the agreement. Such written notice shall include a copy of the agreement to be executed.

(g) Agency as Owner.

FDIC and the Agency agree that, if the Agency shall be the Owner of any Properties, all of the terms hereof and of the Compliance Monitoring Manual shall apply to the Agency with regard to such Properties; provided, however, that in addition, the Agency agrees promptly to notify the FDIC of any finding of noncompliance with respect to any such Property and of the action which it proposes to take to correct such noncompliance; and provided, further, that if the Agency shall own a Property for more than two years, the FDIC shall be authorized to designate another party, whether a governmental agency of the State or any other state, or a private contractor, to carry out monitoring and enforcement activities on its behalf with respect to such Property and to collect the attendant fees.

3. Compensation.

(a) Annual Administrative Fees.

The Agency shall be entitled to collect from the Owners annual administrative fees for performing the monitoring and enforcement services set forth in the Compliance Monitoring Manual. Annual administrative fees shall be payable in such installments and at such times during the year, whether in advance or in arrears, as the Agency shall determine.

(i) Multifamily Property and Condominium Properties. The Agency shall be entitled to collect from he Owners of Multifamily P perty and Condominium Property an annual administrative fee of $50 per Qualifying Unit; provided, however, that the Agency shall be entitled to collect a minimum fee of $250 per Multifamily Property or Condominium Property. Annual administrative Fees shall be adjusted for inflation as provided in the applicable LURAs. The Agency shall not be entitled to collect an administrative fee from a Lower-Income Family that purchases a Qualifying Unit in a Condominium Property in accordance with the resale restrictions set forth in the applicable LURA.

(ii) Single Family Property. The Agency shall be entitled to collect from the Owners of Single Family Property an annual administrative fee of $50 per Property, adjusted for inflation as provided in the applicable LURA.

(b) Property Noncompliance Fees.

Upon finding noncompliance by a Property with the Low-Income Restrictions or the administrative requirements of the LURA, the Agency shall be entitled to charge an annual administrative fee (not exceeding $50 per Qualifying Unit or such other maximum as is applicable under the LURA after adjustment for inflation as provided therein) sufficient to compensate it for the additional monitoring and enforcement activities undertaken. The Agency shall carry out such additional monitoring and enforcement activities for such time period as it determines appropriate to ensure continued compliance by the Property and shall be entitled to compensation for such activities for a period of up to three calendar years following the year of the most recent finding of noncompliance. Any such fees are in addition to, and distinct from, any reimbursements of costs and legal fees to which the Agency may be entitled as a result of judicial enforcement action, and such fees will be payable without regard to whether the Agency undertakes or succeeds in judicial enforcement action.

(c) Conflict With LURAs.

In the event of a conflict between the provisions for payment of fees hereinabove set forth and the terms of a particular LURA, the terms of the LURA shall govern; provided, however, that the Agency shall be permitted to negotiate with the particular Owner for fee terms comparable to those set forth above. If the Agency shall make a finding of noncompliance with respect to a particular Property but shall be unable to collect the fee described in subsection (b) hereof for additional monitoring and enforcement activities because the LURA executed with respect to such Property made no provision for such fee, the Agency may notify the FDIC of any such noncompliance and advise the FDIC that it will not undertake additional monitoring and/or enforcement activities with respect to such Property without receiving equivalent compensation. In such event, FDIC may (i) undertake additional monitoring and enforcement activities directly or (ii) pay to the Agency the additional administrative fee which would have been payable under the applicable LURA had it included the provision for such fees incorporated in the standard form of LURA, in which event the Agency shall undertake appropriate additional monitoring and enforcement activities.

4. Evaluation.

Twelve (12) months after the Effective Date and annually thereafter, the FDIC will evaluate the Agency's performance under this MOU and the Compliance Monitoring Manual. If the FDIC determines, upon an annual evaluation or at any other time, that the Agency's monitoring and enforcement activities hereunder and/or thereunder are unsatisfactory, the FDIC shall provide written notice to

the Agency of the specific items of unsatisfactory performance and provide the Agency a reasonable opportunity to correct such unsatisfactory performance.

5. Semi-Annual Reports.

The Agency shall timely prepare and provide to the appropriate FDIC regional office and to the Washington office of the FDIC, each at the addresses provided hereinafter at Section 12, for each semi-annual period or portion thereof in which this MOU is in effect, the first such period being deemed to have commenced on the Effective Date, a report of its activities hereunder, setting forth: (i) the names of the Owners and a description of the Properties, (ii) a description of the monitoring activities the Agency has undertaken with respect to the Owners and the Properties, (iii) based on such monitoring activities, a list of those Properties which are not in compliance with the Low-Income Restrictions, and (iv) if a Property is not in compliance, a description of the nature of the noncompliance and the enforcement activities the Agency has undertaken with respect to such noncompliance.

6. Record Retention; FDIC's Right to Examine Books and Records; Examination of Records by Comptroller General.

(a) The Agency shall maintain all files and records pertaining to its performance under this MOU at a single location which is secure and accessible. Records shall be retained with respect to the Agency's activities hereunder during the most recent calendar year and the three preceding calendar years.

(b) At all times during the term of this MOU and at all times during the three year period following the expiration or termination of this MOU, the FDIC and its duly authorized agents, representatives or employees may, upon not fewer than five business days' notice and at such reasonable times as the FDIC may determine, inspect, audit, and copy, at the FDIC's expense and on the premises of the Agency if appropriate facilities are available, any of the Agency's records, reports and related materials pertaining to the Agency's performance under this MOU.

(c) The Comptroller General of the United States or a duly authorized representative from the General Accounting Office shall, until three (3) years following the expiration or termination of this MOU, have access to, and the right to examine, any property within the Agency's possession or control, involving transactions related to this MOU.

7. Term of MOU and Compliance Monitoring Manual.

Unless earlier terminated in accordance with the terms hereof, the term of this MOU shall commence on the Effective Date and terminate at such time as there shall be no LURA applicable to any of the Properties. The Agency shall not be responsible for assuring compliance of the Properties prior to the Effective Date, but shall take appropriate steps, in accordance with the Compliance Monitoring Manual, to bring any non-complying Properties into compliance.

8. Termination.

(a) The FDIC may terminate this MOU without cause upon one hundred and twenty (120) days' written notice to the Agency by registered or certified mail, except that the FDIC may, upon thirty (30) days' written notice to the Agency by registered or certified mail, terminate this MOU for cause, upon the happening of either of the following events:

(i) FDIC, in its sole discretion, determines that the Agency has ceased to be a non-profit corporation authorized to operate in the State of Texas; or

(ii) The Agency materially fails to perform the services set out in the Compliance Monitoring Manual, or if there is no Compliance Monitoring Manual in effect, fails to undertake sufficient monitoring and enforcement activities to ensure compliance by the Properties with the Low-Income Restrictions, provided that in any such instance, the Agency shall have been provided with notice and an opportunity to correct any items of unsatisfactory performance in accordance with Section 4 of this MOU and shall have failed to do so.

(b) The Agency may terminate this MOU without cause upon ninety (90) days written notice to the FDIC by registered or certified mail. In addition, the Agency may, upon thirty (30) days written notice to the FDIC by registered or certified mail, provide for a substitute agency of the State, reasonably satisfactory to the FDIC, to carry out its responsibilities hereunder.

The Agency may also terminate this MOU immediately upon the cessation of its authority to operate under the laws of the State or its authority to carry out the activities required hereunder; provided, however, that the Agency agrees to notify the FDIC of any such cessation which is required to occur under the laws of the State no later than (90) days prior to the scheduled date for such cessation.

(c) Except as provided in the paragraph (d), upon any termination of this MOU, the Agency shall, no later than the date of termination, (i) prepare and provide to the FDIC a report of the type required pursuant to Section 5 hereof with respect to its activities for the period subsequent to the last such report and (ii) pay to the FDIC the proportional share of the annual administrative fee payable with respect to each Property for the part of the annual period applicable to such Properties occurring after the date of termination. If Exhibit A is amended by the FDIC pursuant to paragraph 2 (a)(ii) of this MOU, the Agency shall pay to the FDIC the proportional share of the annual administrative fee payable with respect to such Property for the part of the annual period applicable to such Property occurring after the date of such amendment.

(d) If a substitute agency of the State is approved by the FDIC to undertake the responsibilities of the Agency hereunder, such event shall not be treated as a termination of this MOU, provided that the Agency and its successor shall have satisfactorily resolved each party's entitlement to annual administrative fees for the period in which the succession occurs.

9. Exclusive Monitoring and Enforcement Agent.

Except for monitoring and enforcement activities undertaken by the FDIC and except as otherwise specifically provided in this MOU or authorized by the Final Rule or Section 21A of the FHLBA (12 U.S.C. §1441a), the Agency shall have the sole responsibility for the performance of monitoring and enforcement activities under the LURAs with respect to Properties located within the State; provided, however, that any alleged or actual violation of this provision or any other provision of this MOU shall not be a defense against any monitoring or enforcement action taken against an Owner of a Property by the Agency or any other entity, but shall only concern matters between the FDIC and the Agency, including the right to compensation for activities performed hereunder.

10. Indemnification of the Agency.

If any judicial action or legal proceeding shall be instituted against the
Agency by a third party with respect to any action of the Agency which is
authorized by the applicable Land Use Restriction Agreement or the Compliance
Monitoring Manual or which is otherwise authorized in writing by the FDIC, the
FDIC shall indemnify and hold the Agency harmless from and against any and all
loss, damage and expense which the Agency may sustain or incur by reason
thereof, including, without limitation, the amount of any judgment, plus and
costs and interest thereon, which may be entered against the Agency, as well as
reasonable attorneys, fees and expenses paid or incurred in connection
therewith.

In order to avail itself of such indemnity, the Agency must (i) notify the FDIC
immediately upon receiving notice of or information as to any such judicial
action or legal proceeding, (ii) provide the FDIC with an opportunity to defend
the Agency and/or itself in such action or proceeding with counsel chosen by the
FDIC, provided that the Agency shall be entitled to be represented by separate
counsel with respect to any claim in which the Agency believes its interests to
be adverse to those of the FDIC, and (iii) cooperate fully with the FDIC in any
such defense. Notwithstanding the foregoing, the FDIC shall not indemnify and
hold the Agency harmless with respect to any judicial action, legal proceeding,
or settlement not previously submitted to, reviewed and approved by the FDIC, or
the consequences thereof, (I) which is based on acts, failures to act or
omissions of the Agency which are determined by a court or in a legal proceeding
to be ultra vires or to constitute grounds for a writ of mandamus or to
constitute negligence, gross negligence or willful misconduct or (II) in which
the Agency is adjudged to have failed to perform its monitoring or enforcement
obligations hereunder or under the Compliance Manual or the applicable Land Use
Restriction Agreement.

11. Liability of the FDIC

Any financial liability of the FDIC under this MOU, including any obligation to
indemnify the Agency pursuant to paragraph 10 above, shall be a liability of the
FSLIC Resolution Fund and shall be limited to the resources available in such
Fund.

12. Entire Agreement/Modification.

This MOU contains the entire understanding of the parties. The terms contained
in this MOU shall not be modified or amended except as agreed to by the parties
hereto in writing.

13. Notices.

All notices required or permitted to be given hereunder shall be in writing and
deemed given when mailed to such party at its address set forth below:

To FDIC:

Federal Deposit Insurance Corporation
1910 Pacific Avenue
Dallas, Texas 75201
Attn: Affordable Housing Section Chief

With a copy to:

Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C. 20429
Attn: Director, Office Of Affordable Housing

To the Agency:

Affordable Housing Group, Inc.
1910 ESE Loop 323, #: 329
Tyler, Texas 75701
Attn: Deidra D. Young, Director of Compliance

Either party may change its address for notice purposes by giving notice to the
other party in accordance with this Section

14. Successor to the FDIC.

If the FDIC shall cease to manage the FSLIC Resolution Fund or if the FSLIC
Resolution Fund shall cease to exist as a specific entity, all rights and
obligations hereunder shall be transferred to any successor entity thereto,
unless the laws of the United States shall specifically assign the
responsibility for the monitoring and enforcement of the Low-Income Restrictions
to a different entity, in which case such entity shall assume the rights and
obligations hereunder. All references to the FDIC or to the RTC hereunder or in
the LURAs shall, unless the context shall clearly indicate otherwise, be deemed
to refer to any entity succeeding the rights and obligations hereunder.

15. Severability.

If any provision of this MOU is held to be unenforceable, invalid or illegal by
any court of competent jurisdiction, such unenforceable, invalid or illegal
provision shall not affect the remainder of this MOU.

16. Governing Law.

This MOU shall be construed in accordance with and governed by the laws of the
United States.

17. Survival.

The provisions contained in this MOU which, by their terms, require performance
after the expiration or termination of this MOU, shall be enforceable
notwithstanding the expiration or other termination of this MOU.

18. Counterparts.

This MOU may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, each party has caused this instrument to be signed on its behalf by its duly authorized agents.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation

By: _____

Name Gary Holloway
Asset Disposition & Operations

Date: JULY 9, 2002

AFFORDABLE HOUSING GROUP, INC.

By: _____

Name: Donald Cage
Title: President

Date: July 5, 2002

EXHIBIT A

LIST OF PROPERTIES AND OWNERS

[EXHIBIT SHOULD IDENTIFY FOR EACH PROPERTY: (I) OWNER; (II) PROPERTY ADDRESS;
(III) TOTAL NUMBER OF UNITS; (IV) NUMBERS OF LOW-INCOME AND VERY LOW-INCOME
UNITS; (V) MORTGAGE LENDER, IF KNOWN. IF ANY PROPERTIES ARE PART OF A BULK SALE
COMPLIANCE REGIME, SUCH PROPERTIES SHOULD BE IDENTIFIED SEPARATELY, TOGETHER
WITH ALL PROPERTIES SUBJECT TO SUCH REGIME.]

MEMORANDUM OF UNDERSTANDING                    PAGE 5
AFFORDABLE HOUSING GROUP, INC.

2

MEL WILLS JR., CLERK OF THE CIRCUIT COURT - OSCEOLA CTY    BK  1180
04/04/94  16:25   VERIFIED: TAB . INSTR #    94-025302      PG  0185

LAND USE RESTRICTION AGREEMENT
BY AND BETWEEN

RESOLUTION TRUST CORPORATION AS RECEIVER
FOR SOUTHWEST FEDERAL SAVINGS ASSOCIATION
DALLAS, TEXAS

AND

FLORIDA HOUSING AFFORDABILITY, INC.,
A FLORIDA NOT FOR PROFIT CORPORATION

(MULTIFAMILY PROPERTIES)

NOTE:   THIS DOCUMENT MUST BE REFERENCED IN THE DEED, AND MUST BE
RECORDED AND TIME STAMPED IMMEDIATELY AFTER THE DEED

Prepared By and Return To:
Bernice S. Saxon, Esq.
Salem, Saxon & Nielsen, P.A.
P.O. Box 3399
Tampa, FL  33601

October 1992
Version 2.0

| BOOK   1180   PAGE   0186 |

# TABLE OF CONTENTS

**Page**

### ARTICLE I

Definitions. . . . . . . . . . . . . . . . . . . . .    1

Section 1.1.   General . . . . . . . . . . . . . .    1
Section 1.2.   Generic Terms . . . . . . . . . . .    4

### ARTICLE II

Use and Occupancy of the Property. . . . . . . . .    4

Section 2.1.   Use of the Property . . . . . . . .    4
Section 2.2.   Occupancy Requirements. . . . . . .    5

### ARTICLE III

Rent . . . . . . . . . . . . . . . . . . . . . . .    7

Section 3.1   Rent Limitations for Qualified Tenants. . .    7

### ARTICLE IV

Administration . . . . . . . . . . . . . . . . . .    8

Section 4.1.   Lease Provisions. . . . . . . . . .    8
Section 4.2.   Examination and Reexamination of Incomes.    9
Section 4.3.   Certification by Owner. . . . . . .    9
Section 4.4.   Maintenance of Documents. . . . . .    9
Section 4.5.   Compliance Review . . . . . . . . .   10
Section 4.6.   Administrative Fee. . . . . . . . .   10
Section 4.7.   Releasee . . . . . . . . . . . . . .   11

### ARTICLE V

Representations and Warranties of Owner. . . . . .   11

Section 5.1.   Representations and Warranties . . .   11
Section 5.2.   Indemnification . . . . . . . . . . .   12

i

| BOOK   1180   PAGE   0187 |

Page

## ARTICLE VI

Enforcement and Remedies . . . . . . . . . . . . . .    13

Section 6.1.   Remedies of RTC or the Agency . . . . . . .    13
Section 6.2.   Remedies of Other Parties . . . . . . . .    13
Section 6.3.   Reliance Upon Information . . . . . . . . .    13

## ARTICLE VII

Miscellaneous . . . . . . . . . . . . . . . . . . .    14

Section  7.1.  Amendments. . . . . . . . . . . . .    14
Section  7.2.  Notices . . . . . . . . . . . . . .    14
Section  7.3.  Entire Agreement. . . . . . . . . . .    15
Section  7.4.  Governing Law . . . . . . . . . . . .    15
Section  7.5.  Severability. . . . . . . . . . . . .    15
Section  7.6.  Binding Effect; Covenants Running with
               the Land . . . . . . . . . . . . . .    15
Section  7.7.  Counterparts . . . . . . . . . . . .    16
Section  7.8.  Section Titles . . . . . . . . . . .    16

ii

| BOOK   1180   PAGE   0188 |

## LAND USE RESTRICTION AGREEMENT

THIS LAND USE RESTRICTION AGREEMENT (this "Agreement") is made and entered into this 31st day of March, 1994, by and between Resolution Trust Corporation, established pursuant to Section 501(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, acting in its capacity as Receiver for Southwest Federal Savings Association, Dallas, Texas ("Seller"), and Florida Housing Affordability, Inc., a Florida not for profit corporation ("Owner").

### Recitals

Owner has purchased from RTC certain land described on Exhibit A attached hereto and incorporated herein by reference, together with the improvements located thereon, including a 192-unit rental housing project commonly known as Three Fountains Apartments (said land and improvements are hereinafter collectively referred to as the "Property"), which constitute an "eligible multifamily housing property" as defined in Section 21A(c)(9)(D) of the Federal Home Loan Bank Act (12 U.S.C. §1441a(c)(9)(D)), as amended.

Pursuant to Section 21A(c) of the Federal Home Loan Bank Act (12 U.S.C. §1441a(c)), as amended, Owner must agree to comply with certain occupancy and rent restrictions for the remaining useful life of the Property, and the parties hereto have entered into this Agreement to evidence Owner's agreement to comply with such restrictions.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

### ARTICLE I

### Definitions

Section 1.1.  General.  Capitalized terms used in this Agreement shall have, unless the context clearly requires otherwise, the meanings specified in this Article I. Certain additional terms may be defined elsewhere in this Agreement.

1

| BOOK   1180    PAGE    0189 |

(a)  "Act" means Section 21A of the Federal Home Loan Bank Act (12 U.S.C. §1441a), as amended, or any corresponding provision or provisions of succeeding law as it or they may be amended from time to time.

(b)  "Agency" means the State Housing Finance Agency or any agency, corporation or authority of the United States government that normally engages in activities related to the preservation of affordable housing which is a successor to or assignee of RTC with respect to its powers and responsibilities hereunder.

(c)  "Annual Income" means "income" as defined in Section 3(b)(4) of the United States Housing Act of 1937 and as determined in accordance with the regulations thereunder promulgated by the Secretary.

(d)  "Agreement" means this Land Use Restriction Agreement, as it may from time to time be amended.

(e)  "Lower-Income Families" means families and individuals whose Annual Incomes do not exceed 80 percent of area median income in the area in which the Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

(f)  "Owner" means Florida Housing Affordability, Inc., a Florida non-profit corporation, as set forth at the beginning of this Agreement, or any successor in title to the Property.

(g)  "Qualified Tenant" means a family or individual tenant of a Qualifying Unit who satisfies the requirements of Section 2.2(a) of this Agreement with respect to such Qualifying Unit.

(h)  "Qualifying Unit" means a Unit that (i) is rented to either a Lower-Income Family or Very Low-Income Family and (ii) is used in complying with the lower-income occupancy requirements of Section 2.2(a). Any Unit rented to a Lower-Income Family or Very Low Income Family that is not needed to meet the lower income occupancy requirements of Section 2.2(a) will not be deemed a Qualifying Unit and will not be subject to the rent restrictions of Article IV.

(i)  "RTC" means the Resolution Trust Corporation, established pursuant to Section 501(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended.

(j)  "Regulations" means the regulations promulgated pursuant to the Act by RTC or any successor, as amended from time to time.

2

| BOOK   1180   PAGE   0190 |

(k)  "Related Entity" means, with respect to any party which
has been an Owner hereunder: (i) any spouse, parent, child,
grandchild, brother or sister of such Owner; or (ii) any person or
entity (A) that directly or indirectly controls or is controlled by
or is under common control with such Owner, (B) that is an officer
of, partner in or trustee of, or serves in a similar capacity with
respect to, such Owner or of which such Owner is an officer,
partner or trustee, or with respect to which such Owner serves in
a similar capacity, or (C) that is the beneficial owner, directly
or indirectly, of 10% or more of any class of equity securities of
such Owner or of which such Owner is directly or indirectly the
owner of 10% or more of any class of equity securities.

(l)  "Secretary" means the Secretary of Housing and Urban
Development.

(m)  "State" means the state in which the Property is located.

(n)  "State Housing Finance Agency" means the public agency,
authority, corporation, or other instrumentality of the State that
has the authority to provide residential mortgage loan financing
throughout the State.

(o)  "Term" means the period commencing on the date hereof and
continuing until the earliest to occur of the following:

(1)  the date upon which there is an involuntary loss of
the Property by Owner caused by seizure, condemnation, foreclosure
or deed in lieu of foreclosure of a mortgage or deed of trust
securing a bona fide loan from an institutional lender, or upon
which there is a change in federal law which prevents RTC or the
Agency from enforcing this Agreement; provided, however, that in
the event of loss of the Property by foreclosure or deed in lieu of
foreclosure, if the party which was Owner at the time of or
immediately prior to such foreclosure or deed in lieu of
foreclosure, or a Related Entity of such party, acquires an
ownership interest in the Property at any time thereafter, then the
covenants and restrictions set forth in this Agreement shall be
revived and shall remain in force until the further occurrence of
an event described in this subsection;

(2)  the date upon which there is a total involuntary
loss of the use of the Property for residential housing purposes by
Owner caused by fire or other casualty;

(3)  the date upon which there is a partial involuntary
loss of the Property, or of the use thereof for residential housing
purposes, caused by seizure or condemnation or by fire or other
casualty, which partial loss shall not have been restored through
repair or other restoration measure, in which event the covenants
and  restrictions  hereof  shall  be  modified  to  reflect  the
appropriate numbers of Units to be held available for Lower Income

3

BOOK 1180 PAGE 0191

Families and Very Low-Income Families, based upon the reduced number of Units in the Property and the percentages of Units for Lower-Income Families and Very Low-Income Families previously required to be maintained in the Property, which covenants and restrictions shall remain in effect for the remainder of the Term;

(4) the date upon which RTC or the Agency determines, in accordance with the Regulations, (i) that all or a portion of the Property is obsolete as to physical condition, location or other factors, making it unusable for housing purposes, and (ii) that no reasonable program of modifications is financially feasible to retain the Property or a portion of the Property to useful life; or

(5) the date which is the later of (i) forty (40) years from the date of this Agreement or (ii) fifty (50) years from the date the Property was initially occupied as multifamily housing.

(p) "Unit" means a residential accommodation constituting a part of the Property and containing separate and complete living facilities.

(q) "Very Low-Income Families" means families and individuals whose Annual Incomes do not exceed 50 percent of area median income in the area in which the Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(7)), with adjustment for family size.

Section 1.2. Generic Terms. Unless the context clearly indicates otherwise, where appropriate the singular shall include the plural and the masculine shall include the feminine or neuter, and vice versa, to the extent necessary to give the terms defined in this Article I and/or the terms otherwise used in this Agreement their proper meanings.

ARTICLE II

Use and Occupancy of the Property

Section 2.1. Use of the Property. During the Term, Owner will maintain the Property as multifamily rental housing and will rent or hold available for rental each Unit on a continuous basis; provided, however, that Owner may convert a portion of the Property to a use other than multifamily rental housing if Owner shall continue to observe and perform the covenants and restrictions contained in Sections 2.2 and 3.1 hereof.

4

| BOOK   1180   PAGE   0192 |

Section 2.2.   Occupancy Requirements.

(a)  Subject to subsections (c) and (d), during the Term, Owner will make continuously available for occupancy by Lower-Income Families as Qualifying Units (including compliance with Article III hereof) not less than 192 Units, of which not less than 39 Units shall be made available for occupancy by Very Low-Income Families.  Owner shall use its best efforts, subject to current market conditions, (i) to distribute Units reserved for Lower-Income Families and Very Low-Income Families among unit sizes in proportion to the distribution of unit sizes in the Property and (ii) to avoid concentration of Lower-Income Families or Very Low-Income Families in any area or areas of the Property.

(b)     (i)  The determination of whether the Annual Income of a family or individual occupying or seeking to occupy a Qualifying Unit exceeds the applicable income limit shall be made prior to admission of such family or individual to occupancy in a Qualifying Unit (or to designation of a Unit occupied by such family or individual as a Qualifying Unit), except that with respect to families or individuals occupying Units on the date hereof, such determination shall be made within 60 days prior to the designation of any such Unit as a Qualifying Unit.  Thereafter such determinations shall be made at least annually on the basis of an examination or reexamination of the current income of the family or individual.

(ii)  If the Annual Income of a Qualified Tenant which is a Very Low-Income Family shall be determined upon reexamination to exceed the applicable income limit for Very Low-Income Families, but not the applicable income limit for Lower-Income Families, the Unit shall be counted as occupied by a Qualified Tenant which is a Lower-Income Family other than a Very Low-Income Family during such family's or individual's continuing occupancy of such Unit in accordance with clause (iii) below, and Owner shall be required to make the next available Qualifying Unit available for occupancy in accordance with clause (iv) below.

(iii)     If the Annual Income of a Qualified Tenant shall be determined upon reexamination to exceed the applicable income limit for Lower-Income Families, the Unit occupied by such family or individual shall be counted as occupied by a Qualified Tenant (and such family shall be considered, for purposes of subsection (a) and Article III, a Qualified Tenant which is a Lower-Income Family other than a Very Low-Income Family) so long as (A) the Annual Income of such family or individual shall not be determined to exceed 140 percent of the applicable income limit for Lower-Income Families, or (B) if the Annual Income of such family or individual shall be determined to exceed 140 percent of the applicable income limit for Lower-Income Families, so long as each

5

| BOOK  1180  PAGE  0193 |

Unit of comparable or smaller size in the Property which is or
becomes available is occupied or held available for occupancy by a
new resident whose Annual Income does not exceed the applicable
income limit for Lower-Income Families (or a Unit other than a
Qualifying Unit occupied by a family or individual whose Annual
Income is determined to not exceed the applicable income limit for
Lower-Income Families is designated a Qualified Unit) until the
occupancy requirements of subsection (a) are met without counting
such over-income family or individual. If the Annual Income of a
Qualified Tenant shall be determined to exceed 140 percent of the
applicable income limit for Lower-Income Families, Owner shall not
be required to observe, with respect to such tenant, the
restrictions on maximum rents provided under Article III.

(iv) If the required occupancy by Very Low-Income
Families is not met at any time, but the requirement as to
occupancy by Lower-Income Families other than Very Low-Income
Families is met, Owner shall be required to make each available
Unit in the Property available to a Very Low-Income Family until
the required occupancy by Very Low-Income Families is achieved. If
the required occupancy by Very Low-Income Families is not met at
any time but the total requirement as to occupancy by Lower-Income
Families including Very Low-Income Families is met, Owner shall not
be required to make the next available Unit in the Property
available to a Very Low-Income Family but shall be required to make
each Qualifying Unit vacated by a Lower-Income Family available for
occupancy by a Very Low-Income Family until the required occupancy
by Very Low-Income Families is achieved. Notwithstanding the
foregoing two sentences, the State Housing Finance Agency may, upon
application by Owner, permit any such Qualifying Unit to be rented
to a Lower-Income Family other than a Very Low-Income Family if the
Agency determines (i) that Owner has taken reasonable steps to rent
such Unit to a Very Low-Income Family and has been unable to do so
and (ii) that continued vacancy will cause financial hardship to
the Property. If the Agency shall not have responded to an
application by Owner pursuant to the preceding sentence within 90
days from the date of submission thereof, such application shall be
deemed to have been granted.

(v) If neither the required occupancy by Very Low-
Income Families nor the required occupancy by Lower-Income Families
other than Very Low-Income Families is met at any time, preference
(as between potential tenants on a waiting list or simultaneous
applicants) must be given to Very Low-Income Families in the
renting of each Unit in the Property which becomes available until
the requirement as to occupancy by Lower-Income Families other than
Very Low-Income Families is met, after which the rule of clause
(iv) will apply, if necessary.

(vi) A Unit that was occupied by a Qualified Tenant
and becomes vacant shall be counted as occupied by a Qualified
Tenant until it is reoccupied for a period in excess of thirty-one

6

| BOOK   1180   PAGE   0194 |

(31) days, at which time the Unit shall be considered to be occupied by a Qualified Tenant only if the family or individual then occupying the unit satisfies the definition of a Qualified Tenant.

(c)        (i)  Anything to the contrary in the foregoing notwithstanding, Owner will not terminate the occupancy of any tenants in occupancy on the date hereof that are not Lower-Income Families or Very Low-Income Families for purposes of meeting the requirements of this Section. In the event that Owner is unable to comply with the occupancy requirements of this Section because of the occupancy at the date hereof of any Units by tenants who are not Lower-Income Families or Very Low-Income Families, or who have not been determined to be Qualified Tenants, Owner will be in compliance with this Section if each Unit which thereafter becomes vacant is occupied or held available for occupancy by Lower-Income Families or Very Low-Income Families, as the case may be, in accordance with the requirements of subsection (b) until the lower-income occupancy requirements of such subsection are met.

(ii)  If a Unit has been designated as or determined to be a Qualifying Unit, Owner must continue to treat such Unit as a Qualifying Unit for as long as it is continuously occupied by a tenant whose income does not exceed 140 percent of the applicable income limit for Lower-Income Families.

(d)  Notwithstanding the foregoing, the Secretary or the State Housing Finance Agency may, upon application by Owner, temporarily reduce the lower-income occupancy requirements set forth in subsection (a) if the Secretary or the State Housing Finance Agency determines that Owner's compliance with such requirements is no longer financially feasible. Owner will make a good-faith effort to return the lower-income occupancy to the level required by subsection (a), and the Secretary or the State Housing Finance Agency, as appropriate, will review the reduction annually to determine whether financial infeasibility continues to exist.

ARTICLE III

Rent

Section 3.1 Rent Limitations for Qualified Tenants.

(a)        (i)  The rent charged by Owner for Qualifying Units occupied by Very Low Income Families shall not exceed the maximum rent for Qualified Tenants who are Very Low-Income Families for units of the applicable size in the area, as established by RTC or the Agency or the Secretary. Such maximum rent shall be not greater than 30% of the adjusted income of a family whose income equals 50% of area median income, with adjustment for family size based upon unit type.

7

| BOOK   1180   PAGE   0195 |

(ii) The rent charged by Owner for Qualifying Units occupied by Lower-Income Families other than Very Low-Income Families shall not exceed the maximum rent for Qualified Tenants who are Lower-Income Families other than Very Low-Income Families for units of the applicable size in the area, as established by RTC or the Agency or the Secretary. Such maximum rent shall be not greater than 30% of the adjusted income of a family whose income equals 65% of area median income, with adjustment for family size based upon unit type.

(iii)     For purposes of calculating maximum rents under this section, (x) the adjustment for family size based upon unit type shall be calculated on the basis of the number of bedrooms in such unit as set forth in Exhibit B hereto and (y) the adjusted income of a family shall be calculated by subtracting from the annual income of a family at the applicable maximum income level the specific adjustments set forth in Exhibit B hereto.

(b)  Owner may make a written request to RTC for the schedule of maximum rents applicable to the Property as of the date hereof, and RTC shall provide such schedule within thirty days after (i) the date hereof or (ii) the date RTC receives such request, whichever is later.  Such rents shall be subject to annual adjustment upon publication by the U.S. Department of Housing and Urban Development of revised income limits for area lower-income and very low-income families, which adjustment shall be based upon changes in the applicable area median income limits.

(c)  If a Qualified Tenant ceases to be considered a Qualified Tenant in accordance with Section 2.2(b), Owner shall, subject to the terms of the lease and applicable law, be free to condition such family's or individual's continued occupancy in the Property upon its payment of a rental charge not subject to the limitations of this Article III.

ARTICLE IV.

Administration

Section 4.1. Lease Provisions.  All tenant leases entered into with Qualified Tenants during the Term shall contain provisions wherein each individual lessee (i) certifies the accuracy of the information provided in connection with the examination or reexamination of Annual Income of the household of such lessee, and (ii) agrees that the Annual Income and other eligibility requirements shall be deemed substantial and material obligations of his or her tenancy, that he or she will comply promptly with all requests for information with respect thereto from Owner or RTC or the Agency, and that his or her failure to provide accurate information regarding such requirements (regardless of whether such inaccuracy is intentional or unintentional) or refusal to comply

8

| BOOK   1180   PAGE   0196 |

with a request for information with respect thereto shall be deemed a violation of a substantial obligation of his or her tenancy and constitute cause for immediate termination thereof.

Section 4.2. Examination and Reexamination of Incomes.

(a)  Owner shall be responsible for determination of the Annual Income and family composition of Qualified Tenants, and for reexamination of Annual Income and family composition of Qualified Tenants at least annually, in accordance with procedures prescribed by RTC or the Agency.

(b)  As a condition of admission to occupancy of a Qualifying Unit, Owner shall require the household head and other such household member, as it designates to execute an RTC or Agency approved release and consent authorizing any depository or private source of income, or any Federal, State or local agency, to furnish or release to Owner and to RTC or the Agency such information as Owner or RTC or the Agency determines to be necessary. Owner shall also require the household to submit directly documentation determined to be necessary. Information or documentation shall be determined to be necessary if it is required for purposes of determining or auditing a household's eligibility as a Qualified Tenant, or for verifying related information. The use or disclosure of information obtained from a household or from another source pursuant to this release and consent shall be limited to purposes directly connected with administration of this Agreement.

(c)  Owner shall not be deemed to be in violation of Articles II and III of this Agreement if, in determining Annual Income and family composition of a Qualified Tenant, (i) Owner has relied in good-faith upon information which is supplied by the tenant, (ii) Owner has no reason to believe such information is false, and (iii) Owner shall have complied with all requirements of RTC or the Agency with respect to verification of household income and family composition.

Section 4.3.  Certification by Owner.  During the Term, on each anniversary of the date upon which this Agreement was first recorded in the land records of the jurisdiction in which the Property is located, or upon such other annual date as RTC or the Agency, in its discretion, upon reasonable notice to the Owner, shall establish, Owner shall submit to RTC or the Agency a certification, in a form prescribed by RTC or the Agency, as to Owner's compliance with all of the terms and provisions of this Agreement.

Section 4.4.  Maintenance of Documents.  All tenant lists, applications, leases, waiting lists, income examinations and reexaminations relating to the Property shall at all times be kept separate and identifiable from any other business of Owner which is unrelated to the Property, and shall be maintained, as required by

9

| BOOK   1180   PAGE   0197 |

RTC or the Agency, in a reasonable condition for proper audit and subject to examination and photocopying during business hours by representatives of RTC or the Agency.

Section 4.5. <u>Compliance Review</u>. RTC or the Agency periodically will monitor Owner's compliance with the requirements of this Agreement. In conducting its compliance review, RTC or the Agency will rely primarily on information obtained from Owner's records and reports, findings from on-site monitoring, and audit reports. RTC or the Agency may also consider relevant information gained from other sources, including litigation and citizen complaints. Owner shall cooperate with RTC or the Agency in any such compliance review and shall furnish all notices, information and reports reasonably required by RTC or the Agency for such purpose.

Section 4.6. <u>Administrative Fee</u>.

(a) In order to compensate RTC or the Agency for the review performed pursuant to Section 4.5, Owner shall pay to RTC (in its corporate capacity and not as receiver or conservator for the savings institution identified on the first page of this Agreement) or the Agency, as applicable, an annual administrative fee for the first twelve month period of this Agreement in the amount of $50 per Qualifying Unit required to be held available under Section 2.2(a) hereof, but in no event less than $250.

(b) If RTC or the Agency shall find the Property not to be in compliance with the terms hereof (including the requirements of this Article IV), Owner shall pay to RTC or the Agency, as applicable, an additional administrative fee in an amount prescribed from time to time by RTC or the Agency, which amount, for the first twelve month period of this Agreement shall be $50 per Qualifying Unit required to be held available under Section 2.2(a) hereof, for additional monitoring and enforcement activities undertaken with respect to the Property. The annual fee payable in the event of noncompliance shall be in addition to, and distinct from, the amount due pursuant to Section 4.6(a), as well as any reimbursements of costs and legal fees to which RTC or the Agency may be entitled as a result of judicial enforcement action, and such fee shall be payable without respect to whether RTC or the Agency undertakes or succeeds in judicial enforcement action. RTC or the Agency shall be entitled to undertake additional monitoring and enforcement activities, and to be compensated therefor, for a period of up to three years following its most recent finding of noncompliance with respect to the Property.

(c) For each twelve month period after the first twelve month period of this Agreement, the administrative fees payable hereunder shall be the amounts set forth in subsections (a) and (b) of this Section 4.6, as applicable, multiplied by the increase in the

10

| BOOK    1180    PAGE    0198 |

Consumer Price Index for All Urban Consumers (CPI-U) published by the Bureau of Labor Statistics of the United States Department of Labor (or any generally recognized successor to such Index) between the date hereof and the latest publication of such Index immediately preceding the applicable anniversary date of this Agreement.

Section 4.7.  Releases.

(a)  RTC shall --

(i)  execute such documents as may be required to evidence release of the Property from the covenants and restrictions set forth in this Agreement based upon the expiration of the Term as provided in section 1.1(o) hereof (subject, in the event of foreclosure or deed in lieu of foreclosure, to revival as set forth in Section 1.1(o)(1)), upon receipt from Owner of a certification as to the occurrence of the event giving rise to such expiration and such other evidence as RTC or the Agency may reasonably require; and

(ii)  execute an appropriate modification to this Agreement to reflect reduced requirements for occupancy by Qualified Tenants in the event of a partial loss of the Property as provided in Section 1.1(o)(3) hereof.

(b)  If RTC shall have contracted with the Agency for the performance of its responsibilities hereunder, the Agency shall execute the appropriate release and/or modification to this Agreement in the name of RTC in accordance with the terms of subsection (a) of this Section 4.7, and shall provide appropriate evidence to Owner of its authorization so to act in the name of RTC.

ARTICLE V

Representations and Warranties of Owner

Section 5.1.    Representations and Warranties.    Owner represents and warrants to RTC that:

(a)  Valid Execution.  Owner has validly executed this Agreement and the same constitutes the binding obligation of Owner. Owner has full power, authority and capacity (i) to enter into this Agreement, (ii) to carry out Owner's obligations as described in this Agreement and (iii) to assume responsibility for compliance with all applicable federal rules and regulations, including, without limitation, the Regulations.

(b)  No Conflict or Contractual Violation.  To the best of Owner's knowledge the making of this Agreement and Owner's obligations hereunder:

11

| BOOK   1180   PAGE   0199 |

(i)  will not violate any contractual covenants or restrictions (A) between Owner or any third party or (B) affecting the Property;.

(ii) will not conflict with any of the instruments that create or establish Owner's authority;

(iii)    will not conflict with any applicable public or private restrictions;

(iv) do not require any consent or approval of any public or private authority which has not already been obtained; and

(v)   are  not  threatened  with  invalidity  or unenforceability by any action, proceeding or investigation pending or threatened, by or against (A) Owner, without regard to capacity, (B) any Person with whom Owner may be jointly or severally liable, or (C) the Property or any part thereof.

(c)  No Litigation.  No litigation or proceedings are pending or  to  the  best  of  Owner's  knowledge,  threatened against Owner which  if  adversely  determined  could  individually  or  in  the aggregate have an adverse effect on title to or the use and enjoyment or value of the Property, or any portion thereof, or which could in any way interfere with the consummation of this Agreement.

(d)  No Bankruptcy.  There is not pending or, to Owner's best knowledge, threatened against Owner any case or proceeding or other action  in  bankruptcy,  whether  voluntary  or  otherwise,  any assignment for the benefit of creditors, or any petition seeking reorganization,    arrangement,    composition,    readjustment, liquidation, dissolution or similar relief for Owner under any federal,  state  or  other  statute,  law,  regulation  relating  to bankruptcy, insolvency or relief for debtors.

Section 5.2.  Indemnification.  Owner agrees to indemnify and hold harmless RTC or the Agency from and against all liabilities, losses, claims, damages, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by RTC or the Agency as a result of any material inaccuracy in any of the representations and warranties contained in Section 5.1.

12

| BOOK  1180  PAGE  0200 |

## ARTICLE VI

### Enforcement and Remedies

Section 6.1.  Remedies of RTC or the Agency.

(a)  If Owner defaults in the performance of any of its
obligations under this' Agreement or breaches any covenant,
agreement or restriction set forth herein, and if such default
remains uncured for a period of sixty (60) days after notice
thereof shall have been given by RTC or the Agency (or for an
extended period approved in writing by RTC or the Agency if the
default or breach stated in such notice can be corrected, but not
within such 60-day period, unless Owner does not commence such
correction or commences such correction within such 60-day period
but thereafter does not diligently pursue the same to completion
within such extended period), RTC or the Agency shall be entitled
to apply to any court having jurisdiction of the subject matter for
specific performance of this Agreement, for an injunction against
any violation of this Agreement, for the appointment of a receiver
to take over and operate the Property in accordance with the terms
of this Agreement or for such other relief as may be appropriate,
it being acknowledged that the beneficiaries of Owner's obligations
hereunder cannot be adequately compensated by monetary damages in
the event of Owner's default. RTC or the Agency shall be entitled
to its reasonable attorneys' fees in any such judicial action in
which RTC or the Agency shall prevail.

(b)  Each right, power and remedy of RTC or the Agency
provided for in this Agreement now or hereafter existing at law or
in equity or by statute or otherwise shall be cumulative and
concurrent and shall be in addition to every other right, power or
remedy provided for in this Agreement or now or hereafter existing
at law or in equity or by statute or otherwise, and the exercise or
beginning of the exercise by RTC or the Agency of any one or more
of the rights, powers or remedies provided for in this Agreement or
now or hereafter existing at law or in equity or by statute or
otherwise shall not preclude the simultaneous or later exercise by
RTC or the Agency of any or all such other rights, powers or
remedies.

Section 6.2.  Remedies of Other Parties.  The occupancy
requirements set forth in Section 2.2 of this Agreement also shall
inure to the benefit of, and may be judicially enforced against
Owner by, affected Lower-Income Families and Very Low-Income
Families. Any such party that prevails in any such judicial action
shall be entitled to its reasonable attorneys' fees.

Section 6.3.  Reliance Upon Information. In carrying out its
obligations hereunder, Owner shall be entitled to rely upon
information provided by RTC or the Agency with respect to (i)
income limits applicable to Lower-Income Families and Very-Low

13

| BOOK   1180   PAGE   0201 |

Income Families, (ii) the method for calculating the incomes of
such families and (iii) the maximum rents which may be charged to
such families pursuant to Section 3.1 hereof.

## ARTICLE VII

### Miscellaneous

Section 7.1. Amendments. This Agreement may not be amended or
modified except by written instrument signed by each party hereto.

Section 7.2. Notices. All notices required or permitted to be
given under this Agreement must be in writing and will be deemed to
have been duly given if delivered personally or mailed, postage
prepaid, by registered or certified United States mail, return
receipt requested, addressed to the parties at the following
addresses:

If to RTC:          Resolution Trust Corporation
                    801 17th Street, N.W.
                    Washington, DC 20434-0001
                    Attention: Director,     Affordable     Housing
                        Disposition Program

with copies to:     Resolution Trust Corporation
                    801 17th Street, N.W.
                    Washington, DC 20434-0001
                    Attention: Senior Vice President,
                        Assets/Real Estate

                    Resolution Trust Corporation
                    801 17th Street, N.W.
                    Washington, DC 20434-0001
                    Attention: Assistant General Counsel, Real
                        Estate

                    Resolution Trust Corporation
                    100 Colony Square
                    Suite 2300, Box 68
                    Atlanta, GA 30361
                    Attention: Affordable Housing Disposition
                        Specialist

If to Owner:        Florida Housing Affordability, Inc.
                    1101 North Lake Destiny Road, Suite 225
                    Maitland, FL  32751
                    Attention:  Joseph J. Savino, President

14

| BOOK  1180  PAGE  0202 |

wi'' copies to:    Benjamin Felder, Esq.
                   Riden, Earle & Kiefner, P.A.
                   100 2nd Avenue South
                   Suite 400 North Tower
                   St. Petersburg, FL  33701

Any party may change its address for notice purposes by giving
notice to the other parties in accordance with this Section 7.2.

   Section 7.3. Entire Agreement.  This Agreement contains the
entire understanding between the parties hereto with respect to the
subject matter hereof.

   Section 7.4. Governing Law.  This Agreement, as it may affect
the rights, remedies and obligations of RTC or the Agency, shall be
governed by and construed in accordance with federal law. Insofar
as federal law does not apply, the provisions of this Agreement
shall be governed by and construed in accordance with the laws of
the State.

   Section 7.5. Severability.  This Agreement is intended to be
performed in accordance with, and only to the extent permitted by,
all applicable laws, ordinances, rules and regulations. If any
provision of this Agreement or the application thereof to any
person or circumstance shall be held invalid or unenforceable, the
remainder of this Agreement and the application of such provision
to other persons or circumstances shall not be affected thereby,
but rather shall be enforced to the greatest extent permitted by
law.

   Section 7.6. Binding Effect; Covenants Running with the Land.
During the Term, this Agreement and the covenants, reservations and
restrictions contained herein shall be deemed covenants running
with the land for the benefit of RTC and its successors, and shall
pass to and be binding upon Owner's heirs, assigns and successors
in title to the Property, or if the Property shall not include
title to land, but shall include a leasehold interest in land, this
Agreement and the covenants, reservations et al shall bind the
leasehold interest as well as the Property and shall pass to and be
binding upon all heirs, assigns and successors to such interests;
provided, however, that upon expiration of the Term in accordance
with the terms hereof said covenants, reservations and restrictions
shall expire. Each and every contract, deed or other instrument
hereafter executed covering or conveying the Property or any
portion thereof shall conclusively be held to have been executed,
delivered and accepted subject to such covenants, reservations and
restrictions, regardless of whether such covenants, reservations
and restrictions are set forth in such contract, deed or other
instruments. If a portion or portions of the Property are conveyed,
all of such covenants, reservations and restrictions shall run to
each portion of the Property. Owner, at its cost and expense, shall
cause this Agreement to be duly recorded or filed and re-recorded

15

| BOOK   1180   PAGE   0203 |

or refiled in such places, and shall pay or cause to be paid all recording, filing, or other taxes, fees and charges, and shall comply with all such statutes and regulations as may be required by law, in the opinion of qualified counsel, in order to establish, preserve and protect the ability of RTC or the Agency to enforce this Agreement.

Section 7.7. <u>Counterparts</u>. This Agreement and any amendments hereto may be executed in several counterparts, each of which shall be deemed to be an original copy, and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

Section 7.8. <u>Section Titles</u>. Section titles and the table of contents are for descriptive purposes only and shall not control or limit the meaning of this Agreement as set forth in the text.

IN WITNESS WHEREOF, the undersigned have hereunto affixed their signatures and seals as of the date first above written.

ATTEST:

By: _____
Printed Name: DANA R. GEACH
Title: MULTIFAMILY SPECIAL CHIEF
AFFORDABLE HOUSING

SELLER:
RESOLUTION TRUST CORPORATION AS RECEIVER FOR SOUTHWEST FEDERAL SAVINGS ASSOCIATION, DALLAS, TEXAS

By: _____
Printed Name: _____

Attorney-in-fact for Resolution Trust Corporation pursuant to Power of Attorney dated MARCH 4 , 1994

16

| BOOK 1180 PAGE 0204 |

OWNER:
FLORIDA HOUSING AFFORDABILITY,
INC., A FLORIDA NOT FOR PROFIT
CORPORATION

ATTEST:

By: _____      By: _____
Printed Name: _____      Print Name: JOSEPH J. SAVIO
Title: _____      Title: President

### Acknowledgments

STATE OF Georgia
COUNTY OF DeKalb

The foregoing instrument was acknowledged before me on this 28th day of March, 1994, by L LEROY Hill on behalf of the Resolution Trust Corporation, a corporation organized and existing under the laws of the United States, as Receiver for Southwest Federal Savings Association, Dallas, Texas, who is personally known to me or has produced N.A. as identification and who did take an oath.

_____
Notary Public, State of

Notary Public, DeKalb County, Georgia.
My Commission Expires June 1, 1997

My Commission Expires: _____
My Commission Number: _____


STATE OF FLORIDA
COUNTY OF Hillsborough

The foregoing instrument was acknowledged before me on this 31st day of March, 1994, by JOSEPH J. SAVINO as its PRESIDENT on behalf of Florida Housing Affordability, Inc., a Florida not for profit corporation, who is personally known to me or has produced FL DRIVERS LICENSE as identification and who did take an oath.

_____
Notary Public, State of
Florida

My Commission Expires: _____
My Commission Number: _____

JOANNE J. FOMUSE
MY COMMISSION # CC 205203
EXPIRES: April 29, 1997
Bonded Thru Notary Public Underwriters

| BOOK   1180   PAGE   0205 |

## EXHIBIT "A"

### DESCRIPTION OF THE REAL PROPERTY

From the Southeast corner of Section 17, Township 25 South, Range
29 East, run along the East line of said Section 17, North 0°20'0"
West, 2520.00 feet to the Point of Beginning, from said Point of
Beginning continue North 0°20'09" West 410.96 feet; thence run
North 89°42'49" West 1060.20 feet; thence South 0°20'09" East
410.96 feet; thence run East to the Point of Beginning, less the
East 30 feet for road right-of-way, said lands lying and being in
Osceola County, Florida.

| BOOK    1180    PAGE    0205 |

<u>EXHIBIT "A"</u>

<u>DESCRIPTION OF THE REAL PROPERTY</u>

From the Southeast corner of Section 17, Township 25 South, Range
29 East, run along the East line of said Section 17, North 0°20'0"
West, 1520.00 feet to the Point of Beginning, from said Point of
Beginning continue North 0°20'09" West 410.96 feet; thence run
North 89°42'19" West 1060.20 feet; thence South 0°20'09" East
410.96 feet; thence run East to the Point of Beginning, less the
East 30 feet for road right-of-way, said lands lying and being in
Osceola County, Florida.



| BOOK   1180   PAGE   0206 |

## EXHIBIT B

## FAMILY SIZE AND INCOME ADJUSTMENTS

### A.    Family Size Adjustments.

For purposes of Section 3.1(a)(iii)(x), rents for units will be calculated on the basis of the size of household anticipated to occupy a unit with the particular number of bedrooms as follows:

| Unit Size | | | | | |
|---|---|---|---|---|---|
| 0-Bedroom | 1-BR | 2-BR | 3-BR | 4-BR | 5-BR |

| Household Size | | | | | |
|---|---|---|---|---|---|
| 1 Person | 3 Pers. | 3 Pers. | 5 Pers. | 7 Pers. | 8 Pers. |

Thus, for example, rent for a 3-bedroom unit occupied by a very low-income family will be based upon the HUD-determined income for a household at 50% of area median income which has 5 members. The rent for a 2-bedroom unit occupied by a lower-income household will be based upon the HUD figure for a household at 65% of median income which has 3 members.

### B.    Income Adjustments.

Prior to the rent calculation, the applicable income limit must be reduced by an adjustment based upon unit size as follows:

| Unit Size | | | | | |
|---|---|---|---|---|---|
| 0-Bedroom | 1-BR | 2-BR | 3-BR | 4-BR | 5-BR |

| Income Adjustment | | | | | |
|---|---|---|---|---|---|
| $800 | $800 | $880 | $1,560 | $1,560 | $2,040 |

The applicable amount must be subtracted from the applicable income limit before multiplying by 30% in order to determine maximum rent.

Filing # 165625225 E-Filed 01/27/2023 01:58:27 PM

IN THE CIRCUIT COURT IN AND FOR
THE NINTH JUDICIAL CIRCUIT
OSCEOLA COUNTY, FLORIDA

AFFORDABLE HOUSING GROUP, INC.,          CASE NO.:  2020-CA-170
as an agent of the FEDERAL DEPOSIT
INSURANCE CORPORATION, as Manager
of the FSLIC Resolution Fund, successor in
interest to the Resolution Trust Corporation,

      Plaintiff,

v.

FLORIDA HOUSING AFFORDABILITY, INC.,

      Defendant.

_____/

## AMENDED NOTICE OF TAKING DEPOSITION DUCES TECUM
### (Via Zoom)

PLEASE TAKE NOTICE THAT Defendant/Counter-Plaintiff, FLORIDA HOUSING

AFFORDABILITY, INC. by and through its undersigned counsel, will take the deposition at the

time and place set forth hereinafter, upon oral examination before Huseby Court Reporting, an

official court reporter, or any other officer duly authorized by law to take depositions:

| DEPONENT | DATE/TIME | LOCATION |
|---|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION** | **March 2, 2023 at 10:00 A.M.** | **Via Zoom**<br>Join Zoom Meeting<br><br>https://us02web.zoom.us/j/81302016403?pwd=TlJrM3IyNHZ6TFVnTXhmUHgvb3YrQT09<br><br>Meeting ID: 813 0201 6403<br>Passcode: 745579 |

The above-named deponent is required to produce at the taking of said deposition any and

all documents listed on Exhibit "A" attached hereto.

This deposition is being taken pursuant to Rule 1.310, Florida Rules of Civil Procedure, and for such other purposes as are permitted under the applicable and governing rules.

PLEASE BE GOVERNED ACCORDINGLY.

Dated: January 27, 2023.

/s/ *Jason R. Hawkins*
Jason R. Hawkins
Florida Bar No.: 11925
jhawkins@southmilhausen.com
South Milhausen, P.A.
1000 Legion Place, Suite 1200
Orlando, Florida 32801
Telephone: (407) 539-1638
Facsimile: (407) 539-2679
*Attorneys for Defendant,*
*Florida Housing Affordability, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2023, a true and correct copy of the foregoing was filed via the Florida e-Portal which will serve an electronic copy to Russell E. Klemm, Esq. at rklemm@clayton-mcculloh.com and cpraria@clayton-mcculloh.com (*Attorney for Plaintiff*).

/s/ *Jason R. Hawkins*
Jason R. Hawkins

2

# EXHIBIT "A"

## DEFINITIONS

1.     As used herein, "You" and/or "Your", "FDIC", shall refer to FEDERAL DEPOSIT INSURANCE CORPORATION, in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation, and any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of FDIC.

2.     As used herein, "AHG" means AFFORDABLE HOUSING GROUP, INC., and any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of AHG.

3.     As used herein, "FHA", shall refer to Florida Housing Affordability, Inc., and any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of FDIC.

4.     "FHFC" means Florida Housing Finance Corporation, and any employees, agents, attorneys, contractors, sub-contractors, or other persons acting for, on behalf of, or at the request of FHFC.

5.     The Term "Memorandum of Understanding for Monitoring and Enforcement" shall mean the Memorandum of Understanding for Monitoring and Enforcement dated July 9, 2002 by and between the FDIC acting in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation and AHG, a copy of which is attached hereto as **Exhibit "1"**.

6.     The term "LURA" shall mean the Land Use Restriction Agreement for the "Three Fountains Apartments" dated March 31, 1994 and recorded on April 4, 2994 in the Osceola County, Florida public records at Official Records Book 1180, Page 0185, a copy of which is attached hereto as **Exhibit "2"**.

7.     The term "Property" shall refer to the Three Fountains Apartments as more particularly described in the LURA.

8.     The word "document" is used in the broad and liberal sense and means any written, typed, printed, recorded or graphic matter, however produced or reproduced, of any kind and description, whether sent, received, or neither, and all copies which differ in any way from the original (whether by interlineations, stamped received, notation, indication of copy sent or received, or otherwise) regardless of whether designated confidential, privileged or otherwise and whether an original, master, duplicate or copy, including, but not limited to, papers, notes, account statements or summaries, ledgers, pamphlets, periodicals, books, advertisements, electronic mail, computerized information, objects, letters, memoranda, notes or notations of conversations, contracts, agreements, drawings, telegrams, audio or video tape recordings, communications, including inter-office and intra-office memoranda, delivery tickets, bills of lading, invoices, quotations, claims documents, reports, records, studies, work sheets, working papers, corporate

records, minutes of meetings, circulars, bulletins, notebooks, bank deposit slips, bank checks, canceled checks, check stubs, diaries, diary entries, appointment books, desk calendars, data processing cards and/or tapes, computer software, photographs, transcriptions or sound recordings of any type of personal or telephone conversations, interviews, negotiations, meetings or conferences, or any other things similar to any of the foregoing.

9. As used herein, the word "communication" means any words heard, spoken, written or read, regardless of whether designated confidential, privileged or otherwise, and including, without limitation: (a) Words spoken or heard at any meeting, discussion, interview, encounter, conference, speech, conversation or other similar occurrence; and (b) Words written on or read from any document(s) as described above.

10. As used herein, the term "person" means individuals or entities of any type, including, but not limited to, natural persons, governments (or any agencies thereof), quasi-public entities, corporations, partnerships, groups, mutual or joint ventures and other forms of organizations or associations.

11. As used herein, the words or phrases, "explaining", "describing", "defining", "concerning", "reflecting", or "relating to" when used separately or in conjunction with one another mean directly or indirectly mentioning, pertaining to, involving, being connected with or embodying in any way or to any degree the stated subject matter.

12. When the context herein makes it appropriate, each singular word shall include its plural and each plural word shall include its singular.

13. "Evidencing" means tending to show, in any probative manner, the existence or nonexistence of any matter.

14. "Or" and "and" mean "and/or" in any request, where the meaning would have an effect of bringing additional communications, documents, and files within the scope of a request.

## TIME PERIOD

Unless otherwise specified herein, the time period covered in this Duces Tecum is for the period from January 1, 2012 to the present.

## DOCUMENTS REQUESTED

1. Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or relate to any communication(s) between FDIC and AHG, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the LURA and/or Property.

4

      2.     Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or relate to any communication(s) between FDIC and AHG, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the Memorandum of Understanding for Monitoring and Enforcement specifically with respect to the LURA, the Property and/or FHA.

      3.     Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or relate to any communication(s) between FDIC and FHFC, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the LURA, the Property, and/or FHA.

      4.     Produce all documents that constitute, evidence, concern, reflect or that otherwise refer or relate to any communication(s) between FDIC and FHA, including, but not limited to, all e-mail communications, notes, and correspondence that relate to the LURA, the Property, and/or FHA.

      5.     Copies of any and all compliance reviews performed by You for the Property, pursuant to Section 4.5 of the LURA.

1

MEMORANDUM OF UNDERSTANDING
FOR MONITORING AND ENFORCEMENT


By and Between

the

FEDERAL DEPOSIT INSURANCE CORPORATION,
acting in its capacity as Manager of the
FSLIC Resolution Fund, successor in interest to
the Resolution Trust Corporation

and

AFFORDABLE HOUSING GROUP, INC.
(the "Agency")

_____July_____ _o 9_, 2002

MEMORANDUM OF UNDERSTANDING
FOR MONITORING AND ENFORCEMENT

WHEREAS, certain Properties have been sold and certain other such eligible Properties may be sold in the State pursuant to the requirements of the Affordable Housing Disposition Program of the former Resolution Trust Corporation (the "RTC") as set forth in Section 21A(c) of the Federal Home Loan Bank Act (the "FHLBA") (12 U.S.C §1441a(c));

WHEREAS, the Owners of such Properties have entered or will enter into Land Use Restriction Agreements ("LURAs") with respect to the Owners' obligations to comply with the occupancy, rent and resale restrictions with respect to the Properties, as set out in Section 21A(c) of the FHLBA and in the Final Rule for the RTC's Affordable Housing Disposition Program;

WHEREAS, the LURAs provide that the RTC, its successor, or a Agency contracted by the RTC or its successor shall monitor the compliance of the Owners with the occupancy, rent and resale restrictions set out in the LURAs;

WHEREAS, the LURAs and Section 21A(c)(11)(B) of the FHLBA (12 U.S.C. §1441a(c)(11)(B)) authorize the RTC, its successor, and other specified parties to judicially enforce the occupancy, rent, income and resale restrictions set out in the LURAs against purchasers of such Properties, or their successors in interest;

WHEREAS, pursuant to Section 21A(m) of the FHLBA (12 U.S.C.§1441a(m)) upon the termination of the RTC, all of its rights and obligations were transferred to the FSLIC Resolution Fund as the successor in interest to the RTC;

WHEREAS, pursuant to Section 11A of the Federal Deposit Insurance Act, (12 U.S.C. §1821a), the Federal Deposit Insurance Corporation (the "FDIC") is responsible for the management of the FSLIC Resolution Fund; and,

WHEREAS, the FDIC, as the manager of the FSLIC Resolution Fund, successor in interest to the RTC, and the Agency have agreed that the Agency will, for itself and on behalf of the FDIC, under the terms and conditions set forth herein, monitor and enforce the compliance of the Owners with the occupancy, rent and resale restrictions set out in the LURAs;

NOW THEREFORE, in consideration of the mutual promises herein set forth, the FDIC, acting in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust corporation, and the Agency enter into this Memorandum of Understanding and agree as follows:

1. Definitions.

The capitalized terms used herein shall have the meanings given them below and such meanings shall be equally applicable to the singular and the plural forms of such terms, as the context may require.

"Agency" shall mean Affordable Housing Group, Inc., together with its successors and assigns, located at: 1910 ESE Loop 323, # 329, Tyler, Texas 75701.

"Compliance Monitoring Manual" shall mean the Compliance Monitoring Manual for State Agencies attached hereto as Exhibit B.

"Condominium Owners" shall mean nonprofit organizations, public agencies and for-profit entities that purchased Condominium Properties from the RTC in bulk pursuant to Section 21A(c) of the FHLBA (12 U.S.C. §1441a(c)).

"Condominium Property" shall mean an "eligible condominium property" under Section 21A(c)(9)(D) of the FHLBA (12 U.S.C. §1441a(c)(9)(D)) that is sold to a Condominium Owner subject to the Multifamily Occupancy Requirements, the Rent Restrictions and the Condominium Resale Restrictions, under the terms of the applicable LURA.

"Condominium Resale Restrictions" shall mean the requirement that a single Condominium Property may be sold by a Condominium Owner only to a purchaser that is a Lower-Income Family (i) which agrees to occupy, and certifies in writing that it intends to occupy, such property as a principal residence for at least 12 months; and (ii) which enters into an agreement providing for the recapture of seventy-five percent (75%) of the profits from the resale of such property, if such resale takes place within 12 months after such purchase, all as more fully provided in the applicable LURA.

"Effective Date" shall mean _____July    09_____, 2002.

"FDIC" shall mean the Federal Deposit Insurance Corporation, acting in its capacity as manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation, pursuant to Section 21A(m)(2) of the Federal Home Loan Bank Act (12 U.S.C. §1441a(m)(2)), and Section 11A of the Federal Deposit Insurance Act (12 U.S.C. §1821a).

"FHLBA" shall mean the Federal Home Loan Bank Act, 12 U.S.C. §1421, et seq.

"Final Rule" shall mean the final rule for the RTC's Affordable Housing Disposition Program, codified at 12 C.F.R. §1609, et seq., as such rule may be modified or amended from time to time by the RTC or its successor.

"Low-Income Restrictions" shall mean occupancy, rent, income and resale restriction set out in Section 21A(c) of the FHLBA (12 U.S.C. §1441a(c)), the Final Rule, and the applicable LURA, including without limitation, the Occupancy Restrictions, the Rent Restrictions and the Resale Restrictions.

"Lower-Income Families" shall mean families and individuals whose annual incomes do not exceed 80 percent of area median income in the area in which the particular Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

"LURA" shall mean the Land Use Restriction Agreement entered into by the Owner, setting forth the Owner's obligation to comply with the applicable occupancy, rent and resale restrictions with respect to the Owner's Property.

"MOU" shall mean this Memorandum of Understanding for Monitoring and Enforcement between the FDIC, acting in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation, and the Agency.

"Multifamily Occupancy Requirement" shall mean the requirement to set-aside a minimum number of units in a Multifamily Property or a Condominium Property (or a group of such Multifamily Properties or Condominium Properties) for occupancy by Lower-Income Families and Very Low-Income Families, in accordance with

Sections 21A(c)(3) and (14) of the FHLBA (12 U.S.C. §1441a(c)(13) and (14)) and
the applicable LU'

"Multifamily Owners" shall mean owners of Multifamily Property purchased
pursuant to Section 21A(c)(3) of the FHLBA (12 U.S.C. §1441a(c)(3)), and any
successors in title to such owners.

"Multifamily Property" shall mean the eligible Multifamily Properties purchased
by Multifamily Owners pursuant to Section 21A(c)(3) of the FHLBA (12 U.S.C.
§1441a(c)(3)), and subject to the Multifamily Occupancy Requirements and the
Rent Restrictions.

"Occupancy Requirements" shall mean the Multifamily Occupancy Requirement and
the Single Family Occupancy Requirement.

"Owners" shall mean the Multifamily Owners, the Single Family Owners and the
Condominium Owners.

"Property" or "Properties" shall mean, individually and collectively, the
Multifamily Properties, the Single Family Properties and the Condominium
Properties subject to this MOU and listed in Exhibit A hereto.

"Qualifying Units" shall mean the total units in a Property or Properties
required to be set aside to meet the Multifamily Occupancy Requirement or the
Single Family Occupancy Requirement, as applicable.

"Rent Restrictions" shall mean the applicable rent limits for Qualifying Units
in a Property, as provided in the applicable LURA.

"Resale Restrictions" shall mean the Single Family Resale Restrictions and the
Condominium Resale Restrictions.

"RTC" shall mean the former Resolution Trust Corporation as established pursuant
to Section 501(a) of the Financial Institutions Reform, Recovery, and
Enforcement Act of 1989, as amended (Section 21A of the Federal Home Loan Bank
Act; 12 U.S.C. §1441a).

"Secretary" shall mean the Secretary of Housing and Urban Development.

"Single Family Occupancy Requirement" shall mean the requirement that Single
Family Owners set-aside not less than 100% of all eligible Single Family
Property for occupancy by Lower-income Families, as evidenced by the applicable
LURA.

"Single Family Owners" shall mean nonprofit organizations or governmental
agencies which purchased Single Family Property from the RTC or a previous
Single Family Owner in accordance with Section 21A(c)(2)(B) of the FHLBA (12
U.S.C. §1441a(c)(2)(B)).

"Single Family Property" shall mean a one-to-four unit property purchased by a
Single Family Owner pursuant to Section 21A(c)(2)(B) of the FHLBA (12 U.S.C.
§1441a(c)(2)(B)), and subject to the Single Family Occupancy Requirement, the
Rent Restrictions and the Single Family Resale Restrictions.

"Single Family Resale Restrictions" shall mean the requirement that a Single
Family Property may be sold by a Single Family Owner only to a purchaser that is
a Lower-Income Family (i) which agrees to occupy, and certifies in writing that

it intends to occupy, su  Single Family Property as   principal residence for at least 12 months, and  ii) which enters into an a  ement providing for the recapture of seventy-five percent (75%) of the profits from the resale of such property, if such resale takes place within 12 months after such purchase, all as more fully provided in the applicable LURA.

"State" shall mean any state of the United States where properties have been sold through RTC's Affordable Housing Disposition Program and where FDIC has assigned those properties to the Agency to monitor.

"Very Low-Income Families" shall mean families and individuals whose Annual Incomes do not exceed 50 percent of area median income in the area in which the particular Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

2. Monitoring and Enforcement.

(a) Properties and Owners

(i) Inclusion of Properties in Exhibit A - The Properties that the Agency shall monitor under the terms of this MOU, and the Owners thereof, are identified in Exhibit A hereto and incorporated herein. The FDIC may amend Exhibit A at any time to add as Properties additional properties located within the State which have been sold through the RTC's Affordable Housing Disposition Program, upon thirty (30) days written notice to the Agency by registered or certified mail. Upon so amending Exhibit A, the FDIC shall (i) furnish the Agency with copies of the LURA executed with respect to each such property, (ii) advise the Agency as to which of the forms of LURA generally used served as the basis for the LURA for such property and (iii) notify the Agency of any variations in the terms thereof from those of the general form of LURA upon which it was based.

The Agency shall amend Exhibit A to reflect (i) a change in the Owner of a Property as set forth in the related LURA, (ii) the release of a Property from the requirements of the related LURA in accordance with the terms thereof, or (iii) any change in the number of Qualifying Units required to be maintained in a particular Property or group of Properties. The Agency shall notify the FDIC in writing within thirty (30) days of making any such amendment to Exhibit A.

(ii) Removal of Properties from Exhibit A - Upon sixty (60) days written notice to the Agency by registered or certified mail, the FDIC may, without cause, amend Exhibit A to remove any Property listed therein from any or all of the requirements of this MOU.

(b) Agreement to Monitor and Enforce Compliance with the LURAs.

The Agency hereby agrees to monitor and enforce, for itself and on behalf of the FDIC, the compliance of the Owners with all occupancy, rent and resale requirements set out in Section 21A(c) of the FHLBA (12 U.S.C. §1441a(c)) and the applicable LURAs, including, but not limited to, the Occupancy Requirements, the Rent Restrictions and the Resale Restrictions.

(c) Compliance Monitoring Procedures.

The specific services that the Agency shall perform pursuant to this MOU are set out in the Compliance Monitoring Manual attached hereto as Exhibit B and incorporated herein by reference. The Agency shall at all times perform its

duties in accordance with the Compliance Monitoring Manual, provided, however, that the Agency shall be and hereby is authorized to take any and all action authorized by the FHLBA, the Final Rule, the LURAs or the laws of the State which may be necessary or desirable, in its discretion, in order to monitor or assure compliance by the Owners and the Properties with the terms of the LURAs, in particular the Low-Income Restrictions. No monitoring or enforcement action taken by the Agency which is otherwise permitted under the FHLBA, the Final Rule, the LURAs or the laws of the State shall fail or be held to be impermissible because it is not specifically identified or authorized in the Compliance Monitoring Manual. The Agency shall carry out its monitoring and enforcement functions in the State.

After prior consultation with the Agency, the FDIC may amend, modify or replace the Compliance Monitoring Manual. The FDIC shall notify in writing and file with the Agency any such amendment, modification or replacement within thirty (30) days after FDIC's authorization and approval thereof. The replacement, amendment, or modification of the Compliance Monitoring Manual shall in no way be deemed to limit the monitoring and enforcement authority of the Agency hereunder, nor to diminish its obligation to assure that the Owners comply fully with the requirements of the LURAs, in particular the Low-Income Restrictions.

Together with the Compliance Monitoring Manual and appended hereto as Exhibit B-2, FDIC is providing the Agency with the standard forms of LURAs used with respect to Properties to be monitored by the Agency within the State. FDIC agrees to consult with the Agency prior to making any changes in the standard forms of LURAs as hereinafter provided to the Agency.

(d) Judicial Enforcement by FDIC and the Agency.

If the Agency shall find that a Property is not in compliance with the Low-Income Restrictions and if the Agency shall determine that administrative measures have not been effective or are not likely to be effective in bringing such Property into compliance, the Agency may commence appropriate judicial enforcement action pursuant to authority provided under the FHLBA, the laws of the State, and/or the terms of the applicable LURA. No less than thirty (30) days prior to actual commencement of such a judicial enforcement action, the Agency shall notify the FDIC in writing of its intent to do so.

If, prior to commencing such an enforcement action or during the prosecution thereof, the Agency shall determine that, for reasons of administrative capacity, the adequacy of compensation pursuant to Section 3 of this MOU, or other reasons unrelated to the merits of the particular enforcement action, it is unwilling to commence or continue such action on its own, the Agency shall so advise the FDIC in writing and the FDIC may take such steps as the FDIC deems appropriate to ensure compliance by the Owner(s). Nothing in this MOU shall be deemed to limit the FDIC's authority under the FHLBA, the laws of the United States or the LURAs to carry out such monitoring or enforcement activities with respect to the Low-Income Restrictions as it shall determine to be appropriate.

(e) Agreements With Other Monitoring Agencies.

The Agency is authorized to enter into cooperative agreements with State Housing Finance Agencies (as defined in Section 21A(c)(9)(P) of the FHLBA, 12 U.S.C. §1441a(c)(9)(P)) and/or other parties with responsibility for monitoring or enforcing LURAs governing eligible residential properties, whether such properties are located within or without the State, whenever the Agency determines that any such agreement will further the purposes of this MOU or will

assist any other party in performing monitoring and enforcement activities under a LURA with respect to a property. Any such cooperative agreement may provide for such division of administrative fees payable under the LURAs which are the subject of such cooperative agreement as the parties thereto deem appropriate, and if such cooperative agreement provides in writing for a division of responsibilities, the assumption of responsibilities by such State Housing Finance Agency or other party shall relieve or discharge the Agency of the responsibility so assumed.

The Agency shall provide the FDIC with written notice of its intent to enter into such an cooperative agreement no less than thirty (30) days prior to the date of actual execution of the agreement. Such written notice shall include a copy of the agreement to be executed.

(f) Agreements For Performance of Monitoring and Enforcement Activities.

The Agency is authorized to enter into agreements with any party to provide for the performance of specific functions under the Compliance Monitoring Manual or for the carrying out of any of its monitoring or enforcement obligations hereunder whenever the Agency determines that any such agreement will further the purposes of this MOU, provided, however, that only the Agency, or another entity authorized under the laws of the State to prosecute, may commence or prosecute judicial enforcement actions in its own name. By entering into any such agreements, the Agency does not relinquish ultimate responsibility for performance of the obligations comprehended by this MOU and the Compliance Monitoring Manual.

The Agency shall provide the FDIC with written notice of its intent to enter into any such agreement no later than thirty (30) days prior to the date of actual execution of the agreement. Such written notice shall include a copy of the agreement to be executed.

(g) Agency as Owner.

FDIC and the Agency agree that, if the Agency shall be the Owner of any Properties, all of the terms hereof and of the Compliance Monitoring Manual shall apply to the Agency with regard to such Properties; provided, however, that in addition, the Agency agrees promptly to notify the FDIC of any finding of noncompliance with respect to any such Property and of the action which it proposes to take to correct such noncompliance; and provided, further, that if the Agency shall own a Property for more than two years, the FDIC shall be authorized to designate another party, whether a governmental agency of the State or any other state, or a private contractor, to carry out monitoring and enforcement activities on its behalf with respect to such Property and to collect the attendant fees.

3. Compensation.

(a) Annual Administrative Fees.

The Agency shall be entitled to collect from the Owners annual administrative fees for performing the monitoring and enforcement services set forth in the Compliance Monitoring Manual. Annual administrative fees shall be payable in such installments and at such times during the year, whether in advance or in arrears, as the Agency shall determine.

(i) Multifamily Property and Condominium Properties. The Agency shall be entitled to collect from the Owners of Multifamily Property and Condominium Property an annual administrative fee of $50 per Qualifying Unit; provided, however, that the Agency shall be entitled to collect a minimum fee of $250 per Multifamily Property or Condominium Property. Annual administrative fees shall be adjusted for inflation as provided in the applicable LURAs. The Agency shall not be entitled to collect an administrative fee from a Lower-Income Family that purchases a Qualifying Unit in a Condominium Property in accordance with the resale restrictions set forth in the applicable LURA.

(ii) Single Family Property. The Agency shall be entitled to collect from the Owners of Single Family Property an annual administrative fee of $50 per Property, adjusted for inflation as provided in the applicable LURA.

(b) Property Noncompliance Fees.

Upon finding noncompliance by a Property with the Low-Income Restrictions or the administrative requirements of the LURA, the Agency shall be entitled to charge an annual administrative fee (not exceeding $50 per Qualifying Unit or such other maximum as is applicable under the LURA after adjustment for inflation as provided therein) sufficient to compensate it for the additional monitoring and enforcement activities undertaken. The Agency shall carry out such additional monitoring and enforcement activities for such time period as it determines appropriate to ensure continued compliance by the Property and shall be entitled to compensation for such activities for a period of up to three calendar years following the year of the most recent finding of noncompliance. Any such fees are in addition to, and distinct from, any reimbursements of costs and legal fees to which the Agency may be entitled as a result of judicial enforcement action, and such fees will be payable without regard to whether the Agency undertakes or succeeds in judicial enforcement action.

(c) Conflict With LURAs.

In the event of a conflict between the provisions for payment of fees hereinabove set forth and the terms of a particular LURA, the terms of the LURA shall govern; provided, however, that the Agency shall be permitted to negotiate with the particular Owner for fee terms comparable to those set forth above. If the Agency shall make a finding of noncompliance with respect to a particular Property but shall be unable to collect the fee described in subsection (b) hereof for additional monitoring and enforcement activities because the LURA executed with respect to such Property made no provision for such fee, the Agency may notify the FDIC of any such noncompliance and advise the FDIC that it will not undertake additional monitoring and/or enforcement activities with respect to such Property without receiving equivalent compensation. In such event, FDIC may (i) undertake additional monitoring and enforcement activities directly or (ii) pay to the Agency the additional administrative fee which would have been payable under the applicable LURA had it included the provision for such fees incorporated in the standard form of LURA, in which event the Agency shall undertake appropriate additional monitoring and enforcement activities.

4. Evaluation.

Twelve (12) months after the Effective Date and annually thereafter, the FDIC will evaluate the Agency's performance under this MOU and the Compliance Monitoring Manual. If the FDIC determines, upon an annual evaluation or at any other time, that the Agency's monitoring and enforcement activities hereunder and/or thereunder are unsatisfactory, the FDIC shall provide written notice to

the Agency of the specific items of unsatisfactory performance and provide the Agency a reasonable opportunity to correct such unsatisfactory performance.

5. Semi-Annual Reports.

The Agency shall timely prepare and provide to the appropriate FDIC regional office and to the Washington office of the FDIC, each at the addresses provided hereinafter at Section 12, for each semi-annual period or portion thereof in which this MOU is in effect, the first such period being deemed to have commenced on the Effective Date, a report of its activities hereunder, setting forth: (i) the names of the Owners and a description of the Properties, (ii) a description of the monitoring activities the Agency has undertaken with respect to the Owners and the Properties, (iii) based on such monitoring activities, a list of those Properties which are not in compliance with the Low-Income Restrictions, and (iv) if a Property is not in compliance, a description of the nature of the noncompliance and the enforcement activities the Agency has undertaken with respect to such noncompliance.

6. Record Retention; FDIC's Right to Examine Books and Records; Examination of Records by Comptroller General.

(a) The Agency shall maintain all files and records pertaining to its performance under this MOU at a single location which is secure and accessible. Records shall be retained with respect to the Agency's activities hereunder during the most recent calendar year and the three preceding calendar years.

(b) At all times during the term of this MOU and at all times during the three year period following the expiration or termination of this MOU, the FDIC and its duly authorized agents, representatives or employees may, upon not fewer than five business days' notice and at such reasonable times as the FDIC may determine, inspect, audit, and copy, at the FDIC's expense and on the premises of the Agency if appropriate facilities are available, any of the Agency's records, reports and related materials pertaining to the Agency's performance under this MOU.

(c) The Comptroller General of the United States or a duly authorized representative from the General Accounting Office shall, until three (3) years following the expiration or termination of this MOU, have access to, and the right to examine, any property within the Agency's possession or control, involving transactions related to this MOU.

7. Term of MOU and Compliance Monitoring Manual.

Unless earlier terminated in accordance with the terms hereof, the term of this MOU shall commence on the Effective Date and terminate at such time as there shall be no LURA applicable to any of the Properties. The Agency shall not be responsible for assuring compliance of the Properties prior to the Effective Date, but shall take appropriate steps, in accordance with the Compliance Monitoring Manual, to bring any non-complying Properties into compliance.

8. Termination.

(a) The FDIC may terminate this MOU without cause upon one hundred and twenty (120) days' written notice to the Agency by registered or certified mail; except that the FDIC may, upon thirty (30) days' written notice to the Agency by registered or certified mail, terminate this MOU for cause, upon the happening of either of the following events:

(i) FDIC, in its sole discretion, determines that the Agency has ceased to be a non-profit corporation authorized to operate in the State of Texas; or

(ii) The Agency materially fails to perform the services set out in the Compliance Monitoring Manual, or if there is no Compliance Monitoring Manual in effect, fails to undertake sufficient monitoring and enforcement activities to ensure compliance by the Properties with the Low-Income Restrictions, provided that in any such instance, the Agency shall have been provided with notice and an opportunity to correct any items of unsatisfactory performance in accordance with Section 4 of this MOU and shall have failed to do so.

(b) The Agency may terminate this MOU without cause upon ninety (90) days written notice to the FDIC by registered or certified mail. In addition, the Agency may, upon thirty (30) days written notice to the FDIC by registered or certified mail, provide for a substitute agency of the State, reasonably satisfactory to the FDIC, to carry out its responsibilities hereunder.

The Agency may also terminate this MOU immediately upon the cessation of its authority to operate under the laws of the State or its authority to carry out the activities required hereunder; provided, however, that the Agency agrees to notify the FDIC of any such cessation which is required to occur under the laws of the State no later than (90) days prior to the scheduled date for such cessation.

(c) Except as provided in the paragraph (d), upon any termination of this MOU, the Agency shall, no later than the date of termination, (i) prepare and provide to the FDIC a report of the type required pursuant to Section 5 hereof with respect to its activities for the period subsequent to the last such report and (ii) pay to the FDIC the proportional share of the annual administrative fee payable with respect to each Property for the part of the annual period applicable to such Properties occurring after the date of termination. If Exhibit A is amended by the FDIC pursuant to paragraph 2(a)(ii) of this MOU, the Agency shall pay to the FDIC the proportional share of the annual administrative fee payable with respect to such Property for the part of the annual period applicable to such Property occurring after the date of such amendment.

(d) If a substitute agency of the State is approved by the FDIC to undertake the responsibilities of the Agency hereunder, such event shall not be treated as a termination of this MOU, provided that the Agency and its successor shall have satisfactorily resolved each party's entitlement to annual administrative fees for the period in which the succession occurs.

9. Exclusive Monitoring and Enforcement Agent.

Except for monitoring and enforcement activities undertaken by the FDIC and except as otherwise specifically provided in this MOU or authorized by the Final Rule or Section 21A of the FHLBA (12 U.S.C. §1441a), the Agency shall have the sole responsibility for the performance of monitoring and enforcement activities under the LURAs with respect to Properties located within the State; provided, however, that any alleged or actual violation of this provision or any other provision of this MOU shall not be a defense against any monitoring or enforcement action taken against an Owner of a Property by the Agency or any other entity, but shall only concern matters between the FDIC and the Agency, including the right to compensation for activities performed hereunder.

10. Indemnification of the Agency.

If any judicial action or legal proceeding shall be instituted against the Agency by a third party with respect to any action of the Agency which is authorized by the applicable Land Use Restriction Agreement or the Compliance Monitoring Manual or which is otherwise authorized in writing by the FDIC, the FDIC shall indemnify and hold the Agency harmless from and against any and all loss, damage and expense which the Agency may sustain or incur by reason thereof, including, without limitation, the amount of any judgment, plus and costs and interest thereon, which may be entered against the Agency, as well as reasonable attorneys, fees and expenses paid or incurred in connection therewith.

In order to avail itself of such indemnity, the Agency must (i) notify the FDIC immediately upon receiving notice of or information as to any such judicial action or legal proceeding, (ii) provide the FDIC with an opportunity to defend the Agency and/or itself in such action or proceeding with counsel chosen by the FDIC, provided that the Agency shall be entitled to be represented by separate counsel with respect to any claim in which the Agency believes its interests to be adverse to those of the FDIC, and (iii) cooperate fully with the FDIC in any such defense. Notwithstanding the foregoing, the FDIC shall not indemnify and hold the Agency harmless with respect to any judicial action, legal proceeding, or settlement not previously submitted to, reviewed and approved by the FDIC, or the consequences thereof, (I) which is based on acts, failures to act or omissions of the Agency which are determined by a court or in a legal proceeding to be ultra vires or to constitute grounds for a writ of mandamus or to constitute negligence, gross negligence or willful misconduct or (II) in which the Agency is adjudged to have failed to perform its monitoring or enforcement obligations hereunder or under the Compliance Manual or the applicable Land Use Restriction Agreement.

11. Liability of the FDIC

Any financial liability of the FDIC under this MOU, including any obligation to indemnify the Agency pursuant to paragraph 10 above, shall be a liability of the FSLIC Resolution Fund and shall be limited to the resources available in such Fund.

12. Entire Agreement/Modification.

This MOU contains the entire understanding of the parties. The terms contained in this MOU shall not be modified or amended except as agreed to by the parties hereto in writing.

13. Notices.

All notices required or permitted to be given hereunder shall be in writing and deemed given when mailed to such party at its address set forth below:

To FDIC:

Federal Deposit Insurance Corporation
1910 Pacific Avenue
Dallas, Texas 75201
Attn: Affordable Housing Section Chief

With a copy to:

Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C. 20429.
Attn: Director, Office Of Affordable Housing

To the Agency:

Affordable Housing Group, Inc.
1910 ESE Loop 323, #: 329
Tyler, Texas 75701
Attn: Deidra D. Young, Director of Compliance

Either party may change its address for notice purposes by giving notice to the
other party in accordance with this Section

14. Successor to the FDIC.

If the FDIC shall cease to manage the FSLIC Resolution Fund or if the FSLIC
Resolution Fund shall cease to exist as a specific entity, all rights and
obligations hereunder shall be transferred to any successor entity thereto,
unless the laws of the United States shall specifically assign the
responsibility for the monitoring and enforcement of the Low-Income Restrictions
to a different entity, in which case such entity shall assume the rights and
obligations hereunder. All references to the FDIC or to the RTC hereunder or in
the LURAs shall, unless the context shall clearly indicate otherwise, be deemed
to refer to any entity succeeding the rights and obligations hereunder.

15. Severability.

If any provision of this MOU is held to be unenforceable, invalid or illegal by
any court of competent jurisdiction, such unenforceable, invalid or illegal
provision shall not affect the remainder of this MOU.

16. Governing Law.

This MOU shall be construed in accordance with and governed by the laws of the
United States.

17. Survival.

The provisions contained in this MOU which, by their terms, require performance
after the expiration or termination of this MOU, shall be enforceable
notwithstanding the expiration or other termination of this MOU.

18. Counterparts.

This MOU may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, each party has caused this instrument to be signed on its behalf by its duly authorized agents.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation

By: _____
Name Gary Holloway
Asset Disposition & Operations

Date: _____JULY 9, 2002_____

AFFORDABLE HOUSING GROUP, INC.

By: _____
Name:  Donald Cager
Title:  President

Date: _____July 5, 2002_____

EXHIBIT A

LIST OF PROPERTIES AND OWNERS

[EXHIBIT SHOULD IDENTIFY FOR EACH PROPERTY: (I) OWNER; (II) PROPERTY ADDRESS; (III) TOTAL NUMBER OF UNITS; (IV) NUMBERS OF LOW-INCOME AND VERY LOW-INCOME UNITS; (V) MORTGAGE LENDER, IF KNOWN. IF ANY PROPERTIES ARE PART OF A BULK SALE COMPLIANCE REGIME, SUCH PROPERTIES SHOULD BE IDENTIFIED SEPARATELY, TOGETHER WITH ALL PROPERTIES SUBJECT TO SUCH REGIME.]

MEMORANDUM OF UNDERSTANDING                    PAGE 5
AFFORDABLE HOUSING GROUP, INC.

2

MEL WILLS JR., CLERK OF THE CIRCUIT COURT - OSCEOLA CTY    BK 1180
04/04/94  16:25   VERIFIED: TAB  .INSTR # 94-025302    PG 0185

LAND USE RESTRICTION AGREEMENT
BY AND BETWEEN

RESOLUTION TRUST CORPORATION AS RECEIVER
FOR SOUTHWEST FEDERAL SAVINGS ASSOCIATION
DALLAS, TEXAS

AND

FLORIDA HOUSING AFFORDABILITY, INC.,
A FLORIDA NOT FOR PROFIT CORPORATION

(MULTIFAMILY PROPERTIES)

NOTE:   THIS DOCUMENT MUST BE REFERENCED IN THE DEED, AND MUST BE
RECORDED AND TIME STAMPED IMMEDIATELY AFTER THE DEED

Prepared By and Return To:
Bernice S. Saxon, Esq.
Salem, Saxon & Nielsen, P.A.
P.O. Box 3399
Tampa, FL  33601

October 1992
Version 2.0