Filing # 111934469 E-Filed 08/17/2020 04:40:47 PM

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND
FOR OSCEOLA COUNTY, FLORIDA

CASE NO.: 2020-CA-000170

AFFORDABLE HOUSING GROUP, INC.,
as an agent of the FEDERAL DEPOSIT
INSURANCE CORPORATION, as Manager
of the FSLIC Resolution Fund, successor in
interest to the Resolution Trust Corporation,

       Plaintiff,

vs.

FLORIDA HOUSING AFFORDABILITY,
INC.,

       Defendant.

_____/

### AMENDED COMPLAINT

The Plaintiff, AFFORDABLE HOUSING GROUP, INC., ("Agent") acting as an agent of
the FEDERAL DEPOSIT INSURANCE CORPORATION, as Manager of the FSLIC Resolution
Fund, successor in interest to the Resolution Trust Corporation , by and through its undersigned
attorneys, sues Defendant, FLORIDA HOUSING AFFORDABILITY, INC. ("Owner"), and
alleges as follows:

### JURISDICTION AND VENUE

1.      This is an action for damages which exceed $30,000, exclusive of interest, costs
and attorney's fees, and which is otherwise within the jurisdiction of this court.

2.      Venue is proper in Osceola County, Florida, as this cause of action involves real
property located in Osceola County, Florida, and this cause of action accrued in this county.

3.      Plaintiff, acting as an agent of the Federal Deposit Insurance Corporation ("FDIC"), is charged with enforcing certain agreements and recorded documents recorded in the Public Records of Osceola County, Florida.

4.      The real property that is subject to this action is a multi-unit apartment building located in Osceola County, Florida, and is subject to certain agreements entered into between the Owner and the Resolution Trust Corporation ("RTC"), as predecessor in all right, title, and interest to the FDIC.

## GENERAL ALLEGATIONS

5.      On or about March 31, 1994, the RTC, as predecessor in interest to the FDIC, did enter into a "Land Use Restriction Agreement" with Owner, as a condition for purchase of a 192-unit apartment building in Kissimmee, Osceola County, Florida, known as the "Three Fountains Apartments" (a copy of the "Land Use Restriction Agreement" ("LURA") is attached hereto as Exhibit "A").[1]

6.      Owner purchased the subject property on March 31, 1994 (please see the Special Warranty Deed attached as Exhibit "B").

7.      The LURA does constitute a restrictive covenant and covenant running with the land (*Europco Management Company of America v. Smith, 572 So.2d 963 (First DCA 1990), Killearn Acres Homeowners Association, Inc. v. Keever, 595 So.2d 1019 (First DCA 1992)*.

8.      As part of a program administered by the former RTC, the RTC disposed of certain rental properties, at a discount, under the "Affordable Housing Disposition Program" under §21A(c), of the Federal Home Loan Bank Act (12 U.S.C. § 1441a(c)).[2]

---

[1] A corrective LURA was recorded on June 17, 1994, to correct the "Qualifying Unit" requirements of Section 2.2 of the LURA, as recorded in the Official Records of Osceola County, at Official Records Book 1196, Page 0400.
[2] In 1995 Congress transferred the RTC's authority to enforce LURA's to the FDIC (12 U.S.C. §1831q(n)(4). "The Dodd-Frank Act" therefore did not divest the FDIC from enforcing the RTC's Affordable Housing Program then in place and in effect.

2

9.      The purpose of the Affordable Housing Disposition Program ("AHP") was to provide for the sale of rental properties and the requirement that the Owner of said rental properties would set aside and ensure that a certain number of units were to be leased to either a "Lower-Income Family" or "Very-Low-Income Family", as defined in the LURA (Exhibit "A", §2.2 "Occupancy Requirements").

10.      The Owner, in consideration of the reduced purchase price of the property, was to make available the requisite number of qualifying units to either "Lower-Income Families" or "Very-Low-Income Families".

11.      The terms of the LURA do further require that the Owner submit to the Agent a periodic "Compliance Review" and reporting under Section 4.5 of the LURA.

12.      The LURA also requires the Owner to pay an "Administrative Fee", as set forth under Section 4.6.

13.      The Owner has failed to submit the Administrative Fee as required by the LURA and by the program guidelines of the Agent, and has failed to submit the Annual Compliance Reports, along with the "Owner Compliance Certification" and the copies of all "Tenant Income Certification" forms, completed during the prior compliance periods (please see Exhibit "C", Chapter 6 of the Agent's "AHP Owner's Compliance Manual").

14.      The Agent, therefore, has little knowledge or specific information as to whether the required number of qualified units are properly leased or rented to Lower-Income Families or Very-Low-Income Families.

15.      The Agent, as a successor to the "Florida Housing Finance Corporation", is designated by the FDIC as the current monitoring and enforcement agent of the FDIC, by virtue

3

of the "Memorandum of Understanding for Monitoring and Enforcement" in effect since July 9, 2002 (please see attached copy as Exhibit "D", please also see Exhibit "E").

16.     The FDIC has further confirmed the agent status of the Affordable Housing Group, Inc. to Owner by letter dated November 22, 2016 (please see copy attached as Exhibit "F").

17.     The Agent is, by the specific terms of the LURA and the "Memorandum of Understanding for Monitoring and Enforcement" entitled to enforce the terms of the LURA in either state or federal court, and the Agent is entitled to recovery of its attorney's fees and costs in any such action (please see Exhibit "A", Section 6.1).

18.     In addition to the demands for payment of the Annual Fee, as submitted by the Agent to Owner, the Agent, through its counsel, did submit the notice required under Section 6.1 of the LURA, advising of the defaults of Owner's obligations under the LURA, that Owner is required to correct said defaults, and that legal action would be taken should the Owner's defaults not be cured (please see letter of August 2, 2018, to Joseph J. Savino, Esquire, as President of Owner attached hereto as Exhibit "G").

19.     Agent, under the specific terms of the "Memorandum of Understanding for Monitoring and Enforcement" with the FDIC, and pursuant to 12 U.S.C. §1831q(n)(4), is authorized to enforce the restrictions and terms set forth in the LURA, including the reporting requirements and the payment of administrative and other fees called for.

20.     All conditions precedent to the enforcement of the LURA have been performed or have been waived.

21.     Agent is obligated to pay its attorneys, Clayton & McCulloh, P.A., a reasonable fee for their services.

4

## COUNT I – DECLARATORY JUDGMENT

22.    Agent reasserts the allegations contained in Paragraphs 1-21, above, as if fully set forth herein.

23.    This is a claim pursuant to Chapter 68, Fla. Stat., seeking a Declaratory Judgment and an Order of Specific Performance under the terms of the LURA and all administrative and compliance guidelines established pursuant thereto. Under Section 6.1 of the LURA, the parties do agree that the Agent shall be entitled to "apply to any court having jurisdiction of the subject matter for specific performance of this Agreement, . . . ".

24.    The Agent is seeking a Judgment of Specific Performance, as the Plaintiff is clearly entitled to have the Owner ~~to~~ comply with the terms of the LURA, including the reporting requirements called for under the LURA and Owners Compliance Manual, or otherwise required by Agent, the payment of Administrative and other fees, and requiring the Owner to specifically perform and to lease and rent the requisite number of "qualifying units" as called for under the LURA to Lower-Income Families or Very-Low-Income Families, as may be provided for under the LURA, that there is no adequate remedy at law, as the land involved is unique and that justice requires that the Owner of the apartment property comply with the requirements of the Affordable Housing Disposition Program, having taken title to the property under said Program and having promised to abide by its terms and conditions (*Castigliano v. O'Conner (911so.2d.145(Fla. 3rd DCA 2005)*)).

25.    The Agent has demonstrated that there is a bonafide, present and practical need for a Declaratory Judgment, declaring as to the rights, obligations, and duties of the Owner under the terms of the LURA, and its contractual terms and as a covenant running with the land, and that the Agent is unsure with regard to its power, privilege or right to compel compliance with

5

the LURA including the right to receive the monitoring and other fees due and owing under the LURA, to obtain the annual compliance reports, and other reporting and information which may be due to the Agent and to compel Owner to lease and rent the requisite number of qualifying units, as called for under the LURA, to Lower-Income Families or Very-Low-Income Families and that there exists a present and ongoing antagonistic and adverse interest between the parties and that the relief sought herein is not merely giving advice or the relief sought is not otherwise advisory in nature.

26.    There remains an ongoing, bonafide actual and present need to determine the Owner's obligation to comply with the requirements of the LURA to prevent further injury to the Agent, and to the tenants and lessees of the Owner's property and all others affected by any failure to comply with the terms of the LURA, by the Owner.

WHEREFORE, the Plaintiff, AFFORDABLE HOUSING GROUP, INC., acting as an Agent of the Federal Deposit Insurance Corporation, hereby requests this Court to (1) enter a Decree of Specific Performance, requiring the Defendant to provide all reporting and other requirements due under the LURA; (2) declare that the Defendant, as Owner of the property subject to the LURA, is obligated to pay the Administrative Fee as established under the LURA and by the Agent; (3) determine the obligation of the Owner to make available the requisite number of qualifying units to Lower-Income Families or Very-Low-Income Families, and to determine the Owner's requirement to rent all apartment units in conformity with said obligations; (4) award the Plaintiff its reasonable attorney's fees, costs and interest; and (5) grant such further relief as the Court deems just and proper.

## COUNT II – INJUNCTIVE RELIEF

6

27.     Plaintiff reasserts the allegations contained in Paragraphs 1-21, above, as if fully set forth herein.

28.     This is an action for injunctive relief, within the jurisdiction of this Court.

29.     Under the terms of the LURA, in effect between the Owner and the Federal Deposit Insurance Corporation, as successor to the Resolution Trust Corporation, the Plaintiff, acting as Agent for the FDIC, is, under Section 6.1 of the LURA, entitled to "an injunction against any violation of this Agreement [LURA] . . ."

30.     Agent is entitled to an injunction against the Owner, enjoining the Owner from failing to submit the compliance reporting and other documentation as called for under the terms of the LURA and all administrative regulations and guidelines established by the FDIC and by the Agent, with regard to the AHP, and an injunction prohibiting the Owner from leasing apartment units other than in conformity with the terms of the LURA, requiring leasing of a certain number of units to Lower-Income Families or Very-Low-Income Families for which there is no adequate remedy at law and for which both the Agent and the tenants, lessees, and perspective tenants and perspective lessees will suffer irreparable harm.

31.     The conduct of the Owner, in refusing to provide the reporting mandated by the LURA and all administrative regulations and guidelines, if permitted to continue, will inflict irreparable injury upon the Agent, for which there is no adequate remedy at law.

32.     Requiring compliance by the Owner with the terms of the LURA to affect the purpose of the Affordable Housing Disposition Program is clearly in the public interest.

33.     Such irreparable harm is presumed, as this action is to enjoin conduct related to the covenants, restrictions, and conditions running with the land, as contained in the LURA. (See *Europco* and *Killearn Acrers*, supra).

WHEREFORE, the AFFORDABLE HOUSING GROUP, INC., acting as an Agent of the Federal Deposit Insurance Corporation, prays that equity take jurisdiction of the parties and that the Court enter an injunction prohibiting the Owner, FLORIDA HOUSING AFFORDABILITY, INC., from failing to provide the annual compliance, reporting and other documentation, and requiring full reporting and other documentation be provided on an annual basis, and a prohibitory injunction, prohibiting the Owner from leasing or renting units other than as required under the LURA and renting the requisite number of units to "Lower-Income Families or Very-Low-Income Families" and award the Plaintiff Agent its reasonable attorney's fees, costs and interest, and grant such further relief as the Court deems just and proper.

## COUNT III – BREACH OF CONTRACT

34.    Agent reasserts the allegations contained in Paragraphs 1-21, above, as if fully set forth herein.

35.    This is an action for breach of contract, seeking damages exceeding $30,000, exclusive of costs, interest and attorney's fees.

36.    The Owner, to date, has failed to provide the required information and documentation called for under Section 4.2-4.5 of the LURA.

37.    The Owner has failed to submit the "Administrative Fee", as called for under Section 4.6 of the LURA and has failed to pay the additional Administrative Fee as required under Section 4.6(b) of the LURA.

38.    The Agent, through its counsel, did send the written notice ("Exhibit "G") called for under Section 6.1 of the LURA of the ongoing violations and did request the Owner to cure the violations and, despite this notice, the Owner has failed to cure the continuing breaches and

violations of the LURA, including requiring the rental of the requisite number of apartment units to "Lower-Income Families or Very-Low-Income Families" as set forth in the LURA.

39.     As a direct and proximate result of the breaches committed by the Owner of the LURA, the Agent has incurred damages and will continue to incur and suffer damages, including incurring attorney's fees and costs, due to Owner's breach of the LURA.

WHEREFORE, the AFFORDABLE HOUSING GROUP, INC., acting as an Agent of the Federal Deposit Insurance Corporation, hereby demands judgment against Defendant, FLORIDA HOUSING AFFORDABILITY, INC., for damages, in any way connected to the Owner's breach of the LURA, including, but not limited to, payment of the Annual Administrative Fees, plus Administrative Late Fees, and for all costs, interest, prejudgment interest, reasonable attorney's fees, and such other relief as this Court deems just and proper.

### COUNT IV – APPOINTMENT OF RECEIVER FOR RENT

40.     Agent reasserts the allegations contained in Paragraphs 1-21, above, as if fully set forth herein.

41.     This is an action for the appointment of a receiver for rent, under the provisions of Section 6.1 of the Land Use Restriction Agreement entered into by the Owner and by RTC, as predecessor to the FDIC.

42.     Under the terms of the LURA, and Section 6.1, upon a default by the Owner, the Agent is entitled to "the appointment of a receiver to take over and operate the property in accordance with the terms of this Agreement . . .".

43.     The Owner has defaulted under the terms of the LURA by failing to provide the compliance reporting called for under the LURA and by the failure to pay the Administrative Fee and Administrative Late Fee as required.

44.   Due to the Owner's breach of the LURA, the Agent is entitled to the appointment of a receiver for rent, to ensure that the leasing and occupancy requirements of the apartment building, the rent limitations, and the payment of the Administrative Fees and other fees due to the Agent are timely and properly complied with.

45.   The Agent is therefore entitled to the appointment of a receiver to ensure the compliance by Owner with the terms of the LURA and for the collection of rents from the tenants of the qualified units under the terms of the LURA.

WHEREFORE, the AFFORDABLE HOUSING GROUP, INC., acting as an Agent of the Federal Deposit Insurance Corporation, prays this Honorable Court to appoint a receiver for the collection of rents directly from the tenants of the Defendant, FLORIDA HOUSING AFFORDABILITY, INC., and to grant such authority, by a separate Order Appointing Receiver of Rents, and to include such additional authority as is necessary to ensure the Defendant, FLORIDA HOUSING AFFORDABILITY, INC., complies with the terms, conditions, covenants and restrictions, as set forth under the Land Use Restriction Agreement, and to award the Agent its attorney's fees, costs and interest incurred in bringing this action, and grant such further relief as this Court deems just and proper.

DATED this 17th day of August 2020.

/s/ Russell E. Klemm

_____
RUSSELL E. KLEMM, ESQ.
Florida Bar No.: 0292826
Clayton & McCulloh, P.A.
1065 Maitland Center Commons Blvd.
Maitland, Florida 32751
(407) 875-2655 Telephone
(407) 875-3363 Facsimile
E-mail: rklemm@clayton-mcculloh.com (Primary)
          sroe@clayton-mcculloh.com (Secondary)

Attorneys for Plaintiff, Affordable Housing
Group, Inc.

Could Not Access Image

Error: Page Not Found

Filing # 111934469 E-Filed 08/17/2020 04:40:47 PM

```
MEL WILLS JR., CLERK OF THE CIRCUIT COURT - OSCEOLA CTY   BK  1180
04/04/94  16:25   VERIFIED: TAB   INSTR #  94-025301       PG  0182
DOC STMP   $24,192.00
```

Property Appraiser's Parcel Identification No.; 172S2900U000310000

## SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED is made the 31st day of March, 1994, by Resolution Trust Corporation, as Receiver for Southwest Federal Savings Association, Dallas, Texas (TIN ▮▮▮▮▮▮▮), in care of Resolution Trust Corporation, 100 Colony Square, Suite 2300, Box 60, Atlanta, Georgia 30361, as GRANTOR, to Florida Housing Affordability, Inc., a Florida not for profit corporation (TIN ▮▮▮▮▮▮▮), whose address is 1101 North Lake Destiny Road, Suite 225, Maitland, Florida 32751, as GRANTEE.

Witness, that Grantor, for good and valuable consideration, receipt of which is acknowledged, grants, bargains and sells to Grantee all the real property located in Osceola County, Florida, more particularly described as:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

together with all tenements, hereditaments and appurtenances thereto; subject to current real property taxes, zoning and other governmental restrictions, the Land Use Restriction Agreement dated March 31, 1994, the Recapture and Reinvestment of Profits Agreement dated March 31, 1994, and all covenants, conditions, restrictions, easements, rights-of-way and other matters of record.

Grantor hereby covenants with Grantee that Grantor will forever defend Grantee against claims of all persons claiming by, through or under Grantor.  No other covenants or warranties, express or implied, are given by this Special Warranty Deed.

This Instrument Prepared By
And Return To:
Bernice S. Saxon, Esq.
Salem, Saxon & Nielsen, P.A.
P.O. Box 3399
Tampa, FL 33601



EXHIBIT
"B"

| BOOK  1180  PAGE  0183 |

IN WITNESS WHEREOF, Grantor has set its hand and seal the day and year first above written.

WITNESSES:

GRANTOR:

RESOLUTION TRUST CORPORATION, AS RECEIVER FOR SOUTHWEST FEDERAL SAVINGS ASSOCIATION, DALLAS, TEXAS

Print Name: _DANA LEACH_

By: _____
Print Name: _L LeRoy Hiu_

Print Name: _George Cribbs_

Attorney-in-Fact for Resolution Trust Corporation pursuant to Power of Attorney dated _MARCH 24_, 1994

STATE OF GEORGIA
COUNTY OF FULTON  DeKalb

The foregoing instrument was acknowledged before me this _28th_ day of _March_, 1994, by _L. LeRoy Hiu_, as Attorney-In-Fact for Resolution Trust Corporation, as Receiver for Southwest Federal Savings Association, Dallas, Texas, on behalf of the corporation. He/she is personally known to me or has produced _N/A_ as identification and did (did not) take an oath.

_Raye F. Fox_
Printed Name
Notary Public - State of Georgia
Notary Public, DeKalb County, Georgia
My Commission Expires June 6, 1997

MY COMMISSION EXPIRES: _____

COMMISSION NUMBER: _____

rto\afford\3f\deed.2

2

| BOOK   1180   PAGE   0184 |

## EXHIBIT "A"

### DESCRIPTION OF THE REAL PROPERTY

From the Southeast corner of Section 17, Township 25 South, Range 29 East, run along the East line of said Section 17, North 0°20'0" West, 1520.00 feet to the Point of Beginning, from said Point of Beginning continue North 0°20'09" West 410.96 feet; thence run North 89°42'49" West 1060.20 feet; thence South 0°20'09" East 410.96 feet; thence run East to the Point of Beginning, less the East 30 feet for road right-of-way, said lands lying and being in Osceola County, Florida.



Filing # 111934469 E-Filed 08/17/2020 04:40:47 PM

# CHAPTER 6

## REPORTING, RECORD-KEEPING, AND ADMINISTRATIVE REQUIREMENTS

### 6.1   INTRODUCTION

Owners of AHP properties are required to do the following:

♦ Owners are required to submit **regular Compliance Reports** to the monitoring agency. During Pre-Compliance, these reports are submitted monthly. Once a property has met its total set-aside requirements, Compliance Reports are submitted annually, and are accompanied by an Owner Compliance Certification.

♦ Owners must **maintain records**, such as tenant files and monthly rent rolls, in good condition and available for inspection by the monitoring agency or other authorized entities.

♦ Owners must pay an **annual fee** to the monitoring agency and are required to adhere to other administrative requirements, including cooperating with monitoring staff during annual on-site reviews.

### 6.2   AHP REPORTING REQUIREMENTS

There are two reporting forms owners must regularly submit to their monitoring agency:

◊ compliance reports; and

◊ owner compliance certifications.

### A.   Compliance Reports

Compliance reports are submitted either on a monthly or an annual basis, as directed by the monitoring agency.



EXHIBIT

" C "

The AHP Compliance Report Form, and Instructions for completing the report, can be found In Appendix F.

### Monthly Pre-Compliance Reports

Compliance reports are typically submitted on a monthly basis during the Pre-Compliance stage, which begins at property closing and lasts until the monitoring agency has determined that the property is in compliance with AHP occupancy requirements.

Tenant Income Certification (TIC) forms for new and recertified units completed during the month being reported must be attached to each monthly compliance report.

### Annual Compliance Reports

Once the monitoring agency has confirmed that a property complies with its LURA, compliance reports are submitted annually.   The compliance reports should be submitted to the monitoring agency by the date set by the agency.

Tenant Income Certification (TIC) forms for every QU must be attached to annual compliance reports.  This would include all new certifications and recertifications of QUs since the time of the last report.

If a property falls out of compliance, monitoring agencies may require owners to resume submitting monthly compliance reports until compliance Is re-established.

B.      Owner Compliance Certification

The LURA requires owners to certify, at least annually, that they have complied with all the terms and provisions of the LURA.  This certification must be prepared and sent to the monitoring agency when the property reaches full compliance and at the time annual reports are submitted.

The certification must be signed by the owner or a representative with full authority to legally bind the ownership entity.   If the certification is signed by anyone other than the person who signed the LURA, evidence of signature authority must be provided.

A sample Owner Compliance Certification is included in Appendix G.

### C.    Owners Data Entry Program

To assist owners with the tracking and reporting of compliance, FDIC has developed and distributed a computerized data entry system, known as the Owners Data Entry Program (ODEP) for use by owners.

The primary purpose is to help owners compile the monthly or annual reports due to the monitoring agency, but it also offers many additional features which help the owner to determine eligibility, maintain records, and track ongoing compliance.   ODEP can:

◊    calculate applicant/tenant income, compare annual income to eligibility limits, and determine eligibility based upon income information entered;

◊    compare rents to current rent limits;

◊    produce the TIC for tenant and owner signature;

◊    store the TIC information so that owners may produce the monthly rent roll and the monthly or annual compliance report without re-entering any data (assuming owners have entered all unit information); and

◊    allow owners to check their property for ongoing compliance with Set-Asides, proportionality, and (to a limited extent) NAU/NAQU rules, and for expired TICs.

The ODEP system can do all these things provided the owner/manager uses the system on an ongoing basis to process all certifications, recertifications, and unrestricted unit turnovers.   It can speed up tenant processing by doing the calculations and the determination of eligibility without computation errors.   If it is used to enter all information as units and tenants are processed, the production of the monthly rent roll and the monthly or annual compliance reports will be as simple as the push of a button.   Moreover, the owner can use the software to

check for compliance and to correct errors as they occur.

State monitoring agencies may also chose to permit properties in full compliance to submit future reports and TICs in computerized rather than hard copy version, subject to continued AHP record-keeping requirements and access for on-site monitoring.

This software is available to owners at <u>no charge</u> from the monitoring agency.  The software is self-contained, and runs on DOS or Windows-based systems.  It requires a 386SX IBM PC or compatible computer, configured with:

◊   IBM or MS DOS, version 5.0 or higher;
◊   a minimum of 5 megabytes (MB) of memory;
◊   a minimum of 50 MB of hard disk space; and
◊   a 3 ½" floppy drive.

Contact the monitoring agency for a copy.  The agency will have to set up the property in the software, so allow some time for production and shipping.   The instructions for the ODEP system are included in this Manual at Appendix J.

**6.3     AHP RECORD-KEEPING REQUIREMENTS**

There are two important record-keeping requirements: **tenant files** and **monthly unit listings.**

**A.     Tenant Files**

Tenant files must be maintained for a period of at least three (3) years after a tenant moves out.  Tenant files must contain the following items:

**Rental application:**   See Appendix A for a sample application form that requests all the information needed to assess tenant eligibility.

**Release and Consent Form:**   Release and consent forms containing AHP-required language (see sample

Release and Consent form in Appendix B) must be obtained for each adult household member.

**Verifications:**  Appropriate documents verifying the income information provided by the tenant must be included.

**Tenant Income Certification (TIC):**  The original TIC or the most recent recertification must be included, and must contain signatures of the head of household and an authorized property management representative.

**Dwelling Lease:**  The original must be included and should contain signatures of the head of household and an authorized property management representative.

---

### Good Practices:
### Maintaining Tenant Files

◊  Set up applicant files, containing the application form, verifications, and other relevant documentation which may be useful in answering inquiries or complaints on behalf of applicants who were rejected.

◊  Keep all files in separate folders, clearly marked with tenant or applicant name.

◊  Use file checklists to note everything in the file.

◊  Clip applications and Release-and-Consent forms to the left side of the opened folder.   Clip TIC forms and all supporting verification documents to the right side of the opened folder.

◊  Use color coded folders or tabs to readily distinguish between VLI, LI, and unrestricted units.

◊  Maintain these files for at least three (3) years beyond the date of the rejection.

---

**B.    Monthly Unit Listings**

Under the program, owners must keep monthly unit listings showing the occupancy of their property.  Unit

listings must be kept for every month and maintained for a period of three years.

A unit listing should provide the following information for each unit:

- ◊ Unit number
- ◊ Number of bedrooms
- ◊ Tenant name
- ◊ Household size
- ◊ Effective lease date
- ◊ Monthly rent
- ◊ Unit status (VLI-QU, LI-QU, OI-QU, or unrestricted unit)

For many properties, the monthly rent roll owners already keep provides most of this information.   Owners must provide a copy of the most recent monthly unit listing upon request from the monitoring agency.

The ODEP computer system can provide owners with this monthly listing, if the owner keeps all unit turnover up to date in the system.

## 6.4    ADMINISTRATIVE FEES

### A.    Annual Fee

In signing the LURA, owners agreed to pay an annual administrative fee to their monitoring agency.   This fee, based on the schedule established in the LURA, is computed by multiplying the base fee (see Section 4.6(a) of the LURA) by the required number of set-aside units in the LURA.

The annual administrative fee is due the day the LURA is signed and covers the following twelve month period. Each following year, owners will receive an invoice for the coming year's administrative fee prior to the start of the fee period.   The agency may adjust the fee annually for increased costs due to inflation.

### B.    Fees for Non-Compliance

Owners whose properties fall out of compliance may be assessed an additional administrative fee up to an amount equal to the annual fee, including any adjustments for

inflation.   This additional fee is distinct from and in addition to the annual fee.   See Section 2.6.C of this Manual for further details.

## 6.5   RESALE PROCEDURES

Owners should notify the monitoring agency of the proposed resale of the property at least 30 days prior to closing.   This notification is necessary to give the monitoring agency sufficient time to prepare for the change in ownership and take actions necessary to assure continued compliance with the LURA.

In addition, as described in the LURA (generally Section 7.6), sellers must, at their expense, ensure that the LURA is duly recorded and filed in connection with resales.   It should be noted that the LURA binds all subsequent owners of the property to the agreement for the full term, regardless of whether such successors acknowledge or execute the LURA.

## 6.6   USE OF THE PROPERTY

Typically, each LURA contains a brief provision pertaining to the use of the property.   During the term of the agreement, the owner must maintain the property as multifamily rental housing or for resale of single family units to qualified purchasers. Rental units must be occupied or held available for rental on a continuous basis.

## 6.7   COMPLIANCE ENFORCEMENT

### A.   Background

Monitoring agencies will work closely with owners to assure compliance.   If a compliance violation occurs because of misconceptions regarding program procedures or the limitations of the management system in place at the property, owners are encouraged to request additional training or assistance from their monitoring agency.

Sometimes it may be necessary for monitoring agencies to take action to compel owners to bring the property back into compliance.   These actions fall into two categories:

◊   administrative remedies, and

◊ judicial sanctions.

Because a property that is out of compliance requires additional monitoring, agencies also have the authority under the LURA to assess the owner an additional administrative fee for non-compliance.

**NOTE:** Agencies will not categorize owners as being out of compliance with their LURA simply because they are still in the Pre-Compliance period.  However, it is possible for a Pre-Compliance property to be declared in non-compliance if, for example, the owner fails to submit monthly compliance reports on a timely basis, continues to rent next available units to ineligible households or otherwise fails to make efforts to achieve full compliance.

**B.     Administrative Remedies**

Agencies may take steps short of initiating legal action. They include:

◊ informing the property's lenders and other regulators of the non-compliance;

◊ informing agencies or divisions administering other forms of housing assistance, such as tax credits, of continuing non-compliance by an owner;

◊ barring the owner from further participation in other agency programs;

◊ providing notice to the limited partners or investors of a managing partner's non-compliance; or

◊ notifying the board of trustees, the parent organization, or sponsoring entity of a non-profit that is out of compliance.

Agencies can also demand return of excess rents resulting from non-compliance (see below).  If owners fail to comply with disgorgement or other agency demands, agencies then may seek recourse through the judicial system, as described below.

**C.     Judicial Sanctions**

The LURA authorizes the agencies to go to court as a means of forcing owners to correct conditions of non-compliance. Agencies will generally attempt administrative remedies before going to court, but owners must understand that agencies are not obligated to do so, and may begin legal action within sixty (60) days from issuance of a **Notice of Non-Compliance**. These actions could include:

◊ filing suit to force the owner to take corrective action;

◊ filing suit to appoint a receiver for the property; or

◊ filing suit to collect outstanding fees.

### D. Additional Administrative Fee for Non-Compliance

The LURA authorizes agencies to collect an additional administrative fee when they have determined that a property has fallen out of compliance.

The LURA authorizes agencies to charge an additional fee, up to an amount equal to the annual administrative fee for up to three years following its most recent finding of non-compliance. This additional fee is distinct from and in addition to the annual fee.

### E. Corrective Actions to Restore Compliance

Guidance on corrective actions and proposed corrective action deadlines for violations of occupancy is summarized in the following tables:

Exhibit 6.1   Occupancy Violations
Exhibit 6.2   Rent Limit Violations
Exhibit 6.3   Reporting Violations
Exhibit 6.4   Fee Violation

These exhibits are provided as illustration to owners of possible agency actions. Monitoring agencies have been granted considerable latitude in taking corrective actions to restore compliance.

EXHIBIT 6-1

OCCUPANCY VIOLATIONS - CORRECTIVE ACTIONS

| VIOLATION | CORRECTIVE ACTIONS | CORRECTIVE ACTION DEADLINE |
|---|---|---|
| 1. Owner Failed to Maintain the Required Number of QUs | • Follow Next Available Unit (NAU) procedures (Exhibit 3.3) until the required number of QUs is obtained.<br><br>• Submit monthly occupancy reports to monitoring agency until compliance is restored.<br><br>• Submit a certification of compliance form once the required number of QUs is obtained. | Must implement corrective action until number of QUs meets the Total Set-Aside for the property. |
| 2. Owner Failed to Rent Available QUs to VLI tenants to restore required number of VLI—QUs | • Follow NAU procedures (Exhibit 3.3) until the required number of VLI—QUs is obtained.<br><br>• Submit monthly occupancy reports to monitoring agency until compliance is restored.<br><br>• Submit a certification of compliance form once the required number of VLI—QUs is obtained. | Must implement corrective action until number of QUs meets the VLI Set-Aside for the property. |
| 3. QU Designation Removed from Eligible Tenant | • Restore QU designation to the original unit/household. (Note: may exceed total QUs required.)<br><br>• If the rent for the affected unit was raised above the appropriate rent limit, return the excess rent according to actions in Exhibit 6.2.<br><br>• Submit a copy of the lease or rental agreement showing that the rent complies with the rent limit. | Within 30 days of the Notice of Non-Compliance. |

EXHIBIT 6-2

RENT LIMIT VIOLATION - CORRECTIVE ACTIONS

| VIOLATION | CORRECTIVE ACTIONS | CORRECTIVE ACTION DEADLINE |
|---|---|---|
| 1. Qualifying Unit Rent Exceeds Appropriate Limit | • *Reduce the rents for the affected units _____ [list unit #s] to _____ [rent limit]*<br><br>• *Calculate the amount of excess rent received from the tenant.*<br><br>• *Apply overpayment as a rent credit toward next month's rent for unit. If overpayment exceeds next month's rent, any excess must be repaid to tenant.*<br><br>• *If the tenant has moved out, mail the full amount of the overpayment to the tenant. If the tenant cannot be located, pay the overpayment to the monitoring agency for use in providing housing assistance to Low Income families.*<br><br>• *Send letter to tenant by registered mail announcing revised unit rent. The letter must also indicate the amount of the rent credit awarded and indicate any repayment to the tenant.*<br><br>• *Send a copy of tenant letter with the return receipt to monitoring agency prior to the compliance deadline.* | *Within 30 days of the date of the Notice of Non-Compliance* |

EXHIBIT 6-3

REPORTING VIOLATIONS - CORRECTIVE ACTIONS

| VIOLATION | CORRECTIVE ACTIONS | CORRECTIVE ACTION DEADLINE |
|---|---|---|
| 1. Owner Failed to Submit Monthly Compliance Report | • Submit properly completed Monthly Compliance Report by corrective action deadline | Within 10 days of the Notice of Non-Compliance. |
| 2. Owner Failed to Submit Annual Compliance Report | • Submit properly completed Annual Compliance Report by corrective action deadline | Within 30 days of the Notice of Non-Compliance. |
| 3. Owner Failed to Obtain a Tenant Income Certification or Proper Income Verification Prior to Move-in | • Obtain a completed tenant income certification and submit copies of the outstanding documents to the monitoring agency by the corrective action deadline.<br><br>• If over-income and insufficient QUs, follow corrective actions listed for Occupancy Violation No. 1. | Within 30 days of the Notice of Non-Compliance. |
| 4. Owner Failed to Obtain a Tenant Income Recertification by Required Date | • Obtain a completed tenant income recertification and submit copies of the outstanding documents to the monitoring agency by the corrective action deadline.<br><br>• If the tenant is over-income, follow NAU procedures in section 3.5 to obtain the required number of QUs. | Within 30 days of the Notice of Non-Compliance |
| 5. Owner Failed to Maintain Proper On-Site Tenant Files | • Obtain documentation to complete the tenant files.<br><br>• Submit copies of the outstanding documents to the monitoring agency by the corrective action deadline. | Within 30 days of the Notice of Non-Compliance |

EXHIBIT 6-4

MONITORING FEE VIOLATION - CORRECTIVE ACTIONS

| VIOLATION | CORRECTIVE ACTIONS | CORRECTIVE ACTION DEADLINE |
|---|---|---|
| 1. Owner Fails to Pay Annual Monitoring Fee by the Required Date | • Owner must pay annual monitoring fee to agency | Within 30 days after the date of the Notice of Non-Compliance. |

Filing # 111934469 E-Filed 08/17/2020 04:40:47 PM

MEMORANDUM OF UNDERSTANDING
FOR MONITORING AND ENFORCEMENT

By and Between

the

FEDERAL DEPOSIT INSURANCE CORPORATION,
acting in its capacity as Manager of the
FSLIC Resolution Fund, successor in interest to
the Resolution Trust Corporation

and

AFFORDABLE HOUSING GROUP, INC.
(the "Agency")

_July_ _0 9_, 2002



EXHIBIT

" D "

MEMORANDUM OF UNDERSTANDING
FOR MONITORING AND ENFORCEMENT

WHEREAS, certain Properties have been sold and certain other such eligible
Properties may be sold in the State pursuant to the requirements of the
Affordable Housing Disposition Program of the former Resolution Trust
Corporation (the "RTC") as set forth in Section 21A(c) of the Federal Home Loan
Bank Act (the "FHLBA") (12 U.S.C §1441a(c));

WHEREAS, the Owners of such Properties have entered or will enter into Land Use
Restriction Agreements ("LURAs") with respect to the Owners' obligations to
comply with the occupancy, rent and resale restrictions with respect to the
Properties, as set out in Section 21A(c) of the FHLBA and in the Final Rule for
the RTC's Affordable Housing Disposition Program;

WHEREAS, the LURAs provide that the RTC, its successor, or a Agency contracted
by the RTC or its successor shall monitor the compliance of the Owners with the
occupancy, rent and resale restrictions set out in the LURAs;

WHEREAS, the LURAs and Section 21A(c)(11)(B) of the FHLBA (12 U.S.C.
§1441a(c)(11)(B)) authorize the RTC, its successor, and other specified parties
to judicially enforce the occupancy, rent, income and resale restrictions set
out in the LURAs against purchasers of such Properties, or their successors in
interest;

WHEREAS, pursuant to Section 21A(m) of the FHLBA (12 U.S.C.§1441a(m)) upon the
termination of the RTC, all of its rights and obligations were transferred to
the FSLIC Resolution Fund as the successor in interest to the RTC;

WHEREAS, pursuant to Section 11A of the Federal Deposit Insurance Act, (12
U.S.C. §1821a), the Federal Deposit Insurance Corporation (the "FDIC") is
responsible for the management of the FSLIC Resolution Fund; and,

WHEREAS, the FDIC, as the manager of the FSLIC Resolution Fund, successor in
interest to the RTC, and the Agency have agreed that the Agency will, for itself
and on behalf of the FDIC, under the terms and conditions set forth herein,
monitor and enforce the compliance of the Owners with the occupancy, rent and
resale restrictions set out in the LURAs;

NOW THEREFORE, in consideration of the mutual promises herein set forth, the
FDIC, acting in its capacity as Manager of the FSLIC Resolution Fund, successor
in interest to the Resolution Trust corporation, and the Agency enter into this
Memorandum of Understanding and agree as follows:

1. Definitions.

The capitalized terms used herein shall have the meanings given them below and
such meanings shall be equally applicable to the singular and the plural forms
of such terms, as the context may require.

"Agency" shall mean Affordable Housing Group, Inc., together with its successors
and assigns, located at: 1910 ESE Loop 323, # 329, Tyler, Texas 75701.

"Compliance Monitoring Manual" shall mean the Compliance Monitoring Manual for
State Agencies attached hereto as Exhibit B.

"Condominium Owners" shall mean nonprofit organizations, public agencies and for-profit entities that purchased Condominium Properties from the RTC in bulk pursuant to Section 21A(c) of the FHLBA (12 U.S.C. §1441a(c)).

"Condominium Property" shall mean an "eligible condominium property" under Section 21A(c)(9)(D) of the FHLBA (12 U.S.C. §1441a(c)(9)(D)) that is sold to a Condominium Owner subject to the Multifamily Occupancy Requirements, the Rent Restrictions and the Condominium Resale Restrictions, under the terms of the applicable LURA.

"Condominium Resale Restrictions" shall mean the requirement that a single Condominium Property may be sold by a Condominium Owner only to a purchaser that is a Lower-Income Family (i) which agrees to occupy, and certifies in writing that it intends to occupy, such property as a principal residence for at least 12 months, and (ii) which enters into an agreement providing for the recapture of seventy-five percent (75%) of the profits from the resale of such property, if such resale takes place within 12 months after such purchase, all as more fully provided in the applicable LURA.

"Effective Date" shall mean _____July  09_____, 2002.

"FDIC" shall mean the Federal Deposit Insurance Corporation, acting in its capacity as manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation, pursuant to Section 21A(m)(2) of the Federal Home Loan Bank Act (12 U.S.C. §1441a(m)(2)), and Section 11A of the Federal Deposit Insurance Act (12 U.S.C. §1821a).

"FHLBA" shall mean the Federal Home Loan Bank Act, 12 U.S.C. §1421, et seq.

"Final Rule" shall mean the final rule for the RTC'S Affordable Housing Disposition Program, codified at 12 C.F.R. §1609, et seq., as such rule may be modified or amended from time to time by the RTC or its successor.

"Low-Income Restrictions" shall mean occupancy, rent, income and resale restriction set out in Section 21A(c) of the FHLBA (12 U.S.C. §1441a(c)), the Final Rule, and the applicable LURA, including without limitation, the Occupancy Restrictions, the Rent Restrictions and the Resale Restrictions.

"Lower-Income Families" shall mean families and individuals whose Annual Incomes do not exceed 80 percent of area median income in the area in which the particular Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

"LURA" shall mean the Land Use Restriction Agreement entered into by the Owner, setting forth the Owner's obligation to comply with the applicable occupancy, rent and resale restrictions with respect to the Owner's Property.

"MOU" shall mean this Memorandum of Understanding for Monitoring and Enforcement between the FDIC, acting in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation, and the Agency.

"Multifamily Occupancy Requirement" shall mean the requirement to set-aside a minimum number of units in a Multifamily Property or a Condominium Property (or a group of such Multifamily Properties or Condominium Properties) for occupancy by Lower-Income Families and Very Low-Income Families, in accordance with

Sections 21A(c)(3) and (14) of the FHLBA (12 U.S.C. §1441a(c)(13) and (14)) and the applicable LU

"Multifamily Owners" shall mean owners of Multifamily Property purchased pursuant to Section 21A(c)(3) of the FHLBA (12 U.S.C. §1441a(c)(3)), and any successors in title to such owners.

"Multifamily Property" shall mean the eligible Multifamily Properties purchased by Multifamily Owners pursuant to Section 21A(c)(3) of the FHLBA (12 U.S.C. §1441a(c)(3)), and subject to the Multifamily Occupancy Requirements and the Rent Restrictions.

"Occupancy Requirements" shall mean the Multifamily Occupancy Requirement and the Single Family Occupancy Requirement.

"Owners" shall mean the Multifamily Owners, the Single Family Owners and the Condominium Owners.

"Property" or "Properties" shall mean, individually and collectively, the Multifamily Properties, the Single Family Properties and the Condominium Properties subject to this MOU and listed in Exhibit A hereto.

"Qualifying Units" shall mean the total units in a Property or Properties required to be set aside to meet the Multifamily Occupancy Requirement or the Single Family Occupancy Requirement, as applicable.

"Rent Restrictions" shall mean the applicable rent limits for Qualifying Units in a Property, as provided in the applicable LURA.

"Resale Restrictions" shall mean the Single Family Resale Restrictions and the Condominium Resale Restrictions.

"RTC" shall mean the former Resolution Trust Corporation as established pursuant to Section 501(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended (Section 21A of the Federal Home Loan Bank Act; 12 U.S.C. §1441a).

"Secretary" shall mean the Secretary of Housing and Urban Development.

"Single Family Occupancy Requirement" shall mean the requirement that Single Family Owners set-aside not less than 100% of all eligible Single Family Property for occupancy by Lower-income Families, as evidenced by the applicable LURA.

"Single Family Owners" shall mean nonprofit organizations or governmental agencies which purchased Single Family Property from the RTC or a previous Single Family Owner in accordance with Section 21A(c)(2)(B) of the FHLBA (12 U.S.C. §1441a(c)(2)(B)).

"Single Family Property" shall mean a one-to-four unit property purchased by a Single Family Owner pursuant to Section 21A(c)(2)(B) of the FHLBA (12 U.S.C. §1441a(c)(2)(B)), and subject to the Single Family Occupancy Requirement, the Rent Restrictions and the Single Family Resale Restrictions.

"Single Family Resale Restrictions" shall mean the requirement that a Single Family Property may be sold by a Single Family Owner only to a purchaser that is a Lower-Income Family (i) which agrees to occupy, and certifies in writing that

it intends to occupy, su   Single Family Property as   principal residence for at least 12 months, and   i) which enters into an ac   ement providing for the recapture of seventy-five percent (75%) of the profits from the resale of such property, if such resale takes place within 12 months after such purchase, all as more fully provided in the applicable LURA.

"State" shall mean any state of the United States where properties have been sold through RTC's Affordable Housing Disposition Program and where FDIC has assigned those properties to the Agency to monitor.

"Very Low-Income Families" shall mean families and individuals whose Annual Incomes do not exceed 50 percent of area median income in the area in which the particular Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

2. Monitoring and Enforcement.

(a) Properties and Owners

(i) Inclusion of Properties in Exhibit A - The Properties that the Agency shall monitor under the terms of this MOU, and the Owners thereof, are identified in Exhibit A hereto and incorporated herein. The FDIC may amend Exhibit A at any time to add as Properties additional properties located within the State which have been sold through the RTC's Affordable Housing Disposition Program, upon thirty (30) days written notice to the Agency by registered or certified mail. Upon so amending Exhibit A, the FDIC shall (i) furnish the Agency with copies of the LURA executed with respect to each such property, (ii) advise the Agency as to which of the forms of LURA generally used served as the basis for the LURA for such property and (iii) notify the Agency of any variations in the terms thereof from those of the general form of LURA upon which it was based.

The Agency shall amend Exhibit A to reflect (i) a change in the Owner of a Property as set forth in the related LURA, (ii) the release of a Property from the requirements of the related LURA in accordance with the terms thereof, or (iii) any change in the number of Qualifying Units required to be maintained in a particular Property or group of Properties. The Agency shall notify the FDIC in writing within thirty (30) days of making any such amendment to Exhibit A.

(ii) Removal of Properties from Exhibit A - Upon sixty (60) days written notice to the Agency by registered or certified mail, the FDIC may, without cause, amend Exhibit A to remove any Property listed therein from any or all of the requirements of this MOU.

(b) Agreement to Monitor and Enforce Compliance with the LURAs.

The Agency hereby agrees to monitor and enforce, for itself and on behalf of the FDIC, the compliance of the Owners with all occupancy, rent and resale requirements set out in Section 21A(c) of the FHLBA (12 U.S.C. §1441a(c)) and the applicable LURAs, including, but not limited to, the Occupancy Requirements, the Rent Restrictions and the Resale Restrictions.

(c) Compliance Monitoring Procedures.

The specific services that the Agency shall perform pursuant to this MOU are set out in the Compliance Monitoring Manual attached hereto as Exhibit B and incorporated herein by reference. The Agency shall at all times perform its

duties in accordance with the Compliance Monitoring Manual, provided, however, that the Agency shall be, and hereby is authorized to, take any and all action authorized by the FHLBA, the Final Rule, the LURAs or the laws of the State which may be necessary or desirable, in its discretion, in order to monitor or assure compliance by the Owners and the Properties with the terms of the LURAs, in particular the Low-Income Restrictions. No monitoring or enforcement action taken by the Agency which is otherwise permitted under the FHLBA, the Final Rule, the LURAs or the laws of the State shall fail or be held to be impermissible because it is not specifically identified or authorized in the Compliance Monitoring Manual. The Agency shall carry out its monitoring and enforcement functions in the State.

After prior consultation with the Agency, the FDIC may amend, modify or replace the Compliance Monitoring Manual. The FDIC shall notify in writing and file with the Agency any such amendment, modification or replacement within thirty (30) days after FDIC's authorization and approval thereof. The replacement, amendment, or modification of the Compliance Monitoring Manual shall in no way be deemed to limit the monitoring and enforcement authority of the Agency hereunder, nor to diminish its obligation to assure that the Owners comply fully with the requirements of the LURAs, in particular the Low-Income Restrictions.

Together with the Compliance Monitoring Manual and appended hereto as Exhibit B-2, FDIC is providing the Agency with the standard forms of LURAs used with respect to Properties to be monitored by the Agency within the State. FDIC agrees to consult with the Agency prior to making any changes in the standard forms of LURAs as hereinafter provided to the Agency.

(d) Judicial Enforcement by FDIC and the Agency.

If the Agency shall find that a Property is not in compliance with the Low-Income Restrictions and if the Agency shall determine that administrative measures have not been effective or are not likely to be effective in bringing such Property into compliance, the Agency may commence appropriate judicial enforcement action pursuant to authority provided under the FHLBA, the laws of the State, and/or the terms of the applicable LURA. No less than thirty (30) days prior to actual commencement of such a judicial enforcement action, the Agency shall notify the FDIC in writing of its intent to do so.

If, prior to commencing such an enforcement action or during the prosecution thereof, the Agency shall determine that, for reasons of administrative capacity, the adequacy of compensation pursuant to Section 3 of this MOU, or other reasons unrelated to the merits of the particular enforcement action, it is unwilling to commence or continue such action on its own, the Agency shall so advise the FDIC in writing and the FDIC may take such steps as the FDIC deems appropriate to ensure compliance by the Owner(s). Nothing in this MOU shall be deemed to limit the FDIC's authority under the FHLBA, the laws of the United States or the LURAs to carry out such monitoring or enforcement activities with respect to the Low-Income Restrictions as it shall determine to be appropriate.

(e) Agreements With Other Monitoring Agencies.

The Agency is authorized to enter into cooperative agreements with State Housing Finance Agencies (as defined in Section 21A(c)(g)(P) of the FHLBA; 12 U.S.C. §1441a(c)(9)(P)) and/or other parties with responsibility for monitoring or enforcing LURAs governing eligible residential properties, whether such properties are located within or without the State, whenever the Agency determines that any such agreement will further the purposes of this MOU or will

assist any other party in performing monitoring and enforcement activities under a LURA with respect to a property. Any such cooperative agreement may provide for such division of administrative fees payable under the LURAs which are the subject of such cooperative agreement as the parties thereto deem appropriate, and if such cooperative agreement provides in writing for a division of responsibilities, the assumption of responsibilities by such State Housing Finance Agency or other party shall relieve or discharge the Agency of the responsibility so assumed.

The Agency shall provide the FDIC with written notice of its intent to enter into such an cooperative agreement no less than thirty (30) days prior to the date of actual execution of the agreement. Such written notice shall include a copy of the agreement to be executed.

(f) Agreements For Performance of Monitoring and Enforcement Activities.

The Agency is authorized to enter into agreements with any party to provide for the performance of specific functions under the Compliance Monitoring Manual or for the carrying out of any of its monitoring or enforcement obligations hereunder whenever the Agency determines that any such agreement will further the purposes of this MOU, provided, however, that only the Agency, or another entity authorized under the laws of the State to prosecute, may commence or prosecute judicial enforcement actions in its own name. By entering into any such agreements, the Agency does not relinquish ultimate responsibility for performance of the obligations comprehended by this MOU and the Compliance Monitoring Manual.

The Agency shall provide the FDIC with written notice of its intent to enter into any such agreement no later than thirty (30) days prior to the date of actual execution of the agreement. Such written notice shall include a copy of the agreement to be executed.

(g) Agency as Owner.

FDIC and the Agency agree that, if the Agency shall be the Owner of any Properties, all of the terms hereof and of the Compliance Monitoring Manual shall apply to the Agency with regard to such Properties; provided, however, that in addition, the Agency agrees promptly to notify the FDIC of any finding of noncompliance with respect to any such Property and of the action which it proposes to take to correct such noncompliance; and provided, further, that if the Agency shall own a Property for more than two years, the FDIC shall be authorized to designate another party, whether a governmental agency of the State or any other state, or a private contractor, to carry out monitoring and enforcement activities on its behalf with respect to such Property and to collect the attendant fees.

3. Compensation.

(a) Annual Administrative Fees.

The Agency shall be entitled to collect from the Owners annual administrative fees for performing the monitoring and enforcement services set forth in the Compliance Monitoring Manual. Annual administrative fees shall be payable in such installments and at such times during the year, whether in advance or in arrears, as the Agency shall determine.

(i) Multifamily Property and Condominium Property. The Agency shall be entitled to collect from the Owners of Multifamily Property and Condominium Property an annual administrative fee of $50 per Qualifying Unit; provided, however, that the Agency shall be entitled to collect a minimum fee of $250 per Multifamily Property or Condominium Property. Annual administrative fees shall be adjusted for inflation as provided in the applicable LURAs. The Agency shall not be entitled to collect an administrative fee from a Lower-Income Family that purchases a Qualifying Unit in a Condominium Property in accordance with the resale restrictions set forth in the applicable LURA,

(ii) Single Family Property. The Agency shall be entitled to collect from the Owners of Single Family Property an annual administrative fee of $50 per Property, adjusted for inflation as provided in the applicable LURA.

(b) Property Noncompliance Fees.

Upon finding noncompliance by a Property with the Low-Income Restrictions or the administrative requirements of the LURA, the Agency shall be entitled to charge an annual administrative fee (not exceeding $50 per Qualifying Unit or such other maximum as is applicable under the LURA after adjustment for inflation as provided therein) sufficient to compensate it for the additional monitoring and enforcement activities undertaken. The Agency shall carry out such additional monitoring and enforcement activities for such time period as it determines appropriate to ensure continued compliance by the Property and shall be entitled to compensation for such activities for a period of up to three calendar years following the year of the most recent finding of noncompliance. Any such fees are in addition to, and distinct from, any reimbursements of costs and legal fees to which the Agency may be entitled as a result of judicial enforcement action, and such fees will be payable without regard to whether the Agency undertakes or succeeds in judicial enforcement action.

(c) Conflict With LURAs.

In the event of a conflict between the provisions for payment of fees hereinabove set forth and the terms of a particular LURA, the terms of the LURA shall govern; provided, however, that the Agency shall be permitted to negotiate with the particular Owner for fee terms comparable to those set forth above. If the Agency shall make a finding of noncompliance with respect to a particular Property but shall be unable to collect the fee described in subsection (b) hereof for additional monitoring and enforcement activities because the LURA executed with respect to such Property made no provision for such fee, the Agency may notify the FDIC of any such noncompliance and advise the FDIC that it will not undertake additional monitoring and/or enforcement activities with respect to such Property without receiving equivalent compensation. In such event, FDIC may (i) undertake additional monitoring and enforcement activities directly or (ii) pay to the Agency the additional administrative fee which would have been payable under the applicable LURA had it included the provision for such fees incorporated in the standard form of LURA, in which event the Agency shall undertake appropriate additional monitoring and enforcement activities.

4. Evaluation.

Twelve (12) months after the Effective Date and annually thereafter, the FDIC will evaluate the Agency's performance under this MOU and the Compliance Monitoring Manual. If the FDIC determines, upon an annual evaluation or at any other time, that the Agency's monitoring and enforcement activities hereunder and/or thereunder are unsatisfactory, the FDIC shall provide written notice to

the Agency of the specific items of unsatisfactory performance and provide the Agency a reasonable opportunity to correct such unsatisfactory performance.

5. Semi-Annual Reports.

The Agency shall timely prepare and provide to the appropriate FDIC regional office and to the Washington office of the FDIC, each at the addresses provided hereinafter at Section 12, for each semi-annual period or portion thereof in which this MOU is in effect, the first such period being deemed to have commenced on the Effective Date, a report of its activities hereunder, setting forth: (i) the names of the Owners and a description of the Properties, (ii) a description of the monitoring activities the Agency has undertaken with respect to the Owners and the Properties, (iii) based on such monitoring activities, a list of those Properties which are not in compliance with the Low-Income Restrictions, and (iv) if a Property is not in compliance, a description of the nature of the noncompliance and the enforcement activities the Agency has undertaken with respect to such noncompliance.

6. Record Retention; FDIC's Right to Examine Books and Records; Examination of Records by Comptroller General.

(a) The Agency shall maintain all files and records pertaining to its performance under this MOU at a single location which is secure and accessible. Records shall be retained with respect to the Agency's activities hereunder during the most recent calendar year and the three preceding calendar years.

(b) At all times during the term of this MOU and at all times during the three year period following the expiration or termination of this MOU, the FDIC and its duly authorized agents, representatives or employees may, upon not fewer than five business days' notice and at such reasonable times as the FDIC may determine, inspect, audit, and copy, at the FDIC's expense and on the premises of the Agency if appropriate facilities are available, any of the Agency's records, reports and related materials pertaining to the Agency's performance under this MOU.

(c) The Comptroller General of the United States or a duly authorized representative from the General Accounting Office shall, until three (3) years following the expiration or termination of this MOU, have access to, and the right to examine, any property within the Agency's possession or control, involving transactions related to this MOU.

7. Term of MOU and Compliance Monitoring Manual.

Unless earlier terminated in accordance with the terms hereof, the term of this MOU shall commence on the Effective Date and terminate at such time as there shall be no LURA applicable to any of the Properties. The Agency shall not be responsible for assuring compliance of the Properties prior to the Effective Date, but shall take appropriate steps, in accordance with the Compliance Monitoring Manual, to bring any non-complying Properties into compliance.

8. Termination.

(a) The FDIC may terminate this MOU without cause upon one hundred and twenty (120) days' written notice to the Agency by registered or certified mail, except that the FDIC may, upon thirty (30) days' written notice to the Agency by registered or certified mail, terminate this MOU for cause, upon the happening of either of the following events:

(i) FDIC, in its sole discretion, determines that the Agency has ceased to be a non-profit corporation authorized to operate in the State of Texas; or

(ii) The Agency materially fails to perform the services set out in the Compliance Monitoring Manual, or if there is no Compliance Monitoring Manual in effect, fails to undertake sufficient monitoring and enforcement activities to ensure compliance by the Properties with the Low-Income Restrictions, provided that in any such instance, the Agency shall have been provided with notice and an opportunity to correct any items of unsatisfactory performance in accordance with Section 4 of this MOU and shall have failed to do so.

(b) The Agency may terminate this MOU without cause upon ninety (90) days written notice to the FDIC by registered or certified mail. In addition, the Agency may, upon thirty (30) days written notice to the FDIC by registered or certified mail, provide for a substitute agency of the State, reasonably satisfactory to the FDIC, to carry out its responsibilities hereunder.

The Agency may also terminate this MOU immediately upon the cessation of its authority to operate under the laws of the State or its authority to carry out the activities required hereunder; provided, however, that the Agency agrees to notify the FDIC of any such cessation which is required to occur under the laws of the State no later than (90) days prior to the scheduled date for such cessation.

(c) Except as provided in the paragraph (d), upon any termination of this MOU, the Agency shall, no later than the date of termination, (i) prepare and provide to the FDIC a report of the type required pursuant to Section 5 hereof with respect to its activities for the period subsequent to the last such report and (ii) pay to the FDIC the proportional share of the annual administrative fee payable with respect to each Property for the part of the annual period applicable to such Properties occurring after the date of termination. If Exhibit A is amended by the FDIC pursuant to paragraph 2(a)(ii) of this MOU, the Agency shall pay to the FDIC the proportional share of the annual administrative fee payable with respect to such Property for the part of the annual period applicable to such Property occurring after the date of such amendment.

(d) If a substitute agency of the State is approved by the FDIC to undertake the responsibilities of the Agency hereunder, such event shall not be treated as a termination of this MOU, provided that the Agency and its successor shall have satisfactorily resolved each party's entitlement to annual administrative fees, for the period in which the succession occurs.

9. Exclusive Monitoring and Enforcement Agent.

Except for monitoring and enforcement activities undertaken by the FDIC and except as otherwise specifically provided in this MOU or authorized by the Final Rule or Section 21A of the FHLBA (12 U.S.C. §1441a), the Agency shall have the sole responsibility for the performance of monitoring and enforcement activities under the LURAs with respect to Properties located within the State; provided, however, that any alleged or actual violation of this provision or any other provision of this MOU shall not be a defense against any monitoring or enforcement action taken against an Owner of a Property by the Agency or any other entity, but shall only concern matters between the FDIC and the Agency, including the right to compensation for activities performed hereunder.

10. Indemnification of the Agency.

If any judicial action or legal proceeding shall be instituted against the Agency by a third party with respect to any action of the Agency which is authorized by the applicable Land Use Restriction Agreement or the Compliance Monitoring Manual or which is otherwise authorized in writing by the FDIC, the FDIC shall indemnify and hold the Agency harmless from and against any and all loss, damage and expense which the Agency may sustain or incur by reason thereof, including, without limitation, the amount of any judgment, plus and costs and interest thereon, which may be entered against the Agency, as well as reasonable attorneys, fees and expenses paid or incurred in connection therewith.

In order to avail itself of such indemnity, the Agency must (i) notify the FDIC immediately upon receiving notice of or information as to any such judicial action or legal proceeding, (ii) provide the FDIC with an opportunity to defend the Agency and/or itself in such action or proceeding with counsel chosen by the FDIC, provided that the Agency shall be entitled to be represented by separate counsel with respect to any claim in which the Agency believes its interests to be adverse to those of the FDIC, and (iii) cooperate fully with the FDIC in any such defense. Notwithstanding the foregoing, the FDIC shall not indemnify and hold the Agency harmless with respect to any judicial action, legal proceeding, or settlement not previously submitted to, reviewed and approved by the FDIC, or the consequences thereof, (I) which is based on acts, failures to act or omissions of the Agency which are determined by a court or in a legal proceeding to be ultra vires or to constitute grounds for a writ of mandamus or to constitute negligence, gross negligence or willful misconduct or (II) in which the Agency is adjudged to have failed to perform its monitoring or enforcement obligations hereunder or under the Compliance Manual or the applicable Land Use Restriction Agreement.

11. Liability of the FDIC

Any financial liability of the FDIC under this MOU, including any obligation to indemnify the Agency pursuant to paragraph 10 above, shall be a liability of the FSLIC Resolution Fund and shall be limited to the resources available in such Fund.

12. Entire Agreement/Modification.

This MOU contains the entire understanding of the parties. The terms contained in this MOU shall not be modified or amended except as agreed to by the parties hereto in writing.

13. Notices.

All notices required or permitted to be given hereunder shall be in writing and deemed given when mailed to such party at its address set forth below:

To FDIC:

Federal Deposit Insurance Corporation
1910 Pacific Avenue
Dallas, Texas 75201
Attn: Affordable Housing Section Chief

With a copy to:

Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C. 20429
Attn: Director, Office Of Affordable Housing

To the Agency:

Affordable Housing Group, Inc.
1910 ESE Loop 323, # 329
Tyler, Texas 75701
Attn: Deidra D. Young, Director of Compliance

Either party may change its address for notice purposes by giving notice to the
other party in accordance with this Section

14. Successor to the FDIC.

If the FDIC shall cease to manage the FSLIC Resolution Fund or if the FSLIC
Resolution Fund shall cease to exist as a specific entity, all rights and
obligations hereunder shall be transferred to any successor entity thereto,
unless the laws of the United States shall specifically assign the
responsibility for the monitoring and enforcement of the Low-Income Restrictions
to a different entity, in which case such entity shall assume the rights and
obligations hereunder. All references to the FDIC or to the RTC hereunder or in
the LURAs shall, unless the context shall clearly indicate otherwise, be deemed
to refer to any entity succeeding the rights and obligations hereunder.

15. Severability.

If any provision of this MOU is held to be unenforceable, invalid or illegal by
any court of competent jurisdiction, such unenforceable, invalid or illegal
provision shall not affect the remainder of this MOU.

16. Governing Law.

This MOU shall be construed in accordance with and governed by the laws of the
United States.

17. Survival.

The provisions contained in this MOU which, by their terms, require performance
after the expiration or termination of this MOU, shall be enforceable
notwithstanding the expiration or other termination of this MOU.

18. Counterparts.

This MOU may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, each party has caused this instrument to be signed on its behalf by its duly authorized agents.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation

By: _____

Name Gary Holloway
Asset Disposition & Operations

Date: ___JULY 9, 2002___

AFFORDABLE HOUSING GROUP, INC.

By: _____

Name: Donald Cage
Title: President

Date: ___July 6, 2002___

EXHIBIT A

LIST OF PROPERTIES AND OWNERS

[EXHIBIT SHOULD IDENTIFY FOR EACH PROPERTY: (I) OWNER; (II) PROPERTY ADDRESS;
(III) TOTAL NUMBER OF UNITS; (IV) NUMBERS OF LOW-INCOME AND VERY LOW-INCOME
UNITS; (V) MORTGAGE LENDER, IF KNOWN. IF ANY PROPERTIES ARE PART OF A BULK SALE
COMPLIANCE REGIME, SUCH PROPERTIES SHOULD BE IDENTIFIED SEPARATELY, TOGETHER
WITH ALL PROPERTIES SUBJECT TO SUCH REGIME.]

MEMORANDUM OF UNDERSTANDING                                    PAGE 5
AFFORDABLE HOUSING GROUP, INC.

Filing # 111934469 E-Filed 08/17/2020 04:40:47 PM



**FDIC**
Federal Deposit Insurance Corporation
3501 Fairfax Drive, Arlington, VA 22226-3500                         Division of Resolutions and Receiverships

November 22, 2016

Mr. Joseph J. Savino
The Law Offices of Joseph J. Savino, P.A.
1101 N. Lake Destiny Road, Suite 250
Maitland, FL 32751

RE: Three Fountains Apartments
    2102 Fountain Blvd.
    Kissimmee, FL  34741
    AHP File #:  40162398

Dear Mr. Savino:

The Affordable Housing Group, Inc. ("AHG") has forwarded to us your request for information regarding their authority to assume responsibility as compliance monitoring agency for properties participating in the Resolution Trust Corporation's ("RTC") Affordable Housing Program ("AHP").

The Federal Deposit Insurance Corporation ("FDIC"), acting in its capacity as Manager of the FSLIC Resolution Fund, successor in interest to the RTC entered into a Memorandum of Understanding with The Affordable Housing Group, Inc. ("AHG") to act in the capacity of a monitoring agency for specific AHP properties. The Three Fountains Apartments were assigned to AHG in order to bring the property into compliance with the guidelines of the AHP.

AHG has the authority to monitor for compliance with the program guidelines detailed in the Land Use Restriction Agreement ("LURA") that was recorded at the time of your purchase of the property. AHG's responsibilities include, but are not limited to:

• Monitor properties for compliance with program requirements;
• Collect monitoring fees from owners;
• Monitor and enforce corrective action in cases of non-compliance and assess non-compliance fees;
• Review requests for LURA modification; and
• Report to the FDIC

. Florida Housing Affordability, Inc. has outstanding compliance fees owed to the Florida Housing Finance Corporation ("FHLC") in the amount of $25,369.96 for compliance years 2014 and 2015. In order to prevent additional judicial action as allowed by the LURA, payment for outstanding fees must be received by December 9th, 2016.

Please contact Deidra Young at AHG at (888) 748-8244 for payment arrangements and future compliance matters.



EXHIBIT
"F"

Three Fountains Apartments
November 22, 2016
Page 2

It is our understanding that AHG offered to waive annual compliance fees for 2016 on the
condition that a compliance report was received by November 10, 2016. AHG has agreed to
extend this offer pending receipt of your compliance report by December 9, 2016.

Please contact AHG at (888) 748-8244 to begin the process of re-establishing compliance with
the requirements of the AHP. This offer is predicated upon your response to AHG for
outstanding compliance fees and submission of your compliance report by the deadline.

If you have any additional questions regarding the FDIC's or AHG's authority, please contact
me at (571) 858-8171 or via e-mail at jtillman@fdic.gov.

Sincerely,

Johnette Tillman
Risk Sharing Asset Management Policy

cc:  Deidra Young, Director of Compliance Monitoring, AHG

---

**Subject:** AHG: Three Fountains Apartments - Establishing Compliance
**Sent By:** Deidra Young
**Sent To:** info@usa-immigrationattorney.com
**Sent On:** 10/12/2017 3:06:58 pm

---

Mr. Savino,

Thank you for taking the time to discuss the current compliance situation at the **Three Fountains Apartments**. As you are aware, The Affordable Housing Group, Inc. ("AHG") is the monitoring agency for properties participating in the Federal Deposit Insurance Corporation's ("FDIC") Affordable Housing Program ("AHP").

Based on our phone conversation, the main concerns you have regarding re-establishing compliance with the Land Use Restriction Agreement ("LURA") guidelines at the Three Fountains Apartments are the following:

- The very low-income (VLI) requirements of 39 units is problematic. While you don't have an issue with the 80% requirements as your main focus is affordable housing, the 20% VLI requirements means a substantial loss of income.

- For approximately the last 6 years, compliance fees assessed by the previous monitoring agency have increased based on the Consumer Price Index ("CPI"). However, during the same period the rent limits for qualifying units have not increased.

- You, as the original purchaser, executed the LURA and have maintained compliance with the guidelines for 23 years. The reporting requirements, especially for a property that has maintained compliance, are burdensome.

AHG provides the following:

- **Qualifying Unit Requirements** -- Unfortunately, until such time as a current Unit Status Report (USR) is provided, AHG cannot accurately analyze the impact of these requirements and make any recommendation to the FDIC for a possible reduction in the required number of qualifying units. Once the USR is received and reviewed and an on-site visit conducted, AHG will be able to determine if any reduction in the qualifying unit requirements is warranted.

  In regards to the VLI requirements, we cannot offer any type of adjustment as the current 20% requirement is the program minimum. However, Chapter 7 of the Owner's Compliance Manual, available on our website at www.theaffordablehousinggroup.org, provides for the monitoring agency to evaluate an owner's request for a financial infeasibility waiver and temporarily reduce the qualifying unit requirements. Carefully review the requirements, and if your property is currently experiencing any financial distress (i.e. long-term documented losses) submit sufficient evidence as detailed in the chapter and AHG will review to determine if the property is eligible for a temporary reduction in the VLI qualifying unit requirements.

- **Outstanding Compliance Fees** – The FDIC has authorized AHG to offer a reduction in the outstanding compliance fees of $25,369.96 to $12,500. This reduction is available as long as 1) payment is made within 30 days, and 2) all other conditions (i.e. leasing and reporting requirements) are maintained.

- **On-going Compliance Fees** – AHG bills compliance fees on January 1st each year at a rate of $75 per qualifying unit. However, a full compliance waiver of $25 per qualifying unit is available for those properties that maintain compliance throughout the year, resulting in a net fee of only $50 per qualifying unit. For your property, this should result in substantial savings over previous fees.

- **Compliance Monitoring** – Per the program guidelines, once compliance has been confirmed the owner is required to submit annual reports to the monitoring agency along with an Owner's Certification of Program Compliance and copies of all Tenant Income Certifications (TICS) completed during the prior compliance period.

  While you indicated that you "self-monitor" compliance with the AHP guidelines, the LURA requires that a monitoring agency actually *confirm* compliance by performing annual desk reviews and periodic on-site visits. There is no mechanism that allows the owner to simply state they are in compliance. This is true even if the owner has a pattern of sufficient internal controls that did not result in any uncorrected findings of non-compliance.

  In order to facilitate the owner's reporting requirements, AHG has developed an on-line system that will streamline the reporting requirements. The on-line system allows property management to update the Unit Status Report with current occupancy information and submit to AHG for review. Once received, AHG will select a sample of files and request copies of the required program documents (i.e. TICs, income verification documents, application, etc.) for review. Only if a substantial number of issues are identified during the review of the documents will the owner be required to submit copies of all documents for each qualifying unit.

  This method substantially decreases the amount of staff time allocated to reporting. This is especially true for those properties that have established sufficient on-site procedures to ensure on-going compliance.

- **Rent and Income Limits** – The rent limits, which are calculated based on the area median incomes, are furnished to the FDIC by the Department of Housing and Urban Affairs ("HUD"). These limits cannot be modified. You indicated that the rent limits for Orlando MSA have not increased in greater than 6 years. We will look into this issue further at a later date. The currently published limits remain in effect.

As I mentioned, it is vitally important that we get the property back into full compliance with the LURA guidelines. The definition of full compliance is that the qualifying unit requirements of Section 2.2 of the LURA have been achieved and confirmed by the monitoring agency and compliance fees are current.

AHG looks forward to working with you and your staff on continuing to make affordable units available to lower income households in your community. Please review the above and contact

us at (888) 748-8244 so that we can begin the process of assisting you on re-establishing compliance.


Deidra Young
Director of Compliance Monitoring

The Affordable Housing Group, Inc.
P.O. Box 601759
Dallas, Texas 75360-1759
(888) 748-8244
(214) 823-1244 (fax)

www.theaffordablehousinggroup.org
compliance@theaffordablehousinggroup.org

Filing # 111934469 E-Filed 08/17/2020 04:40:47 PM



# Clayton & McCulloh
## ATTORNEYS AT LAW
www.clayton-mcculloh.com

RUSSELL E. KLEMM
Attorney & Counselor at Law
rklemm@clayton-mcculloh.com

Clayton & McCulloh, P. A.
Servicing 25 Counties
Respond to: Orlando Office

August 2, 2018

*Via Certified Mail-Return Receipt Requested*
*No. 7015 0920 0001 4336 5796*
Mr. Joseph J. Savino, Esq.
The Law Offices of Joseph J. Savino, P.A.
1101 N. Lake Destiny Road, Suite 250
Maitland, FL 32751

> Re:   *Florida Housing Affordability, Inc. DBA Three Fountains Apartments*
>       *2102 Fountain Blvd., Kissimmee, Florida — AHP File #40162398*

Dear Mr. Savino:

The undersigned and the firm of Clayton & McCulloh, P.A. are legal counsel for The Affordable Housing Group, Inc. ("AHG"), which firm is the monitoring agency and enforcement agency for Affordable Housing Program ("AHP") properties in the state of Florida.[1]

As you are aware, the Three Fountains Apartments ("Apartments") is subject to a "Land Use Restriction Agreement" ("LURA"), by and between the Resolution Trust Corporation, as receiver for Southwest Federal Savings Association, Dallas, Texas, and Florida Housing Affordability, Inc., a Florida not-for-profit corporation, which LURA is recorded in the Official Records of Osceola County, at Book 1180 at Page 0185.

As set forth under the LURA and the Affordable Housing Program ("AHP"), the Apartments are required to abide by certain rental qualifications, as well as reporting requirements and the payment of compliance fees which are now seriously past due and payable to AHG. Among the violations with regard to qualifying unit rentals, compliance monitoring, compliance reporting, and the payment of compliance fees, said violations include but are not limited to the following:

1.   Failing to maintain the required number of "Qualifying Units" (QU's);

2.   Failing to pay the outstanding compliance fees;

---

[1] The FSLIC Resolution Fund is the legal successor in interest to the Resolution Trust Corporation ("RTC"), and said Fund is managed by the Federal Deposit Insurance Corporation ("FDIC"), with the AHG acting in the capacity as a monitoring agent for the FDIC.

Orlando Office:
The Clayton & McCulloh Building
1065 Maitland Center Commons Blvd.
Maitland, FL 32751
Phone: (407) 875-2655
Fax: (407) 875-3363



**EXHIBIT**
"G"

Melbourne Office: Suntree/Viera
Baytree Corporate Park
1301 Bedford Drive, Suite 101
Melbourne, FL 32940
Phone: (321) 751-3449
Fax: (321) 751-3450

Mr. Joseph J. Savino, Esq.
August 2, 2018
Page 2

3.     Failure to pay the ongoing compliance fees, at a rate of $75.00 per QU; and

4.     Failure to submit the required compliance report to AHG.

Under the terms of the LURA, and under Section 6.1 "Remedies of RTC or the Agency", the LURA provides as follows:

"Section 6.1.     Remedies of RTC or the Agency.

(a)     If Owner defaults in the performance of any of its obligations under this Agreement, or breaches any covenant, agreement or restriction set forth herein, and if such default remains uncured for a period of sixty (60) days after notice thereof shall have been given by RTC or the Agency (or for an extended period approved in writing by RTC or the Agency if the default or breach stated in such notice can be corrected, but not within such 60-day period, unless Owner does not commence such correction or commences such correction within such 60-day period but thereafter does not diligently pursue the same to completion within such extended period), RTC or the Agency shall be entitled to apply to any court having jurisdiction of the subject matter for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the Property in accordance with the terms of this Agreement or for such other relief as may be appropriate, it being acknowledged that the beneficiaries of Owner's obligations hereunder cannot be adequately compensated by monetary damages in the event of Owner's default. RTC or the Agency shall be entitled to its reasonable attorneys' fees in any such judicial action in which RTC or the Agency shall prevail."

This letter does constitute 60 days' notice of default under the terms of the LURA, and of violations of the LURA, and intent to take legal action against Florida Housing Affordability, Inc., including but not limited to an action for damages, for injunctive relief, and the appointment of a receiver for the operation of the Apartments. AHG shall also seek the recovery of all attorney's fees and costs, as provided for under the LURA.

Please note, that the unpaid and outstanding compliance fees, through 2017, are not less than $25,369.96. Additional compliance fees of $24,000.00 are also due and owing, for a total due of $49,369.96. AHG may be willing to negotiate the payment of these outstanding fees provided the property comes into compliance as soon as possible. It is strongly recommended that this office be immediately contacted with regard to your intent to comply with the terms of the LURA and to specify the corrective actions that will be taken, so as to prevent further legal action in this matter.

Mr. Joseph J. Savino, Esq.
August 2, 2018
Page 3

Thank you for your prompt attention.

Sincerely,

CLAYTON & MCCULLOH

*Russell E. Klemm* pro

Russell E. Klemm, Esq.
REK/sar
cc:     The Affordable Housing Group, Inc.

Signed in Attorney Klemm's absence to avoid delay.



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at www.usps.com®.

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent to MR. JOSEPH S. SAVINO, ESQ.
LAW OFFICES OF JOSEPH S. SAVINO, P.A.
Street & Apt. No., 1101 N. LAKE DESTINY ROAD
or PO Box No. SUITE 850
City, State, ZIP+4 MAITLAND, FL 32751

PS Form 3800, July 2014

7015 0920 0001 4336 5796

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

MR. JOSEPH S. SAVINO, ESQ.
LAW OFFICES OF JOSEPH J.
SAVINO, ESQ.
1101 N. LAKE DESTINY ROAD
SUITE 850
MAITLAND, FL 32751

9590 9402 3066 7124 3732 97

2. Article Number (Transfer from service label)

7015 0920 0001 4336 5796

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)  C. Date of Delivery
JAN GARDNER  8-06-18

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053  Domestic Return Receipt

Filing # 139267615 E-Filed 11/29/2021 03:02:03 PM

IN THE CIRCUIT COURT OF THE NINTH
JUDICIAL CIRCUIT IN AND FOR OSCEOLA
COUNTY, FLORIDA

CASE NO.: 2020-CA-000170 OC

AFFORDABLE HOUSING GROUP, INC.,
as an agent of the FEDERAL DEPOSIT
INSURANCE CORPORATION, as Manager
of the FSLIC Resolution Fund, successor in
interest to the Resolution Trust Corporation,

       Plaintiff,

vs.

FLORIDA HOUSING AFFORDABILITY, INC.,

       Defendant.

_____/

## NOTICE OF RE-FILING

**COMES NOW,** Plaintiff, AFFORDABLE HOUSING GROUP, INC., by and through its

undersigned attorney, and gives notice of re-filing the attached Exhibit "A" to Plaintiff's

Complaint, originally filed January 20, 2020, and Plaintiff's Amended Complaint, originally filed

August 17, 2020, per a November 29, 2021, request of the Osceola Clerk of Court.

DATED this 29th day of November, 2021.

                 */s/ Russell E. Klemm*

                 _____

                 RUSSELL E. KLEMM, ESQ.
                 Florida Bar No.: 0292826
                 Clayton & McCulloh, P.A.
                 1065 Maitland Center Commons Blvd.
                 Maitland, FL   32751
                 (407) 875-2655 Telephone
                 (407) 875-3363 Facsimile
                 E-mail: rklemm@clayton-mcculloh.com (Primary)
                              epraria@clayton-mcculloh.com (Secondary)
                 Attorneys for Plaintiff

- 1-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via the E-Portal to Jason R. Hawkins, Esq., *jhawkins@southmilhausen.com*, and *lcarpenter@southmilhausen.com*, on this 29th day of November, 2021.

*/s/ Russell E. Klemm*

RUSSELL E. KLEMM, ESQ.
Florida Bar No.: 0292826
Clayton & McCulloh, P.A.
1065 Maitland Center Commons Blvd.
Maitland, Florida 32751
(407) 875-2655 Telephone
(407) 875-3363 Facsimile
Attorney for Plaintiff

NEL WILLS JR., CLERK OF THE CIRCUIT COURT - OSCEOLA CTY    BK  1180
04/04/94  16:25   VERIFIED: TAB . INSTR #  94-025302       PG  0185

LAND USE RESTRICTION AGREEMENT
BY AND BETWEEN

RESOLUTION TRUST CORPORATION AS RECEIVER
FOR SOUTHWEST FEDERAL SAVINGS ASSOCIATION
DALLAS, TEXAS

AND

FLORIDA HOUSING AFFORDABILITY, INC.,
A FLORIDA NOT FOR PROFIT CORPORATION

(MULTIFAMILY PROPERTIES)

NOTE:   THIS DOCUMENT MUST BE REFERENCED IN THE DEED, AND MUST BE
RECORDED AND TIME STAMPED IMMEDIATELY AFTER THE DEED

Prepared By and Return To:
Bernice S. Saxon, Esq.
Salem, Saxon & Nielsen, P.A.
P.O. Box 3399
Tampa, FL  33601

October 1992
Version 2.0

EXHIBIT
"A"

| BOOK   1180   PAGE   0186 |

## TABLE OF CONTENTS

Page

### ARTICLE I

Definitions. . . . . . . . . . . . . . . . . . . . . . .   1

Section 1.1.   General . . . . . . . . . . . . . . .   1
Section 1.2.   Generic Terms . . . . . . . . . . . .   4

### ARTICLE II

Use and Occupancy of the Property. . . . . . . . . . .   4

Section 2.1.   Use of the Property . . . . . . . . .   4
Section 2.2.   Occupancy Requirements. . . . . . . .   5

### ARTICLE III

Rent . . . . . . . . . . . . . . . . . . . . . . . . .   7

Section 3.1   Rent Limitations for Qualified Tenants. . .   7

### ARTICLE IV

Administration . . . . . . . . . . . . . . . . . . . .   8

Section 4.1.   Lease Provisions. . . . . . . . . . .   8
Section 4.2.   Examination and Reexamination of Incomes.   9
Section 4.3.   Certification by Owner. . . . . . . .   9
Section 4.4.   Maintenance of Documents. . . . . . .   9
Section 4.5.   Compliance Review . . . . . . . . . .   10
Section 4.6.   Administrative Fee. . . . . . . . . .   10
Section 4.7.   Releases. . . . . . . . . . . . . . .   11

### ARTICLE V

Representations and Warranties of Owner. . . . . . . .   11

Section 5.1.   Representations and Warranties. . . .   11
Section 5.2.   Indemnification . . . . . . . . . . .   12

i

| BOOK   1180   PAGE   0187 |

Page

## ARTICLE VI

Enforcement and Remedies . . . . . . . . . . . . . . . . 13

Section 6.1.   Remedies of RTC or the Agency . . . . . . . 13
Section 6.2.   Remedies of Other Parties . . . . . . . . . 13
Section 6.3.   Reliance Upon Information . . . . . . . . . 13

## ARTICLE VII

Miscellaneous . . . . . . . . . . . . . . . . . . . . . 14

Section   7.1.  Amendments . . . . . . . . . . . . . . . . 14
Section   7.2.  Notices . . . . . . . . . . . . . . . . . 14
Section   7.3.  Entire Agreement . . . . . . . . . . . . . 15
Section   7.4.  Governing Law . . . . . . . . . . . . . . 15
Section   7.5.  Severability . . . . . . . . . . . . . . . 15
Section   7.6.  Binding Effect; Covenants Running with
                the Land . . . . . . . . . . . . . . . . . 15
Section   7.7.  Counterparts . . . . . . . . . . . . . . . 16
Section   7.8.  Section Titles . . . . . . . . . . . . . . 16

ii

| BOOK   1180   PAGE   0188 |

## LAND USE RESTRICTION AGREEMENT

THIS LAND USE RESTRICTION AGREEMENT (this "Agreement") is made and entered into this 31st day of March, 1994, by and between Resolution Trust Corporation, established pursuant to Section 501(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, acting in its capacity as Receiver for Southwest Federal Savings Association, Dallas, Texas ("Seller"), and Florida Housing Affordability, Inc., a Florida not for profit corporation ("Owner").

### Recitals

Owner has purchased from RTC certain land described on Exhibit A attached hereto and incorporated herein by reference, together with the improvements located thereon, including a 192-unit rental housing project commonly known as Three Fountains Apartments (said land and improvements are hereinafter collectively referred to as the "Property"), which constitute an "eligible multifamily housing property" as defined in Section 21A(c)(9)(D) of the Federal Home Loan Bank Act (12 U.S.C. §1441a(c)(9)(D)), as amended.

Pursuant to Section 21A(c) of the Federal Home Loan Bank Act (12 U.S.C. §1441a(c)), as amended, Owner must agree to comply with certain occupancy and rent restrictions for the remaining useful life of the Property, and the parties hereto have entered into this Agreement to evidence Owner's agreement to comply with such restrictions.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows.

### ARTICLE I

### Definitions

Section 1.1.   **General.**   Capitalized terms used in this Agreement shall have, unless the context clearly requires otherwise, the meanings specified in this Article I. Certain additional terms may be defined elsewhere in this Agreement.

1

| BOOK  1180  PAGE  0189 |

(a)  "Act" means Section 21A of the Federal Home Loan Bank Act (12 U.S.C. §1441a), as amended, or any corresponding provision or provisions of succeeding law as it or they may be amended from time to time.

(b)  "Agency" means the State Housing Finance Agency or any agency, corporation or authority of the United States government that normally engages in activities related to the preservation of affordable housing which is a successor to or assignee of RTC with respect to its powers and responsibilities hereunder.

(c)  "Annual Income" means "income" as defined in Section 3(b)(4) of the United States Housing Act of 1937 and as determined in accordance with the regulations thereunder promulgated by the Secretary.

(d)  "Agreement" means this Land Use Restriction Agreement, as it may from time to time be amended.

(e)  "Lower-Income Families" means families and individuals whose Annual Incomes do not exceed 80 percent of area median income in the area in which the Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

(f)  "Owner" means Florida Housing Affordability, Inc., a Florida non-profit corporation, as set forth at the beginning of this Agreement, or any successor in title to the Property.

(g)  "Qualified Tenant" means a family or individual tenant of a Qualifying Unit who satisfies the requirements of Section 2.2(a) of this Agreement with respect to such Qualifying Unit.

(h)  "Qualifying Unit" means a Unit that (i) is rented to either a Lower-Income Family or Very Low-Income Family and (ii) is used in complying with the lower income occupancy requirements of Section 2.2(a).  Any Unit rented to a Lower-Income Family or Very Low Income Family that is not needed to meet the lower income occupancy requirements of Section 2.2(a) will not be deemed a Qualifying Unit and will not be subject to the rent restrictions of Article IV.

(i)  "RTC" means the Resolution Trust Corporation, established pursuant to Section 501(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended.

(j)  "Regulations" means the regulations promulgated pursuant to the Act by RTC or any successor, as amended from time to time.

2

| BOOK   1180   PAGE   0190 |

(k)  "Related Entity" means, with respect to any party which has been an Owner hereunder: (i) any spouse, parent, child, grandchild, brother or sister of such Owner; or (ii) any person or entity (A) that directly or indirectly controls or is controlled by or is under common control with such Owner, (B) that is an officer of, partner in or trustee of, or serves in a similar capacity with respect to, such Owner or of which such Owner is an officer, partner or trustee, or with respect to which such Owner serves in a similar capacity, or (C) that is the beneficial owner, directly or indirectly, of 10% or more of any class of equity securities of such Owner or of which such Owner is directly or indirectly the owner of 10% or more of any class of equity securities.

(l)  "Secretary" means the Secretary of Housing and Urban Development.

(m)  "State" means the state in which the Property is located.

(n)  "State Housing Finance Agency" means the public agency, authority, corporation, or other instrumentality of the State that has the authority to provide residential mortgage loan financing throughout the State.

(o)  "Term" means the period commencing on the date hereof and continuing until the earliest to occur of the following:

(1)  the date upon which there is an involuntary loss of the Property by Owner caused by seizure, condemnation, foreclosure or deed in lieu of foreclosure of a mortgage or deed of trust securing a bona fide loan from an institutional lender, or upon which there is a change in federal law which prevents RTC or the Agency from enforcing this Agreement; provided, however, that in the event of loss of the Property by foreclosure or deed in lieu of foreclosure, if the party which was Owner at the time of or immediately prior to such foreclosure or deed in lieu of foreclosure, or a Related Entity of such party, acquires an ownership interest in the Property at any time thereafter, then the covenants and restrictions set forth in this Agreement shall be revived and shall remain in force until the further occurrence of an event described in this subsection;

(2)  the date upon which there is a total involuntary loss of the use of the Property for residential housing purposes by Owner caused by fire or other casualty;

(3)  the date upon which there is a partial involuntary loss of the Property, or of the use thereof for residential housing purposes, caused by seizure or condemnation or by fire or other casualty, which partial loss shall not have been restored through repair or other restoration measure, in which event the covenants and restrictions hereof shall be modified to reflect the appropriate numbers of Units to be held available for Lower Income

3

| BOOK   1180   PAGE   0191 |

Families and Very Low-Income Families, based upon the reduced number of Units in the Property and the percentages of Units for Lower-Income Families and Very Low-Income Families previously required to be maintained in the Property, which covenants and restrictions shall remain in effect for the remainder of the Term;

(4) the date upon which RTC or the Agency determines, in accordance with the Regulations, (i) that all or a portion of the Property is obsolete as to physical condition, location or other factors, making it unusable for housing purposes, and (ii) that no reasonable program of modifications is financially feasible to return the Property or a portion of the Property to useful life; or

(5) the date which is the later of (i) forty (40) years from the date of this Agreement or (ii) fifty (50) years from the date the Property was initially occupied as multifamily housing.

(p) "Unit" means a residential accommodation constituting a part of the Property and containing separate and complete living facilities.

(q) "Very Low-Income Families" means families and individuals whose Annual Incomes do not exceed 50 percent of area median income in the area in which the Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

Section 1.2. Generic Terms. Unless the context clearly indicates otherwise, where appropriate the singular shall include the plural and the masculine shall include the feminine or neuter, and vice versa, to the extent necessary to give the terms defined in this Article I and/or the terms otherwise used in this Agreement their proper meanings.

ARTICLE II

Use and Occupancy of the Property

Section 2.1. Use of the Property. During the Term, Owner will maintain the Property as multifamily rental housing and will rent or hold available for rental each Unit on a continuous basis; provided, however, that Owner may convert a portion of the Property to a use other than multifamily rental housing if Owner shall continue to observe and perform the covenants and restrictions contained in Sections 2.2 and 3.1 hereof.

4

| BOOK   1180   PAGE   0192 |

Section 2.2.   Occupancy Requirements.

(a)  Subject to subsections (c) and (d), during the Term, Owner will make continuously available for occupancy by Lower-Income Families as Qualifying Units (including compliance with Article III hereof) not less than 192 Units, of which not less than 39 Units shall be made available for occupancy by Very Low-Income Families.  Owner shall use its best efforts, subject to current market conditions, (i) to distribute Units reserved for Lower-Income Families and Very Low-Income Families among unit sizes in proportion to the distribution of unit sizes in the Property and (ii) to avoid concentration of Lower-Income Families or Very Low-Income Families in any area or areas of the Property.

(b)   (i)  The determination of whether the Annual Income of a family or individual occupying or seeking to occupy a Qualifying Unit exceeds the applicable income limit shall be made prior to admission of such family or individual to occupancy in a Qualifying Unit (or to designation of a Unit occupied by such family or individual as a Qualifying Unit), except that with respect to families or individuals occupying Units on the date hereof, such determination shall be made within 60 days prior to the designation of any such Unit as a Qualifying Unit.  Thereafter such determinations shall be made at least annually on the basis of an examination or reexamination of the current income of the family or individual.

(ii)  If the Annual Income of a Qualified Tenant which is a Very Low-Income Family shall be determined upon reexamination to exceed the applicable income limit for Very Low-Income Families, but not the applicable income limit for Lower-Income Families, the Unit shall be counted as occupied by a Qualified Tenant which is a Lower-Income Family other than a Very Low-Income Family during such family's or individual's continuing occupancy of such Unit in accordance with clause (iii) below and Owner shall be required to make the next available Qualifying Unit available for occupancy in accordance with clause (iv) below.

(iii)   If the Annual Income of a Qualified Tenant shall be determined upon reexamination to exceed the applicable income limit for Lower-Income Families, the Unit occupied by such family or individual shall be counted as occupied by a Qualified Tenant (and such family shall be considered, for purposes of subsection (a) and Article III, a Qualified Tenant which is a Lower-Income Family other than a Very Low-Income Family) so long as (A) the Annual Income of such family or individual shall not be determined to exceed 140 percent of the applicable income limit for Lower-Income Families, or (B) if the Annual Income of such family or individual shall be determined to exceed 140 percent of the applicable income limit for Lower-Income Families, so long as each

5

| BOOK   1180   PAGE   0193 |

Unit of comparable or smaller size in the Property which is or becomes available is occupied or held available for occupancy by a new resident whose Annual Income does not exceed the applicable income limit for Lower-Income Families (or a Unit other than a Qualifying Unit occupied by a family or individual whose Annual Income is determined to not exceed the applicable income limit for Lower-Income Families is designated a Qualified Unit) until the occupancy requirements of subsection (a) are met without counting such over-income family or individual. If the Annual Income of a Qualified Tenant shall be determined to exceed 140 percent of the applicable income limit for Lower-Income Families, Owner shall not be required to observe, with respect to such tenant, the restrictions on maximum rents provided under Article III.

(iv) If the required occupancy by Very Low-Income Families is not met at any time, but the requirement as to occupancy by Lower-Income Families other than Very Low-Income Families is met, Owner shall be required to make each available Unit in the Property available to a Very Low-Income Family until the required occupancy by Very Low-Income Families is achieved. If the required occupancy by Very Low-Income Families is not met at any time but the total requirement as to occupancy by Lower-Income Families including Very Low-Income Families is met, Owner shall not be required to make the next available Unit in the Property available to a Very Low-Income Family, but shall be required to make each Qualifying Unit vacated by a Lower-Income Family available for occupancy by a Very Low-Income Family until the required occupancy by Very Low-Income Families is achieved. Notwithstanding the foregoing two sentences, the State Housing Finance Agency may, upon application by Owner, permit any such Qualifying Unit to be rented to a Lower-Income Family other than a Very Low-Income Family if the Agency determines (i) that Owner has taken reasonable steps to rent such Unit to a Very Low-Income Family and has been unable to do so and (ii) that continued vacancy will cause financial hardship to the Property. If the Agency shall not have responded to an application by Owner pursuant to the preceding sentence within 90 days from the date of submission thereof, such Application shall be deemed to have been granted.

(v) If neither the required occupancy by Very Low-Income Families nor the required occupancy by Lower-Income Families other than Very Low-Income Families is met at any time, preference (as between potential tenants of a waiting list or simultaneous applicants) must be given to Very Low-Income Families in the renting of each Unit in the Property which becomes available until the requirement as to occupancy by Lower-Income Families other than Very Low-Income Families is met, after which the rule of clause (iv) will apply, if necessary.

(vi) A Unit that was occupied by a Qualified Tenant and becomes vacant shall be counted as occupied by a Qualified Tenant until it is reoccupied for a period in excess of thirty-one

6

| BOOK   1180   PAGE   0194 |

(31) days, at which time the Unit shall be considered to be occupied by a Qualified Tenant only if the family or individual then occupying the unit satisfies the definition of a Qualified Tenant.

(c)      (i)  Anything to the contrary in the foregoing notwithstanding, Owner will not terminate the occupancy of any tenants in occupancy on the date hereof that are not Lower-Income Families or Very Low-Income Families for purposes of meeting the requirements of this Section. In the event that Owner is unable to comply with the occupancy requirements of this Section because of the occupancy at the date hereof of any Units by tenants who are not Lower-Income Families or Very Low-Income Families, or who have not been determined to be Qualified Tenants, Owner will be in compliance with this Section if each Unit which thereafter becomes vacant is occupied or held available for occupancy by Lower-Income Families or Very Low-Income Families, as the case may be, in accordance with the requirements of subsection (b) until the lower-income occupancy requirements of such subsection are met.

(ii)  If a Unit has been designated as or determined to be a Qualifying Unit, Owner must continue to treat such Unit as a Qualifying Unit for as long as it is continuously occupied by a tenant whose income does not exceed 140 percent of the applicable income limit for Lower-Income Families.

(d)  Notwithstanding the foregoing, the Secretary or the State Housing Finance Agency may, upon application by Owner, temporarily reduce the lower-income occupancy requirements set forth in subsection (a) if the Secretary or the State Housing Finance Agency determines that Owner's compliance with such requirements is no longer financially feasible. Owner will make a good-faith effort to return the lower-income occupancy to the level required by subsection (a), and the Secretary or the State Housing Finance Agency, as appropriate, will review the reduction annually to determine whether financial infeasibility continues to exist.

ARTICLE III

Rent

Section 3.1  Rent Limitations for Qualified Tenants.

(a)      (i)  The rent charged by Owner for Qualifying Units occupied by Very Low Income Families shall not exceed the maximum rent for Qualified Tenants who are Very Low-Income Families for units of the applicable size in the area, as established by RTC or the Agency or the Secretary. Such maximum rent shall be not greater than 30% of the adjusted income of a family whose income equals 50% of area median income, with adjustment for family size based upon unit type.

7

| BOOK 1180 PAGE 0195 |

(ii) The rent charged by Owner for Qualifying Units occupied by Lower-Income Families other than Very Low-Income Families shall not exceed the maximum rent for Qualified Tenants who are Lower-Income Families other than Very Low-Income Families for units of the applicable size in the area, as established by RTC or the Agency or the Secretary. Such maximum rent shall be not greater than 30% of the adjusted income of a family whose income equals 65% of area median income, with adjustment for family size based upon unit type.

(iii) For purposes of calculating maximum rents under this section, (x) the adjustment for family size based upon unit type shall be calculated on the basis of the number of bedrooms in such unit as set forth at Exhibit B hereto and (y) the adjusted income of a family shall be calculated by subtracting from the annual income of a family at the applicable maximum income level the specific adjustments set forth at Exhibit B hereto.

(b) Owner may make a written request to RTC for the schedule of maximum rents applicable to the Property as of the date hereof, and RTC shall provide such schedule within thirty days after (i) the date hereof or (ii) the date RTC receives such request, whichever is later. Such rents shall be subject to annual adjustment upon publication by the U.S. Department of Housing and Urban Development of revised income limits for area lower-income and very low-income families, which adjustment shall be based upon changes in the applicable area median income limits.

(c) If a Qualified Tenant ceases to be considered a Qualified Tenant in accordance with Section 2.2(b), Owner shall, subject to the terms of the lease and applicable law, be free to condition such family's or individual's continued occupancy in the Property upon its payment of a rental charge not subject to the limitations of this Article III.

### ARTICLE IV

### Administration

Section 4.1. Lease Provisions. All tenant leases entered into with Qualified Tenants during the Term shall contain provisions wherein each individual lessee (i) certifies the accuracy of the information provided in connection with the examination or reexamination of Annual Income of the household of such lessee, and (ii) agrees that the Annual Income and other eligibility requirements shall be deemed substantial and material obligations of his or her tenancy, that he or she will comply promptly with all requests for information with respect thereto from Owner or RTC or the Agency, and that his or her failure to provide accurate information regarding such requirements (regardless of whether such inaccuracy is intentional or unintentional) or refusal to comply

8

| BOOK  1180  PAGE  0196 |

with a request for information with respect thereto shall be deemed a violation of a substantial obligation of his or her tenancy and constitute cause for immediate termination thereof.

Section 4.2. Examination and Reexamination of Incomes.

(a)  Owner shall be responsible for determination of the Annual Income and family composition of Qualified Tenants, and for reexamination of Annual Income and family composition of Qualified Tenants at least annually, in accordance with procedures prescribed by RTC or the Agency.

(b)  As a condition of admission to occupancy of a Qualifying Unit, Owner shall require the household head and other such household member as it designates to execute an RTC or Agency approved release and consent authorizing any depository or private source of income, or any Federal, State or local agency, to furnish or release to Owner and to RTC or the Agency such information as Owner or RTC or the Agency determines to be necessary. Owner shall also require the household to submit directly documentation determined to be necessary. Information or documentation shall be determined to be necessary if it is required for purposes of determining or auditing a household's eligibility as a Qualified Tenant, or for verifying related information. The use or disclosure of information obtained from a household or from another source pursuant to this release and consent shall be limited to purposes directly connected with administration of this Agreement.

(c)  Owner shall not be deemed to be in violation of Articles II and III of this Agreement if, in determining Annual Income and family composition of a Qualified Tenant, (i) Owner has relied in good-faith upon information which is supplied to Owner by the tenant, (ii) Owner has no reason to believe such information is false, and (iii) Owner shall have complied with all requirements of RTC or the Agency with respect to verification of household income and family composition.

Section 4.3.  Certification by Owner.  During the Term, on each anniversary of the date upon which this Agreement was first recorded in the land records of the jurisdiction in which the Property is located, or upon such other annual date as RTC or the Agency, in its discretion, upon reasonable notice to the Owner, shall establish, Owner shall submit to RTC or the Agency a certification, in a form prescribed by RTC or the Agency, as to Owner's compliance with all of the terms and provisions of this Agreement.

Section 4.4.  Maintenance of Documents.  All tenant lists, applications, leases, waiting lists, income examinations and reexaminations relating to the Property shall at all times be kept separate and identifiable from any other business of Owner which is unrelated to the Property, and shall be maintained, as required by

9

| BOOK   1180   PAGE   0197 |

RTC or the Agency, in a reasonable condition for proper audit and subject to examination and photocopying during business hours by representatives of RTC or the Agency.

Section 4.5. Compliance Review. RTC or the Agency periodically will monitor Owner's compliance with the requirements of this Agreement. In conducting its compliance review, RTC or the Agency will rely primarily on information obtained from Owner's records and reports, findings from on-site monitoring, and audit reports. RTC or the Agency may also consider relevant information gained from other sources, including litigation and citizen complaints. Owner shall cooperate with RTC or the Agency in any such compliance review and shall furnish all notices, information and reports reasonably required by RTC or the Agency for such purpose.

Section 4.6. Administrative Fee.

(a) In order to compensate RTC or the Agency for the review performed pursuant to Section 4.5, Owner shall pay to RTC (in its corporate capacity and not as receiver or conservator for the savings institution identified on the first page of this Agreement) or the Agency, as applicable, an annual administrative fee for the first twelve month period of this Agreement in the amount of $50 per Qualifying Unit required to be held available under Section 2.2(a) hereof but in no event less than $250.

(b) If RTC or the Agency shall find the Property not to be in compliance with the terms hereof (including the requirements of this Article IV), Owner shall pay to RTC or the Agency, as applicable, an additional administrative fee in an amount prescribed from time to time by RTC or the Agency, which amount, for the first twelve month period of this Agreement shall be $50 per Qualifying Unit required to be held available under Section 2.2(a) hereof, for additional monitoring and enforcement activities undertaken with respect to the Property. The annual fee payable in the event of noncompliance shall be in addition to, and distinct from, the amount due pursuant to Section 4.6(a), as well as any reimbursements of costs and legal fees to which RTC or the Agency may be entitled as a result of judicial enforcement action, and such fee shall be payable without respect to whether RTC or the Agency undertakes or succeeds in judicial enforcement action. RTC or the Agency shall be entitled to undertake additional monitoring and enforcement activities, and to be compensated therefor, for a period of up to three years following its most recent finding of noncompliance with respect to the Property.

(c) For each twelve month period after the first twelve month period of this Agreement, the administrative fees payable hereunder shall be the amounts set forth in subsections (a) and (b) of this Section 4.6, as applicable, multiplied by the increase in the

10

| BOOK  1180   PAGE   0198 |

Consumer Price Index for All Urban Consumers (CPI-U) published by the Bureau of Labor Statistics of the United States Department of Labor (or any generally recognized successor to such Index) between the date hereof and the latest publication of such Index immediately preceding the applicable anniversary date of this Agreement.

Section 4.7. Releases.

(a)  RTC shall --

(i)  execute such documents as may be required to evidence release of the Property from the covenants and restrictions set forth in this Agreement based upon the expiration of the Term as provided in section 1.1(o) hereof (subject, in the event of foreclosure or deed in lieu of foreclosure, to revival as set forth in Section 1.1(o)(1)), upon receipt from Owner of a certification as to the occurrence of the event giving rise to such expiration and such other evidence as RTC or the Agency may reasonably require; and

(ii) execute an appropriate modification to this Agreement to reflect reduced requirements for occupancy by Qualified Tenants in the event of a partial loss of the Property as provided in section 1.1(o)(3) hereof.

(b)  If RTC shall have contracted with the Agency for the performance of its responsibilities hereunder, the Agency shall execute the appropriate release and/or modification to this Agreement in the name of RTC in accordance with the terms of subsection (a) of this Section 4.7, and shall provide appropriate evidence to Owner of its authorization so to act in the name of RTC.

ARTICLE V

Representations and Warranties of Owner

Section 5.1.    Representations and Warranties.    Owner represents and warrants to RTC that:

(a)  Valid Execution.   Owner has validly executed this Agreement and the same constitutes the binding obligation of Owner. Owner has full power, authority and capacity (i) to enter into this Agreement, (ii) to carry out Owner's obligations as described in this Agreement and (iii) to assume responsibility for compliance with all applicable federal rules and regulations, including, without limitation, the Regulations.

(b)  No Conflict or Contractual Violation.   To the best of Owner's knowledge the making of this Agreement and Owner's obligations hereunder:

11

| BOOK   1180   PAGE   0199 |

(i)  will not violate any contractual covenants or restrictions (A) between Owner or any third party or (B) affecting the Property;.

(ii) will not conflict with any of the instruments that create or establish Owner's authority;

(iii)   will not conflict with any applicable public or private restrictions;

(iv) do not require any consent or approval of any public or private authority which has not already been obtained; and

(v)  are  not  threatened  with  invalidity  or unenforceability by any action, proceeding or investigation pending or threatened, by or against (A) Owner, without regard to capacity, (B) any Person with whom Owner may be jointly or severally liable, or (C) the Property or any part thereof.

(c)  No Litigation.  No litigation or proceedings are pending or, to the best of Owner's knowledge, threatened against Owner which if adversely determined could individually or in the aggregate have an adverse effect on title to or the use and enjoyment or value of the Property, or any portion thereof, or which could in any way interfere with the consummation of this Agreement.

(d)  No Bankruptcy.  There is not pending or, to Owner's best knowledge, threatened against Owner any case or proceeding or other action in bankruptcy, whether voluntary or otherwise, any assignment for the benefit of creditors, or any petition seeking reorganization,  arrangement,  composition,  readjustment, liquidation, dissolution or similar relief for Owner under any federal, state or other statute, law, regulation relating to bankruptcy, insolvency or relief for debtors.

Section 5.2.  Indemnification.  Owner agrees to indemnify and hold harmless RTC or the Agency from and against all liabilities, losses, claims, damages, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by RTC or the Agency as a result of any material inaccuracy in any of the representations and warranties contained in Section 5.1.

12

| BOOK   1180   PAGE   0200 |

## ARTICLE VI

### Enforcement and Remedies

Section 6.1.  Remedies of RTC or the Agency.

(a)  If Owner defaults in the performance of any of its obligations under this' Agreement or breaches any covenant, agreement or restriction set forth herein, and if such default remains uncured for a period of sixty (60) days after notice thereof shall have been given by RTC or the Agency (or for an extended period approved in writing by RTC or the Agency if the default or breach stated in such notice can be corrected, but not within such 60-day period, unless Owner does not commence such correction or commences such correction within such 60-day period but thereafter does not diligently pursue the same to completion within such extended period), RTC or the Agency shall be entitled to apply to any court having jurisdiction of the subject matter for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the Property in accordance with the terms of this Agreement or for such other relief as may be appropriate, it being acknowledged that the beneficiaries of Owner's obligations hereunder cannot be adequately compensated by monetary damages in the event of Owner's default. RTC or the Agency shall be entitled to its reasonable attorneys' fees in any such judicial action in which RTC or the Agency shall prevail.

(b)  Each right, power and remedy of RTC or the Agency provided for in this Agreement now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by RTC or the Agency of any one or more of the rights, powers or remedies provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by RTC or the Agency of any or all such other rights, powers or remedies.

Section 6.2.  Remedies of Other Parties.  The occupancy requirements set forth in Section 2.2 of this Agreement also shall inure to the benefit of, and may be judicially enforced against Owner by, affected Lower-Income Families and Very Low-Income Families. Any such party that prevails in any such judicial action shall be entitled to its reasonable attorneys' fees.

Section 6.3.  Reliance Upon Information.  In carrying out its obligations hereunder, Owner shall be entitled to rely upon information provided by RTC or the Agency with respect to (i) income limits applicable to Lower-Income Families and Very-Low

13

| BOOK   1180   PAGE   0201 |

Income Families, (ii) the method for calculating the incomes of such families and (iii) the maximum rents which may be charged to such families pursuant to Section 3.1 hereof.

## ARTICLE VII

### Miscellaneous

Section 7.1. Amendments. This Agreement may not be amended or modified except by written instrument signed by each party hereto.

Section 7.2. Notices. All notices required or permitted to be given under this Agreement must be in writing and will be deemed to have been duly given if delivered personally or mailed, postage prepaid, by registered or certified United States mail, return receipt requested, addressed to the parties at the following addresses:

If to RTC:

Resolution Trust Corporation
801 17th Street, N.W.
Washington, DC 20434-0001
Attention: Director, Affordable Housing
Disposition Program

with copies to:

Resolution Trust Corporation
801 17th Street, N.W.
Washington, DC 20434-0001
Attention: Senior Vice President,
Assets/Real Estate

Resolution Trust Corporation
801 17th Street, N.W.
Washington, DC 20434-0001
Attention: Assistant General Counsel, Real
Estate

Resolution Trust Corporation
100 Colony Square
Suite 2300, Box 68
Atlanta, GA 30361
Attention: Affordable Housing Disposition
Specialist

If to Owner:

Florida Housing Affordability, Inc.
1101 North Lake Destiny Road, Suite 225
Maitland, FL 32751
Attention: Joseph J. Savino, President

14

| BOOK 1180 PAGE 0202 |

wi' copies to:    Benjamin Felder, Esq.
                  Riden, Earle & Kiefner, P.A.
                  100 2nd Avenue South
                  Suite 400 North Tower
                  St. Petersburg, FL 33701

Any party may change its address for notice purposes by giving notice to the other parties in accordance with this Section 7.2.

Section 7.3. Entire Agreement. This Agreement contains the entire understanding between the parties hereto with respect to the subject matter hereof.

Section 7.4. Governing Law. This Agreement, as it may affect the rights, remedies and obligations of RTC or the Agency, shall be governed by and construed in accordance with federal law. Insofar as federal law does not apply, the provisions of this Agreement shall be governed by and construed in accordance with the laws of the State.

Section 7.5. Severability. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of this Agreement or the application thereof to any person or circumstance shall be held invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

Section 7.6. Binding Effect; Covenants Running with the Land. During the Term, this Agreement and the covenants, reservations and restrictions contained herein shall be deemed covenants running with the land for the benefit of RTC and its successors, and shall pass to and be binding upon Owner's heirs, assigns and successors in title to the Property, or if the Property shall not include title to land, but shall include a leasehold interest in land, this Agreement and the covenants, reservations et al shall bind the leasehold interest as well as the Property and shall pass to and be binding upon all heirs, assigns and successors to such interests; provided, however, that upon expiration of the Term in accordance with the terms hereof said covenants, reservations and restrictions shall expire. Each and every contract, deed or other instrument hereafter executed covering or conveying the Property or any portion thereof shall conclusively be held to have been executed, delivered and accepted subject to such covenants, reservations and restrictions, regardless of whether such covenants, reservations and restrictions are set forth in such contract, deed or other instruments. If a portion or portions of the Property are conveyed, all of such covenants, reservations and restrictions shall run to each portion of the Property. Owner, at its cost and expense, shall cause this Agreement to be duly recorded or filed and re-recorded

15

| BOOK   1180   PAGE   0203 |

or refiled in such places, and shall pay or cause to be paid all recording, filing, or other taxes, fees and charges, and shall comply with all such statutes and regulations as may be required by law, in the opinion of qualified counsel, in order to establish, preserve and protect the ability of RTC or the Agency to enforce this Agreement.

Section 7.7. <u>Counterparts</u>.  This Agreement and any amendments hereto may be executed in several counterparts, each of which shall be deemed to be an original copy, and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

Section 7.8. <u>Section Titles</u>.  Section titles and the table of contents are for descriptive purposes only and shall not control or limit the meaning of this Agreement as set forth in the text.

IN WITNESS WHEREOF, the undersigned have hereunto affixed their signatures and seals as of the date first above written.

ATTEST:

By: _____
Printed Name: DANNY R. BEACH
Title: MANAGING SENIOR CHIEF
AFFORDABLE HOUSING

SELLER:
RESOLUTION TRUST CORPORATION AS RECEIVER FOR SOUTHWEST FEDERAL SAVINGS ASSOCIATION, DALLAS, TEXAS

By: _____
Printed Name: _____ L. LEBY HU

Attorney-in-Fact for Resolution Trust Corporation pursuant to Power of Attorney dated _____ MARCH 3 4 , 1994

16

| BOOK   1180   PAGE   0204 |

OWNER:
FLORIDA HOUSING AFFORDABILITY,
INC., A FLORIDA NOT FOR PROFIT
CORPORATION

ATTEST:

By:_____     By:_____
Printed Name:_____     Print Name: JOSEPH J. SAVINO
Title:_____     Title: President

Acknowledgments

STATE OF Georgia
COUNTY OF DeKalb

     The foregoing instrument was acknowledged before me on this
28th day of March , 1994, by L LEROY HILL on behalf
of the Resolution Trust Corporation, a corporation organized and
existing under the laws of the United States, as Receiver for
Southwest Federal Savings Association, Dallas, Texas, who is
personally known to me or has produced N/A as
identification and who did take an oath.

                                     Rose F. Fox
                              Notary Public, State of

My Commission Expires:     Notary Public, DeKalb County, Georgia.
My Commission Number:      My Commission Expires June 8, 1997

STATE OF FLORIDA
COUNTY OF Hillsborough

     The foregoing instrument was acknowledged before me on this
31st day of March , 1994, by JOSEPH J. SAVINO as
its President on behalf of Florida Housing
Affordability, Inc., a Florida not for profit corporation, who is
personally known to me or has produced FL DRIVERS LICENSE as
identification and who did take an oath.

                              Joanne J. Fornuto
                              Notary Public, State of
                              Florida

My Commission Expires:     JOANNE J. FORNUTO
My Commission Number:      MY COMMISSION # CC 206503
                 EXPIRES: April 29, 1997
                 Bonded Thru Notary Public Underwriters

| BOOK   118ᴏ   PAGE   0205 |

## EXHIBIT "A"

## DESCRIPTION OF THE REAL PROPERTY

From the Southeast corner of Section 17, Township 25 South, Range 29 East, run along the East line of said Section 17, North 0°20'0" West, 1520.00 feet to the Point of Beginning, from said Point of Beginning continue North 0°20'09" West 410.96 feet; thence run North 89°42'49" West 1060.20 feet; thence South 0°20'09" East 410.96 feet; thence run East to the Point of Beginning, less the East 30 feet for road right-of-way, said lands lying and being in Osceola County, Florida.



| BOOK   1180   PAGE   0205 |

EXHIBIT "A"

DESCRIPTION OF THE REAL PROPERTY

From the Southeast corner of Section 17, Township 25 South, Range
29 East, run along the East line of said Section 17, North 0°20'0"
West, 1520.00 feet to the Point of Beginning, from said Point of
Beginning continue North 0°20'09" West 410.96 feet; thence run
North 89°42'19" West 1060.20 feet; thence South 0°20'09" East
410.96 feet; thence run East to the Point of Beginning, less the
East 30 feet for road right-of-way, said lands lying and being in
Osceola County, Florida.

| BOOK   1180   PAGE   0206 |

## EXHIBIT B

## FAMILY SIZE AND INCOME ADJUSTMENTS

A.   Family Size Adjustments.

For purposes of Section 3.1(a)(iii)(x), rents for units will be calculated on the basis of the size of household anticipated to occupy a unit with the particular number of bedrooms as follows:

| Unit Size | | | | | |
|---|---|---|---|---|---|
| O-Bedroom | 1-BR | 2-BR | 3-BR | 4-BR | 5-BR |

| Household Size | | | | | |
|---|---|---|---|---|---|
| 1 Person | 3 Pers. | 3 Pers. | 5 Pers. | 7 Pers. | 8 Pers. |

Thus, for example, rent for a 3-bedroom unit occupied by a very low-income family will be based upon the HUD-determined income for a household at 50% of area median income which has 5 members. The rent for a 2-bedroom unit occupied by a lower-income household will be based upon the HUD figure for a household at 65% of median income which has 3 members.

B.   Income Adjustments.

Prior to the rent calculation, the applicable income limit must be reduced by an adjustment based upon unit size as follows:

| Unit Size | | | | | |
|---|---|---|---|---|---|
| O-Bedroom | 1-BR | 2-BR | 3-BR | 4-BR | 5-BR |

| Income Adjustment | | | | | |
|---|---|---|---|---|---|
| $800 | $800 | $880 | $1,560 | $1,560 | $2,040 |

The applicable amount must be subtracted from the applicable income limit before multiplying by 30% in order to determine the maximum rent.

Filing # 139267615 E-Filed 11/29/2021 03:02:03 PM

IN THE CIRCUIT COURT OF THE NINTH
JUDICIAL CIRCUIT IN AND FOR OSCEOLA
COUNTY, FLORIDA

CASE NO.: 2020-CA-000170 OC

AFFORDABLE HOUSING GROUP, INC.,
as an agent of the FEDERAL DEPOSIT
INSURANCE CORPORATION, as Manager
of the FSLIC Resolution Fund, successor in
interest to the Resolution Trust Corporation,

      Plaintiff,

vs.

FLORIDA HOUSING AFFORDABILITY, INC.,

      Defendant.

_____/

## NOTICE OF RE-FILING

    **COMES NOW,** Plaintiff, AFFORDABLE HOUSING GROUP, INC., by and through its

undersigned attorney, and gives notice of re-filing the attached Exhibit "A" to Plaintiff's

Complaint, originally filed January 20, 2020, and Plaintiff's Amended Complaint, originally filed

August 17, 2020, per a November 29, 2021, request of the Osceola Clerk of Court.

    DATED this 29th day of November, 2021.

                */s/ Russell E. Klemm*

                _____

                RUSSELL E. KLEMM, ESQ.
                Florida Bar No.: 0292826
                Clayton & McCulloh, P.A.
                1065 Maitland Center Commons Blvd.
                Maitland, FL  32751
                (407) 875-2655 Telephone
                (407) 875-3363 Facsimile
                E-mail: rklemm@clayton-mcculloh.com (Primary)
                        cpraria@clayton-mcculloh.com (Secondary)
                Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished via the E-Portal to Jason R. Hawkins, Esq., *jhawkins@southmilhausen.com*, and *lcarpenter@southmilhausen.com*, on this 29th day of November, 2021.

*/s/ Russell E. Klemm*

_____

RUSSELL E. KLEMM, ESQ.
Florida Bar No.: 0292826
Clayton & McCulloh, P.A.
1065 Maitland Center Commons Blvd.
Maitland, Florida 32751
(407) 875-2655 Telephone
(407) 875-3363 Facsimile
Attorney for Plaintiff

- 2-

MEL WILLS JR., CLERK OF THE CIRCUIT COURT - OSCEOLA CTY      BK  1180
04/04/94  16:25   VERIFIED: TAB . INSTR #    94-025302      PG  0185

## LAND USE RESTRICTION AGREEMENT
### BY AND BETWEEN

**RESOLUTION TRUST CORPORATION AS RECEIVER**
**FOR SOUTHWEST FEDERAL SAVINGS ASSOCIATION**
**DALLAS, TEXAS**

**AND**

**FLORIDA HOUSING AFFORDABILITY, INC.,**
**A FLORIDA NOT FOR PROFIT CORPORATION**

**(MULTIFAMILY PROPERTIES)**

**NOTE:   THIS DOCUMENT MUST BE REFERENCED IN THE DEED, AND MUST BE
RECORDED AND TIME STAMPED IMMEDIATELY AFTER THE DEED**

Prepared By and Return To:
Bernice S. Saxon, Esq.
Salem, Saxon & Nielsen, P.A.
P.O. Box 3399
Tampa, FL  33601

October 1992
Version 2.0

**EXHIBIT**
"A"

| BOOK   1180   PAGE   0186 |

## TABLE OF CONTENTS

Page

### ARTICLE I

Definitions. . . . . . . . . . . . . . . . . .     1

Section 1.1.   General . . . . . . . . . . . .     1
Section 1.2.   Generic Terms . . . . . . . . .     4

### ARTICLE II

Use and Occupancy of the Property. . . . . . . . .     4

Section 2.1.   Use of the Property . . . . . . . . .     4
Section 2.2.   Occupancy Requirements. . . . . . . .     5

### ARTICLE III

Rent . . . . . . . . . . . . . . . . . . . . . . .     7

Section 3.1   Rent Limitations for Qualified Tenants. . .     7

### ARTICLE IV

Administration . . . . . . . . . . . . . . . . .     8

Section 4.1.   Lease Provisions. . . . . . . . .     8
Section 4.2.   Examination and Reexamination of Incomes.     9
Section 4.3.   Certification by Owner. . . . . . .     9
Section 4.4.   Maintenance of Documents. . . . . .     9
Section 4.5.   Compliance Review. . . . . . . . .    10
Section 4.6.   Administrative Fee. . . . . . . . .    10
Section 4.7.   Releases . . . . . . . . . . . . .    11

### ARTICLE V

Representations and Warranties of Owner. . . . . . .    11

Section 5.1.   Representations and Warranties . . . .    11
Section 5.2.   Indemnification . . . . . . . . . .    12

i

| BOOK   1180   PAGE   0187 |

Page

## ARTICLE VI

Enforcement and Remedies . . . . . . . . . . . . . . . .   13

Section 6.1.    Remedies of RTC or the Agency . . . . . . .   13
Section 6.2.    Remedies of Other Parties . . . . . . . . .   13
Section 6.3.    Reliance Upon Information . . . . . . . . .   13

## ARTICLE VII

Miscellaneous . . . . . . . . . . . . . . . . . . . . . .   14

Section    7.1. Amendments . . . . . . . . . . . . . . . .   14
Section    7.2. Notices . . . . . . . . . . . . . . . . .   14
Section    7.3. Entire Agreement . . . . . . . . . . . . .   15
Section    7.4. Governing Law . . . . . . . . . . . . . .   15
Section    7.5. Severability . . . . . . . . . . . . . . .   15
Section    7.6. Binding Effect; Covenants Running with
                the Land . . . . . . . . . . . . . . . . .   15
Section    7.7. Counterparts . . . . . . . . . . . . . . .   16
Section    7.8. Section Titles . . . . . . . . . . . . . .   16

ii

| BOOK   1180   PAGE   0188 |

## LAND USE RESTRICTION AGREEMENT

THIS LAND USE RESTRICTION AGREEMENT (this "Agreement") is made and entered into this 31st day of March, 1994, by and between Resolution Trust Corporation, established pursuant to Section 501(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, acting in its capacity as Receiver for Southwest Federal Savings Association, Dallas, Texas ("Seller"), and Florida Housing Affordability, Inc., a Florida not for profit corporation ("Owner").

### Recitals

Owner has purchased from RTC certain land described on Exhibit A attached hereto and incorporated herein by reference, together with the improvements located thereon, including a 192-unit rental housing project commonly known as Three Fountains Apartments (said land and improvements are hereinafter collectively referred to as the "Property"), which constitute an "eligible multifamily housing property" as defined in Section 21A(c)(9)(D) of the Federal Home Loan Bank Act (12 U.S.C. §1441a(c)(9)(D)), as amended.

Pursuant to Section 21A(c) of the Federal Home Loan Bank Act (12 U.S.C. §1441a(c)), as amended, Owner must agree to comply with certain occupancy and rent restrictions for the remaining useful life of the Property, and the parties hereto have entered into this Agreement to evidence Owner's agreement to comply with such restrictions.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows.

### ARTICLE I

### Definitions

Section 1.1.   General.   Capitalized terms used in this Agreement shall have, unless the context clearly requires otherwise, the meanings specified in this Article I. Certain additional terms may be defined elsewhere in this Agreement.

1

| BOOK   1180   PAGE   0189 |

(a)   "Act" means Section 21A of the Federal Home Loan Bank Act (12 U.S.C. §1441a), as amended, or any corresponding provision or provisions of succeeding law as it or they may be amended from time to time.

(b)   "Agency" means the State Housing Finance Agency or any agency, corporation or authority of the United States government that normally engages in activities related to the preservation of affordable housing which is a successor to or assignee of RTC with respect to its powers and responsibilities hereunder.

(c)   "Annual Income" means "income" as defined in Section 3(b)(4) of the United States Housing Act of 1937 and as determined in accordance with the regulations thereunder promulgated by the Secretary.

(d)   "Agreement" means this Land Use Restriction Agreement, as it may from time to time be amended.

(e)   "Lower-Income Families" means families and individuals whose Annual Incomes do not exceed 80 percent of area median income in the area in which the Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(2)), with adjustment for family size.

(f)   "Owner" means Florida Housing Affordability, Inc., a Florida non-profit corporation, as set forth at the beginning of this Agreement, or any successor in title to the Property.

(g)   "Qualified Tenant" means a family or individual tenant of a Qualifying Unit who satisfies the requirements of Section 2.2(a) of this Agreement with respect to such Qualifying Unit.

(h)   "Qualifying Unit" means a Unit that (i) is rented to either a Lower-Income Family or Very Low-Income Family and (ii) is used in complying with the lower income occupancy requirements of Section 2.2(a).  Any Unit rented to a Lower-Income Family or Very Low Income Family that is not needed to meet the lower income occupancy requirements of Section 2.2(a) will not be deemed a Qualifying Unit and will not be subject to the rent restrictions of Article IV.

(i)   "RTC" means the Resolution Trust Corporation, established pursuant to Section 501(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, as amended.

(j)   "Regulations" means the regulations promulgated pursuant to the Act by RTC or any successor, as amended from time to time.

2

| BOOK   1180   PAGE   0190 |

(k)   "Related Entity" means, with respect to any party which has been an Owner hereunder: (i) any spouse, parent, child, grandchild, brother or sister of such Owner; or (ii) any person or entity (A) that directly or indirectly controls or is controlled by or is under common control with such Owner, (B) that is an officer of, partner in or trustee of, or serves in a similar capacity with respect to, such Owner or of which such Owner is an officer, partner or trustee, or with respect to which such Owner serves in a similar capacity, or (C) that is the beneficial owner, directly or indirectly, of 10% or more of any class of equity securities of such Owner or of which such Owner is directly or indirectly the owner of 10% or more of any class of equity securities.

(l)   "Secretary" means the Secretary of Housing and Urban Development.

(m)   "State" means the state in which the Property is located.

(n)   "State Housing Finance Agency" means the public agency, authority, corporation, or other instrumentality of the State that has the authority to provide residential mortgage loan financing throughout the State.

(o)   "Term" means the period commencing on the date hereof and continuing until the earliest to occur of the following:

(1)   the date upon which there is an involuntary loss of the Property by Owner caused by seizure, condemnation, foreclosure or deed in lieu of foreclosure of a mortgage or deed of trust securing a bona fide loan from an institutional lender, or upon which there is a change in federal law which prevents RTC or the Agency from enforcing this Agreement; provided, however, that in the event of loss of the Property by foreclosure or deed in lieu of foreclosure, if the party which was Owner at the time of or immediately prior to such foreclosure or deed in lieu of foreclosure, or a Related Entity of such party, acquires an ownership interest in the Property at any time thereafter, then the covenants and restrictions set forth in this Agreement shall be revived and shall remain in force until the further occurrence of an event described in this subsection;

(2)   the date upon which there is a total involuntary loss of the use of the Property for residential housing purposes by Owner caused by fire or other casualty;

(3)   the date upon which there is a partial involuntary loss of the Property, or of the use thereof for residential housing purposes, caused by seizure or condemnation or by fire or other casualty, which partial loss shall not have been restored through repair or other restoration measure, in which event the covenants and restrictions hereof shall be modified to reflect the appropriate numbers of Units to be held available for Lower Income

3

BOOK  1180  PAGE  0191

Families and Very Low-Income Families, based upon the reduced number of Units in the Property and the percentages of Units for Lower-Income Families and Very Low-Income Families previously required to be maintained in the Property, which covenants and restrictions shall remain in effect for the remainder of the Term;

(4)  the date upon which RTC or the Agency determines, in accordance with the Regulations, (i) that all or a portion of the Property is obsolete as to physical condition, location or other factors, making it unusable for housing purposes, and (ii) that no reasonable program of modifications is financially feasible to return the Property or a portion of the Property to useful life; or

(5)  the date which is the later of (i) forty (40) years from the date of this Agreement or (ii) fifty (50) years from the date the Property was initially occupied as multifamily housing.

(p)  "Unit" means a residential accommodation constituting a part of the Property and containing separate and complete living facilities.

(q)  "Very Low-Income Families" means families and individuals whose Annual Incomes do not exceed 50 percent of area median income in the area in which the Property is located, as determined by the Secretary under Section 3(b)(2) of the United States Housing Act of 1937 (42 U.S.C. §1437a(b)(7)), with adjustment for family size.

Section 1.2.  Generic Terms.  Unless the context clearly indicates otherwise, where appropriate the singular shall include the plural and the masculine shall include the feminine or neuter, and vice versa, to the extent necessary to give the terms defined in this Article I and/or the terms otherwise used in this Agreement their proper meanings.

ARTICLE II

Use and Occupancy of the Property

Section 2.1.  Use of the Property.  During the Term, Owner will maintain the Property as multifamily rental housing and will rent or hold available for rental each Unit on a continuous basis; provided, however, that Owner may convert a portion of the Property to a use other than multifamily rental housing if Owner shall continue to observe and perform the covenants and restrictions contained in Sections 2.2 and 3.1 hereof.

4

| BOOK   1180   PAGE   0192 |

### Section 2.2.   Occupancy Requirements.

(a)  Subject to subsections (c) and (d), during the Term, Owner will make continuously available for occupancy by Lower-Income Families as Qualifying Units (including compliance with Article III hereof) not less than 192 Units, of which not less than 39 Units shall be made available for occupancy by Very Low-Income Families.  Owner shall use its best efforts, subject to current market conditions, (i) to distribute Units reserved for Lower-Income Families and Very Low-Income Families among unit sizes in proportion to the distribution of unit sizes in the Property and (ii) to avoid concentration of Lower-Income Families or Very Low-Income Families in any area or areas of the Property.

(b)  (i)  The determination of whether the Annual Income of a family or individual occupying or seeking to occupy a Qualifying Unit exceeds the applicable income limit shall be made prior to admission of such family or individual to occupancy in a Qualifying Unit (or to designation of a Unit occupied by such family or individual as a Qualifying Unit), except that with respect to families or individuals occupying Units on the date hereof, such determination shall be made within 60 days prior to the designation of any such Unit as a Qualifying Unit.  Thereafter such determinations shall be made at least annually on the basis of an examination or reexamination of the current income of the family or individual.

(ii)  If the Annual Income of a Qualified Tenant which is a Very Low-Income Family shall be determined upon reexamination to exceed the applicable income limit for Very Low-Income Families, but not the applicable income limit for Lower-Income Families, the Unit shall be counted as occupied by a Qualified Tenant which is a Lower Income Family other than a Very Low-Income Family during such family's or individual's continuing occupancy of such Unit in accordance with clause (iii) below and Owner shall be required to make the next available Qualifying Unit available for occupancy in accordance with clause (iv) below.

(iii)  If the Annual Income of a Qualified Tenant shall be determined upon reexamination to exceed the applicable income limit for Lower-Income Families, the Unit occupied by such family or individual shall be counted as occupied by a Qualified Tenant (and such family shall be considered, for purposes of subsection (a) and Article III, a Qualified Tenant which is a Lower-Income Family other than a Very Low-Income Family) so long as (A) the Annual Income of such family or individual shall not be determined to exceed 140 percent of the applicable income limit for Lower-Income Families, or (B) if the Annual Income of such family or individual shall be determined to exceed 140 percent of the applicable income limit for Lower-Income Families, so long as each

5

| BOOK   1180   PAGE   0193 |

Unit of comparable or smaller size in the Property which is or becomes available is occupied or held available for occupancy by a new resident whose Annual Income does not exceed the applicable income limit for Lower-Income Families (or a Unit other than a Qualifying Unit occupied by a family or individual whose Annual Income is determined to not exceed the applicable income limit for Lower-Income Families is designated a Qualified Unit) until the occupancy requirements of subsection (a) are met without counting such over-income family or individual. If the Annual Income of a Qualified Tenant shall be determined to exceed 140 percent of the applicable income limit for Lower-Income Families, Owner shall not be required to observe, with respect to such tenant, the restrictions on maximum rents provided under Article III.

(iv) If the required occupancy by Very Low-Income Families is not met at any time, but the requirement as to occupancy by Lower-Income Families other than Very Low-Income Families is met, Owner shall be required to make each available Unit in the Property available to a Very Low-Income Family until the required occupancy by Very Low-Income Families is achieved. If the required occupancy by Very Low-Income Families is not met at any time but the total requirement as to occupancy by Lower-Income Families including Very Low-Income Families is met, Owner shall not be required to make the next available Unit in the Property available to a Very Low-Income Family, but shall be required to make each Qualifying Unit vacated by a Lower-Income Family available for occupancy by a Very Low-Income Family until the required occupancy by Very Low-Income Families is achieved. Notwithstanding the foregoing two sentences, the State Housing Finance Agency may, upon application by Owner, permit any such Qualifying Unit to be rented to a Lower-Income Family other than a Very Low-Income Family if the Agency determines (i) that Owner has taken reasonable steps to rent such Unit to a Very Low-Income Family and has been unable to do so and (ii) that continued vacancy will cause financial hardship to the Property. If the Agency shall not have responded to an application by Owner pursuant to the preceding sentence within 90 days from the date of submission thereof, such application shall be deemed to have been granted.

(v) If neither the required occupancy by Very Low-Income Families nor the required occupancy by Lower-Income Families other than Very Low-Income Families is met at any time, preference (as between potential tenants of a waiting list or simultaneous applicants) must be given to Very Low-Income Families in the renting of each Unit in the Property which becomes available until the requirement as to occupancy by Lower-Income Families other than Very Low-Income Families is met, after which the rule of clause (iv) will apply, if necessary.

(vi) A Unit that was occupied by a Qualified Tenant and becomes vacant shall be counted as occupied by a Qualified Tenant until it is reoccupied for a period in excess of thirty-one

6

| BOOK   1180   PAGE   0194 |

(31) days, at which time the Unit shall be considered to be occupied by a Qualified Tenant only if the family or individual then occupying the unit satisfies the definition of a Qualified Tenant.

(c)      (i) Anything to the contrary in the foregoing notwithstanding, Owner will not terminate the occupancy of any tenants in occupancy on the date hereof that are not Lower-Income Families or Very Low-Income Families for purposes of meeting the requirements of this Section. In the event that Owner is unable to comply with the occupancy requirements of this Section because of the occupancy at the date hereof of any Units by tenants who are not Lower-Income Families or Very Low-Income Families, or who have not been determined to be Qualified Tenants, Owner will be in compliance with this Section if each Unit which thereafter becomes vacant is occupied or held available for occupancy by Lower-Income Families or Very Low-Income Families, as the case may be, in accordance with the requirements of subsection (b) until the lower-income occupancy requirements of such subsection are met.

(ii) If a Unit has been designated as or determined to be a Qualifying Unit, Owner must continue to treat such Unit as a Qualifying Unit for as long as it is continuously occupied by a tenant whose income does not exceed 140 percent of the applicable income limit for Lower-Income Families.

(d)  Notwithstanding the foregoing, the Secretary or the State Housing Finance Agency may, upon application by Owner, temporarily reduce the lower-income occupancy requirements set forth in subsection (a) if the Secretary or the State Housing Finance Agency determines that Owner's compliance with such requirements is no longer financially feasible. Owner will make a good-faith effort to return the lower-income occupancy to the level required by subsection (a), and the Secretary or the State Housing Finance Agency, as appropriate, will review the reduction annually to determine whether financial infeasibility continues to exist.

## ARTICLE III

### Rent

Section 3.1 Rent Limitations for Qualified Tenants.

(a)      (i) The rent charged by Owner for Qualifying Units occupied by Very Low Income Families shall not exceed the maximum rent for Qualified Tenants who are Very Low-Income Families for units of the applicable size in the area, as established by RTC or the Agency or the Secretary. Such maximum rent shall be not greater than 30% of the adjusted income of a family whose income equals 50% of area median income, with adjustment for family size based upon unit type.

7

| BOOK   1180   PAGE   0195 |

(ii) The rent charged by Owner for Qualifying Units occupied by Lower-Income Families other than Very Low-Income Families shall not exceed the maximum rent for Qualified Tenants who are Lower-Income Families other than Very Low-Income Families for units of the applicable size in the area, as established by RTC or the Agency or the Secretary. Such maximum rent shall be not greater than 30% of the adjusted income of a family whose income equals 65% of area median income, with adjustment for family size based upon unit type.

(iii)    For purposes of calculating maximum rents under this section, (x) the adjustment for family size based upon unit type shall be calculated on the basis of the number of bedrooms in each unit as set forth at Exhibit B hereto and (y) the adjusted income of a family shall be calculated by subtracting from the annual income of a family at the applicable maximum income level the specific adjustments set forth at Exhibit B hereto.

(b)   Owner may make a written request to RTC for the schedule of maximum rents applicable to the Property as of the date hereof, and RTC shall provide such schedule within thirty days after (i) the date hereof or (ii) the date RTC receives such request, whichever is later.   Such rents shall be subject to annual adjustment upon publication by the U.S. Department of Housing and Urban Development of revised income limits for area lower-income and very low-income families, which adjustment shall be based upon changes in the applicable area median income limits.

(c)   If a Qualified Tenant ceases to be considered a Qualified Tenant in accordance with Section 2.2(b), Owner shall, subject to the terms of the lease and applicable law, be free to condition such family's or individual's continued occupancy in the Property upon its payment of a rental charge not subject to the limitations of this Article III.

ARTICLE IV

Administration

Section 4.1. Lease Provisions.  All tenant leases entered into with Qualified Tenants during the Term shall contain provisions wherein each individual lessee (i) certifies the accuracy of the information provided in connection with the examination or reexamination of Annual Income of the household of such lessee, and (ii)  agrees that the Annual Income and other eligibility requirements shall be deemed substantial and material obligations of his or her tenancy, that he or she will comply promptly with all requests for information with respect thereto from Owner or RTC or the Agency,  and that his or her failure to provide accurate information regarding such requirements (regardless of whether such inaccuracy is intentional or unintentional) or refusal to comply

8

| BOOK   1180   PAGE   0196 |

with a request for information with respect thereto shall be deemed a violation of a substantial obligation of his or her tenancy and constitute cause for immediate termination thereof.

Section 4.2. <u>Examination and Reexamination of Incomes</u>.

(a)  Owner shall be responsible for determination of the Annual Income and family composition of Qualified Tenants, and for reexamination of Annual Income and family composition of Qualified Tenants at least annually, in accordance with procedures prescribed by RTC or the Agency.

(b)  As a condition of admission to occupancy of a Qualifying Unit, Owner shall require the household head and other such household members as it designates to execute an RTC or Agency approved release and consent authorizing any depository or private source of income or any Federal, State or local agency, to furnish or release to Owner and to RTC or the Agency such information as Owner or RTC or the Agency determines to be necessary. Owner shall also require the household to submit directly documentation determined to be necessary. Information or documentation shall be determined to be necessary if it is required for purposes of determining or auditing a household's eligibility as a Qualified Tenant, or for verifying related information. The use or disclosure of information obtained from a household or from another source pursuant to this release and consent shall be limited to purposes directly connected with administration of this Agreement.

(c)  Owner shall not be deemed to be in violation of Articles II and III of this Agreement if, in determining Annual Income and family composition of a Qualified Tenant, (i) Owner has relied in good-faith upon information which is supplied to Owner by the tenant, (ii) Owner has no reason to believe such information is false, and (iii) Owner shall have complied with all requirements of RTC or the Agency with respect to verification of household income and family composition.

Section 4.3.  <u>Certification by Owner</u>.  During the Term, on each anniversary of the date upon which this Agreement was first recorded in the land records of the jurisdiction in which the Property is located, or upon such other annual date as RTC or the Agency, in its discretion, upon reasonable notice to the Owner, shall establish, Owner shall submit to RTC or the Agency a certification, in a form prescribed by RTC or the Agency, as to Owner's compliance with all of the terms and provisions of this Agreement.

Section 4.4.  <u>Maintenance of Documents</u>.  All tenant lists, applications, leases, waiting lists, income examinations and reexaminations relating to the Property shall at all times be kept separate and identifiable from any other business of Owner which is unrelated to the Property, and shall be maintained, as required by

9

| BOOK   1180   PAGE   0197 |

RTC or the Agency, in a reasonable condition for proper audit and subject to examination and photocopying during business hours by representatives of RTC or the Agency.

Section 4.5.  Compliance Review.   RTC or the Agency periodically will monitor Owner's compliance with the requirements of this Agreement. In conducting its compliance review, RTC or the Agency will rely primarily on information obtained from Owner's records and reports, findings from on-site monitoring, and audit reports.  RTC or the Agency may also consider relevant information gained from other sources, including litigation and citizen complaints.  Owner shall cooperate with RTC or the Agency in any such compliance review and shall furnish all notices, information and reports reasonably required by RTC or the Agency for such purpose.

Section 4.6.    Administrative Fee.

(a)  In order to compensate RTC or the Agency for the review performed pursuant to Section 4.5, Owner shall pay to RTC (in its corporate capacity and not as receiver or conservator for the savings institution identified on the first page of this Agreement) or the Agency, as applicable, an annual administrative fee for the first twelve month period of this Agreement in the amount of $50 per Qualifying Unit required to be held available under Section 2.2(a) hereof, but in no event less than $250.

(b)  If RTC or the Agency shall find the Property not to be in compliance with the terms hereof (including the requirements of this Article IV), Owner shall pay to RTC or the Agency, as applicable,  an  additional  administrative  fee  in  an  amount prescribed from time to time by RTC or the Agency, which amount, for the first twelve month period of this Agreement shall be $50 per Qualifying Unit required to be held available under Section 2.2(a) hereof, for additional monitoring and enforcement activities undertaken with respect to the Property. The annual fee payable in the event of noncompliance shall be in addition to, and distinct from, the amount due pursuant to Section 4.6(a), as well as any reimbursements of costs and legal fees to which RTC or the Agency may be entitled as a result of judicial enforcement action, and such fee shall be payable without respect to whether RTC or the Agency undertakes or succeeds in judicial enforcement action. RTC or the Agency shall be entitled to undertake additional monitoring and enforcement activities, and to be compensated therefor, for a period of up to three years following its most recent finding of noncompliance with respect to the Property.

(c)  For each twelve month period after the first twelve month period of this Agreement, the administrative fees payable hereunder shall be the amounts set forth in subsections (a) and (b) of this Section 4.6, as applicable, multiplied by the increase in the

10

| BOOK   1180   PAGE   0198 |

Consumer Price Index for All Urban Consumers (CPI-U) published by the Bureau of Labor Statistics of the United States Department of Labor (or any generally recognized successor to such Index) between the date hereof and the latest publication of such Index immediately preceding the applicable anniversary date of this Agreement.

Section 4.7.  Releases.

(a)  RTC shall --

(i)  execute such documents as may be required to evidence release of the Property from the covenants and restrictions set forth in this Agreement based upon the expiration of the Term as provided in section 1.1(o) hereof (subject, in the event of foreclosure or deed in lieu of foreclosure, to revival as set forth in Section 1.1(o)(1)), upon receipt from Owner of a certification as to the occurrence of the event giving rise to such expiration and such other evidence as RTC or the Agency may reasonably require; and

(ii)  execute an appropriate modification to this Agreement to reflect reduced requirements for occupancy by Qualified Tenants in the event of a partial loss of the Property as provided in section 1.1(o)(3) hereof.

(b)  If RTC shall have contracted with the Agency for the performance of its responsibilities hereunder, the Agency shall execute the appropriate release and/or modification to this Agreement in the name of RTC in accordance with the terms of subsection (a) of this Section 4.7 and shall provide appropriate evidence to Owner of its authorization so to act in the name of RTC.

ARTICLE V

Representations and Warranties of Owner

Section 5.1.    Representations and Warranties.    Owner represents and warrants to RTC that:

(a)  Valid Execution.    Owner has validly executed this Agreement and the same constitutes the binding obligation of Owner. Owner has full power, authority and capacity (i) to enter into this Agreement, (ii) to carry out Owner's obligations as described in this Agreement and (iii) to assume responsibility for compliance with all applicable federal rules and regulations, including, without limitation, the Regulations.

(b)  No Conflict or Contractual Violation.    To the best of Owner's knowledge the making of this Agreement and Owner's obligations hereunder:

11

| BOOK  1180  PAGE  0199 |

(i) will not violate any contractual covenants or restrictions (A) between Owner or any third party or (B) affecting the Property;.

(ii) will not conflict with any of the instruments that create or establish Owner's authority;

(iii)    will not conflict with any applicable public or private restrictions;

(iv) do not require any consent or approval of any public or private authority which has not already been obtained; and

(v) are not threatened with invalidity or unenforceability by any action, proceeding or investigation pending or threatened, by or against (A) Owner, without regard to capacity, (B) any Person with whom Owner may be jointly or severally liable, or (C) the Property or any part thereof.

(c)  No Litigation.   No litigation or proceedings are pending or, to the best of Owner's knowledge, threatened against Owner which if adversely determined could individually or in the aggregate have an adverse effect on title to or the use and enjoyment or value of the Property, or any portion thereof, or which could in any way interfere with the consummation of this Agreement.

(d)  No Bankruptcy.  There is not pending or, to Owner's best knowledge, threatened against Owner any case or proceeding or other action in bankruptcy, whether voluntary or otherwise, any assignment for the benefit of creditors, or any petition seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for Owner under any federal, state or other statute, law, regulation relating to bankruptcy, insolvency or relief for debtors.

Section 5.2.  Indemnification.  Owner agrees to indemnify and hold harmless RTC or the Agency from and against all liabilities, losses, claims, damages, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by RTC or the Agency as a result of any material inaccuracy in any of the representations and warranties contained in Section 5.1.

12

| BOOK   1180   PAGE   0200 |

## ARTICLE VI

### Enforcement and Remedies

Section 6.1.   <u>Remedies of RTC or the Agency.</u>

(a)   If Owner defaults in the performance of any of its obligations under this' Agreement or breaches any covenant, agreement or restriction set forth herein, and if such default remains uncured for a period of sixty (60) days after notice thereof shall have been given by RTC or the Agency (or for an extended period approved in writing by RTC or the Agency if the default or breach stated in such notice can be corrected, but not within such 60-day period, unless Owner does not commence such correction or commences such correction within such 60-day period but thereafter does not diligently pursue the same to completion within such extended period), RTC or the Agency shall be entitled to apply to any court having jurisdiction of the subject matter for specific performance of this Agreement, for an injunction against any violation of this Agreement, for the appointment of a receiver to take over and operate the Property in accordance with the terms of this Agreement or for such other relief as may be appropriate, it being acknowledged that the beneficiaries of Owner's obligations hereunder cannot be adequately compensated by monetary damages in the event of Owner's default. RTC or the Agency shall be entitled to its reasonable attorneys' fees in any such judicial action in which RTC or the Agency shall prevail.

(b)   Each right, power and remedy of RTC or the Agency provided for in this Agreement now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by RTC or the Agency of any one or more of the rights, powers or remedies provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise shall not preclude the simultaneous or later exercise by RTC or the Agency of any or all such other rights, powers or remedies.

Section 6.2.   <u>Remedies of Other Parties</u>.   The occupancy requirements set forth in Section 2.2 of this Agreement also shall inure to the benefit of, and may be judicially enforced against Owner by, affected Lower-Income Families and Very Low-Income Families. Any such party that prevails in any such judicial action shall be entitled to its reasonable attorneys' fees.

Section 6.3.   <u>Reliance Upon Information</u>. In carrying out its obligations hereunder, Owner shall be entitled to rely upon information provided by RTC or the Agency with respect to (i) income limits applicable to Lower-Income Families and Very-Low

13

| BOOK   1180   PAGE   0201 |

Income Families, (ii) the method for calculating the incomes of such families and (iii) the maximum rents which may be charged to such families pursuant to Section 3.1 hereof.

## ARTICLE VII

### Miscellaneous

Section 7.1. Amendments. This Agreement may not be amended or modified except by written instrument signed by each party hereto.

Section 7.2. Notices. All notices required or permitted to be given under this Agreement must be in writing and will be deemed to have been duly given if delivered personally or mailed, postage prepaid, by registered or certified United States mail, return receipt requested, addressed to the parties at the following addresses:

If to RTC:            Resolution Trust Corporation
                      801 17th Street, N.W.
                      Washington, DC 20434-0001
                      Attention: Director, Affordable    Housing
                          Disposition Program

with copies to:       Resolution Trust Corporation
                      801 17th Street, N.W.
                      Washington, DC 20434-0001
                      Attention: Senior Vice President,
                          Assets/Real Estate

                      Resolution Trust Corporation
                      801 17th Street, N.W.
                      Washington, DC 20434-0001
                      Attention: Assistant General Counsel, Real
                          Estate

                      Resolution Trust Corporation
                      100 Colony Square
                      Suite 2300, Box 68
                      Atlanta, GA 30361
                      Attention: Affordable Housing Disposition
                          Specialist

If to Owner:          Florida Housing Affordability, Inc.
                      1101 North Lake Destiny Road, Suite 225
                      Maitland, FL 32751
                      Attention:  Joseph J. Savino, President

14

| BOOK   1180   PAGE   0202 |

wi' copies to:      Benjamin Felder, Esq.
                    Riden, Earle & Kiefner, P.A.
                    100 2nd Avenue South
                    Suite 400 North Tower
                    St. Petersburg, FL  33701

Any party may change its address for notice purposes by giving
notice to the other parties in accordance with this Section 7.2.

     Section 7.3. <u>Entire Agreement</u>.  This Agreement contains the
entire understanding between the parties hereto with respect to the
subject matter hereof.

     Section 7.4. <u>Governing Law</u>.  This Agreement, as it may affect
the rights, remedies and obligations of RTC or the Agency, shall be
governed by and construed in accordance with federal law. Insofar
as federal law does not apply, the provisions of this Agreement
shall be governed by and construed in accordance with the laws of
the State.

     Section 7.5. <u>Severability</u>.  This Agreement is intended to be
performed in accordance with, and only to the extent permitted by,
all applicable laws, ordinances, rules and regulations. If any
provision of this Agreement or the application thereof to any
person or circumstance shall be held invalid or unenforceable, the
remainder of this Agreement and the application of such provision
to other persons or circumstances shall not be affected thereby,
but rather shall be enforced to the greatest extent permitted by
law.

     Section 7.6. <u>Binding Effect; Covenants Running With the Land</u>.
During the Term, this Agreement and the covenants, reservations and
restrictions contained herein shall be deemed covenants running
with the land for the benefit of RTC and its successors, and shall
pass to and be binding upon Owner's heirs, assigns and successors
in title to the Property, or if the Property shall not include
title to land, but shall include a leasehold interest in land, this
Agreement and the covenants, reservations et al shall bind the
leasehold interest as well as the Property and shall pass to and be
binding upon all heirs, assigns and successors to such interests;
provided, however, that upon expiration of the Term in accordance
with the terms hereof said covenants, reservations and restrictions
shall expire. Each and every contract, deed or other instrument
hereafter executed covering or conveying the Property or any
portion thereof shall conclusively be held to have been executed,
delivered and accepted subject to such covenants, reservations and
restrictions, regardless of whether such covenants, reservations
and restrictions are set forth in such contract, deed or other
instruments. If a portion or portions of the Property are conveyed,
all of such covenants, reservations and restrictions shall run to
each portion of the Property. Owner, at its cost and expense, shall
cause this Agreement to be duly recorded or filed and re-recorded

15

| BOOK 1180 PAGE 0203 |

or refiled in such places, and shall pay or cause to be paid all recording, filing, or other taxes, fees and charges, and shall comply with all such statutes and regulations as may be required by law, in the opinion of qualified counsel, in order to establish, preserve and protect the ability of RTC or the Agency to enforce this Agreement.

Section 7.7. Counterparts. This Agreement and any amendments hereto may be executed in several counterparts, each of which shall be deemed to be an original copy, and all of which together shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties shall not have signed the same counterpart.

Section 7.8. Section Titles. Section titles and the table of contents are for descriptive purposes only and shall not control or limit the meaning of this Agreement as set forth in the text.

IN WITNESS WHEREOF, the undersigned have hereunto affixed their signatures and seals as of the date first above written.

ATTEST:

By: _____
Printed Name: DANA R. BEACH
Title: MULTIFAMILY SENIOR CHIEF- AFFORDABLE HOUSING

SELLER:
RESOLUTION TRUST CORPORATION AS RECEIVER FOR SOUTHWEST FEDERAL SAVINGS ASSOCIATION, DALLAS, TEXAS

By: _____
Printed Name: J. LEROY NIX

Attorney-in-Fact for Resolution Trust Corporation pursuant to Power of Attorney dated MARCH 4, 1994

16

| BOOK   1180   PAGE   0204 |

OWNER:
FLORIDA HOUSING AFFORDABILITY,
INC., A FLORIDA NOT FOR PROFIT
CORPORATION

ATTEST:

By: _____         By: _____
Printed Name: _____         Print Name: _Joseph J. Savino_
Title: _____         Title: _President_

Acknowledgments

STATE OF _Georgia_
COUNTY OF _DeKalb_

The foregoing instrument was acknowledged before me on this
_28th_ day of _March_, 1994, by _L LeRoy Hill_ on behalf
of the Resolution Trust Corporation, a corporation organized and
existing under the laws of the United States, as Receiver for
Southwest Federal Savings Association, Dallas, Texas, who is
personally known to me or has produced _NA_ as
identification and who did take an oath.

_____
Notary Public, State of

My Commission Expires: Notary Public, DeKalb County, Georgia.
My Commission Number: My Commission Expires June 5, 1997

STATE OF FLORIDA
COUNTY OF _Hillsborough_

The foregoing instrument was acknowledged before me on this
_31st_ day of _March_, 1994, by _Joseph J. Savino_ as
its _President_ on behalf of Florida Housing
Affordability, Inc., a Florida not for profit corporation, who is
personally known to me or has produced _FL Drivers License_ as
identification and who did take an oath.

_____
Notary Public, State of
Florida

My Commission Expires: JOANNE J. FOMUKE
My Commission Number: MY COMMISSION # CC 295905
EXPIRES: April 29, 1997
Bonded Thru Notary Public Underwriters

| BOOK   1180   PAGE   0205 |

## EXHIBIT "A"

### DESCRIPTION OF THE REAL PROPERTY

From the Southeast corner of Section 17, Township 25 South, Range
29 East, run along the East line of said Section 17, North 0°20'0"
West, 1520.00 feet to the Point of Beginning, from said Point of
Beginning continue North 0°20'09" West 410.96 feet; thence run
North 89°42'49" West 1060.20 feet; thence South 0°20'09" East
410.96 feet; thence run East to the Point of Beginning, less the
East 30 feet for road right-of-way, said lands lying and being in
Osceola County, Florida.



| BOOK   1180   PAGE   0205 |

### EXHIBIT "A"

#### DESCRIPTION OF THE REAL PROPERTY

From the Southeast corner of Section 17, Township 25 South, Range 29 East, run along the East line of said Section 17, North 0°20'0" West, 1520.00 feet to the Point of Beginning, from said Point of Beginning continue North 0°20'09" West 410.96 feet; thence run North 89°42'49" West 1060.20 feet; thence South 0°20'09" East 410.96 feet; thence run East to the Point of Beginning, less the East 30 feet for road right-of-way, said lands lying and being in Osceola County, Florida.



| BOOK   1180   PAGE   0206 |

## EXHIBIT B

## FAMILY SIZE AND INCOME ADJUSTMENTS

### A.   Family Size Adjustments.

For purposes of Section 3.1(a)(iii)(x), rents for units will be calculated on the basis of the size of household anticipated to occupy a unit with the particular number of bedrooms as follows:

| Unit Size | | | | | |
|---|---|---|---|---|---|
| 0-Bedroom | 1-BR | 2-BR | 3-BR | 4-BR | 5-BR |
| Household Size | | | | | |
| 1 Person | 2 Pers. | 3 Pers. | 5 Pers. | 7 Pers. | 8 Pers. |

Thus, for example, rent for a 3-bedroom unit occupied by a very low-income family will be based upon the HUD-determined income for a household at 50% of area median income which has 5 members. The rent for a 2-bedroom unit occupied by a lower-income household will be based upon the HUD figure for a household at 65% of median income which has 3 members.

### B.   Income Adjustments.

Prior to the rent calculation, the applicable income limit must be reduced by an adjustment based upon unit size as follows:

| Unit Size | | | | | |
|---|---|---|---|---|---|
| 0-Bedroom | 1-BR | 2-BR | 3-BR | 4-BR | 5-BR |
| Income Adjustment | | | | | |
| $800 | $800 | $880 | $1,560 | $1,560 | $2,040 |

The applicable amount must be subtracted from the applicable income limit before multiplying by 30% in order to determine maximum rent.

Filing # 154146373 E-Filed 07/27/2022 11:14:53 AM

IN THE CIRCUIT COURT IN AND FOR
THE NINTH JUDICIAL CIRCUIT
OSCEOLA COUNTY, FLORIDA

AFFORDABLE HOUSING GROUP, INC.,
as an agent of the FEDERAL DEPOSIT
INSURANCE CORPORATION, as Manager
of the FSLIC Resolution Fund, successor in
interest to the Resolution Trust Corporation,

CASE NO.: 2020-CA-170

      Plaintiff,

v.

FLORIDA HOUSING AFFORDABILITY, INC.,

      Defendant.

_____/

## DEFENDANT'S MOTION FOR LEAVE TO FILE SECOND AMENDED
## ANSWER AND AFFIRMATIVE DEFENSES AND COUNTERCLAIM

Defendant, FLORIDA HOUSING AFFORDABILITY, INC., ("Defendant") by and through

its undersigned counsel, hereby moves this Court for leave to file its Second Amended Answer and

Affirmative Defenses and Counterclaim and states:

1.     After a responsive pleading has already been filed, a party may only amend its

pleading by leave of court or by written consent of the adverse party. FLA.R.CIV.P. 1.190. "Leave of

court shall be given freely when justice so requires." *Id.*; *see also, Ujcic v. City of Apopka*, 581 So.

2d (Fla. 5th DCA 1991). Any doubts in determining whether leave should be granted must be

resolved in favor of allowing the amendments unless it appears the privilege is being abused.

*Siverling v. Siverling*, 447 So. 2d 996 (Fla. 5th DCA 1984); *see Sonny Boy, LLC v. Asnani*, 879 So.

2d 25 (Fla. 5th DCA 2004) (courts abuse their discretion in denying a motion to amend unless it

clearly appears that the amendment would prejudice the opposing party, the privilege has been

abused or amendment would be futile).

2.    Defendant seeks to amend its Answer and Affirmative Defenses and Counterclaim, which seeks to add one additional affirmative defense based upon new facts which have arisen during the pendency of this litigation.

3.    Accordingly, Defendant has prepared a proposed Second Amended Answer and Affirmative Defenses and Counterclaim attached hereto as **Exhibit A.**

4.    No party will be prejudiced by the amendment.

WHEREFORE, Defendant, FLORIDA HOUSING AFFORDABILITY, INC., respectfully requests that this Honorable Court enter an Order granting this Motion, and for any other relief this Court deems just and equitable

Dated this 27th day of July 2022.

/s/ *Jason R. Hawkins*
Jason R. Hawkins
Florida Bar No.: 11925
jhawkins@southmilhausen.com
South Milhausen, P.A.
1000 Legion Place, Suite 1200
Orlando, Florida 32801
Telephone: (407) 539-1638
Facsimile: (407) 539-2679
*Attorneys for Defendant,*
*Florida Housing Affordability, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of July 2022, a true and correct copy of the foregoing document has been filed via the Florida e-portal which will furnish an electronic copy to: Russell E. Klemm, Esq. at rklemm@clayton-mcculloh.com and sroe@clayton-mcculloh.com (*Attorney for Plaintiff*).

s/ *Jason R. Hawkins*
Jason R. Hawkins

2

EXHIBIT "A"

IN THE CIRCUIT COURT IN AND FOR
THE NINTH JUDICIAL CIRCUIT
OSCEOLA COUNTY, FLORIDA

AFFORDABLE HOUSING GROUP, INC.,          CASE NO.: 2020-CA-170
as an agent of the FEDERAL DEPOSIT
INSURANCE CORPORATION, as Manager
of the FSLIC Resolution Fund, successor in
interest to the Resolution Trust Corporation,

         Plaintiff,

v.

FLORIDA HOUSING AFFORDABILITY, INC.,

         Defendant.

_____/

### DEFENDANT, FLORIDA HOUSING AFFORDABILITY, INC.'S
### SECOND AMENDED ANSWER AND AFFIRMATIVE DEFENSES
### TO AMENDED COMPLAINT AND COUNTERCLAIM

Defendant, FLORIDA HOUSING AFFORDABILITY, INC. ("FHA"), by and through its

undersigned counsel, hereby files its Second Amended Answer and Affirmative Defenses to the

Amended Complaint of Plaintiff, AFFORDABLE HOUSING GROUP, INC., as an agent of the

FEDERAL DEPOSIT INSURANCE CORPORATION, as Manager of the FSLIC Resolution

Fund, successor in interest to the Resolution Trust Corporation ("AHG"), and Counterclaim and

alleges:

         1.     Admitted.

         2.     Admitted

         3.     Without knowledge.

         4.     Denied.

         5.     Admitted

         6.     Admitted

7.    Denied.

8.    Denied.

9.    Admitted

10.   Denied

11.   Denied.

12.   Admitted.

13.   Denied.

14.   Without knowledge.

15.   Denied.

16.   Denied.

17.   Denied.

18.   Denied.

19.   Denied.

20.   Denied.

21.   Without knowledge.

### Count I – Declaratory Judgment

22.   FHA re-alleges its responses to paragraphs 1-21 as if fully set forth herein.

23.   Denied.  Section 6.1 speaks for itself.

24.   Denied.

25.   Denied.

26.   Denied.

## Count II – Injunctive Relief

27.   FHA re-alleges its responses to paragraphs 1-21 as if fully set forth herein.

28.   Admitted that such an action is alleged.

29.   Denied.

30.   Denied.

31.   Denied.

32.   Denied.

33.   Denied.

## Count III – Breach of Contract

34.   FHA re-alleges its responses to paragraphs 1-21as if fully set forth herein.

35.   Admitted that such an action is alleged.

36.   Denied.

37.   Denied.

38.   Denied.

39.   Denied.

## Count IV – Appointment of Receiver for Rent

40.   FHA re-alleges its responses to paragraphs 1-21as if fully set forth herein.

41.   Admitted that such an action is alleged.

42.   Denied.

43.   Denied.

44.   Denied.

45.   Denied.

## AFFIRMATIVE DEFENSES

### *Allegations Common to All Affirmative Defenses*

Plaintiff sues FHA in the Amended Complaint on four (4) counts: (1) Declaratory Judgment; (2) Injunctive Relief; (3) Breach of Contract; (4) Appointment of Receiver for Rent. Plaintiff does not allege that FHA has not rented the appropriate portion of units to Lower-Income Families or Very-Low-Income Families or that FHA has exceed any other rent requirements. Rather, Plaintiff complains that FHA has not provided certain documents and paid the fees for monitoring from 2014 to the present (the dispute over the legitimacy and amount of fees is summarized in Exhibit "F" to the Amended Complaint). Regardless of that factual dispute, the Amended Complaint essentially amounts to Plaintiff bringing a single cause of action for specific performance of a contract (the "Land Use Restriction Agreement" or "LURA"), based on the two core allegations that "to date" FHA failed to 1) provide information to Plaintiff and 2) pay the administrative fee for monitoring under the LURA. Those allegations sound in contract (on which all four counts are based), are not covenants that run with the land and began over five years ago, even if alleged to be ongoing after 2014, which have the unavoidable defect of being precluded by Florida's statute of limitations.

For the defaults alleged in the Amended Complaint, Plaintiff seeks relief under Section 6.1 of the LURA (Remedies). Plaintiff has to plead the required elements under each cause of action below (and distinguish them from a breach of contract claim) and any alleged breaches have to fall within the applicable statutes of limitation. Moreover, the LURA requires in Section 6.1 that Plaintiff can only seek a remedy for any alleged breach after it has given a 60 day notice and opportunity to cure, which Plaintiff admits it did not issue to FHA until August 2, 2018. *See* Am. Comp. at paragraph eighteen and Exhibit "G." At a minimum, any alleged breach of the

4

LURA is limited to the period of August 2, 2018 and any proven relief or damages occurring for the same period after notice was provided.

<u>*First Affirmative Defense as to Count I – Declaratory Judgment*</u>

In Count I, Plaintiffs seek a declaratory judgment to require Defendant to specifically perform its contractual duties under the LURA and provide documents and pay an administrative fee. Complaint at ¶ 23, 24. But there is no identification of any specific legal doubt by the Plaintiff or uncertainty as to Plaintiff's interpretation of the LURA. Plaintiff only alleges that Defendant has failed to provide documents and pay the fee identified in the attached letters since 2014, and seeks to enforce certain LURA provisions on that basis. Plaintiff has failed to plead any of the required elements for a declaratory judgment.

Fla. Stat. § 86.021 creates a right to a declaratory judgment when the elements of such a claim are pled and proven. The purpose of a declaratory judgment is to afford the parties relief from their insecurity and uncertainty with respect to their rights, status, and other equitable or legal relations. *Coalition for Adequacy and Fairness in School Funding, Inc. v. Chiles*, 680 So. 2d 400 (Fla. 1996). Plaintiff is required to allege the necessary minimum elements of the cause of action of declaratory judgment – that there is "[1] a bona fide adverse interest between the parties concerning a power, privilege, immunity or right of the plaintiff; [2] the plaintiff's doubt about the existence or non-existence of his rights or privileges; [3] that he is entitled to have the doubt removed." *Grove Isle Ass'n, Inc. v. Grove Isle Associates, LLLP*, 137 So. 3d 1081 (Fla. 3d DCA 2014). Plaintiff fails to allege any doubt as to its understanding of the LURA or its allegation that Defendant has failed to perform. Florida's declaratory judgment statute is not available to settle liability under a contract which is alleged to be clear and unambiguous. *Burns v. Hartford Acc. & Indem. Co.*, 157 So. 2d 84 (Fla. 3d DCA 1963).

5

### *Second Affirmative Defense as to Count I – Declaratory Judgment*

The statute of limitations for a claim of declaratory judgment is four years. F.S.A. § 95.11(3)(p). The claim here is based on an alleged failure to provide information and payment of fees in 2014 and to date. The limitations period begins to run when the last element constituting the cause of action occurs. Fla. Stat. § 95.031(1). Count I is a transparent attempt to simply have another way of bringing a claim for specific performance that might get around the problem of the statute of limitations for specific performance (addressed below). However, Plaintiff has failed to plead a cause of action for a declaratory judgment, which nevertheless is further precluded by the four year statute of limitations.

### *Third Affirmative Defense as to Count II - Injunction*

Plaintiff brings an action in Count II for injunctive relief, based again on nothing more than an alleged breach of contract claim. Complaint at ¶ 29 -32. To obtain an injunction, "the petitioner must satisfy a 'four-part test under Florida law: a substantial likelihood of success on the merits; lack of an adequate remedy at law; irreparable harm absent the entry of an injunction; and that injunctive relief will serve the public interest.'" *Gainesville Woman Care, LLC v. State*, 210 So.3d 1243, 1267 (Fla. 2017). Since the first test is arguably an evidentiary issue to be determined at a hearing, it is the second and third parts that will be addressed. As it relates to the second part of the four-part test — lack of an adequate remedy at law — Plaintiff alleges it has a cause of action for specific performance under the LURA and is entitled to recover money damages, which precludes a claim to injunctive relief (even if collectability is alleged to be uncertain). *Sammie Investments, LLC v. Strategica Capital Associates, Inc.*, 247 So.3d 596 (Fla. 3d DCA 2018). A preliminary injunction cannot be issued solely to preserve funds to satisfy eventual monetary relief. *Id.* This is essentially what Plaintiff seeks in Count II. As it relates to

6

the third part of the four-part test — irreparable harm absent the entry of an injunction — "irreparable harm" has been defined as harm "of such nature that it cannot be redressed in a court of law; an injury for which monetary compensation will not suffice." *Gonzalez v. Benoit*, 424 So.2d 957, 959 (Fla. 3d DCA 1983). *See also Stand Up for Animals, Inc. v. Monroe County*, 69 So.3d 1011 (Fla. 3d DCA 2011) (explaining that irreparable harm is not established when harm can be compensated for adequately by money damages and that judgment for money damages is adequate even when party alleges that opposing party may dissipate assets and money judgment might be uncollectable). Again, this is essentially what Plaintiff seeks here, trying to get injunctive relief based on the allegation of a contractual breach for specific performance and money damages. Since Plaintiff has failed to properly allege at least two of the four requirements, Count II's request for an injunction must be denied. *Genchi v. Lower Florida Keys Hospital District*, 45 So.3d 915 (Fla 3d DCA 2010); *Russell v. Florida Ranch Lands, Inc.*, 414 So.2d 1178 (Fla. 5th DCA 1982).

<u>*Fourth Affirmative Defense as to Count III – Breach of Contract*</u>

The Amended Complaint's alleged facts and legal theories are centrally based on the claim for relief brought in Count III. However, notwithstanding any issues of disputed fact or Plaintiff's own breaches of the LURA, Plaintiff admits it failed to act *for almost six years* on what it alleges is a serious breach of the underlying agreement in 2014 and is now calling for the remedy of specific performance. Complaint at ¶¶ 36-38. The statute of limitations for a claim of specific performance is one year. Fla. Stat. § 95.11(5)(a). And the limitations period begins to run when the last element constituting the cause of action occurs, which based on the Complaint was in 2014. Fla. Stat. § 95.031(1). This same limitation would apply to preclude any alleged claims for specific performance in the following years, presumably up to January 20, 2019 (one

7

year before the Complaint here was filed). Even if Plaintiff were to argue they are not seeking specific performance, the statute of limitations for a claim of breach of contract (written) is five years. Fla. Stat. § 95.11(2)(b). And Plaintiff clearly admits in the initial Complaint that it was aware of the alleged breach in 2014. Moreover, even assuming they alleged they were unaware, the "discovery rule" does not apply to a breach of contract action in Florida because the Florida Supreme Court specifically held that the limitation period in Fla. Stat. § 95.11(2)(b) is not tolled by the lack of discovery of a breach within the limitation period and that actions for breach of contract are barred five years after the cause of action accrued regardless of whether the plaintiff knew that it had a claim. *Federal Ins. Co. v. Southwest Florida Retirement Center, Inc.*, 707 So. 2d 1119, 1122 (Fla. 1998). Count III should therefore be dismissed as Plaintiff admits it has failed to bring a claim for specific performance under the LURA within the one year time limited after the alleged breach in 2014 or even a more general breach of contract claim within the five year limitations period.

Moreover, the LURA requires in Section 6.1 that Plaintiff can only seek a remedy for any alleged breach after it has given a 60 day notice and opportunity to cure, which Plaintiff admits it did not issue to FHA until August 2, 2018. *See* Am. Comp. at paragraph 18 and Exhibit "G." At a minimum, any alleged breach of the LURA is limited to the period of October 2, 2018 (60 days after notice) and any proven relief or damages occurring for the same period after notice was provided.

### *Fifth Affirmative Defense as Count IV – Receiver*

Plaintiff has asserted no grounds which would support the appointment of a receiver over the assets of Defendant. The appointment of a receiver is a "last resort remedy" which should only be carefully considered after all other remedies have been exhausted. *Recarey v. Rader*, 320

So. 2d 28, 30 (Fla. 3d DCA 1975) (reversing appointment of receiver over the affairs of a hospital because the pleadings and testimony "did not reveal an emergency situation" and because "the trial court could have granted appropriate and effective relief to appellees without the necessity of appointing a receiver for the hospital"); *ANJ Future Invs., Inc. v. Alter*, 756 So. 2d 153, 154 (Fla. 3d DCA 2000) (reversing appointment of receiver and noting "[w]here there are other less drastic methods to protect Alter's security interest, the appointment of a receiver was an abuse of discretion."). A receiver can be appointed only when "it appears that the appointment is necessary, either to prevent fraud or to save the property from injury or threatened loss or destruction." *Apalachicola Northern R. Co. v. Sommers*, 79 Fla. 816, 85 So. 361, 362 (1920); *see also Plaza v. Plaza*, 78 So.3d 4 (Fla. 3d DCA 2011). A receiver will not be appointed unless the plaintiff shows the corporate assets are in imminent danger and the corporate existence is seriously threatened. For example, in *Sharon Gardens Assocs., Ltd. P'ship v. Florescue*, 629 So. 2d 1002, 1003 (Fla. 4th DCA 1993) the plaintiff and defendant were both members of a limited partnership. The plaintiff sued the defendant contending the loans the plaintiff made to the limited partnership and the profit distributions the plaintiff was entitled to receiver under the limited partnership were being converted by the defendant to his own personal use. *Id.* The plaintiff sought appointment of a receiver for the limited partnership on the grounds the defendant was collecting monies on behalf of the limited partnership but failing to remit those monies to the plaintiff as required by the limited partnership agreement. *Id.* The only danger of loss shown by the plaintiff was that the plaintiff's loans to the partnership and profit distributions were in danger of being improperly converted by the plaintiff. *Id.* Thus, the appointment of a receiver was not appropriate because the plaintiff had an adequate remedy at law for damages. *Id.*

9

Applying the foregoing analysis to the instant case, Plaintiff is not entitled to the appointment of a receiver over Defendant because Plaintiff has an alleged adequate remedy at law for contractual damages against Defendant, albeit one that is subject to the statute of limitations.

<u>Sixth Affirmative Defense as to all Counts –</u>
<u>Breach of implied covenant of good faith and fair dealing</u>.

In the enforcement of the rent restrictions imposed on Defendant under Section 3.1 of the LURA and the imposition of the Administrative Fess by Plaintiff in Section 4.6 of the LURA, the Plaintiff has failed to exercise such duties and discretion (in the adjustment of rent restrictions and lowering of administration fess) in bad faith and to the sole advantage of Plaintiff. The rents allowed under the LURA have not been allowed to increase in accordance with local area market changes while the administration fee charged by the agency under the LURA has not been lowered per similar market conditions (increased technological efficiencies and cost lowering for monitoring agencies and increased competition from other monitoring services offering the same services for a significantly lower fee). The implied covenant of good faith and fair dealing "imposes upon each party the duty to do nothing destructive of the other party's right to enjoy the fruits of the contract and to do everything that the contract presupposes they will do to accomplish its purpose" and protect the contracting parties' reasonable expectations.

<u>Seventh Affirmative Defense as to all Counts –</u>
<u>The Compliance Review in Section 4.5 and the Administrative Fees imposed by Plaintiff in</u>
<u>Section 4.6 of the LURA are not covenants running with the land</u>

The compliance review in Section 4.5 and the administrative fees charged to Defendant in Section 4.6 of the LURA are not covenants running with the land because they fail to satisfy the required elements under Florida law as set forth in *Winn Dixie Stores v Dolgencorp, Inc.*,

10

*Caulk v Orange County*, and *Suniland Associates Ltd v Wilbenka, Inc.*. (i.e. such review and the charging of fees are personal contractual obligations that do not touch and concern the land, and a mere agreement that obligations run with the land is insufficient unless the duties in fact touch and concern the land at issue).

<u>*Eighth Affirmative Defense as to all Counts – Standing*</u>

Plaintiff was not a party to the LURA. Pursuant to Article VI of the LURA, enforcement of the LURA can only be undertaken by the RTC or the Agency. The term "Agency" is defined under Section 1.1(b) of the LURA. Plaintiff is not the State Housing Finance Agency nor is it an "agency, corporation or authority of the United States government." Additionally, the Memorandum of Understanding attached to Plaintiff's Amended Complaint does not specifically reference the property at issue in this case. Therefore, Plaintiff lacks standing to pursue this action.

<u>*Ninth Affirmative Defense as to all Counts – Unconscionability*</u>

The provisions of the LURA related to the payment of administrative fees is procedurally and substantively unconscionable. The administrative fees continued to increase during the term of the LURA due to the escalating Consumer Price Index, but the restrictions on the amount of rent that could be charged did not similarly increase. These issues, which were not contemplated by the parties at the time of execution of the agreement, resulted in unfair contract terms that unreasonably favor the party attempting to enforce the LURA and charge administrative fees.

<u>*Tenth Affirmative Defense as to all Counts – Termination of the LURA*</u>

The terms of the LURA may end when there is "a change in federal law which prevents RTC or the Agency from enforcing this Agreement." The RTC was dissolved on December 31, 1995. Thereafter, the FDIC derived its authority to "carry out any remaining authority and

11

responsibilities of the Resolution Trust Corporation, as set forth in section 1441a(c)" by virtue of 12 U.S.C. 1831q(n)(4). However, Section 21A (12 U.S.C. §1441a) was repealed by P.L. 111-203 Section 364, which was enacted on July 21, 2010. Given this repeal by Congress, neither the FDIC nor any party meeting the definition of "Agency" under the LURA has the necessary authority to prosecute this claim on behalf of RTC.

<em>Eleventh Affirmative Defense – Waiver</em>

The Florida Housing Finance Corporation, which is the only "Agency" as defined under the terms of the LURA that Defendant communicated with since the execution of the LURA, explicitly published that it was ceasing all monitoring of the LURA. Therefore, to the extent Plaintiff claims to have any standing to enforce the LURA, Plaintiff's predecessor, through express and implied conduct, waived all rights to enforce the LURA.

<em>Twelfth Affirmative Defense – First to Breach</em>

Plaintiff's claims are barred by the first to breach doctrine. Sections 2.2(b)(iv) and 2.2(d) (as well as provisions under the AHDP Owner's Compliance Manual dated November 19, 1992 which are "Regulations" as defined under the LURA) contemplate that Defendant may apply for relief under the LURA based on financial infeasibility. Additionally, Plaintiff, who has alleged rights to collect a monitoring fee under the LURA, was hired subsequent to the express waiver by Florida Housing Finance Corporation described in Defendant's Eleventh Affirmative Defense, and the attempts to collect a monitoring fee after the express waiver constitutes a breach of the LURA. These provisions were material terms of the LURA and constitute dependent covenant(s) given the importance and the essential nature of the requirements related the occupancy of "Lower-Income Family" and "Very Low-Income Family." On or before June 2012, Defendant petitioned the Florida Housing Finance Corporation (the "Agency" and the

12

"State Housing Finance Agency" as defined in the LURA) for financial infeasibility waiver review of Defendant's continued performance under the LURA and the "Regulations". Defendant's request was received by the Florida Housing Finance Corporation. Based upon Defendant's knowledge and belief the Florida Housing Finance Corporation (i) failed to undertake any financial infeasibility waiver review, (ii) failed to grant or deny Defendant's request for financial infeasibility waiver, (iii) failed to indicate the areas where Defendant's request did not provide sufficient documentation to grant the waiver, and (iv) failed to afford Defendant the opportunity to submit a revised application addressing deficiencies, if any. The failure by the Florida Housing Finance Corporation to respond to Defendant's requests/applications was a material breach of the LURA and Regulations prior to any breach alleged by Plaintiff in its Complaint against Defendant. Given the prior breach(es) by Plaintiff and/or Plaintiff's alleged predecessor(s) in interest (or any party claiming to be the "Agency" as defined under the LURA), Defendant was entitled to stop performing under the LURA, treating the breach(es) as a discharge of its contractual liability.

## COUNTERCLAIM

1.      Defendant/Counter-Plaintiff FLORIDA HOUSING AFFORDABILITY, INC. ("FHA") adopts and realleges the general factual, identity, definitional and jurisdiction allegations of Plaintiff/Counter-Defendant, AFFORDABLE HOUSING GROUP, INC., as an agent of the FEDERAL DEPOSIT INSURANCE CORPORATION, as Manager of the FSLIC Resolution Fund, successor in interest to the Resolution Trust Corporation ("AHG") Complaint to the extent admitted above, and its attachments by references, as well as the additional factual allegations common to the Affirmative Defenses and Counterclaim, and states as follows:

2.     This is an action for declaratory judgment and a temporary and permanent injunction against AHG.

3.     All conditions precedent to this action have occurred, have been performed or have been waived or excused.

4.     FHA has been required to engage undersigned counsel to represent it in this action and is obliged to pay its lawyers a reasonable fee for their services.

5.     The Resolution Trust Corporation ("RTC") entered into LURAs with purchasers of certain properties pursuant to 12 U.S.C. § 1441a of the Federal Home Loan Bank Act ("the Act").

6.     Section 21A(c)(11)(B) of the Act provided that "[t]he lower income occupancy requirements…shall be judicially enforceable against the purchasers of the property under this subsection or their successors in interest by … State housing finance agencies, and any agency, corporation, or authority of the United States Government."

7.     RTC was dissolved on December 31, 1995 pursuant to 12 U.S.C. §1441a(m).

8.     The FDIC derived its authority to "carry out any remaining authority and responsibilities of the Resolution Trust Corporation, as set forth in section 1441a(c)" by virtue of 12 U.S.C. 1831q(n)(4).

9.     Pursuant to the language of the LURA at issue in this case, the terms of the LURA may end when there is "a change in federal law which prevents RTC or the Agency from enforcing this Agreement."

10.     Pursuant to Article VI of the LURA, enforcement of the LURA can only be undertaken by the RTC or the Agency. The term "Agency" is defined under Section 1.1(b) of the LURA.

14

11.   To the extent the FDIC is a "successor to or assignee of RTC", the authority of FDIC only extends as far as was granted to FDIC under Section 1441a(c).

12.   Section 21A was repealed by P.L. 111-203 Section 364, enacted July 21, 2010.

13.   As the authority of FDIC is limited by the phrase "as set forth in Section 1441a(c)," which is now repealed, the FDIC no longer has the necessary authority to prosecute this claim on behalf of RTC.

14.   Additionally, the repeal of 21A prevents the State Housing Finance Agency, which is included in the definition of "Agency" in the LURA, from enforcing the LURA.

15.   AHG is not the State Housing Finance Agency nor is it an "agency, corporation or authority of the United States government."

16.   As such, the term of the LURA ended with the repeal of 12 U.S.C. 1441a.

## COUNT I – DECLARATORY JUDGMENT

17.   FHA realleges and adopts by reference paragraphs 1 through 16 above.

18.   FHA contends the terms of the LURA ended when there was "a change in federal law which prevents RTC or the Agency from enforcing this Agreement."

19.   FHA's need for a declaratory judgment is real and immediate. The action taken by AHG to enforce the LURA against FHA is contrary and inconsistent with the terms of the LURA.

20.   The dispute between FHA and AHG is is sufficiently adversarial, concrete, immediate, and capable of a complete and authoritative judicial determination to justify a declaratory judgment. There is a clear disagreement between the parties that can and should be resolved by a declaratory judgment, which judgment will fully and authoritatively declare the respective rights and obligations of the parties.

15

WHEREFORE, FHA requests the Court enter a judgment that declares the term of the LURA to have ended upon the repeal of the above applicable statutes and award FHA its reasonable costs and attorneys' fees pursuant to the LURA, and any other relief as this Court deems just and proper.

## COUNT II – TEMPORARY INJUNCTION

21. FHA realleges and adopts by reference paragraphs 1 through 16 above.

22. FHA has a substantial likelihood of success in that the term of the LURA has ended.

23. FHA has a substantial likelihood of success in that AHG lacks standing to enforce the LURA.

24. FHA lacks an adequate remedy at law in that they will continually be subjected to the LURA unless this Court enjoins enforcement of the LURA.

25. Irreparable harm will occur absent the entry of an injunction in that burdensome record keeping and occupancy requirements will be forced on FHA and increasing costs associated with owning and managing the property.

26. Injunctive relief serves the public good by allowing FHA to freely exercise their property rights unencumbered by the terms of an instrument that have ended via federal legislation.

WHEREFORE, FHA respectfully requests that the Court enjoin AHG from taking any action to enforce the LURA and award FHA its reasonable costs and attorneys' fees pursuant to the LURA, and any other relief as this Court deems just and proper.

16

## COUNT III – PERMANENT INJUNCTION

27.   FHA realleges and adopts by reference paragraphs 1 through 16 and 22 through 26 above.

28.   FHA has a clear legal right to prohibit AHG from enforcing the LURA because the term of the LURA has ended.

29.   FHA lacks an adequate remedy at law in that FHA will continually be subjected to the LURA unless this Court enjoins enforcement of the LURA.

30.   Irreparable harm will occur absent the entry of an injunction in that burdensome record keeping and occupancy requirements will be forced on FHA and increasing costs associated with owning and managing the property.

WHEREFORE, FHA respectfully requests that the Court enjoin AHG from taking any action to enforce the LURA and award FHA its reasonable costs and attorneys' fees pursuant to the LURA, and any other relief as this Court deems just and proper.

Dated: _____.

/s/ Jason R. Hawkins
Jason R. Hawkins, Esq.
Florida Bar No.: 11925
**South Milhausen, P.A.**
1000 Legion Place, Suite 1200
Orlando, Florida 32801
Telephone: (407) 539-1638
Facsimile: (407) 539-2679
jhawkins@southmilhausen.com
*Attorneys for Defendant, Florida Housing Affordability, Inc.*

17

## CERTIFICATE OF SERVICE

I hereby certify that on _____, a true and correct copy of the foregoing was filed via the Florida e-Portal which will serve an electronic copy to Russell E. Klemm, Esq. at rklemm@clayton-mcculloh.com and sroe@clayton-mcculloh.com (*Attorney for Plaintiff*).

*/s/ Jason R. Hawkins*
Jason R. Hawkins, Esq.

18

Filing # 157611979 E-Filed 09/16/2022 05:49:09 PM

IN THE CIRCUIT COURT OF THE
NINTH JUDICIAL CIRCUIT IN AND FOR
OSCEOLA COUNTY, FLORIDA

AFFORDABLE HOUSING GROUP, INC.,
as an agent of the FEDERAL DEPOSIT      CASE NO.: 2020-CA-000170 OC
INSURANCE CORPORATION, as Manager
of the FSLIC Resolution Fund, successor in
interest to the Resolution Trust Corporation,

      Plaintiff,

vs.

FLORIDA HOUSING AFFORDABILITY, INC.,

      Defendant.

_____/

### AGREED ORDER ON DEFENDANT'S MOTION FOR LEAVE TO FILE SECOND AMENDED ANSWER AND AFFIRMATIVE DEFENSES AND COUNTERCLAIM

THIS CAUSE came before the Court upon an agreement between the Parties on Defendant,

FLORIDA HOUSING AFFORDABILITY, INC.'s Motion to for Leave to File Second Amended

Answer and Affirmative Defenses and Counterclaim, and this Court having reviewed the Motion

and pleadings, and being otherwise fully advised in the premises, it is hereby:

**ADJUDGED:**

1.    Defendant's Motion is hereby **GRANTED**.

2.    Defendant's Second Amended Answer and Affirmative Defenses and

Counterclaim attached to the Motion for Leave shall be deemed filed as of the date of this Order.

Plaintiff shall have twenty (20) days to file a response.

**DONE AND ORDERED** in Kissimmee, Osceola County, Florida on this 16 day of

September 2022.

_____
HONORABLE MARGARET H. SCHREIBER
Circuit Judge

CASE NO.: 2020-CA-000170 OC
ORDER ON DEFENDANT'S MOTION FOR LEAVE

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 16th day of September 2022, this Order was filed with the Clerk of Court and served on all interested parties via the Florida Statewide ePortal: Jason R. Hawkins Esq., jhawkins@southmilhausen.com , lcarpenter@southmilhausen.com; and Russell E. Klemm, Esq.: rklemm@clayton-mcculloh.com, and epraria@clayton-mcculloh.com.

_____
Judicial Assistant

2